**Case No. 22-15961**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD J. TRUMP, the Forty-Fifth President of the United States;
LINDA CUADROS; AMERICAN CONSERVATIVE UNION; RAFAEL BARBOSA;
DOMINICK LATELLA; WAYNE ALLYN ROOT; NAOMI WOLF,
*Plaintiffs-Appellants,*

v.

TWITTER, INC.; JACK DORSEY,
*Defendants-Appellees,*

and

UNITED STATES OF AMERICA,
*Intervenor-Appellee.*

_____

*Appeal from the United States District Court for the Northern District of California (San Francisco),*
*Case No. 3:21-cv-08378-JD · The Honorable James Donato, District Judge*

## EXCERPTS OF RECORD
## VOLUME I OF III – Pages 1 to 58

JOHN P. COALE
2901 Fessenden Street NW
Washington, D.C. 20008
Telephone: (202) 255-2096
johnpcoale@aol.com

ALEX KOZINSKI
719 Yarmouth Road, Suite 101
Palos Verdes Estates, CA 90274
Telephone: (310) 541-5885
alex@kozinski.com

ANDREI POPOVICI
MARIE L. FIALA
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd., Suite 290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
andrei@apatent.com
marie@apatent.com

*Attorneys for Plaintiffs-Appellants,*
*Donald J. Trump, the Forty-fifth President of the United States;*
*Linda Cuadros; American Conservative Union; Rafael Barbosa;*
*Dominick Latella; Wayne Allyn Root*

 COUNSEL PRESS · (213) 680-2300     PRINTED ON RECYCLED PAPER 

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DONALD J. TRUMP, et al.,

Plaintiffs,

v.

TWITTER INC., et al.,

Defendants.

Case No.  3:21-cv-08378-JD

**JUDGMENT**

The Court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) with leave to amend.  Dkt. No. 165.  Plaintiffs have advised the Court that they have elected not to file an amended complaint.  Consequently, pursuant to Federal Rule of Civil Procedure 58, judgment is entered against plaintiffs.

**IT IS SO ORDERED.**

Dated:  June 7, 2022

_____
JAMES DONATO
United States District Judge

| 05/06/2022 | 166 | **ORDER. In light of the dismissal of the operative complaint,** *see* **Dkt. No. 165, the motion for a preliminary injunction, Dkt. No. 62, is terminated as moot. Signed by Judge James Donato on 5/6/2022.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(jdlc2, COURT STAFF) (Filed on 5/6/2022) (Entered: 05/06/2022)** |

1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10    DONALD J. TRUMP, et al.,                    Case No. 21-cv-08378-JD

11                   Plaintiffs,

12           v.                                   **ORDER RE MOTION TO DISMISS**

                                                  Re: Dkt. No. 138
13    TWITTER INC., et al.,

14                   Defendants.

15

16          Former President Donald J. Trump, the American Conservative Union, and five

17    individuals have sued Twitter, Inc., and Jack Dorsey (together, Twitter), on behalf of themselves

18    and a putative class of Twitter users who have been "de-platformed" and "censored by

19    Defendants." Dkt. No. 21 (AC) ¶¶ 8, 18.  Plaintiffs alleged claims under the First Amendment and

20    Florida state consumer and "social media" statutes, and seek a declaration that Section 230 of the

21    Communications Decency Act, which states that online service providers like Twitter cannot be

22    held responsible for content posted by others, is unconstitutional. *Id.* ¶¶ 168-233.  Twitter has

23    moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 138.  The amended

24    complaint is dismissed.

25                                      **BACKGROUND**

26          As alleged in the amended complaint, which the Court accepts as true for Rule 12(b)(6)

27    purposes, *see In re Capacitors Antitrust Litigation*, 106 F. Supp. 3d 1051, 1060 (N.D. Cal. 2015),

28    Twitter is the well-known "social networking service that allows its Users to post and interact with

United States District Court
Northern District of California

1    each other through short messages known as 'tweets.'"  AC ¶ 28.  Dorsey co-founded Twitter in

2    2006, and the company today hosts more than 500 million tweets posted daily by approximately

3    340 million users worldwide.  *Id.* ¶¶ 28-29, 36.

4        Plaintiff Trump opened a Twitter account in May 2009 and was an active user until

5    January 7, 2021.  *Id.* ¶¶ 43-49, 113.  On January 8, 2021, Twitter stated that it had "permanently

6    suspended" the account "due to the risk of further incitement of violence."  *Id.* ¶ 114.

7        The amended complaint alleges that the other named plaintiffs also had their Twitter

8    accounts treated unfavorably.  Linda Cuadros's account was "permanently banned" in 2020 "due

9    to a post about vaccines."  *Id.* ¶ 124.  Rafael Barboza's account was "indefinitely suspended" on

10   January 8, 2021, "after retweeting President Trump and other conservatives on January 6, 2021."

11   *Id.* ¶ 137.  Dominick Latella's account "was permanently removed from the Defendants' platform

12   during the 2018 election cycle" after he "post[ed] positive messages about Republican candidates

13   and President Trump," although Latella has a "second account [which] is still active" albeit

14   "shadow banned."  *Id.* ¶¶ 142-46.  Wayne Allyn Root was "banned permanently by Twitter" after

15   "multiple occasions where the Defendants censored his account for messages he posted related to

16   COVID-19 and the 2020 election results."  *Id.* ¶¶ 152, 155.  Dr. Naomi Wolf's account was

17   "suspended" for "vaccine misinformation."  *Id.* ¶¶ 159, 162.  The American Conservative Union

18   "started noticing a reduction in engagement in its content" in 2017, and alleges its "followers were

19   purged," dropping from 99,000 followers in June 2020 to 88,000 by January 19, 2021.  *Id.* ¶¶ 128-

20   29.

21       In plaintiffs' view, these account actions were the result of coercion by members of

22   Congress affiliated with the Democratic Party.  *Id.* ¶¶ 51-64.  Plaintiffs quote Senator Mark

23   Warner (D-VA) as saying on October 28, 2020, that "[w]e can and should have a conversation

24   about Section 230 -- and the ways in which it has enabled platforms to turn a blind eye as their

25   platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight."  *Id.*

26   ¶ 55.  Section 230 of the Communications Decency Act is said to have "significantly encouraged

27   defendants' censorship of the plaintiff and the putative class members," *id.* ¶¶ 65-77, and the

28

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1   amended complaint alleges that defendants "willful[ly] participat[ed] in joint activity with federal
2   actors to censor plaintiff and the putative class members." *Id.* ¶¶ 78-112.

3        Plaintiffs allege:  (1) a violation of the First Amendment to the United States Constitution;
4   (2) that Section 230 of the Communications Decency Act is unconstitutional; (3) deceptive and
5   misleading practices in violation of the Florida Deceptive and Unfair Trade Practices Act
6   (FDUTPA), Florida Statutes § 501.201 et seq.; and (4) a violation of the Stop Social Media
7   Censorship Act (SSMCA), Florida Statutes § 501.2041.  *Id.* ¶¶ 168-233.  In the prayer for relief,
8   plaintiffs seek, among other things, compensatory and punitive damages, and injunctive and
9   declaratory relief, including an order for Twitter to "immediately reinstate the Twitter accounts of"
10  plaintiffs.  *Id.* at 56.

11       This case was originally filed by plaintiffs in the United States District Court for the
12  Southern District of Florida, Dkt. No. 1, and transferred to this District on Twitter's motion, which
13  was made on the basis of a forum selection clause in Twitter's Terms of Service.  Dkt. No. 87.
14  The amended complaint, Dkt. No. 21, is the operative complaint.  Defendants ask to dismiss all
15  four of the claims in the AC for failure to plausibly state a claim.  Dkt. No. 138.

16                                    **DISCUSSION**
17  **I.     TWITTER AND THE FIRST AMENDMENT**

18       Plaintiffs' main claim is that defendants have "censor[ed]" plaintiffs' Twitter accounts in
19  violation of their right to free speech under the First Amendment to the United States Constitution.
20  AC ¶¶ 168-87.  Plaintiffs are not starting from a position of strength.  Twitter is a private
21  company, and "the First Amendment applies only to governmental abridgements of speech, and
22  not to alleged abridgements by private companies."  *Williby v. Zuckerberg*, No. 3:18-cv-06295-JD,
23  Dkt. No. 19 at 1 (N.D. Cal. June 18, 2019), *appeal dismissed as frivolous*, No. 19-16306, 2019
24  WL 11662186 (9th Cir. Nov. 25, 2019); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139
25  S. Ct. 1921, 1928 (2019) ("the Free Speech Clause prohibits only *governmental* abridgement of
26  speech.  The Free Speech Clause does not prohibit *private* abridgment of speech.") (emphases in
27  original).

28

1    Plaintiffs' only hope of stating a First Amendment claim is to plausibly allege that Twitter

2    was in effect operating as the government under the "state-action doctrine."  This doctrine

3    provides that, in some situations, "governmental authority may dominate an activity to such an

4    extent that its participants must be deemed to act with the authority of the government and, as a

5    result, be subject to constitutional constraints."  *Edmonson v. Leesville Concrete Co.*, 500 U.S.

6    614, 620 (1991); *see also Manhattan Cmty. Access*, 139 S. Ct. at 1928.  This is not an easy claim

7    to make, for good reasons.  Private entities are presumed to act as such, and maintaining the line

8    "between the private sphere and the public sphere, with all its attendant constitutional

9    obligations," is a matter of great importance, as "[o]ne great object of the Constitution is to permit

10   citizens to structure their private relations as they choose subject only to the constraints of

11   statutory or decisional law."  *Edmonson*, 500 U.S. at 619.  "As a matter of substantive

12   constitutional law the state-action requirement reflects judicial recognition of the fact that 'most

13   rights secured by the Constitution are protected only against infringement by governments.'"

14   *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982) (citation omitted).  "Careful

15   adherence to the 'state action' requirement preserves an area of individual freedom by limiting the

16   reach of federal law and federal judicial power."  *Id.*

17   Plaintiffs say that the question of whether they have a First Amendment claim on the basis

18   of the state action doctrine is a factual matter "ill-suited to a Rule 12(b)(6) motion."  Dkt. No. 145

19   at 7.  Not so.  It is certainly true that the ultimate determination of state action is a "necessarily

20   fact-bound inquiry," *Lugar*, 457 U.S. at 939, but that does not relieve plaintiffs of their obligation

21   under Rule 8 and Rule 12(b)(6) to provide in the complaint enough facts to plausibly allege a

22   claim against Twitter on the basis of state action.  *See, e.g.*, *Heineke v. Santa Clara Univ.*, 965

23   F.3d 1009, 1015 n.5 (9th Cir. 2020) ("Heineke's contention that it is inappropriate to dismiss his

24   § 1983 constitutional claims at the motion to dismiss stage, is unpersuasive.  We have accepted his

25   allegations as true.  Because he has failed to plead any allegations sufficient to support his

26   argument that SCU acted under color of state law, however, his § 1983 claims must fail as a

27   matter of law.").  To conclude otherwise, as plaintiffs urge, would fly in the face of the pleading

28

4

United States District Court
Northern District of California

1    requirements squarely stated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft*

2    *v. Iqbal*, 556 U.S. 662 (2009).[1]

3              The salient question under the state action doctrine is whether "the conduct allegedly

4    causing the deprivation of a federal right" is "fairly attributable to the State." *Id.* at 937; *see also*

5    *Belgau v. Inslee*, 975 F.4th 940, 946 (9th Cir. 2020) ("The state action inquiry boils down to this:

6    is the challenged conduct that caused the alleged constitutional deprivation 'fairly attributable' to

7    the state?").  The answer is determined by a "two-part approach," which requires that "the

8    deprivation must be caused by the exercise of some right or privilege created by the State or by a

9    rule of conduct imposed by the state or by a person for whom the State is responsible"; and that

10   "the party charged with the deprivation must be a person who may fairly be said to be a state

11   actor." *Lugar*, 457 U.S. at 937; *see also Sutton v. Providence St. Joseph Medical Center*, 192 F.3d

12   826, 835 (9th Cir. 1999).  These factors "are not the same," and they "diverge when the

13   constitutional claim is directed . . . against a private party." *Lugar*, 457 U.S. at 937.

14             As the parties noted, different formulations of the factors appear in the case law.  *See, e.g.*,

15   *Manhattan Cmty. Access*, 139 S. Ct. at 1928; *Lugar*, 457 U.S. at 939; Dkt. No. 145 at 7-21; Dkt.

16   No. 147 at 1-6.  But "[w]hether these different tests are actually different in operation or simply

17   different ways of characterizing the necessarily fact-bound inquiry," *Lugar*, 457 U.S. at 939, is a

18   question that the Court need not resolve for present purposes.  That is because there is "no specific

19   formula for defining state action." *Sutton*, 192 F.3d at 836 (quotations and citation omitted).

20   What matters is whether plaintiffs have plausibly alleged facts to "show that there is a sufficiently

21   close nexus between the State and the challenged action of" the private defendants, such that "the

22   action of the latter may be fairly treated as that of the State itself." *Id.* (quotations and citations

23   omitted).  The specific question the Court must answer here is:  have plaintiffs plausibly alleged

24

25   _____

26   [1] Plaintiffs make the odd assertion that these pleading standards apply only in antitrust conspiracy
     actions. Dkt. No. 145 at 6 n.7.  *Twombly* and *Iqbal* expressed no such limitation, and their
     standards have been applied to a myriad of Rule 12(b)(6) motions in non-antitrust actions in every
27   federal district and circuit court.  A scant minute of online research makes this abundantly clear.
     *See, e.g., Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 886 n.1 (9th Cir. 2022)
28   (labor and employment case); *Hoffman v. Preston*, 26 F.4th 1059, 1063 (9th Cir. 2022) (*Bivens*
     claims).

1    that Twitter was behaving as a state actor pursuant to "a governmental policy" when it closed their

2    accounts?  *Id.* at 835.

3          This inquiry "must be determined based on the circumstances of each case," *id*. at 836, and

4    the facts alleged in the amended complaint are not nearly enough for plaintiffs to proceed on a

5    state action theory.  To start, the amended complaint does not plausibly show that plaintiffs'

6    ostensible First Amendment injury was caused by "a rule of conduct imposed by the government."

7    *id*. at 835 (cleaned up); *see also Mathis v. Pacific Gas and Elec. Co.*, 891 F.2d 1429, 1432 (9th

8    Cir. 1989) ("no state, or federal, action unless" a private entity's decision is "made on the basis of

9    some rule of decision for which the State is responsible.") (quotations and citation omitted).  The

10   amended complaint merely offers a grab-bag of allegations to the effect that some Democratic

11   members of Congress wanted Mr. Trump, and "the views he espoused," to be banned from Twitter

12   because such "content and views" were "contrary to those legislators' preferred points of view."

13   *See, e.g.,* AC ¶¶ 53, 55, 60, 61.  But the comments of a handful of elected officials are a far cry

14   from a "rule of decision for which the State is responsible."  Legislators are perfectly free to

15   express opinions without being deemed the official voice of "the State."  Government in our

16   republic of elected representatives would be impossible otherwise.  It is also not plausible to

17   conclude that Twitter or any other listener could discern a clear state rule in such remarks, or even

18   determine what a legislator's "preferred views" might be.

19         The weakness of the state action theory in the amended complaint is further demonstrated

20   by plaintiffs' own explanation of why their accounts were closed.  Twitter is said to have closed

21   Mr. Trump's account because of "the risk of further incitement of violence" and "threats to

22   physical safety."  *Id.* ¶¶ 114-15.  Twitter closed plaintiff Cuadros's account "due to a post about

23   vaccines," *id*. ¶ 124, and Dr. Wolf's account for "vaccine misinformation," *id*. ¶ 162.  Plaintiff

24   Barboza's account was closed "after retweeting President Trump and other conservatives on

25   January 6, 2021," *id*. ¶ 137; plaintiff Latella after he "post[ed] positive messages about Republican

26   candidates and President Trump," *id*. ¶ 142; and plaintiff Root for "messages he posted related to

27   COVID-19 and the 2020 election results," *id*. ¶ 152.

28

United States District Court
Northern District of California

6

9

1       If anything, these explanations indicate that Twitter acted in response to factors specific to

2  each account, and not pursuant to a state rule of decision.  These circumstances are not at all

3  comparable to those in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), as plaintiffs urge.  In

4  that case, which is discussed *infra* in more detail, a state commission was empowered to compel a

5  private book distributor from selling or supplying certain books.  The amended complaint does not

6  allege anything like this type of state dictate to Twitter.

7       The amended complaint also does not plausibly allege that Twitter could fairly be deemed

8  to be a state actor.  Plaintiffs say they have done so by cataloguing "coercive statements" in

9  paragraph 55 of the amended complaint, and statements made during a March 22, 2021, House

10  Committee on Energy and Commerce hearing on the topic of "Disinformation Nation:  Social

11  Media's Role in Promoting Extremism and Misinformation."  *See* Dkt. No. 145 at 3-4 (quoting

12  from AC ¶ 55, and Dkt. No. 145-1 (RJN) ¶¶ 2-4).[2]  These statements are said to have compelled

13  Twitter to act as a government entity.

14       They are again not enough for pleading purposes.  Paragraph 55 is said to offer "examples

15  of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230

16  immunity for Defendants and other social media platforms if Twitter did not censor views and

17  content with which these Members of Congress disagreed."  AC ¶ 55.  The actual quotes do not

18  live up to that billing.  The statements attributed to "Bruce Reed, Biden's Top Tech Advisor," and

19  Michelle Obama are of no moment because Reed and Obama were not legislators.  *Id*. at 5th and

20  12th bullet points.  Other statements in Paragraph 55 pertain only to Facebook, and not Twitter.

21  *Id*. at 8th, 9th, and 15th bullet points (Senator Markey's question and Mark Zuckerberg's answer

22  regarding Facebook's algorithms and policies; Rep. Adam Schiff's Tweet that "Facebook must

23  ban" Trump).  Then-Senator Kamala Harris is quoted three times for calling for "Trump's Twitter

24  account [to be] suspended" and calling on Dorsey to "do something about this Tweet" from

25  Trump, but conspicuously missing is any threatening remark directed to Twitter.  *Id*. at 1st, 6th,

26

27  ———————————

28  [2]  The proffered statements appear in part only in a request for judicial notice, Dkt. No. 145-1, and not in the amended complaint.  Twitter did not object to the judicial notice request, and the Court has taken those materials into account.

1   and 7th bullet points.  Five statements are nothing more than general comments about Section 230

2   (*e.g.*, "We can and should have a conversation about Section 230") untethered to any substance

3   that might have conveyed any threat or punishment tied to any specific action by Twitter.  *Id*. at

4   2nd, 3rd, 4th, 11th, and 13th bullet points.  The remaining two statements, at the 10th and 14th

5   bullet points, express general concerns and criticisms that Twitter has become a "terrifying tool[]

6   of persuasion and manipulation," and that "[i]ndustry self-regulation has failed."

7        The statements attributed to the "Disinformation Nation" congressional hearing may have

8   been more heated, but they are still not enough to satisfy plaintiffs' pleading obligation.

9   Committee Chairman Frank Pallone, Jr., is quoted as saying, "it is time for Congress and this

10  Committee to legislate and realign these companies' incentives to effectively deal with

11  disinformation and extremism. . . . The time for self-regulation is over.  It is time we legislate to

12  hold you accountable."  Dkt. No. 145 at 4.  Representative Mike Doyle said, "Your companies

13  need to be held accountable . . . and we will legislate to stop this."  *Id*.  Representative Janice D.

14  Schakowsky said, "What our witnesses need to take away from this hearing is that self-regulation

15  has come to the end of its road, and that this democratically elected body is prepared to move

16  forward with legislation and regulation.  Misinformation regarding the election dropped by 73%

17  across social media platforms after Twitter permanently suspended Trump . . . .  The question is,

18  what took so long?"  *Id*.

19        Even giving plaintiffs every benefit of the doubt, these comments fall short of the mark.

20  Plaintiffs' own case citations show why.  *See* Dkt. No. 145 at 7-17.  Strictly speaking, not all of

21  plaintiffs' cases involve the state action doctrine, as the ensuing discussion makes clear.

22  Nevertheless, plaintiffs argued the cases to that end, and the Court will take those arguments on

23  their own terms.

24        In one of plaintiffs' main citations, *Bantam Books*, 372 U.S. 58, the Rhode Island

25  Legislature established a "Rhode Island Commission to Encourage Morality in Youth" that was

26  composed of members appointed by the state Governor.  *Id*. at 59-60 & n.1.  The Commission was

27  empowered "to educate the public concerning any book . . . manifestly tending to the corruption of

28  the youth," and "to investigate and recommend the prosecution" of all violations of the relevant

United States District Court
Northern District of California

8

11

1  laws. *Id*. at 59-60. Put more simply, it was tasked with formulating and enforcing a blacklist of

2  proscribed books. *Id*. at 68. The Commission sent letters "on official Commission stationery" to a

3  book distributor listing "certain designated books or magazines distributed by him" that had been

4  declared by the Commission as "objectionable for sale, distribution or display" to minors. *Id*. at

5  61. The notice thanked the distributor in advance "for his 'cooperation' with the Commission,

6  usually reminding [him] of the Commission's duty to recommend to the Attorney General

7  prosecution of purveyors of obscenity." *Id*. at 62. "Copies of the lists of 'objectionable'

8  publications were circulated to the local police departments, and [the distributor] was so informed

9  in the notices." *Id*. at 62-63. "A local police officer usually visited [the distributor] shortly after

10  [his] receipt of a notice to learn what action he had taken." *Id*. at 63.

11         In a lawsuit brought by the publishers of books supplied to the distributor, the Supreme

12  Court had no trouble concluding that the acts of the Commission "were performed under color of

13  state law," and that the distributor's "compliance with the Commission's directives was not

14  voluntary." *Id*. at 68. As the Court stated, "[p]eople do not lightly disregard public officers'

15  thinly veiled threats to institute criminal proceedings against them if they do not come around, and

16  [the distributor's] reaction . . . was no exception to this general rule." *Id*. "The Commission's

17  notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably

18  followed up by police visitations, in fact stopped the circulation of the listed publications ex

19  proprio vigore." *Id*. The Court held that the "procedures of the Commission" were

20  constitutionally deficient, and that "the system of informal censorship disclosed by this record

21  violates the Fourteenth Amendment." *Id*. at 71.

22         In *Lombard v. State of Louisiana*, 373 U.S. 267 (1963), the Supreme Court reversed the

23  state criminal mischief convictions of three black and one white college students who had

24  participated in a "sit-in demonstration" at a restaurant in New Orleans to promote racial

25  desegregation. Although it was a private restaurant that had refused service and called the police,

26  the Court held that "these convictions, commanded as they were by the voice of the State directing

27  segregated service at the restaurant, cannot stand." *Id*. at 274. Prior to the demonstration, the

28  Superintendent of Police had stated that "such actions are not in the community interest," and "we

1   want everyone to fully understand that the police department and its personnel is ready and able to

2   enforce the laws of the city of New Orleans and the state of Louisiana." *Id*. at 270.  In addition,

3   "four days before petitioners' arrest, the Mayor of New Orleans issued an unequivocal statement

4   condemning such conduct and demanding its cessation." *Id*. at 271.  The Mayor said that "I have

5   today directed the superintendent of police that no additional sit-in demonstrations will be

6   permitted regardless of the avowed purpose or intent of the participants," and "[i]t is my

7   determination that the community interest, the public safety, and the economic welfare of this city

8   require that such demonstrations cease and that henceforth they be prohibited by the police

9   department." *Id*.  Both statements were well publicized, and there was evidence in the case "to

10  indicate that the restaurant manager asked petitioners to leave in obedience to the directive of the

11  city officials." *Id*. at 272.

12          In *Carlin Communications, Inc. v. The Mountain States Telephone and Telegraph

13  Company*, 827 F.2d 1291 (9th Cir. 1987), the defendant, a private regional telephone company,

14  "refuse[d] to carry smut on its dial-a-message network." *Id*. at 1292.  This happened after a

15  "deputy attorney of Maricopa County, Arizona, wrote to Mountain Bell threatening to prosecute if

16  the company continued to provide [dial-a-message network service] to Carlin.  The letter stated

17  that Carlin's 976 service violated an Arizona statute prohibiting the distribution of sexually

18  explicit material to minors." *Id*. at 1293.  "Mountain Bell immediately sent Carlin a notice that its

19  service would be terminated in five days." *Id*.  The Ninth Circuit concluded that the termination

20  decision amounted to state action because the "county attorney's threat of prosecution provided

21  the requisite 'nexus' between the state and the challenged action." *Id*. at 1295.  In effect, "Arizona

22  'exercised coercive power' over Mountain Bell and thereby converted its otherwise private

23  conduct into state action." *Id*.

24          In *Mathis v. Pacific Gas and Electric Company*, 891 F.2d 1429 (9th Cir. 1989), defendant

25  PG&E had barred plaintiff Mathis from entering the Diablo Canyon Nuclear Power Plant for work

26  because "he was suspected of illegal drug use or sales." *Id*. at 1430.  Mathis argued that this was

27  state action because "his denial of access by PG&E was directed or encouraged by the [Nuclear

28  Regulatory Commission (NRC)] pursuant to its Fitness for Duty program." *Id*. at 1433.  At the

*United States District Court*
*Northern District of California*

10

13

United States District Court
Northern District of California

1    time, the Fitness for Duty program was only a proposed rule, and the NRC eventually withdrew it

2    "to encourage the initiatives concerning fitness for duty being taken by the nuclear power

3    industry," so long as "the industry programs produce the desired results." *Id*. at 1433. The NRC

4    added that "[i]t is Commission policy that the sale, use, or possession of alcoholic beverages or

5    illegal drugs within protected areas at nuclear plant sites is unacceptable," and that the "decision to

6    use discretion in enforcement to recognize industry initiatives in no way changes the NRC's

7    ability to issue orders, call enforcement meetings, or suspend licenses should a significant safety

8    problem be found." *Id*. The NRC also stated that "[a]n acceptable fitness for duty program should

9    at a minimum include the following essential elements: (1) A provision that the sale, use, or

10   possession of illegal drugs within the protected area will result in immediate revocation of access

11   to vital areas and discharge from nuclear power plant activities . . . ; [and] (2) A provision that any

12   other sale, possession, or use of illegal drugs will result in immediate revocation of access to vital

13   areas, mandatory rehabilitation prior to reinstatement of access, and possible discharge from

14   nuclear power plant activities." *Id*. In these circumstances, the circuit court concluded that Mathis

15   had plausibly made out a state action claim because "[t]he minimum standard [wa]s stated by the

16   NRC, as a minimum acceptable industry plan, backed up by threats of enforcement or of formal

17   rulemaking." *Id*. at 1434.

18          These cases, which are the centerpieces of plaintiffs' state action argument, are strikingly

19   different from the allegations in the amended complaint. In each of the cases, a concrete and

20   specific government action, or threatened action, was identified. Here, plaintiffs offer only

21   ambiguous and open-ended statements to the effect that "we may legislate" something unfavorable

22   to Twitter or the social media sector. This is a world away from: (1) a state commission sending

23   local police officers for drop-in visits and threatening prosecution by the state attorney general

24   (*Bantam Books*); (2) a city mayor and police superintendent threatening law enforcement action to

25   crack down on sit-in demonstrations (*Lombard*); (3) a deputy county attorney threatening

26   prosecution against a private company under a specific law (*Carlin*); and (4) a federal

27   administrative commission threatening the suspension of licenses or formal rulemaking if its

28   specified elements for an anti-drug program were not followed voluntarily (*Mathis*).

United States District Court
Northern District of California

1    The fact that enacting a bill is rarely fast or easy further attenuates the plausibility of the

2 legislative threat plaintiffs speak of.  As the process was described in another context,

3 "[d]issatisfaction . . . is often the cost of legislative compromise.  And negotiations surrounding

4 enactment of this bill tell a typical story of legislative battle among interest groups, Congress, and

5 the President.  Indeed, this legislation failed to ease tensions among many of the interested parties.

6 Its delicate crafting reflected a compromise amidst highly interested parties attempting to pull the

7 provisions in different directions. . . . The deals brokered during a Committee markup, on the floor

8 of the two Houses, during a joint House and Senate Conference, or in negotiations with the

9 President are not for us to judge or second-guess." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S.

10 438, 461 (2002) (internal citations omitted).  There is no way to allege with any degree of

11 plausibility when, if ever, the comments voiced by a handful of members of Congress might

12 become a law, or what changes such a law might impose on social media companies like Twitter.

13    Plaintiffs also overlook Congress's role as an investigatory body, and the fact that "each

14 House has power 'to secure needed information' in order to legislate." *Trump v. Mazars USA,*

15 *LLP*, 140 S. Ct. 2019, 2031 (2020) (citation omitted).  This power "encompasses inquiries into the

16 administration of existing laws, studies of proposed laws, and 'surveys of defects in our social,

17 economic or political system for the purpose of enabling the Congress to remedy them.'" *Id.*

18 (quotations and citation omitted).

19    Much of what plaintiffs challenge fits within the normal boundaries of a congressional

20 investigation, as opposed to threats of punitive state action.  Plaintiffs' own submissions indicate

21 that the House Committee was making inquiries and surveying possible problems "for the purpose

22 of enabling the Congress to remedy them."  In this respect, the allegations in the amended

23 complaint are much more comparable to the cases plaintiffs cited in which no state action was

24 found.  *See Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) (no state

25 action where Administrator of the Human Resources Administration of New York City wrote

26 letters "urg[ing]" department stores, as a gesture of "public service," not to carry a board game the

27 Administrator found problematic; state action absent where "comments of a government official"

28 cannot "reasonably be interpreted as intimating that some form of punishment or adverse

12

15

1    regulatory action will follow the failure to accede to the official's request"); *see also American*

2    *Family Ass'n, Inc. v. City and County of San Francisco*, 177 F.3d 1114 (9th Cir. 2002) (no First

3    Amendment violation found where City and County of San Francisco passed resolution "urg[ing]

4    'local television stations not to broadcast advertising campaigns aimed at "converting"

5    homosexuals'"; holding that "public officials may criticize practices that they would have no

6    constitutional ability to regulate, so long as there is no actual or threatened imposition of

7    government power or sanction").

8           Overall, the amended complaint does not plausibly allege that Twitter acted as a

9    government entity when it closed plaintiffs' accounts.  This resolves the main thrust of plaintiffs'

10   state action theory.  Plaintiffs' cursory mention of state "encouragement" (through Section 230(c))

11   and "joint action" are minor variations on the state action theme, and are unavailing for the same

12   reasons.  Dkt. No. 145 at 17-21.  In addition, "compliance with generally applicable laws" is not

13   "sufficient to convert private conduct into state action."  *Heineke*, 965 F.3d at 1013.  The

14   government cannot plausibly be said to have compelled Twitter's action through Section 230,

15   which in any event imposed no affirmative obligations on Twitter to act in any particular way.

16          Consequently, the amended complaint does not plausibly allege a First Amendment claim

17   against Twitter.  Plaintiffs' first claim is dismissed.

18   **II.     SECTION 230**

19          Plaintiffs' claim for a declaratory judgment that Section 230 is unconstitutional is

20   dismissed for lack of standing.  As Article III of the United States Constitution states, federal

21   courts have the "power to decide legal questions only in the presence of an actual 'Cas[e]' or

22   'Controvers[y].'"  *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016).  The party invoking a

23   federal court's jurisdiction must demonstrate standing by showing that she has "suffered an 'injury

24   in fact,' that the injury is 'fairly traceable' to the conduct being challenged, and that the injury will

25   likely be 'redressed' by a favorable decision."  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504

26   U.S. 555, 560-61 (1992)).  Standing is an ongoing inquiry, and "[t]he need to satisfy these three

27   [Article III standing] requirements persists throughout the life of the lawsuit."  *Id.* (citation

28   omitted).  The Court has an independent duty to be vigilant about standing.

United States District Court
Northern District of California

1    To establish an injury in fact, a plaintiff must show that he or she suffered "an invasion of

2    a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

3    conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up).  These facts are entirely absent

4    from the amended complaint with respect to Section 230.  Plaintiffs offer only the vague and

5    speculative allegation that "[u]pon information and belief, defendants would not have de-

6    platformed the plaintiff or similarly situated putative class members but for the immunity

7    purportedly offered by Section 230(c)."  AC ¶ 190.  Why this might be plausible is left unsaid.

8    The Court declines to accept such speculative and conclusory allegations as grounds for a

9    declaratory judgment claim.  *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

10   2008).

11   **III.    THE FDUTPA CLAIM**

12   Twitter says that plaintiffs' third claim under the Florida Deceptive and Unfair Trade

13   Practices Act should be dismissed because plaintiffs have agreed, pursuant to the Twitter Terms of

14   Service (TOS), that California law will govern all disputes that arise between Twitter and its users.

15   Dkt. No. 138 at 14.  Plaintiffs do not dispute that the TOS is a valid contract between the parties,

16   or that it includes an express choice of California law.  Dkt. No. 145 at 22-23.

17   Neither side identified the choice-of-law rules that should apply, but the basic rule is that,

18   "[i]n determining what state law to apply, a federal court applies the choice-of-law rules of the

19   state in which it sits." *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106,

20   1111 (9th Cir. 2006) (quotations and citation omitted).  An exception may arise for federal courts

21   sitting in diversity when a case has been transferred from another jurisdiction, as is the situation

22   here.  *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 65

23   (2013).  In that case, the Court will apply the choice-of-law rules of the transferor court, unless the

24   transfer was made on the basis of a valid forum-selection clause.  *Id.*; *see also In re Facebook

25   Biometric Information Privacy Litig.*, 185 F. Supp. 3d 1155, 1168 (N.D. Cal. 2016).  The TOS

26   specifies venue in this District, and the case was transferred here from the Southern District of

27   Florida for that contractual reason.  *See* Dkt. No. 87.  Consequently, the Court will apply the

28   choice-of-law rules of its home state, California.

United States District Court
Northern District of California

14

17

1   Under California law, to determine whether a choice-of-law clause is enforceable, courts

2   consider "(1) whether the chosen state has a substantial relationship to the parties or their

3   transaction, or (2) whether there is any other reasonable basis for the parties' choice of law."

4   *Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 916 (2001).  If either test is met,

5   the parties' choice of law "generally will be enforced unless the other side can establish that the

6   chosen law is contrary to a fundamental policy of the state law alternative to the contractual

7   choice, and that the other state has a materially greater interest in the determination of the matter."

8   *In re Facebook*, 185 F. Supp. 3d at 1168 (internal quotations omitted).

9   There is no reasonable doubt that California has a substantial relationship to this case.

10   Twitter is a leading social media company with hundreds of millions of users, and has its principal

11   place of business in California.  Plaintiffs do not dispute this point.  They contend only that

12   Florida law should be applied on the basis of a "fundamental policy" conflict with California law.

13   Dkt. No. 145 at 22-23.

14   This is plaintiffs' burden to establish, *In re Facebook*, 185 F. Supp. 3d at 1168, and they

15   have not succeeded.  Plaintiffs contend, in the space of less than half a page, that a fundamental

16   conflict exists because the FDUPTA allows claims for injunctive relief without financial injury,

17   and the UCL supposedly does not.  Dkt. No. 145 at 23.  The point is not well taken.  To start,

18   plaintiffs substantially undercut their position by saying that they have, in effect, already pleaded

19   "a UCL claim for injunctive relief" on the same facts alleged for the FDUPTA claim.  Dkt. No.

20   145 at 23 n.18.  That goes a long way to neutralizing the suggestion that the two state statutes are

21   fundamentally at odds.  In addition, plaintiffs did not account for the California Supreme Court's

22   conclusions that:

23   > Section 17203 makes injunctive relief "the primary form of relief
24   > available under the UCL," while restitution is merely "ancillary."
> (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 319, 93
25   > Cal.Rptr.3d 559, 207 P.3d 20.)  Nothing in the statute's language
> conditions a court's authority to order injunctive relief on the need
26   > in a given case to also order restitution.  Accordingly, the right to
> seek injunctive relief under section 17203 is not dependent on the
27   > right to seek restitution; the two are wholly independent remedies.
> (*See ABC Internat. Traders, Inc. v. Matsushita Electric Corp.*
28   > (1997) 14 Cal.4th 1247, 1268, 61 Cal.Rptr.2d 112, 931 P.2d 290
> [§ 17203 "contains ... no language of condition linking injunctive

15

and restitutionary relief"]; *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1139, 111 Cal.Rptr.2d 296 [plaintiff could pursue injunctive relief even though restitution was unavailable].)

*Clayworth v. Pfizer, Inc.*, 49 C.4th 758, 790 (2010). Plaintiffs also did not demonstrate that Florida "has a materially greater interest in the determination of the matter." *In re Facebook*, 185 F. Supp. 3d at 1168. Consequently, plaintiffs have not presented a good reason to disregard the choice of California law in the TOS in favor of the FDUTPA.

Although this is enough to dismiss the third claim, some additional observations are useful. A good argument can be made that plaintiffs did not plausibly allege deceptive conduct by Twitter for purposes of either the FDUTPA or the UCL. The TOS expressly states that Twitter may suspend or terminate an account "at any time for any or no reason." Dkt. No. 138-7 at 8. It also states that Twitter may remove or refuse to distribute any content. *Id*. at 5. There is nothing cagey or misleading about these provisions, and plaintiffs' suggestion that Twitter may have applied them inconsistently, *see* AC ¶¶ 212-16, or at the government's behest, does not change that. The TOS gave Twitter contractual permission to act as it saw fit with respect to any account or content for any or no reason, which makes its ostensible motives irrelevant for a deceptive practices claim.

## IV.   THE SSMCA CLAIM

Plaintiffs' fourth claim under Florida's Stop Social Media Censorship Act is also due for dismissal. Twitter did not make a choice-of-law argument for this claim, *see* Dkt. No. 138 at 14-19, and so the Court addresses the SSMCA claim on its own terms.

An initial problem for plaintiffs is that only one named plaintiff (Dominick Latella) was a Florida resident with any active Twitter account at the time the statute took effect on July 1, 2021, AC ¶¶ 138, 146, and so he is the only plaintiff who might conceivably have a SSMCA claim. *See* Fla. Stat. § 501.2041(1)(h) ("user" is "a person who resides or is domiciled in [Florida] and who has an account on a social media platform."). The amended complaint alleges that all of the other plaintiffs were domiciled outside of Florida, or had their Twitter accounts closed prior to July 1, 2021.

Another problem is that plaintiffs say they are challenging only conduct that occurred after the SSMCA effective date. Dkt. No. 145 at 24. But the amended complaint focuses on actions

16

United States District Court
Northern District of California

1    affecting plaintiffs' accounts prior to July 1, 2021.  *See* AC ¶¶ 113, 124, 128-29, 137, 143, 150,

2    158-59, 226.  Consequently, it is unclear what plaintiffs allege to be the potential application of

3    the statute to their case.

4           There is also a major concern about the enforceability of the SSMCA.  Florida government

5    officials were enjoined from enforcing the SSMCA on June 30, 2021, the day before the law was

6    to take effect, in a well-reasoned decision issued by the Northern District of Florida.  *NetChoice,*

7    *LLC v. Moody*, 546 F. Supp. 3d 1082 (N.D. Fla. 2021), *appeal pending sub nom*, *NetChoice LLC*

8    *v. Attorney Gen., State of Fla.*, No. 21-12355 (11th Cir.).  The court concluded that the statute

9    violated the First Amendment and was preempted by 47 U.S.C. § 230; it also expressed strong

10   concerns that the statute was impermissibly vague.  The Court declines plaintiffs' invitation to

11   disregard this decision, particularly while an appeal is pending, and dismisses the SSMCA claim

12   without prejudice.

13                                    **CONCLUSION**

14          The amended complaint is dismissed in its entirety.  Plaintiffs will have an opportunity to

15   amend their complaint.  *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).  Plaintiffs may

16   file an amended complaint that is consistent with this order by May 27, 2022.  The amended

17   complaint may not add any new claims or defendants without express prior leave of Court.

18   Plaintiffs are advised that further opportunities to amend are not likely to be granted.

19          **IT IS SO ORDERED.**

20   Dated:  May 6, 2022

21

22                                                    _____

23                                                    JAMES DONATO
                                                      United States District Judge
24

25

26

27

28

                                              17

**Pages 1 - 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
DONALD J. TRUMP, the          )
Forty-Fifth President of the  )
United States, et al.,        )
                              )
          Plaintiffs,         )
                              )
   VS.                        )   NO. C 21-08378-JD
                              )
TWITTER INC., et al.,         )
                              )
          Defendants.         )
_____)
```

San Francisco, California
Thursday, February 24, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                  LAW OFFICE OF ANDREI D. POPOVICI, P.C.
                  2121 North California Boulevard
                  Number 290
                  Walnut Creek, California 94596
        **BY:  ANDREI D. POPOVICI, ATTORNEY AT LAW**

                  LAW OFFICE OF MARIE L. FIALA
                  1450 West Highway 290
                  Suite 1200
                  Dripping Springs, Texas 78620
        **BY:  MARIE L. FIALA, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
               Official Reporter, CSR No. 12219

```
 1    APPEARANCES:   (CONTINUED)

 2    For Plaintiffs:
                            GARDNER BREWER HUDSON, P.A.
 3                          400 N. Ashley Drive
                            Suite 1100
 4                          Tampa, Florida 33602
                      BY:   RICHARD POLK LAWSON, ATTORNEY AT LAW
 5
                            IVEY, BARNUM & O'MARA
 6                          170 Mason Street
                            Greenwich, Connecticut 06830
 7                    BY:   JOHN Q. KELLY, ATTORNEY AT LAW

 8    For Defendants:
                            WILMER, CUTLER, PICKERING, HALE
 9                            & DORR LLP
                            1875 Pennsylvania Ave., NW
10                          Washington, D.C. 20006
                      BY:   PATRICK J. CAROME, ATTORNEY AT LAW
11                          ARI HOLTZBLATT, ATTORNEY AT LAW

12                          WILMER, CUTLER, PICKERING, HALE
                              & DORR LLP
13                          2600 El Camino Real - Number 400
                            Palo Alto, California 94306
14                    BY:   THOMAS G. SPRANKLING, ATTORNEY AT LAW

15    For Intervenor United
      States of America:
16                          US DEPARTMENT OF JUSTICE
                               CIVIL DIVISION
17                          Federal Programs Branch
                            1100 L Street - Room 12010
18                          Washington, D.C. 20530
                      BY:   INDRANEEL SUR, ASSISTANT U.S. ATTORNEY
19

20

21

22

23

24

25
```

PROCEEDINGS

1    Thursday - February 24, 2022                    11:07 a.m.

2                        P R O C E E D I N G S

3                              ---o0o---

4          THE CLERK:  All rise.  This Court is now in session.

5    The Honorable James Donato presiding.

6          THE COURT:  Good morning.

7          MS. FIALA:  Good morning, Your Honor.

8          THE CLERK:  Please be seated.

9       Calling Civil 21-8378, Trump, et al. v. Twitter, Inc.,

10   et al.

11      Counsel, please state your appearances for the record.

12         MS. FIALA:  Good morning, Your Honor.

13         THE CLERK:  Use the microphones.

14         MS. FIALA:  Good morning, Your Honor.  Marie Fiala

15   appearing for plaintiffs.

16         MR. LAWSON:  Richard Lawson for the plaintiffs.

17         MR. POPOVICI:  Andre Popovici for the plaintiffs.

18         MR. KELLY:  John Kelly for the plaintiffs, Your Honor.

19         THE COURT:  Oh.  Okay.  All right.

20         MR. CAROME:  Good morning, Your Honor.  Patrick Carome

21   for the defendants.

22         MR. HOLTZBLATT:  Ari Holtzblatt, also for the

23   defendants.

24         MR. SPRANKLING:  And Thomas Sprankling, also for the

25   defendants.

4

PROCEEDINGS

1        **THE COURT:**  Oh, okay.  Where is Mr. Sur?  Ah.

2        **MR. SUR:**  Your Honor, I'm Indraneel Sur, of the

3 Justice Department, for the intervenor.

4        **THE COURT:**  You can sit where you like.  You can

5 certainly sit in the well.

6        Okay.  That sounds fine.  And it's entirely up to you, but

7 if you would like to take your masks off while you're speaking,

8 that's perfectly fine, as long as you're fully vaccinated and

9 you're comfortable doing it.  If you don't want to, that's also

10 fine, too.

11        You can just use the mics at the table as well.

12        Okay.  Well, I have read with great attention all of the

13 papers that you both have filed, and today we're going to focus

14 on the motion to dismiss.  I'm not going to hear any argument

15 on the preliminary injunction.  I want to get to the

16 plausibility of the claims first because that may or may not be

17 dispositive of what the next step will be.

18        So who is going to take the lead on the plaintiffs' side?

19        **MS. FIALA:**  Your Honor, Marie Fiala.  I'll be arguing

20 for plaintiffs on the motion to dismiss.

21        **THE COURT:**  Okay.  So I do have some questions.  I'm

22 happy to hear whatever it is you would like to raise, but I do

23 have a couple of targeted questions.  And let me start with the

24 first one.

25        You're in Silicon Valley.  You're in the district court

PROCEEDINGS

1   that handles all of the Silicon Valley matters.  If there is

2   one thing that we see a lot of, it's change:  Change in the

3   law, change in technology.  They both intersect.  Things move

4   along and evolve, part and parcel as developments occur.

5        The one thing, though, Ms. Fiala, that's been more or less

6   a constant, I'd say going back two decades, 20 years, is that

7   private companies, private entities like Twitter, are not

8   subject to the First Amendment.

9        And, you know, just to hit some flag points, the Supreme

10  Court made a very definitive statement to that effect in the

11  *Halleck* case at 139 S. Ct. 1921.  They did that in 2019.  The

12  Ninth Circuit did the same in the case called *Prager*, 951

13  F.3d 991, in 2020.  And this Court also came to the same

14  conclusion in a case called *Williby* -- W-I-L-L-I-B-Y -- in

15  2019, and you can find that at 2019 Westlaw 11662186.  That's

16  actually the unpublished Ninth Circuit affirmance of my finding

17  that Facebook was not a state actor for First Amendment

18  purposes.

19       So you've got a mountain of law saying "no" to your First

20  Amendment claim, and it's just not clear to me how you're

21  traversing that.

22       **MS. FIALA:**  Thank you, Your Honor, for the opportunity

23  to respond.

24       It is true that there have been decisions holding that in

25  specific contexts the social media giants from Silicon Valley

25

PROCEEDINGS

1    are not subject to limitations under the First Amendment.

2        But the answer to that question depends on the operation

3    of a doctrine that's much older than the cases Your Honor has

4    referenced state action, dating back to the civil rights cases

5    of the 1960s.  And the answer to Your Honor's question is very

6    heavily fact-dependent and, as such, unsuitable for disposition

7    on this motion.

8        The cases Your Honor mentioned, *Halleck* and *Prager*, sought

9    to hold social media platforms responsible as state actors

10   under a theory that they were public forums.  We have no

11   disagreement at this point with the holdings in those cases

12   because we do not allege state action under a public forum

13   theory.

14       The Supreme Court allows at least four different factual

15   contexts to give rise to state action, and we rely on two of

16   those:  The compulsion theory, which includes either coercion

17   by the Government or encouragement by the Government, and the

18   joint action theory, by which the Government and a private

19   actor work hand-in-hand to censor or limit a speaker's First

20   Amendment rights.

21       So my starting answer to Your Honor's question is that

22   *Prager* and *Halleck* are not relevant to the issues before

23   the Court today.

24       I'll touch briefly on the civil right cases, especially

25   *Lombard*, because it does illustrate the basis on which we are

PROCEEDINGS

1　claiming state action.  In fact, our facts are significantly,

2　significantly stronger than what was before the Supreme Court

3　in *Lombard*.

4　　　As Your Honor will recall, that was a case in which the

5　mayor and the police chief of the City of New Orleans stood on

6　the courthouse or the City Hall steps and gave press

7　conferences in which they said, "We will not tolerate sitting

8　demonstrations in our city."

9　　　A week later, a group of African-American citizens

10　attempted to order a meal at a restaurant.  They were asked to

11　leave.  They refused to leave.  The restaurant owner called the

12　police.  They were arrested and convicted.

13　　　And the Court -- a supreme court -- after the conviction

14　was affirmed by the state supreme court, the Supreme Court

15　reversed, saying the reason these folks were arrested was

16　because of the coercive or compulsive force of the mayor's and

17　the police chief's public statements.  In fact, the Court said

18　those rose to the same level as if there had been an ordinance

19　compelling the restaurant to segregate.

20　　　The Court --

21　　　　**THE COURT:**  Let me just jump in.  I'm with you on all

22　that.  That is what the case says.  But that doesn't really

23　shed much light on your complaint.  So let me just see if I can

24　put a finer point on it.

25　　　And, by the way, it's perfectly fine to resolve state

**PROCEEDINGS**

1    action issues at the motion to dismiss stage.  Our circuit

2    certainly held so in a case call *Heinicke*, at 965 F.3d 1009 in

3    2020.

4         So there is nothing wrong with that.  Of course, you get

5    every benefit of the doubt, because that's what we do at the

6    pleadings motion stage.  But I just read and reread and read

7    again, your complaint, and I just -- I'm not seeing any

8    coercive statements by state actors, and that is the hook that

9    you are hanging your hat on.

10         So what were the coercive statements by state actors?

11         Clearly, politicians spoke, but that's what politicians

12    do; they speak.  That doesn't necessarily -- that isn't always

13    and necessarily a statement or expression of state power.

14         So what's the coercive element?

15         **MS. FIALA:**  Your Honor, between middle of 2020 and

16    middle of 2021, the House and the Senate held multiple hearings

17    at which the CEOs of Twitter, Facebook, and YouTube were asked

18    to appear, and the specific purpose and intent of those

19    hearings was to examine how these social media platforms were

20    managing content -- what they call "content moderation" -- on

21    their platforms.

22         The CEOs appearing were subjected to aggressive

23    questioning by the Democratic members of the committees holding

24    the hearings, at which repeatedly the congressmen or senators

25    asked and demanded that speech -- specifically, speech by

PROCEEDINGS

1    then-President Trump, or in the 2021 hearing, recently former

2    President Trump, be moderated, suppressed, labeled as false, or

3    otherwise censored.

4        There are a few statements quoted in the brief, but due to

5    page limitations, we were only able to quote a small portion of

6    the Government's coercive statements.  We have --

7        **THE COURT:**  Sorry.  I have to just jump in on that.

8        You know, it's perfectly fine for a politician to express

9    dissatisfaction with conduct.  I mean, to quote another

10   relatively recent case, *American Family Association v. City and*

11   *County of San Francisco*, that's 277 F.3d 1114, a 2002 case, and

12   on page 1125, the circuit panel concluded, quote (as read):

13       "We agree with the host of other circuits that

14       recognize that public officials may criticize

15       practices that they would have no constitutional

16       ability to regulate so long as there is no actual or

17       threatened imposition of government power or

18       sanction."

19       So what I'm really looking for is not so much what a

20   Democrat or Republican might have said in front of a camera at

21   a committee hearing, but the actual threat that Government

22   power would be brought to bear, and I just didn't see it in the

23   complaint.

24       **MS. FIALA:**  Your Honor, it is not possible to

25   understand the answer to that question without understanding

PROCEEDINGS

1   the critical role that the immunity under Section 230 of the

2   Communications Decency Act -- the benefit that that

3   congressionally-enacted immunity from liability confers on the

4   social media platforms and the effect on those platforms that

5   at the -- of the fact that at these same hearings, senators and

6   congressional representatives repeatedly linked their overt

7   demands that speech that differed from the official narrative

8   be limited or censored; repeatedly linked those demands with

9   the threat to repeal Section 230 immunity for these platforms

10   if they did not fall in line.

11      Those two are inextricably linked.  They occurred at the

12   same hearings, the same speakers uttering both of those

13   comments within minutes of each other.

14      And the threats were not, in the least, subtle or

15   difficult to understand.

16      We have submitted --

17      **THE COURT:**  Just to jump in:  The threats that --

18   you know, look, it's just a baseline concept that private

19   companies, private entities are not subject to the First

20   Amendment.  That's the baseline, and it's a strong baseline.

21      So when we talk about government threats in the cases

22   enough to really overcome that strong presumption against the

23   application of the First Amendment to private entities, we're

24   talking about express threats of Government prosecution, of,

25   you know, some kind of criminal sanction, takings.

PROCEEDINGS

1    I mean, just saying, you know, I have an idea that we

2    might amend the Communications Decency Act, I just -- I

3    really -- the threat factor there seems pretty low.

4    One other -- I mean, we are going to get to the

5    Section 230 point in a moment -- your ability to challenge the

6    constitutionality of that.  But, if I might, let me just

7    hear -- we'll take a little break and hear from the defendants.

8    Okay.

9    **MR. CAROME:**  Thank you, Your Honor.  Patrick Carome,

10    WilmerHale, on behalf of the defendants.

11    I think your questions go directly to the heart of the

12    issue here, Your Honor.  And there has to be -- I mean, there

13    is an extremely strong presumption against state action.  If

14    there weren't such a presumption, you would have a situation

15    where the actions of private companies, left and right, would

16    become subject to the federal constitution, and that's clearly

17    not what we have in this country.

18    And *Halleck* couldn't have been clearer about the

19    importance of really policing carefully where that line is

20    drawn so as not to affect the liberties of everybody who is not

21    in government, like Twitter.

22    So, if you look at the statements that they are relying

23    on -- I mean, first of all, a number of courts have held that

24    the statements of solo legislators do not have the power of

25    state action at all behind them.  Congress doesn't act by

PROCEEDINGS

1  individual; it acts by majority votes of multiple houses.

2      And, you know, in the *Abu-Jamal* case from the First

3  Circuit and from a series of cases here in the Northern

4  District of California from other courts, there has been just a

5  principle recognized which I think is just central, actually,

6  to our democracy, which is that haranguing, jawboning of

7  individual legislators -- which is what elected officials do --

8  is not the stuff of coercive state action that means every time

9  a private actor acts coincidentally with a wish of a

10 legislator, suddenly makes it the Government's action.

11     We wouldn't --

12     **THE COURT:**  I imagine a lot of politicians would like

13 it to be -- would like to have the ability to say that once I

14 speak, it becomes law.

15     But I agree with what you're saying.  It's sort of what

16 their job is.  They comment on what's happening in the world,

17 and in very rare circumstances, it might actually turn into a

18 legislative bill that's signed by the president into law.  But

19 short of that, it's just commentary.  That's basically what

20 you're saying.

21     **MR. CAROME:**  Yes, Your Honor.  And actually, if you

22 look at the transcript of the hearings that they're referring

23 to, where lots of different congresspeople spoke, it was very

24 much a bipartisan haranguing or jawboning from both Republican

25 members and Democratic members.  I mean, that's what you

PROCEEDINGS

1  expect; nothing wrong with it.  They couldn't be sued for

2  having done it.

3      I mean, if the legislator had actually engaged in coercive

4  state action, they would be the ones violating Twitter's First

5  Amendment rights, and Twitter might have a right to sue them.

6  Of course, we're nowhere near that realm of anything

7  approaching state action here.

8      And, you know, it's not just that individual legislators

9  have no to power on their own.  It's also that they --

10  you know, Your Honor mentioned the examples of prosecutors or

11  other types of executive branch officials who can arrest,

12  impose criminal sanctions.  In the *Lombard* case that Ms. Fiala

13  referred to, yeah, you had the mayor and chief of police saying

14  they were going to arrest people.  And they did, and, of

15  course, there was state action.  There were convictions of

16  individuals.

17      We've got nothing like that here.  Congresspeople don't

18  have that authority.  I mean, you've got cases like where you

19  have the potential for state action coercion.  You know, cases

20  like *Carolyn Communications v. AT&T Mobility*, a Ninth Circuit

21  case, where the prosecutor called up a phone company and said,

22  stop running Mr. Carolyn's supposedly indecent audiotapes.  Of

23  course, there could be state action there with a prosecutor

24  threatening to prosecute AT&T.

25      Or in the *Mathis* case, one of the leading Ninth Circuit

PROCEEDINGS

1   cases on state action.  There, you had the Nuclear Regulatory
2   Commission with licensing authority over PG&E with the threat
3   of taking away PG&E's licensing to operate a nuclear plant.  I
4   mean, the cases where state action has been found are so far
5   afield from what we have here.
6       Ms. Fiala suggests that, you know, well, there was some
7   threat to take away Section 230 protection from the social
8   media platforms if they didn't do something differently.  Well,
9   if you actually look at the materials that they've cited,
10  you know, there are only four or five statements that -- even
11  in the mountains of exhibits they submitted, where there was
12  even a mention of Mr. Trump's account and some desire to do --
13  that his account be moderated, that there be different
14  editorial decisions with respect to it.
15      There were a couple of tweets from Kamala Harris while she
16  was a candidate for president, and there were a couple of
17  statements, one by Blumenthal, one by Markey, at these
18  hearings.  But even those statements didn't connect:  Oh, take
19  down Mr. Trump's account with -- and, if you don't, you're
20  going to lose Section 230; you're going to go to jail.
21      There is nothing like that at all.  And so the allegations
22  are really -- are really extremely paltry, and --
23          **THE COURT:**  On that issue, though -- so let's just
24  talk out loud among friends here for a moment.
25      Assuming that I end up dismissing -- and I don't know yet,

1  but assuming that I do, we have a long policy and practice of

2  allowing amendments.

3       What's your position on whether that should be afforded to

4  the plaintiffs?

5       **MR. CAROME:** It should not be, Your Honor. They've

6  already amended once, and they appeared to have a lot of time

7  to collect mountains of paper where they've just combed through

8  every news article, every congressional hearing, everything

9  they could find. And the paltry things they have come up with

10  are really nowhere close. If there was something more here to

11  show that Twitter was, in fact, coerced, that this decision was

12  not Twitter's decision, they would have found it.

13       You know, even after, you know, they put in a mountain of

14  paper with their motion for preliminary injunction, they put in

15  another mountain with their opposition. Now, a lot of folks

16  might say that's improper, but we don't quarrel with that. I

17  mean, they -- we're happy to have the Court look at the full

18  record that they put in. And it's a big record.

19       There is just -- there is no "there" there. There is

20  nothing to suggest coercion.

21       **THE COURT:** Okay. If I -- Ms. Fiala, what are your

22  thoughts about, if you had a chance to amend, do you feel like

23  you have some facts you could add on the state actor point?

24       **MS. FIALA:** Yes, Your Honor. We feel we have more

25  than enough facts presently, especially if the Court admits the

1  material that we've submitted with our request for judicial

2  notice, especially the many statements -- coercive statements

3  included at Exhibit A to the request for judicial notice.  But

4  we would certainly be able to adduce additional facts upon

5  amendment.

6      There has been one previous amendment, but it was not in

7  response to a motion to dismiss.  It was a voluntary amendment.

8  This is the first time the complaint has been tested on a

9  motion to dismiss.

10      Your Honor, if I may --

11          THE COURT:  You do feel like you have facts you could

12  allege?

13          MS. FIALA:  Yes, Your Honor.  We --

14          THE COURT:  Not presently in the current complaint?

15          MS. FIALA:  We certainly have facts we could allege

16  that are not in the current complaint.

17          THE COURT:  Okay.  All right.  I would like to move to

18  Section 230.  Is there anything else you want to add on --

19          MS. FIALA:  Your Honor, if I may --

20          THE COURT:  Yes.

21          MS. FIALA:  I would like to respond briefly to

22  Mr. Carome's comments and then move on.

23          THE COURT:  Sure.

24          MS. FIALA:  I mentioned at the outset that there are

25  different tests or theories for application of state action.

PROCEEDINGS

1     *Heinicke* and the other cases that Your Honor asked about

2    were based on -- *Sutton* in the Ninth Circuit as well -- were

3    based on a plaintiff coming in and saying, This defendant has

4    acted pursuant to a law of general applicability.

5     In *Sutton*, the plaintiff said, This employer has asked me

6    to give them my Social Security number.  That's under

7    compulsion by federal law because the Federal Government

8    requires employers to ask Social Security numbers from

9    employees.

10     In *Heinicke*, the professor who was terminated said, I was

11    terminated because the University of Santa Clara complied with

12    the law of general applicability, that is, federal

13    antidiscrimination laws.

14     That is nothing like the facts that we have alleged here,

15    where threats made --

16     **THE COURT:**  I understand your point, but the case I

17    was trying to highlight -- may have come out differently than I

18    intended -- was *American Family*.  And that is where the Board

19    of Supervisors of the City and County of San Francisco, in

20    which you currently stand, took a very strong position on

21    statements about LGBT orientation that Christian groups had

22    been putting out, and said that they were anathema to the Board

23    of Supervisors' views to human rights and a number of other

24    things; encouraged media outlets not to run them; encouraged

25    people not to support the Christian group.

PROCEEDINGS

1          To be honest, at least at, you know, some level of

2     generality, pretty similar to the allegations in your

3     complaint.

4          And the circuit had no problem concluding that the

5     comments by the Board of Supervisors, the legislative body

6     locally, was not anywhere close to being the type of coercive

7     conduct that might -- might amount to state action.

8          So --

9          **MS. FIALA:**  Your Honor --

10         **THE COURT:**  Anyway -- yes.  Go ahead.

11         **MS. FIALA:**  The existence of Section 230, the fact

12    that Congress passed 230, and Congress can take it away, makes

13    a critical dispositive difference between supervisors and the

14    Mayor of San Francisco standing on the steps of City Hall

15    saying, "This is distasteful.  This is awful.  We don't support

16    this."

17         This social media platform industry exists only because of

18    Section 230.  Twitter and the other social media platforms

19    disclosed in their Forms 10-K that repeal or modification of

20    Section 230 would have a material adverse effect.  It's a

21    material adverse business risk.  And that's in our request for

22    judicial notice, Your Honor.  They themselves recognize and

23    highlight to their investors the importance of Section 230.

24         A congressional hearing, where the very legislators who

25    have the power to take away that immunity, say:  We are going

1  to compel you, compel you to toe the line at risk.

2      And that is a quote:  Compel you, at risk of losing your

3  immunity to moderate -- i.e. remove -- content that we find,

4  quote/unquote, misleading.

5      Misleading because it disagrees with the official

6  narrative.  That is a world of difference from what occurred in

7  San Francisco.

8          **THE COURT:**  I'm struggling with how so, because -- and

9  this is a little bit outside the corners of the complaint.

10 But, under *Twombly* and *Iqbal*, we don't consider complaints in a

11 vacuum.  But, you know, at various points, we all certainly

12 know -- I certainly have seen both parties threatening to take

13 away all sorts of things from groups that they have an issue

14 with.

15     And I cannot say -- and I don't think you can -- as a

16 matter of historical fact that it's Democrats alone who have

17 threatened to take away Section 230 immunity for online conduct

18 that one or another legislator didn't like.  Certainly

19 Republicans have said the same thing.

20     So, when it's a bipartisan issue like that, and at the end

21 of the day, it's just individual politicians speaking with no

22 actual consequence in terms of something coercive happening, I

23 think they are free to say what they want, and it doesn't make

24 Twitter a state actor.

25     It's just -- it's a big jump.  I'm not sure you're jumping

PROCEEDINGS

1    at --

2         **MS. FIALA:**  Your Honor, I believe that we already

3    have, and certainly could, upon amendment, allege more facts

4    showing coercion than any other state action case of which I am

5    aware.

6      And I'd ask the Court:  If this is not state action, does

7    that doctrine still exist?  Under what circumstances could one

8    find state action under the compulsion theory if not based on

9    the facts as alleged here?

10        **THE COURT:**  Oh, I think the cases are replete with

11    examples where state action could be found in the presence of

12    actual coercive, prosecutorial, criminal regulatory

13    consequences that have not been alleged here.

14      But if we may, Ms. Fiala, I would like to go to

15    Section 230 --

16         **MS. FIALA:**  Yes, Your Honor.

17        **THE COURT:**  -- and the constitutional challenge to

18    Section 230.

19      You know, this is a relatively recent decision that came

20    out.  Let me just get it here.  Ah.  Came out about 10 months

21    ago, April of 2021.  It is, of course, unpublished, and so it's

22    not necessarily the law of the land for the Ninth Circuit.

23      But in *Lewis v. Google*, which is at 851 Federal

24    Appendix 723, 2021, the plaintiff there brought exactly the

25    same challenge that you are alleging here to the

PROCEEDINGS

1  constitutionality of CDA Section 230.  The plaintiff in that

2  case, Lewis, alleged that Google had removed videos, canceled

3  advertising, sharing, and engaged in shadow banning in

4  connection with, I guess, YouTube in a way that the plaintiff

5  thought was viewpoint discriminatory.

6      So he tried to bring a constitutional challenge to

7  Section 230, and the Circuit said, plain as day, that, quote,

8  (as read):

9          "Section 230 does not apply to plaintiff's

10         conduct or provide a mechanism for sanctions that

11         could affect the plaintiff.  Instead, it provides

12         immunity to providers of interactive computer

13         services against liability arising from content

14         created by third parties.  As a result of that, the

15         plaintiff had no standing under Article III to seek a

16         declaration that Section 230 was unconstitutional."

17     As I said, it's unpublished.  The reasoning is sound, in

18  my view.  Why should I not -- why is that not the end of the

19  question for you?

20     **MS. FIALA:**  Your Honor, we agree that Section 230

21  provides no immunity for the defendants against the federal

22  claims, the First Amendment claim, that we have alleged.  But

23  we also have state law claims.  And although the defendants

24  have not yet pled an affirmative defense under Section 230, it

25  is reasonable and predictable that they will do so.

1       The state law claims, especially -- particularly the claim

2 under the Florida Stop Social Media Censorship Act, alleged

3 that by applying content moderation standards inconsistently,

4 the defendants have censored plaintiffs' speech, at the same

5 time allowing other content which is a violation of their terms

6 of service to remain on the platform.

7       **THE COURT:**  I may have -- I appreciate that.  And

8 you'll have a chance to talk about that.  But this is going to

9 whether you have standing -- you have challenged the

10 constitutionality of Section 230, I think; is that --

11       **MS. FIALA:**  Yes, Your Honor.

12       **THE COURT:**  So what I want to kind of focus on now is,

13 how is it, in light of *Lewis* and similar cases, you have

14 standing to bring that -- Article III standing to bring that

15 claim?

16     That's what I'm focusing on now.

17       **MS. FIALA:**  Yes, Your Honor.

18     The Supreme Court, in a case called *Gonzales v. Carhart*,

19 said that a preenforcement as applied challenge to a statute

20 can be maintained and that standing exists because a

21 particular -- in a discrete and well-defined instance, a

22 particular condition either has occurred or is likely to

23 concur [sic].

24     In *Blum v. Yaretsky*, one of the leading state action

25 cases, the Supreme Court said, "One does not have to wait the

1    consummation of a threatened injury" to avoid -- "to obtain

2    preventative relief."

3        The question becomes whether the perceived threat is

4    sufficiently real and immediate to show an existing

5    controversy.

6        Defendants have not waived the Section 230 immunity

7    defense, and unless they are willing to do so, it is entirely

8    predictable that if the Court dismisses the claim based on

9    standing, the very next thing the defendants are going to do is

10   to assert that claim as a defense.

11       At a minimum, Your Honor, we would ask the Court to hold

12   decision on standing in abeyance until defendants are put to

13   the test.  They either waive 230 -- I doubt very much they'll

14   do that -- or they assert it, at which point if standing -- if

15   we need that additional step to be taken for standing to exist,

16   we would clearly have standing.

17       But we are, literally, in a catch-22 at this point.  We

18   know they are going to assert 230.  I'd respectfully submit

19   that if Your Honor were to ask defendants today whether they

20   waive 230 immunity to the state law claims, they would decline

21   to do so; but they haven't done it yet.

22       We predict, as the Supreme Court said in *Gonzales v.*

23   *Carhart*, that this particular condition is likely to occur, and

24   we believe that that is sufficient at this time because the

25   affirmative defense is obvious and can be seen on the face of

1    the pleadings.

2          **THE COURT:**  Well, the point I was maybe not artfully

3    making is *Lewis* said, when in the face of an actual challenge

4    to the constitutionality by Section 230, the plaintiff, who is

5    pretty much in the same position as your client, had no

6    standing to sue.  So I don't think we have to wait on anything.

7    *Lewis* says, when it happens, it ain't going to happen.

8          So, anyway, Defendants, do you have any -- yeah.

9          **MR. CAROME:**  Yes, Your Honor.  This is a

10   straightforward question of Article III standing.

11         The only way that -- there is a path, if this case has a

12   life beyond where it is now -- which I hope it doesn't -- where

13   Section 230 might come up.

14         But three things would have to happen before that could

15   happen:  The plaintiffs would have to have stated a claim that

16   survives a motion to dismiss; the defendants would have to

17   actually elect to assert to defend the claim on that basis; and

18   then the plaintiffs, if they then argue that application of the

19   defense to that claim somehow would deprive them of a

20   constitutional right, then, as in any affirmative defense

21   situation, the Court could reach that question.

22         But, as a matter of Article III jurisdiction and just for

23   the scope of the Declaratory Judgment Act, there is no basis

24   whatsoever for the Court to just have a free run at the

25   constitutionality of a federal statute when --

PROCEEDINGS

1         **THE COURT:** I think maybe a better way of putting it

2 is: It's not me; it's plaintiff. The plaintiff does not have

3 standing to present the issue to me. Yeah.

4         **MR. CAROME:** Correct.

5         **THE COURT:** Mr. Sur, would you want to add anything to

6 that?

7         **MR. SUR:** Thank you, Your Honor. If I may, just very

8 briefly. I'm a little bit --

9         **THE COURT:** Focusing in on -- I'm happy to hear

10 whatever you have, but I was really kind of lasering in on the

11 standing point.

12         **MR. SUR:** Certainly.

13     And to that point, what I'm a little bit surprised about

14 is that I thought there were papers that there was agreement on

15 this point at this stage in the case, because, when the

16 plaintiffs responded to the United States's memo, as they did

17 relatively recently, they said there -- this is the

18 next-to-last page of that brief -- that the plaintiff agrees

19 with the U.S., that the Court need not decide the

20 constitutionality of Section 230 in the case at bar.

21     I took that sentence to have essentially solved the

22 problem as far as the very limited intervention by the United

23 States was concerned.

24     The next sentence says that, "Yet, if the statute is later

25 asserted by the defendants, the Court should invalidate it."

PROCEEDINGS

1  That would be anticipating or questioning of constitutional
2  law, which is contrary to the Avoidance Doctrine, among other
3  problems, including standing.
4      So I think that wouldn't be a course that's consistent
5  with the precedent, Your Honor, but certainly a decision now
6  that there is an Article III standing doesn't preclude the
7  development of some configuration of circumstances where the
8  plaintiff might have standing.
9      But, as I say, I'm a little bit surprised by the
10  disagreement right now because I thought, from the papers, that
11  there was agreement that this constitutional question was --
12      **THE COURT:**  Well, it's more than entirely clear to me.
13  And I think Ms. Fiala is suggesting that it's still at issue,
14  but --
15      **MS. FIALA:**  If I may respond to that specific --
16      **THE COURT:**  Sure.
17      **MS. FIALA:**  Our intention -- and let me say in the
18  papers -- was to say that the Court did not need to decide the
19  merits of the unconstitutionality issue.
20      We were not making any concession about standing or lack
21  of standing.  But we are going to be in, literally, a catch-22.
22  I would stake my -- a significant portion of my savings on the
23  fact that if the case goes further, we're going to get a
24  Section 230 defense, and at that point, we would have had
25  standing, unless this claim has been dismissed.

PROCEEDINGS

1    So, again, at a minimum, I would ask Your Honor to hold in

2   abeyance the determination of standing until defendants are put

3   to the test of either pleading it or not.

4        **THE COURT:**  Okay.  All right.  Moving from sort of the

5   more federal points into the state issues, I don't really have

6   too much.  The papers, I thought, were quite thorough.  I don't

7   have too much to ask.

8    I just -- with respect to the Florida unfair practices

9   claim -- and the plaintiffs' claim sort of hangs on the

10  deception aspect of that statute.  The FDUPTA -- I can't figure

11  out a good way of saying that.

12       **MS. FIALA:**  "FDUPTA," Your Honor.

13       **THE COURT:**  It doesn't -- it's not musical to the ear.

14   You know, Twitter, like every social media site

15  everywhere, is pretty clear that -- in the terms of service

16  that you have to accept before you can do anything on the

17  website that the company has the right to suspend or terminate

18  accounts at any time for any or no reason, I think the terms of

19  service say.

20   With that much sunshine, how can anybody say they were in

21  the dark about Twitter's practices?

22       **MS. FIALA:**  Twitter does have extensive conditions for

23  content moderation which they've attached in -- to counsel's

24  declaration on the motion to dismiss, setting forth numerous

25  conditions and circumstances under which they purport to

**PROCEEDINGS**

1  moderate content.

2       What they haven't disclosed -- and this is a

3  nondisclosure-based claim.  What they haven't disclosed is that

4  they, in fact, selectively moderate or remove content based on

5  the political perspective or other perspectives, unpopular

6  perspectives, that are involved, while allowing other content,

7  for example, the Ayatollah of Iran and the Taliban, to maintain

8  Twitter accounts that, on their faces, equally violate -- or

9  not equally -- more -- much more egregiously violate the terms

10 of service.

11      So the nondisclosure at issue is the fact that the

12 content -- extensive content moderation policies are, in fact,

13 applied selectively and at the whim and discretion of Twitter.

14      Your Honor, if I may, on the Florida claims, there is one

15 point that I think is critical to the choice of law questions,

16 and I don't think it came out clearly in the briefing.

17      The Florida unfair competition Law, "FDUPTA," is

18 fundamentally different than California's Unfair Competition

19 Law.  It is a private attorney general statute.  It allows any

20 user of the service to bring a legal challenge, whether or not

21 they are personally impacted, simply for -- if they are

22 aggrieved, simply to vindicate/validate the rights of other

23 users.

24      And the courts in this Florida have held that "aggrieved"

25 literally means a person angry or sad on grounds of perceived

1  unfair treatment.

2       **THE COURT:** Well, I think I'm good on choice of law.

3  But my point is, I'm just having a hard time seeing how any of

4  this matters if Twitter expressly says: Before you can do

5  anything on the website, please be advised we can suspend your

6  account and do anything else we want for, quote, "any or no

7  reason at all at any time."

8      I just -- I don't see any room for anybody to say that

9  they felt deceived by having something taken down when you have

10  that broad of a scope of action.

11       **MS. FIALA:** Twitter also says that its terms of

12  service are part of its contract with its users, and the

13  content moderation statements in its terms of service are

14  material and extensive. And if Twitter takes that position,

15  they are, on their face, omitting to add the key fact that

16  these content moderation policies apparently are meaningless.

17  They are not what Twitter is going to apply at all. Twitter is

18  going to be subjective.

19      Twitter is going to apply -- as Twitter recently -- a

20  couple of years ago said in a San Francisco Superior Court

21  proceeding in front of Judge Harold Kahn, to its counsel, that

22  Twitter can take someone off of its platform if it doesn't like

23  the fact that the person is a woman or gay.

24      Well, that is nowhere in their content moderation

25  policies. If they -- not to say we can take someone off the

PROCEEDINGS

1   platform because the user is a woman or gay or Republican, and

2   they ought to disclose that that's a factor that they're --

3       **THE COURT:** Well, I don't know anything about that

4   case. It's interesting to hear about. But, when Twitter says,

5   "for any or no reason," that's pretty limitless.

6       Anyway, may I hear from the defendants on this?

7       **MR. HOLTZBLATT:** Thank you, Your Honor. Ari

8   Holtzblatt. I'll be addressing the state law claims.

9       And, if I may, let me address both the merits that

10  Your Honor raised and the choice of law briefly -- issue --

11  unless Your Honor would prefer I not.

12      **THE COURT:** I think I'm good on choice of law, but I

13  would like to hear about the substantive -- I guess FDUPTA.

14      **MR. HOLTZBLATT:** Of course, Your Honor.

15      As Your Honor indicated, to establish a claim under FDUPTA

16  as to establish a claim under the California UCL, which we do

17  believe should apply here, the plaintiff must establish an

18  actor or actress is, quote, "likely to deceive a consumer

19  acting reasonably in the same circumstances."

20      And a deception claim such as this one, that's sounding in

21  fraud, must satisfy Rule 9(b), which sets a heightened pleading

22  standard.

23      And both of those barriers set an impossible barrier for

24  the plaintiffs' claim for the very reason that Your Honor

25  highlighted, which is that, in the terms of service, Twitter

PROCEEDINGS

1   makes clear that it is not going to -- and really can't, given

2   the fire hose of information that is on the Internet and on the

3   Twitter platform -- and that makes any content moderation

4   exercise an extraordinarily difficult one; that it is not going

5   to be able to apply its content moderation policies with

6   perfect consistency.  It doesn't purport that it will.

7        And, really, the plaintiffs' claim here is predicated on

8   the notion that there is some perceived inconsistency in how

9   Twitter has carried out its policies.

10       It makes clear in the rules themselves, for example, in

11  the Glorification of Violence Policy, which is attached as

12  Exhibit B to the Sprankling declaration, or the Civic Integrity

13  Policy or the COVID Misleading Information Policy, all of which

14  are attached to the Sprankling declaration.  Twitter makes

15  clear that how it enforces its rules will, quote, "depend on

16  the severity of the violation and the account's previous

17  history of violations."  Twitter uses the terms, "we may take

18  this action."  "We may under this circumstance."

19       Twitter is making clear that it is going to have to apply

20  some discretion.  It has a large number of individuals who

21  carry out those policies.  There is going to be -- there is not

22  going to be perfect consistency, and I think that's one of the

23  reasons why, in the terms of service themselves, which were

24  also attached to the Sprankling declaration, there is the

25  language that Your Honor quoted, "We may remove content for any

PROCEEDINGS

1    or no reason at all."

2         And there is other language, including the statement that

3    Twitter may not -- not we are going to every time, but we may

4    take action when we determine that there has been a violation

5    that we reasonably believe violates our rules, but we also may

6    not monitor or control certain content.

7         Twitter warns users that we sometimes are going to do

8    this, and we are sometimes not go to do this.  And frankly,

9    that's just the nature of the exercise of having to moderate

10   content when you have hundreds of millions of users and, by

11   necessity, have to moderate content across a broad array.

12   Under those circumstances, no reasonable consumer would be

13   deceived by the fact that there happens to be a perceived

14   inconsistency.

15        The last point I'll make on this, Your Honor, is that, to

16   the extent that what plaintiffs are claiming is that what was

17   omitted was something having to do with Twitter carrying out

18   its moderation at the direction of or under the coercive force

19   of the Government, that really -- that the failure of that

20   claim collapses with the failure of the state action claim.

21        There is -- as my colleague, Mr. Carome, has already

22   explained, there is no plausible allegation of state action.  I

23   think, therefore, there can be no plausible allegation of

24   having omitted that Twitter was acting at the direction of the

25   state.

PROCEEDINGS

1    So unless Your Honor has questions about --

2         THE COURT:  You know, my other question is on that

3    Florida -- that social media statute.  I guess it's the SSMCA,

4    so I know the district court in the Northern District of

5    Florida struck it down.

6         What's the status of the appeal right now?  Do you know?

7         MR. HOLTZBLATT:  The status of what?

8         THE COURT:  To the Eleventh Circuit.

9         MR. HOLTZBLATT:  That oral argument has been

10   scheduled, and that appeal just was scheduled for April 28th.

11        THE COURT:  April 28th?

12        MR. HOLTZBLATT:  Yes.

13        THE COURT:  Okay.  All right.  Then it could be not

14   until the end of year that that comes out.  I have read the

15   decision and looked at the statute.  I'm not making any

16   findings on it right now because it's not on the books.  It's

17   been struck down.

18        But I certainly had some constitutional concerns after

19   looking at, for example, how censor -- quote/unquote, "censor"

20   is defined by the statute was awfully broad.

21        I do have just one sort of technical question.  I'm kind

22   of reluctant even to mention it because the statute has been

23   taken off the books for the moment at least.

24        A user under the SSMCA is defined as a Florida resident

25   who had an account on or after July 2021; is that right?

PROCEEDINGS

1    **MR. HOLTZBLATT:** That's correct, Your Honor.

2    **THE COURT:** Okay. So no matter what happens, that

3    claim would be solely limited to Florida residents.

4    **MS. FIALA:** We agree, Your Honor. We are only -- we

5    have four -- five -- four Florida plaintiffs, including the

6    former president. The claims are -- under that statute are

7    brought solely on their behalf at this time.

8    Your Honor, the question Your Honor has asked is a

9    fundamental question of contract interpretation.

10   **THE COURT:** Yeah. Which one? Are we talking about --

11   **MS. FIALA:** The question about Twitter can moderate

12   content for any reason, whether you're a woman; whether you're

13   gay; whether you're Republican?

14   **THE COURT:** This is for the Deceptive Practices Act;

15   is that fair?

16   **MS. FIALA:** Yes, Your Honor. The SSMCA, by the way,

17   is a part of FDUPTA.

18   **THE COURT:** Yes.

19   **MS. FIALA:** Yes.

20   But the question you've asked, Your Honor, is a

21   fundamental question of contract interpretation. If that

22   interpretation is correct, then all of the many pages of

23   content moderation policies that were attached to the

24   declaration submitted with the motion to dismiss are mere

25   surplusage. They're part of the contract. They're mere

PROCEEDINGS

1  surplusage.  They mean nothing, violating canons of contract

2  interpretation.

3      And I'd submit, Your Honor, that that's not a question --

4  that contract interpretation question is not one for resolution

5  without a factual record on a motion to dismiss.

6          **THE COURT:**  Well, it's an interesting point.  As a

7  matter -- it is typically the case a contract interpretation is

8  a matter of law just for the Court.  So it usually almost

9  always is done legally and often at the 12(b)(6) stage.

10         **MS. FIALA:**  Yes, Your Honor.  There may be evidence

11  going to the meaning and proper interpretation of the contract

12  provisions.  However, that's not submitted at this time and

13  might be more appropriate on summary judgment.

14      Your Honor, before we close, I do have a technical request

15  of my own, which is -- we have submitted a request for judicial

16  notice.  The materials attached to the RJN are all judicially

17  noticeable, as explained in Mr. Popovici's declaration, and

18  we'd ask the Court to grant the request so that those materials

19  are part of the record.

20         **THE COURT:**  I will take that under submission, along

21  with the motion to dismiss.  I'm not going to take any argument

22  or decide the preliminary injunction motion at this time until

23  we know that the claims are plausible on the merits.

24      You both have approved -- or both have proposed, jointly,

25  to stay discovery.  That seems fine with me.  Should we just do

PROCEEDINGS

1   that?  Let's just -- in fact, can we just put everything on ice

2   until I get my order out?  I don't see any reason why --

3           **MS. FIALA:**  Yes, Your Honor.

4           **THE COURT:**  You okay with that, Plaintiffs?  Yes?

5           **MS. FIALA:**  Good.

6           **THE COURT:**  Good?

7       Defendants, you're okay with that?

8           **MR. HOLTZBLATT:**  Yes, Your Honor.

9           **THE COURT:**  Also, we can defer any alternative dispute

10  resolution as well.  I'll be happy -- you're certainly free to

11  do it, but -- you know, we have a very good program here in

12  this district.  I'm just not going to trigger it for right now.

13      Okay.  So it will take me a little bit of time to get this

14  thing done.  We have this important case -- all the cases are

15  important.  You know that.  Everybody has a stake in their

16  cases.

17      And our district filings are up 25 percent last year,

18  which is -- for this district, which is one of the busiest in

19  the country, that equates to thousands of new cases that we had

20  not had before.  Just last month, I got -- just last -- just in

21  January alone, I got 70 new cases.

22      And so I'll get it out when I can, but it won't be

23  tomorrow.  Okay?

24          **MS. FIALA:**  Thank you, Your Honor.

25          **MR. CAROME:**  Thank you, Your Honor.

PROCEEDINGS

```
 1          THE COURT:  Just a long pitch to give the judge a
 2   break.  It won't be tomorrow.  Okay.
 3       Anything else from the defendants?
 4          MR. CAROME:  I would just say one thing, Your Honor.
 5   Patrick Carome.
 6       On the question of amendment, I think there has been a lot
 7   of time here, and Ms. Fiala has said a couple of times, "Oh,
 8   there is more we could add."  I would suggest that if she isn't
 9   able to identify something now as to what more there is out
10   there that's so different in kind from what we've -- has
11   already been alleged, I think it's important that we not be put
12   to the task of continuing the life of this case if there is not
13   really something more and quite different.
14          THE COURT:  Okay.  Ms. Fiala?
15          MS. FIALA:  There are extensive additional facts.
16   There are congressional hearings on this content moderation
17   policy that we did not reference in our first amended
18   complaint.  There are exhaustive factual materials submitted in
19   connection with the preliminary injunction motion, many of
20   which were not referenced in the first amended complaint.
21       I can't detail them for the Court, but --
22          THE COURT:  That's okay.
23          MS. FIALA:  -- I'd make the representation that --
24          THE COURT:  We don't require people to do that.  It's
25   just -- what I need to hear -- or what I'm interested in
```

PROCEEDINGS

1    hearing, I should say, is whether you have a good-faith belief

2    that there are additional facts.  And I'm hearing that you

3    believe that you do, and I will take that into account --

4              **MS. FIALA:**  Thank you, Your Honor.

5              **THE COURT:**  -- and we'll see.

6         All right.  Thanks very much, everyone.  This has been

7    very useful.  And I'll have this out when I can.

8              **MS. FIALA:**  Thank you, Your Honor.

9              **MR. CAROME:**  Thank you, Your Honor.

10             **THE CLERK:**  All rise.  Court is in recess.

11             (Proceedings adjourned at 12:00 p.m.)

12                         ---o0o---

13             **CERTIFICATE OF REPORTER**

14        I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   DATE:   Monday, July 11, 2022

18

19

20

21   _____

22        Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
               Official Reporter, U.S. District Court

23

24

25