**Case No. 22-15961**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD J. TRUMP, the Forty-Fifth President of the United States;
LINDA CUADROS; AMERICAN CONSERVATIVE UNION; RAFAEL BARBOSA;
DOMINICK LATELLA; WAYNE ALLYN ROOT; NAOMI WOLF,
*Plaintiffs-Appellants,*

v.

TWITTER, INC.; JACK DORSEY,
*Defendants-Appellees,*

and

UNITED STATES OF AMERICA,
*Intervenor-Appellee.*

_____

*Appeal from the United States District Court for the Northern District of California (San Francisco),*
*Case No. 3:21-cv-08378-JD · The Honorable James Donato, District Judge*

## APPELLANTS DONALD J. TRUMP, AMERICAN CONSERVATIVE UNION, RAFAEL BARBOSA, LINDA CUADROS, DOMINICK LATELLA, AND WAYNE ALLYN ROOT'S OPENING BRIEF

JOHN P. COALE
2901 Fessenden Street NW
Washington, D.C. 20008
Telephone: (202) 255-2096
johnpcoale@aol.com

ALEX KOZINSKI
719 Yarmouth Road, Suite 101
Palos Verdes Estates, CA 90274
Telephone: (310) 541-5885
alex@kozinski.com

ANDREI POPOVICI
MARIE L. FIALA
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd., Suite 290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
andrei@apatent.com
marie@apatent.com

*Attorneys for Plaintiffs-Appellants,*
*Donald J. Trump, the Forty-fifth President of the United States;*
*Linda Cuadros; American Conservative Union; Rafael Barbosa;*
*Dominick Latella; Wayne Allyn Root*

**Additional Counsel Listed on Signature Page**

 COUNSEL PRESS · (213) 680-2300          PRINTED ON RECYCLED PAPER 

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. Proc. 26.1, the undersigned certifies that Plaintiff American Conservative Union does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

Date:  December 9, 2022

Law Office of Andrei D. Popovici, P.C.


*s/ Marie L. Fiala*
Marie L. Fiala

*Attorneys for Appellants*
*Donald J. Trump, American Conservative*
*Union, Rafael Barbosa, Linda Cuadros,*
*Dominick Latella, and Wayne Allyn Root*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT .................................................................... i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ..........................................................4

ISSUES PRESENTED............................................................................5

STATUTORY AUTHORITIES ...............................................................5

STATEMENT OF THE CASE.................................................................5

     I.     Threats and Inducements by Congressional Democrats ......................7

     II.     Executive Branch Actions to Censor Speech......................................10

     III.     Concerted Action by Defendants and Government Actors.................13

     IV.     Procedural Background .....................................................................18

SUMMARY OF ARGUMENT ...............................................................18

ARGUMENT .......................................................................................21

     I.     The District Court Erroneously Concluded That Plaintiffs Had Not Plausibly Alleged Facts Giving Rise to State Action .........................21

          A.     Legal Standards.........................................................................21

               1.     Standards Governing a Rule 12(b)(6) Motion...............21

               2.     Standards Governing a State Action Determination ......22

          B.     The District Court Failed to Apply the Correct Legal Test for Pleading State Action.................................................................23

ii

1. The District Court Erred by Failing to Assess Plaintiffs' Showing Under *Brentwood* ...............................................24

2. The District Court Also Failed to Apply *Lugar* Correctly ...........................................................................28

3. The District Court Erroneously Held That Defendants Must Have Been Motivated by Governmental Coercion...........................................................................30

C. Plaintiffs Have Met the *Lugar* Test, However Construed ........32

1. "Exercise of a Right or Privilege" ...................................32

2. "Rule of Conduct" ...........................................................34

D. The District Court Erroneously Concluded That the Extensive Record of Government Threats Did Not Amount to Coercion ................................................................................35

1. Plaintiffs Have Pleaded Ample Facts Showing Coercion.............................................................................35

2. The District Court Erred in Holding That This Extensive Record Did Not Meet the Threshold for Pleading Coercion...........................................................43

(a) The District Court Failed to Properly Credit Plaintiffs' Allegations .............................................43

(b) The District Court Erroneously Concluded That Legislative Threats to Repeal Section 230 Could Not Constitute Coercion ..............................44

3. The District Court Wrongly Concluded That the Plaintiffs' Allegations Were Insufficient Compared to the Facts of *Bantam Books*, *Lombard*, *Carlin*, and *Mathis* ......................................................................47

4. Plaintiffs Do Not Rely on Compliance with Generally Applicable Laws ..........................................................52

E.    Plaintiffs Also Adequately Alleged State Action by
      Encouragement and Joint Action .................................................53

      1.    Encouragement ...............................................................53

      2.    Joint Action.....................................................................54

II.   The District Court Erred in Applying California Law.......................57

III.  Plaintiffs Have Standing Under the SSMCA ......................................58

CONCLUSION ...........................................................................................60

CERTIFICATE OF COMPLIANCE .......................................................62

STATEMENT OF RELATED CASES .....................................................63

ADDENDUM

# TABLE OF AUTHORITIES

**CASES**                                                          **Page(s)**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)......................................................................55

*Ahearn v. Mayo Clinic*,
   180 So. 3d 165 (Fla. Dist. Ct. App. 2015).....................................57

*American Family Ass'n v. City of San Francisco*,
   277 F.3d 1114 (9th Cir. 2002) .................................................23, 36

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................21

*Aubrecht v. Penn. State Policy*,
   389 F. App'x. 189 (3d Cir. 2010) .................................................29

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) .........................................31, 35, 42

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)............................... 36, 41, 47, 48, 49, 50

*Bell Atl. Corp v. Twombly*,
   550 U.S. 544 (2007)......................................................................22

*Biden v. Knight First Amendment Institute at Columbia Univ.*,
   141 S. Ct. 1220 (2021)..................................................................37

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)...............................................................35, 53

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001).............................................................*passim*

*Brodheim v. Cry*,
   584 F.3d 1262 (9th Cir. 2009) ....................................................36

*Burton v. Wilmington Parking Auth.*,
   365 U.S. 715 (1961)......................................................................23

*Californians for Disability Rights v. Mervyn's LLC*,
   39 Cal. 4th 223 (2006).................................................................57

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
   827 F.2d 1291 (9th Cir. 1987) .........................................30, 47, 50

*City of Homestead v. Johnson*,
    760 So. 2d 80 (Fla. Sup. Ct. 2000) ................................................. 58

*Clayworth v. Pfizer, Inc.*,
    49 Cal. 4th 758 (2010) .......................................................... 57, 58

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ................................................................ 21

*Florer v. Congregation Pidyon Shevuyim*,
    603 F.3d 1118 (9th Cir. 2010) ................................................... 29

*Garnier v. O'Connor-Ratcliff*,
    41 F.4th 1158 (9th Cir. 2022) ................................................... 29

*Garza v. Bandy*,
    293 F. App'x 565 (10th Cir. 2008) ............................................. 29

*Hammerhead Enters., Inc. v. Brezenoff*,
    707 F.2d 33 (2d Cir. 1983) ...................................................... 36

*Heineke v. Santa Clara University*,
    965 F.3d 1009 (9th Cir. 2020) ................................................... 52

*In re Alphabet Securities Litig.*,
    1 F.4th 687 (9th Cir. 2021) ...................................................... 21

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ................................................... 21

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990) ...................................................... 7

*In re Crystal Prop., Ltd.*,
    268 F.3d 743 (9th Cir. 2001) .................................................... 58

*Keates v. Koile*,
    883 F.3d 1228 (9th Cir. 2018) ................................................... 21

*Kirtley v. Rainey*,
    326 F.3d 1088 (9th Cir. 2003) ................................................... 27

*Lee v. Katz*,
    276 F.3d 550 (9th Cir. 2002) .................................................... 27

*Lombard v. State of Louisiana*,
    373 U.S. 267 (1963) ............................... 35, 40, 47, 49, 50, 52

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) ....................................................... *passim*

*Martinex v. UPMC Susquehanna*,
    986 F.3d 261 (3d Cir. 2021) ..........................................................22

*Mathis v. Pacific Gas & Elec. Co.*,
    891 F.2d 1429 (9th Cir. 1989) ........................................ 31, 34, 47, 50, 51, 52

*Mendocino Env. Ctr. v. Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999) ......................................................55

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) ........................................................26

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972)...................................................................34

*Neighborhood Enters., Inc. v. City of St. Louis*,
    540 F.3d 882 (8th Cir. 2008) ........................................................29

*NetChoice, LLC v. Attorney General, Florida*,
    34 F.4th 1196 (11th Cir. 2022) ......................................................59

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) .............................................23, 42, 44

*Packingham v. North Carolina*,
    582 U.S. ___, 137 S. Ct. 1730 (2017) ............................................2

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ......................................................21

*Pasadena Republican Club v. W. Justice Ctr.*,
    985 F.3d 1161 (9th Cir. 2021) ......................................................27

*Patterson v. County of Oneida, N.Y.*,
    375 F.3d 206 (2d Cir. 2004) ........................................................29

*Railway Employees' Dept. v. Hanson*,
    351 U.S. 225 (1956)...................................................................32

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) .................................................41, 42

*Rawson v. Recovery Innovations, Inc.*,
    975 F.3d 742 (9th Cir. 2020) .............................................22, 23, 27

*Reitman v. Mulkey*,
    387 U.S. 369 (1967)...........................................................33, 34, 54

*Roque v. Jazz Casino Co. LLC*,
    388 F. App'x 402 (5th Cir. 2010).................................................29

*Skinner v. Railway Labor Executives' Ass'n,*
    489 U.S. 602 (1989)................................................................32, 54

*Sutton v. Providence St. Joseph Medical Center,*
    192 F.3d 826 (9th Cir. 1999) ........................................ 23, 24, 25, 26, 27, 56

*Terry v. Adams,*
    345 U.S. 461 (1953)................................................................34

*Tsao v. Desert Palace, Inc.,*
    698 F.3d 1128 (9th Cir. 2012) ......................................................54

*United States v. Davis,*
    482 F.2d 893, 904 (9th Cir. 1973) ..................................................52

*United States v. Ross,*
    32 F.3d 1411 (9th Cir. 1994) ......................................................52

*Villegas v. Gilroy Garlic Festival Ass'n,*
    541 F.3d 950 (9th Cir. 2008) ......................................................26

*West v. Atkins,*
    487 U.S. 42 (1988)................................................28, 29, 30, 34

## STATUTES

28 U.S.C. § 1291 ................................................................4

28 U.S.C. § 1331 ................................................................4

28 U.S.C. § 1332 ................................................................4

28 U.S.C. § 2201 ................................................................4

28 U.S.C. § 2202 ................................................................4

42 U.S.C. § 1983 ................................................................24

47 U.S.C. § 230 ............................................................*passim*

Cal. Bus. and Prof. Code § 17200 ....................................................57, 58

Fla. Stat. § 501.201 ................................................................5

Fla. Stat. § 501.211 ................................................................57

Fla. Stat. § 501.2041 ................................................................5, 58, 59

## RULES

Fed. R. Civ. Proc. 12(b)(6) ......................................................18, 20, 21, 23

**OTHER AUTHORITIES**

*FBI Agent Testimony: Warnings of a 'hack and leak' ahead of the Hunter Biden revelations*, THE REACTIONARY (Dec. 6, 2022), https://tinyl.io/7UE6 ........................................................................4

Hans Israel, Erich Ruckhaber, & Rudolf Weinmann, Hundert Autoren Gegen Einstein (One Hundred Authors Against Einstein) (1931). https://archive.org/details/HundertAutorenGegenEinstein ............................2

## INTRODUCTION

This case presents the most important free speech issue of our day: Can government officials use the power of their office to suppress speech they disagree with by threatening, demanding, and colluding with social media platforms (SMPs) to remove ideas from the public square? These officials use SMPs as cat's paws to suppress opinions and information about matters that Americans consider of vital interest—including those that turn out to be correct or at least debatable, such as that the Hunter Biden laptop was authentic, the COVID virus leaked from a laboratory, COVID vaccines provide weak protection that does not outweigh the risk of vaccine injury, and the 2020 election was stolen.

Most people once believed these to be crackpot ideas; many still do. But crackpot ideas sometimes turn out to be true. The earth does revolve around the sun, and it was Hunter Biden, not Russian disinformation agents, who dropped off a laptop full of incriminating evidence at a repair shop in Delaware. Galileo spent his remaining days under house arrest for spreading heretical ideas, and thousands of dissidents today are arrested or killed by despotic governments eager to suppress ideas they disapprove of. But this is not the American way. We believe the path to truth is forged by exposing all ideas to opposition, debate, and discussion. Confident in the wisdom of the American people, we believe ideas that withstand the gauntlet of criticism will flourish. Others will fall by the wayside. $E=mc^2$

1

revolutionized physics, not because it got thousands of likes on Facebook, but because it survived withering criticism by proclaimed experts.[1]

As the Supreme Court recognized, SMPs are "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730, 1737 (2017). Information suppressed on social media cannot reach large segments of the public, rendering discussion and debate of those ideas difficult, sometimes impossible. On their own, SMPs are free to allow or block whatever content they wish. But, as the record documents and recent disclosures confirm, SMPs are not acting on their own. Rather, they are the subjects of bullying, threats, and invitations to collaborate by government actors who wield immense power to harm them if they don't toe the line.

SMPs have very good reasons to fear such threats. They comprise an industry founded on an immensely generous grant of legal protection: Section 230(c) of the Communications Decency Act, 47 U.S.C. § 230(c) ("Section 230"). Congress gave SMPs and other Internet denizens a golden gift enjoyed by no one else in the publishing industry: immunity from liability based on hosting or

---

[1] *E.g.*, Hans Israel, Erich Ruckhaber, & Rudolf Weinmann, HUNDERT AUTOREN GEGEN EINSTEIN (ONE HUNDRED AUTHORS AGAINST EINSTEIN) (1931). https://archive.org/details/HundertAutorenGegenEinstein.

removing content on their platforms. Investors and developers are, naturally, worried about threats to remove that protection and destroy their industry. Powerful governmental actors are well aware of this vulnerability and have exploited it by getting SMPs to do for them what they cannot do directly: censor ideas they fear, thereby precluding large swaths of the public from transmitting, receiving, or debating them.

This is not an arcane First Amendment issue; our democracy itself is at stake. In a poll conducted after the 2020 election, almost half of Biden voters in key states "were unaware of the financial scandal enveloping Biden and his son, Hunter (a story infamously censored by Twitter and Facebook, as well as ignored by the liberal media). According to [the] poll, full awareness of the Hunter Biden scandal would have led 9.4% of Biden voters to abandon the Democratic candidate, flipping all six of the swing states he won to Trump, giving [him] 311 electoral votes."[2] Whether or not one credits such polls, suppression of ideas is unhealthy for a democracy and leads millions of Americans to profoundly mistrust public institutions. This mistrust is exacerbated by recent efforts to establish a Ministry of Truth and to control public discourse on social media by battalions of

---

[2] MJN–164. Plaintiffs have filed concurrently with this brief a Motion for Judicial Notice ("MJN") asking the Court to take judicial notice of the appended judicially noticeable and relevant documents. Page cites to the MJN attachments appear in the form "MJN–xx."

government officials, including FBI agents.  *See FBI Agent Testimony: Warnings of a 'hack and leak' ahead of the Hunter Biden revelations*, THE REACTIONARY (Dec. 6, 2022), https://tinyl.io/7UE6 (FBI Supervisory Special Agent testifies to regularly meeting with Twitter and other SMPs to coordinate "account takedowns"; accounts flagged by FBI always removed by SMPs in part due to "intense pressure from U.S. lawmakers").

The Supreme Court has long recognized that government officials can use their authority to encourage, cajole, co-opt, and intimidate private parties to do their dirty work for them.  In cases dating back almost a century, the Court has held that encouragement, collaboration, or coercion by government officials can convert ostensibly private conduct into state action that is subject to constitutional constraints.  While each situation must be judged on its facts, what happened here crossed far over the line.  The sheer volume and overtness of the public threats involved (to say nothing of the covert communications now coming to light) make this an easy case for finding state action sufficiently alleged.

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction lies pursuant to 28 U.S.C. §§ 1331, 1332(d), 2201, and 2202.  The District Court entered final judgment on June 7, 2022.  1–ER–2.  On June 27, 2022, Plaintiffs timely filed their Notice of Appeal.  3–ER–325–27.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

4

## ISSUES PRESENTED

(1) Whether Plaintiffs adequately alleged state action by means of governmental compulsion of, encouragement of, and/or joint action with Defendants. (2) Whether the District Court erred in dismissing Plaintiffs' claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. §§ 501.201 *et seq.*, based on its choice of law analysis. (3) Whether Plaintiffs sufficiently alleged standing to bring a claim under Florida's Stop Social Media Censorship Act ("SSMCA"), Fla. Stat. § 501.2041.

## STATUTORY AUTHORITIES

Relevant legal authorities appear in the attached Addendum.

## STATEMENT OF THE CASE

The record documents a litany of events where members of Congress and the Executive Branch coerced Defendants to censor certain categories speech on pain of catastrophic legal consequences. 3–ER–335–39. The speech to be censored included content tweeted by President Trump and others questioning the integrity of the 2020 presidential election or communicating information about COVID-19 that departed from Democrats' preferred narratives, such as stating that the virus leaked from a Chinese laboratory or questioning the efficacy and safety of COVID-19 vaccines (collectively, "disfavored content"). 3–ER–YY 338, 342; *see also* 3–ER–343–50, 352–54. These facts have now been established. Twitter's

5

owner and CEO, Elon Musk, has publicly admitted that Twitter acted on orders from the government to suspend Plaintiff Trump's account without any violation of Twitter's terms of service.



https://twitter.com/elonmusk/status/1596275526259425280.



https://twitter.com/elonmusk/status/1598853708443357185.  These admissions are

binding on Twitter. [3]

On appeal from a dismissal order, the following allegations and judicially

noticeable facts must be accepted as true.  The sole issue for this Court is whether

they create a plausible inference of coercion, encouragement, and/or joint action.

## I.     Threats and Inducements by Congressional Democrats

Powerful Democratic legislators threatened to use their official authority to

impose Draconian legal consequences against Defendants and other SMPs if they

did not censor disfavored speakers and speech.  3–ER–335–37.  Democratic

officials overtly threatened sanctions for Defendants' non-compliance, including

repealing Defendants' Section 230 immunity:

> • **Speaker Nancy Pelosi (D–CA), April 12, 2019:**  "It [Section 230]
> is a gift to [tech companies] and I don't think that they are treating it
> with the respect that they should, and so I think that that could be a
> question mark and in jeopardy…. I do think that for the privilege of
> 230, there has to be a bigger sense of responsibility on it.  And it is not
> out of the question that that could be removed." 3–ER–336; MJN–
> 170.

> • **Senator Kamala Harris (D–CA), Sept. 30, 2019:**  "Look, let's be
> honest, Donald Trump's Twitter account should be suspended." 3–
> ER–336.

---

[3] "[A] statement made by a party's agent or servant may be introduced against that
party if it concerns a matter within the scope of the agency or employment and was
made during the existence of the relationship." *In re Coordinated Pretrial
Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 458 (9th Cir.
1990).

• **Senator Kamala Harris (D–CA), Oct. 2, 2019:** "Hey @*jack* [Defendant Dorsey]. Time to do something about this," providing picture of a tweet from President Trump. 3–ER–336; MJN–148.

• **Rep. Cedric Richmond (D–LA)** and **Rep. Jerrold Nadler (D–NY), April 2019:** Warned social media platforms that they had "better" restrict what they saw as harmful content, or else face regulation. **Rep. Richmond:** "We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable." **Rep. Nadler:** "Let's see what happens by just pressuring them." MJN–175–76.

Democratic legislators convened formal hearings to which they summoned Defendant Dorsey and other social media CEOs.[4] 3–ER–337. The coercive, viewpoint-discriminatory statements by legislators at these official proceedings should shock the conscience of any American:

• **Sen. Mark Warner (D–VA):** "[T]he President himself … continue[s] to exploit social media platforms to sow disinformation, engage in targeted harassment, and suppress voter participation. **We can and should have a conversation about Section 230….**" 3–ER–336, 338; MJN–13 (emphasis added).

• **Sen. Richard Blumenthal (D–CT):** "Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media. The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters…. **Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation … I have urged, in fact, a breakup of tech giants because they've misused their bigness and power…. And indeed**

---

[4] These included a Senate Commerce Committee hearing on October 28, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

**Section 230 reform, meaningful reform, including even possible repeal in large part**…. Change is going to come, no question. **Change is on the way and I intend to bring aggressive and targeted reform to Section 230.**" 3–ER–336–38; MJN–16–18 (emphasis added).

• **Rep. Frank Pallone, Jr. (D–NJ):** "The time has come to hold online platforms accountable for their part in the rise of disinformation and extremism…. **[I]t is time for Congress and this Committee to legislate and realign these companies' incentives to effectively deal with disinformation** and extremism…. So when a company is actually promoting this harmful content, **I question whether existing liability protections should apply…. That is why you are here today … Mr. Dorsey….** The time for self-regulation is over. **It is time we legislate to hold you accountable.**" 2–ER–139-40; 3–ER–338 (emphasis added).

• **Rep. Mike Doyle (D–PA):** "Your companies need to be held accountable…. **Ours is the committee of jurisdiction, and we will legislate to stop this.**" 2–ER–144; 3–ER–338 (emphasis added).

• **Rep. Janice Schakowsky (D–IL):** "What our witnesses need to take away from this hearing is that self-regulation has come to the end of its road, and that **this democratically elected body is prepared to move forward with legislation and regulation. Misinformation regarding the election dropped by 73% across social media platforms after Twitter permanently suspended Trump…. The question is, what took so long?**" 2–ER–146–47; 3–ER–338 (emphasis added).

• **Democratic Committee Chairs:** "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation…. Industry self-regulation has failed. **We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation.**" 3–ER–337–38; MJN–40 (emphasis added).

• **Rep. G.K. Butterfield (D–NC): "Congress will have to compel you, compel you perhaps with penalties, to make meaningful**

9

**changes.**" 3–ER–338; MJN–26 (addressing hiring practices; emphasis added).

• **Rep. Doris Matsui (D–CA):** "[T]he companies before us today [including Twitter] aren't doing enough … **I think Congress must revisit Section 230.**" 3–ER–338; MJN–27 (emphasis added).

• **Rep. Darren Soto (D–FL):** "[P]ursuant to 230, you all [YouTube, Twitter, and Facebook] can't be sued.  You have immunity.  But it ain't 1996 anymore, is it?  Meanwhile, lies are spreading like wildfire through platforms.…  And the reason is your algorithms.…  **What specific changes to Section 230 do you support to ensure more accountability?**" 3–ER–338; MJN–29–30 (emphasis added).

• **Rep. Blunt Rochester (D–DE):** "And while we are considering Section 230, what is clear from this hearing is that we should all be concerned by all of your abilities to adequately—and just as importantly, rapidly—**moderate content**." 3–ER–338; MJN–31 (emphasis added).

These threats were effective because they targeted the chink in SMPs' legal armor.  3–ER–335, 338-41, 362.  According to an official congressional source, "[t]hese platforms [Twitter, YouTube, and Facebook] often **ramp up their efforts** against [disfavored] content in response to social and political pressure." 2–ER–117–18, 150 (emphasis added).

## II.  Executive Branch Actions to Censor Speech

Then-candidate and now-President Biden has led this charge on behalf of the Executive Branch, clearly linking adverse government action to calls for more aggressive censorship of disfavored speech by SMPs.  On January 17, 2020, candidate Biden stated in an interview with *The New York Times*: "The idea that

10

it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one.  For Zuckerberg and other platforms."  He further said:  "It should be revoked because it is not merely an Internet company.  It is propagating falsehoods they know to be false…."  3–ER–336; MJN–151.  Then-Senator Kamala Harris made similar threats:  "We will hold social media platforms responsible for the hate infiltrating their platforms….  And if you … don't police your platforms—we are going to hold you accountable…."  3–ER–335; MJN–168.

On July 20, 2021, White House Communications Director Bedingfield announced that President Biden was considering repealing Section 230's liability protections if SMPs did not increase censorship of disfavored viewpoints:

> "The White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms….  The White House is examining how misinformation fits into the liability protections granted by Section 230….

3–ER–352–53; *see also* MJN–172–173.  When asked whether President Biden was considering amending Section 230 to keep social media outlets from spreading false information, Ms. Bedingfield responded:  "We're reviewing that and certainly they should be held accountable.  And I think you heard the president speak very aggressively about this.  He understands that this is an important piece of the ecosystem."  *Id.*

11

Since taking office, the Biden administration has acted aggressively to bully, encourage, and collude with SMPs to censor speech that departs from the "party line" regarding COVID vaccines and treatments, one of the categories of disfavored speech. On May 5, 2021, White House Press Secretary Psaki gave a press conference at which she linked the threat of antitrust enforcement to the demand for more aggressive censorship by SMPs, saying that President Biden "supports … a robust antitrust program," and relating his view "that there's more that needs to be done to ensure that this type of misinformation … is not going out to the American public." MJN–43. On July 15, 2021, Surgeon General Murthy released an advisory regarding "health misinformation." He called on SMPs to "[r]edesign recommendation algorithms to avoid amplifying misinformation," to "build in 'frictions'—such as suggestions and warnings—to reduce the sharing of misinformation," and to "make it easier for users to report misinformation." It further called on SMPs to "[p]rioritize early detection of misinformation 'super-spreaders' and repeat offenders. **Impose clear consequences for accounts that repeatedly violate platform policies.**" MJN–62 (emphasis added). In a July 15, 2021 press briefing, the Surgeon General said that the CDC wanted SMPs to "take action against" those it considers to be spreading misinformation:

> M**odern technology companies have enabled misinformation to poison our information environment** with little accountability to their users…. We're asking them to monitor misinformation more

12

closely.  We're asking them **to consistently take action** against misinformation super-spreaders on their platforms…. [T]hey have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through.

3–ER–348–49; MJN–46–47, 50 (emphasis added).

Ms. Psaki admitted that senior government officials acted in concert with SMPs to censor speech:  "[W]e are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff…."  3–ER–346–48.  She further admitted that "[w]e engage with them [i.e., SMPs] regularly and they certainly understand what our asks are."  MJN–55.  The next day she called for SMPs to coordinate with each other in censoring disfavored speakers:  "You shouldn't be banned from one platform and not others ... for providing misinformation out there."  3–ER–349–52.  Ms. Psaki also demanded that social-media companies "create robust enforcement strategies," "tak[e] faster action against harmful posts," and "promot[e] quality information algorithms," which is a euphemism for algorithms that suppress disfavored messages.  3–ER–349–52.

## III.  Concerted Action by Defendants and Government Actors

Defendant Dorsey admitted at congressional hearings that Defendants "partnered" with the federal government to "share information" and "gather input" to "inform [Twitter's] policy and enforcement decisions," and would continue

13

working with Congress to identify "additional steps [Twitter] can take" to address disfavored information. 2–ER–122, 125–26, 130. The following exchange took place during his appearance at the October 28, 2020 hearing:

> **Sen. Tammy Duckworth (D–IL):** "So in closing, **I would like each witness to provide a personal commitment that your respective companies will proactively counter domestic disinformation that spreads the dangerous lies, such as masks don't work**…. Do I have that commitment from each of you gentlemen?"
>
> **Defendant Dorsey:** "**We make that commitment.**"

MJN–10–11 (emphases added); *see also* MJN–6–7. Similar exchanges occurred at the Nov. 17, 2020 hearing:

> **Sen. Blumenthal:** "**[W]ill you commit to the same kind of robust content modification playbook in this coming election**, including fact-checking, labeling, reducing the spread of misinformation, and other steps, even for politicians in the runoff elections ahead?"
>
> **Defendant Dorsey:** "**Yes, we do.**"
>
> **Sen. Corey Booker (D–NJ):** "[S]pecifically the two gentlemen here, their platforms, Twitter and Facebook…. **I'd like to ask specifically, have you taken any steps to modify your platforms' algorithms to ensure that blatantly false election disinformation posted by election officials and specifically the most powerful person in the United States, Donald Trump, isn't amplified?** … Mr. Dorsey … [d]o you have specific measures that you're taking to prevent your algorithms from boosting false content?"
>
> **Defendant Dorsey:** "**Yes, so many of the labels did change how the algorithms amplify content.**"

14

MJN–21 (emphases added).  More of the same at the March 25, 2021 hearing:

> **Rep. Doyle:**  "Oh, I know you have a policy, but **will you take the sites [questioning integrity of 2020 Presidential election] down today**?"
>
> **Defendant Dorsey:**  "Yes.  We remove everything against our policy."

MJN–23 (emphases added).

As is now evident, that was only the beginning of a war on free speech.  The government's censorship-by-proxy revealed since this case was dismissed is beyond what Plaintiffs could have imagined.

Documents obtained in discovery in a lawsuit against the U.S. alleging free speech violations provide a window into a massive federal "Censorship Enterprise" where the White House, State Department, and alphabet-soup agencies, including HHS, DHS, CISA, CDC, FBI, and FDA, regularly coordinate with SMPs about suppressing speech that disagrees with the government's preferred narratives and cancelling citizens who post such content.  MJN–76–78.

Federal officials are deeply embedded in a joint enterprise with SMPs, including Defendants, to censor speech.  Administration officials meet regularly with senior executives at Twitter and other platforms to discuss "what the White House expects from us on misinformation."  MJN–80–83, 129–34, 136–142.  Officials coordinate censorship with SMPs to "drive behavior" by holding weekly

15

"Be On The Lookout" meetings to flag disfavored content, sending lists of disfavored posts, consulting with the SMPs about censoring specific speech, and exchanging detailed reports with SMPs about so-called "misinformation." MJN–84–88, 91, 94–127. "I'm looking forward to setting up regular chats," says one message from Twitter to the CDC. "**[M]y team has asked for examples of problematic content so we can examine trends.** All examples of misinformation are helpful, but in particular, if you have any examples of fraud … that would be very helpful." MJN–80 (emphasis added). "Thanks so much for this," a Twitter official responds to a CDC email headed "Request for problem accounts," and which identifies accounts to be censored. "[W]e actioned (by labeling or removing) the Tweets in violation of our Rules." MJN–80. In an email titled "Twitter VaccineMisinfo Briefing," Deputy Assistant to the President Rob Flaherty tells colleagues that Twitter will inform "White House staff" about "the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work." MJN–81. Twitter even created a secret channel for flagging misinformation—a "Partner Support Portal"—which enables federal officials to submit expedited requests to censor content. MJN–92–93.

16

There is more. Documents provided by a whistleblower to members of Congress reveal that the Department of Homeland Security was designated as the central clearinghouse for the Administration's responses to whatever it decides is "disinformation." MJN–70–74. The documents describe a meeting between the Undersecretary of Homeland Security and Twitter executives to "operationalize" DHS's relationship with Twitter. MJN–72. "By sharing information," the DHS documents state, the agency "can empower [Twitter and other social media] partners to … enable[] them to remove content at their discretion." MJN–72. Senators Grassley and Hawley asserted that these documents indicate that DHS is "seeking an active role in coordinating … censorship … by enlisting the help of social media companies…," and demanded further information from DHS Secretary Mayorkas. MJN–73.

And yet more. As has also recently become public, shortly before the 2020 election, Facebook—acting at the behest of the FBI—suppressed an explosive *New York Post* article detailing how Hunter Biden used his father's position and influence for personal gain, with the apparent awareness and profit-participation of now-President Biden. MJN–64–68. The FBI applied similar pressure on Twitter. As noted, this government-coerced censorship may well have changed the election results. MJN–164–166.

17

IV.    **Procedural Background**

Plaintiffs initiated this case in the Southern District of Florida on July 7,

2021 on behalf of a putative class and filed their First Amended Complaint

("FAC") on July 27, 2021.  3–ER–325–81; 3–ER–397.  Plaintiff Trump filed a

motion for preliminary injunction on October 1, 2021.  3–ER–400–01.  The case

was transferred to the Court below on October 26, 2021 and assigned to The Hon.

James Donato.  3–ER–404–05.

Defendants moved to dismiss under Fed. R. Civ. Proc. 12(b)(6).  3–ER–408.

Plaintiffs opposed the motion and filed a request for judicial notice of certain

governmental records, *id*., which was granted.  1–ER–10.  The preliminary

injunction and dismissal motions were heard on February 24, 2022.  On May 6,

2022, the District Court entered its order dismissing the FAC in its entirety.  1–

ER–4–20.  Judgment was entered on June 7, 2022.  1–ER–2.

## SUMMARY OF ARGUMENT

As a direct result of these governmental pressures and solicitations,

Defendants censored then-President Trump's Twitter account multiple times and

suspended it on January 7, 2021.[5]  3–ER–353–55.  Defendants also censored the

---

[5] Defendants exercise various means of censorship, including terminating or
suspending accounts, "shadow banning," adjusting algorithms to suppress or de-
emphasize speakers or messages, and placing warning labels on content.  3–ER–
327, 354–61, 365, 367–68, 375.

18

other named Plaintiffs when they contradicted the government's preferred positions. Defendants' censorship prevented millions of Americans' from participating in public discourse, contrary to First Amendment principles deeply rooted in American history and law. 3–ER–319–21.

None of government officials' pressure tactics were subtle; many were not even covert. Senate and House committees convened multiple hearings at which Defendant Dorsey and other social media CEOs were required to appear and be pummeled by legislators into agreeing to join Democrats' "censorship enterprise." Senior members of the Executive Branch, from President Biden on down, announced criteria for what they viewed as "disinformation" and enlisted—by means of threats and inducements—Defendants' and other SMPs' cooperation in censoring speech. And the evidence disclosed since the case was dismissed reveals the most serious, coordinated, and large-scale violation of First Amendment free speech rights in our nation's history.

Plaintiffs have alleged in detail that the government's entanglement with Defendants' "content moderation" program (a euphemism worthy of Orwell) is state action, subjecting Defendants' censorship to constitutional constraints. State action exists by virtue of (1) government coercion, including directing Defendants and other SMPs to target users posting disfavored content; (2) substantial encouragement of Defendants' censorship by official exhortations coupled with

threatened withdrawal of Section 230 immunity; and (3) joint action between Defendants and the government to suppress disfavored speech. Plaintiffs also alleged that Defendants' censorship violates provisions of FDUPTA and the SSMCA.

Had Plaintiffs' case proceeded to discovery, additional damning evidence similar to the recent revelations summarized above would have come to light, confirming Plaintiffs' claims. Instead, the District Court dismissed the action, notwithstanding that Plaintiffs' allegations are significantly more extensive and detailed than those in Supreme Court and Ninth Circuit cases where state action was found. It also dismissed the state-law claims for lack of standing. The Court reached that result by disregarding the standards governing Fed. R. Civ. Proc. 12(b)(6) dismissals; misapplying or failing to consider precedents applicable to Plaintiffs' constitutional and state-law claims; failing to credit Plaintiffs' allegations or flatly misreading the FAC; and making factual determinations contradicting Plaintiffs' showing. Each of these is a sufficient ground for reversal.

**ARGUMENT**

**I.    The District Court Erroneously Concluded That Plaintiffs Had Not Plausibly Alleged Facts Giving Rise to State Action.**

    **A.    Legal Standards**

        **1.    Standards Governing a Rule 12(b)(6) Motion**

The District Court's dismissal is reviewed *de novo*.  *In re Alphabet Securities Litig.*, 1 F.4th 687, 698 (9th Cir. 2021).

The Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a Rule 12(b)(6) motion, all well-pleaded allegations of material fact are taken as true and construed most favorably to the non-moving party.  *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018).  Moreover, "plaintiffs should be given the full benefit of their proof **without tightly compartmentalizing the various factual components**…."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (emphasis added).  A claim may not be dismissed if a plaintiff's allegations, together with "matters of which a court may take judicial notice," *Alphabet Securities Litig.*, 1 F.4th at 693–94, and "all factual inferences [drawn] in the light most favorable to the plaintiff," *Parents for Privacy v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020), "suggest that the claim has at least a plausible chance of success." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013).

21

"Plausible does not mean probable." *Martinex v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021). A plausible claim is one that "raise[s] the right to relief … above the speculative level," even if "it appears 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).

## 2. Standards Governing a State Action Determination

A private party's conduct becomes state action when it (1) "results from the State's exercise of 'coercive power,' when (2) the State provides 'significant encouragement, either over or covert,' **or** (3) when a private actor operates as a 'willful participant in joint activity'" with the government. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citations omitted) (emphasis added). Determining whether state action exists is highly fact-specific. The Court must engage in a nuanced and "necessarily fact-bound" inquiry, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982), to which no single rubric can supply the answer. *See Brentwood*, 531 U.S. at 295 (existence of state action "is a matter of normative judgment, and the criteria lack rigid simplicity … [no] one fact can function as a necessary condition across the board ... nor is any set of circumstances absolutely sufficient"). The state's entanglement can consist solely of "winks and nods." *Id.* at 301. A state action determination thus requires the Court to "consider the full factual context of [the] case," *Rawson v. Recovery*

22

*Innovations, Inc.*, 975 F.3d 742, 751 (9th Cir. 2020).  "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961).

Where seemingly threatening governmental statements are ambiguous, a court considering a Rule 12(b)(6) motion must draw a reasonable inference of coercion.  *See, e.g.*, *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (district court "should have viewed the language of [the official's] letter in the light most favorable to plaintiffs" and thus should have found coercion adequately alleged). The test is whether a reasonable person could view the governmental statements as "exceeding mere criticism" and conveying a threat to impose "government power" or "adverse regulatory actions." *American Family Ass'n v. City of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002).

## B.    The District Court Failed to Apply the Correct Legal Test for Pleading State Action.

The District Court concluded that Plaintiffs had failed to plead state action under the "rule of conduct" test articulated in *Lugar* and repeated, with a material alteration, in *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999).  The District Court described its inquiry thus:  "The specific question the Court must answer here is:  have plaintiffs plausibly alleged that Twitter was

23

behaving as a state actor **pursuant to a 'governmental policy'** when it closed

their accounts?" 1–ER–7–8 (citing *Sutton*) (emphasis added); *see also* 1–ER–8

(District Court rejected multiple specific threats by government officials as source

of coercion because "[i]t is … not plausible to conclude that Twitter or any other

listener could discern a **clear state rule** in such remarks") (emphasis added).

However, the Supreme Court in *Brentwood* announced a new state-action

test, satisfaction of which suffices to plead a viable state-action claim; a

"governmental policy" or "clear state rule" is not required. Additionally, the

Supreme Court has modified the rule adopted in *Lugar* and paraphrased in *Sutton*.

Plaintiffs' FAC passes muster under either test. The District Court erred by failing

to consider whether Plaintiffs adequately pleaded state action under the alternative

test announced by the Supreme Court in *Brentwood* or under the modified *Lugar*

rule (assuming it is still good law).

### 1. The District Court Erred by Failing to Assess Plaintiffs' Showing Under *Brentwood*.

In *Sutton*, this Court discussed the test for determining whether a defendant

is acting "under color of state law" for purposes of 42 U.S.C. § 1983. 192 F.3d at

835. For a claim to proceed, *Sutton* said, a plaintiff must show that the

"deprivation [of a federal right] results from a governmental policy" and that the

defendant is "a person who may fairly be said to be a [governmental] actor." *Id.*

(citation omitted; brackets in original). But *Sutton* failed to quote *Lugar* correctly, substituting the "policy" language for *Lugar's* considerably broader "rule of conduct" articulation. *See Lugar*, 457 U.S. at 937 (deprivation "must be caused by … a rule of conduct imposed by the [government]").

Nearly twenty years after *Lugar* and two years after *Sutton*, the Supreme Court announced a new multi-factor test for state action:

> **[S]tate action may be found if**, though only if, **there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself**." … Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, **for example, held that a challenged activity may be state action [1] when it results from the State's exercise of "coercive power," [2] when the State provides "significant encouragement, either overt or covert," or [3] when a private actor operates as a "willful participant in joint activity with the State or its agents**."

*Brentwood*, 531 U.S. at 295–96 (citations omitted; bracketed material added) (emphasis added). *Brentwood* made no mention of *Lugar's* "rule of conduct" requirement, and the Court has never applied that test since *Brentwood*. Rather, the Court held that state action "*may be found*" if there is a sufficient "nexus" between the private party and the state, with the existence of such "nexus" assessed under each of the three tests quoted above. *Id.* at 295.

This Court has recognized *en banc* that the Supreme Court in *Brentwood* announced a new test for whether a private entity becomes a state actor:

In *Lugar v. Edmondson Oil Co.*, the Supreme Court created a two step
analysis for determining whether or not there was state action by a
private actor sufficient to establish liability for a constitutional tort.
The first inquiry was "whether the claimed deprivation has resulted
from the exercise of a right or privilege having its source in state
authority." The second was "whether, under the facts of this case, …
[the] private parties, may be appropriately characterized as 'state
actors.'" In [*Brentwood*], the Court introduced a multi-factored test.
The inquiry is a general one: "[S]tate action may be found if, though
only if, there is such a 'close nexus between the State and the
challenged action' that seemingly private behavior 'may be fairly
treated as that of the State itself.'"

*Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954–55 (9th Cir. 2008) (*en
banc*) (citations omitted; ellipsis in original).[6]  This Court has also expressly found
that, *Lugar* notwithstanding, satisfying any one of the *Brentwood* tests *is sufficient
by itself* to establish state action:

Previously, we expressed uncertainty as to whether satisfaction of
a single test could be sufficient to establish that a private entity was
a State actor. However, in *Brentwood*, the Court determined that the
nominally private entity whose conduct was challenged was a State
actor **solely on the basis that the entity was entwined with the
State. The Court held that satisfaction of this single test was
sufficient**, so long as no countervailing factor existed. *See
Brentwood*, 531 U.S. at 304 ("**When … the relevant facts show**

---

[6] *Villegas* cites *Sutton* once but does not mention the "governmental policy"
language on which the District Court below relied and does not harmonize the two
opinions. This Court must resolve any conflict between *Villegas* and *Sutton* in
favor of *Villegas*, a later *en banc* ruling. Moreover, this Court can consider *Sutton*
"effectively overruled," insofar as it purports to make a "governmental policy" the
exclusive test for finding state action, because "the reasoning or theory of [*Sutton*]
is clearly irreconcilable with the reasoning or theory of [*Brentwood* and
*Villegas*]…." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (*en banc*).

**pervasive entwinement …, the implication of state action is not affected by pointing out that the facts might not loom large under a different test.**").

*Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (citations omitted; emphasis added); *see also Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021) ("[s]atisfaction of any one [*Brentwood*] test is sufficient to find state action"); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (state action determined solely under *Brentwood's* public function, joint action, coercion, or governmental nexus tests; no mention of *Lugar's* "rule of conduct" language); *Kirtley v. Rainey*, 326 F.3d 1088, 1092–95 (9th Cir. 2003) (Court applied *Brentwood* to determine whether private actor was acting under color of state law; *Lugar* not even cited).

The Supreme Court has never said whether the *Brentwood* test supplants *Lugar's* analysis or whether they are alternatives.  Regardless, the Supreme Court and this Court undoubtedly have held that pleading facts that satisfy any one of the *Brentwood* tests is enough for a state-action claim to proceed.  The District Court erred by relying only on *Lugar* and *Sutton* without considering whether Plaintiffs have alleged state action under *Brentwood*.

27

## 2. The District Court Also Failed to Apply *Lugar* Correctly.

Even if *Lugar* remains good law, the District Court failed to apply it consistently with the Supreme Court's and this Court's narrowed application of that case.

Under the so-called "first prong" of *Lugar*, private conduct can be attributed to the state where "deprivation [of a federal right is] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible."  457 U.S. at 937.  The Supreme Court subsequently abridged this part of the *Lugar* test, as follows:

> To constitute state action, "**the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible,**" and "the party charged with the deprivation must be a person who may fairly be said to be a state actor."

*West v. Atkins*, 487 U.S. 42, 49 (1988) (citing *Lugar*) (emphasis added; ellipsis in original).  Under *West*, the first prong of *Lugar* is satisfied where the deprivation is caused *either* by "the exercise of some right or privilege" *or* by "a person for whom the State is responsible."[7]  Where the second condition is met, *Brentwood*

---

[7] The portion of *Lugar* on which the District Court relied is ambiguous: "deprivation…caused [1] by the exercise of some right or privilege created by the State or [2] by a rule of conduct imposed by the state or [3] by a person for whom the State is responsible."  457 U.S. 937 (bracketed material added).  The District Court read the third clause as merely one of two possible conditions modifying the *(footnote continues on next page)*

laid out the tests for determining whether a private party was, in given circumstances, a "person for whom the State is responsible."[8]  Numerous post-*West* decisions have relied on *West's* reading of *Lugar*.  *See, e.g.*, *Florer v. Congregation Pidyon Shevuyim*, 603 F.3d 1118, 1122 (9th Cir. 2010) ("To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the State **or by a person for whom the State is responsible**….") (emphasis added).[9]

This reading of *Lugar* finds indirect but strong support in this Court's recent opinion in *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022).  Two school-board trustees blocked access to the trustees' social-media pages by parents who had posted comments criticizing the trustees and board.  The parents claimed

---

*(footnote continued from previous page)*
phrase "rule of conduct" in the second clause.  In *West* the Court resolved the ambiguity by treating the third clause as an independent test for determining whether a "deprivation" results from state action.

[8] *West's* construction of *Lugar* squares any seeming inconsistency between that decision and *Brentwood*.  As the law stands after *West*, state action exists where the alleged violation was caused by "the exercise of some right or privilege created by the State," or by "a person for whom the State is responsible," with *Brentwood* supplying the analysis for the second prong of the test.

[9] *See also, e.g., Aubrecht v. Penn. State Policy*, 389 F. App'x. 189, 193 (3d Cir. 2010); *Roque v. Jazz Casino Co. LLC*, 388 F. App'x 402 (5th Cir. 2010); *Neighborhood Enters., Inc. v. City of St. Louis*, 540 F.3d 882 (8th Cir. 2008); *Garza v. Bandy*, 293 F. App'x 565, 567 (10th Cir. 2008) (describing *West's* abridged language as "the general rule"); *Patterson v. County of Oneida*, 375 F.3d 206, 230 (2d Cir. 2004).

that ejection from the social-media pages violated their First Amendment rights.

Applying *Brentwood*, this Court found that the trustees were acting under color of

state law. When the case is viewed through the *Lugar* prism, it is clear the

defendants were not "exercising a right or privilege created by the State," nor were

they acting pursuant to a "rule of conduct" imposed by the State. The only way

this fact pattern could satisfy the original *Lugar* test (which the Court never

mentioned) is that the trustees were "persons for whom the State is responsible."

This can only mean that this clause is an independent predicate for state action.

The District Court erred in failing to acknowledge, let alone apply, the

revised *Lugar/West* standard and relying instead on the "governmental policy" test

as a basis for dismissing Plaintiffs' First Amendment claim.

### 3.    The District Court Erroneously Held That Defendants Must Have Been Motivated by Governmental Coercion.

The District Court concluded that Plaintiffs' claim failed because

Defendants censored Plaintiffs' accounts "in response to factors specific to each

account, and not pursuant to a state rule of decision." 1–ER–10. However, once

coercion exists, the private actor's motives for acting are immaterial. A plaintiff

need not show that governmental coercion was "the real motivating force" behind

defendant's action. *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827

F.2d 1291, 1295 (9th Cir. 1987) ("[The phone company] insists that it remains an

unresolved question of fact whether the county attorney's letter was the **real motivating force** behind the termination. Even if unresolved, this factual question is immaterial.") (emphasis added). "The mere fact that [a defendant] might have been willing to act without coercion makes no difference if the government did coerce." *Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429, 1434 (9th Cir. 1989). *See also Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (state action exists even where threatened party denies it perceived or was moved by government threat).

In addition, the reasons given for Defendants' censorship of Plaintiffs' accounts (as described in the Dismissal Order) map *exactly* onto the categories of disfavored speech specified in the FAC: tweets by President Trump or by others questioning the integrity of the 2020 presidential election or disseminating COVID-19 "disinformation." *Compare* 3–ER–338, 340 *with* 1–ER–9 (Plaintiff Trump's account closed; other Plaintiffs' accounts censored due to "posts about vaccines," "vaccine misinformation," "retweeting President Trump," "positive messages about Republican candidates and President Trump," and "messages related to COVID-19 and the 2020 election results"). The District Court doubly erred in first considering the reasons for Defendants' censorship at all, and then failing to acknowledge that Defendants acted in lockstep with the government's wishes.

31

**C.     Plaintiffs Have Met the *Lugar* Test, However Construed.**

     **1.     "Exercise of a Right or Privilege"**

By conferring Section 230 immunity on Defendants, the state has granted

them a "right or privilege"—the right to censor protected speech risk-free, which

has enormous economic value.  The District Court failed to consider this factor,

which satisfies the first part of the *Lugar* test.  457 U.S. at 937.

The Supreme Court has held that federal laws which, like Section 230,

immunize private conduct, convert such conduct into state action.  *Railway*

*Employees' Dep't v. Hanson*, 351 U.S. 225, 232 (1956), found state action in

private employers' union-shop agreements because, under a federal statute, such

agreements could not be "made illegal" by any state law.  Like Section 230, the

federal law was permissive; it did not compel employers to enter into union-shop

agreements; it only prohibited states from banning them.  In *Skinner v. Railway*

*Labor Executives' Ass'n*, 489 U.S. 602 (1989), the Court found state action where

private employers conducted employee drug testing after the government adopted

regulations immunizing employers for performing such tests.  The challenged

regulation did not compel the testing but immunized it from private lawsuits—like

Section 230.[10]  *Id.* at 611.  The Supreme Court rejected the argument that no state

action existed because the testing was voluntary:

> We are unwilling to conclude … that breath and urine tests required
> by private railroads in reliance on Subpart D will not implicate the
> Fourth Amendment….  **The fact that the Government has not
> compelled a private party to perform a search does not, by itself,
> establish that the search is a private one.**

*Id.* at 614–15 (emphasis added).  The regulation rendered private employer's

conduct state action because the regulations "removed all legal barriers" to such

testing.  *Id.* at 615.  Similarly, Section 230(c) removes all legal barriers to

Defendants' censorship.

In *Reitman v. Mulkey*, 387 U.S. 369 (1967), California voters amended the

state constitution to preclude the state from forbidding racial discrimination in

private housing.  The amendment left private actors free to discriminate without

fear of legal consequences.  *Id.* at 381.  Sued by parties denied housing on account

of their race, property owners cited the constitutional amendment as a defense.

The Supreme Court acknowledged that the amendment, and thus the state, had

done nothing to encourage the discrimination.  But, by making private

---

[10] Subpart C of the regulation, which was not at issue, mandated toxicological
testing following a "major train accident."  Petitioners' claim pertained to
*voluntary testing* conducted under *Subpart D*:  "Petitioners contend, however, that
the Fourth Amendment is not implicated by Subpart D of the regulations, as
nothing in Subpart D compels any testing by private railroads."  *Id.* at 614.

33

discriminatory practices immune from the legislative process, the amendment enabled private parties to engage in racial discrimination and thus violated the Equal Protection Clause. *Id.* Analogously, Section 230's immunity impermissibly grants SMPs the right to block protected speech, free not merely from official restraint, but private lawsuits as well.

### 2. "Rule of Conduct"

Even if *Lugar's* "rule of conduct" remains a relevant standard after *West* and *Brentwood*, Plaintiffs have met it. Defendants' actions need not have been mandated by a law or governmental regulation. Rather, the threshold requirement is that the "impetus for the forbidden discrimination" originate with the state rather than a private individual. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172–73 (1972). Justice Frankfurter elegantly described the modest degree of state involvement required:

> This phrase [state action] gives rise to a false direction in that it implies some impressive machinery or deliberative conduct normally associated with what orators call a sovereign state. The vital requirement is State responsibility—**that somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme [to deny protected rights]**.

*Terry v. Adams*, 345 U.S. 461, 473 (1953) (concurrence) (emphasis added). That "impetus" or "infusion of conduct" can take a variety of forms that fall short of an official rule, including a threatened but not-enacted agency rule, *Mathis*, 891 F.2d

34

at 1433, or even municipal officials' informal statements that civil rights sit-ins would not be tolerated in their city. *Lombard v. State of Louisiana*, 373 U.S. 267, 270–71 (1963).

Plaintiffs have alleged such a "rule of conduct" imposed by government officials. Leading Democratic members of Congress and the Biden administration pressured Defendants to censor speech by President Trump, questioning the integrity of the 2020 election, and communicating information about COVID-19 that departed from government's preferred narratives. 3–ER–338, 342; *see also* 3–ER–343–54. The material that has surfaced since the FAC was dismissed contains even more specific censorship directives from government agencies. *See* 15–17, *supra*.

### D. The District Court Erroneously Concluded That the Extensive Record of Government Threats Did Not Amount to Coercion.

#### 1. Plaintiffs Have Pleaded Ample Facts Showing Coercion.

Government officials are free to express their views as to matters of public interest. But they are not free to deploy the powers of their office to coerce private conduct. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). The line between "government expression and intimidation—the first permitted by the First Amendment, the latter forbidden by it," *Backpage.com*, 807 F.3d at 230—is crossed when there is an "actual **or threatened** imposition of government power or

35

sanction." *American Family*, 277 F.3d at 1125 (emphasis added). The threat need not be "explicit" or "specific." *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009). Veiled or implicit threats suffice, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) ("veiled" threats); *Brodheim*, 584 F.3d at 1270 ("implicit threat"), so long as the officials' statements "can reasonably be interpreted as intimating that some form of … adverse regulatory action will follow failure to accede to the officials' request." *Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983), *quoted approvingly in American Family*, 277 F.3d at 1125.

Plaintiffs provided factual support for their claims in the 56-page FAC, augmented by some 30 pages of admitted judicially-noticeable materials. Further factual support is appended to the Motion for Judicial Notice. This record shows that some of the most powerful members of Congress and the Executive Branch repeatedly threatened Defendants and other SMPs with seismic legal consequences, including repealing their Section 230 immunity, unless Defendants cooperated in censoring disfavored content. This was no mere puffery; these officials—members of powerful committees, the Speaker of the House, the Vice-President, and the President himself—had it well within their power to carry out their threats.

The coercive effects of the government officials' statements must be assessed in the context of Defendants' enormously valuable Section 230 immunity.

36

Michael Beckerman, former president of the industry trade group the Internet Association, has described Section 230 as "the one line of federal code that has created more economic value in this country any other."  2–ER–61, 68.  In 2017, NERA, a leading economics consulting firm, valued Section 230 and the Digital Millennium Copyright Act at $40 billion annually.  2–ER–61, 89.  Freed from the burden of responsibly overseeing their content, SMPs and their role in contemporary American society have grown explosively.[11]

Twitter's more than $44 billion dollars in market value is directly attributable to this immunity.  2–ER–61, 157; MJN–185-90.  Twitter hosts an immense volume of third-party content; it would face economic ruin if it could be held liable for defamatory content published in these tweets.  Twitter discloses this risk in its SEC filings:

> [T]here are various Executive and Congressional efforts to restrict the scope of the protections from legal liability for content moderation decisions and third-party content … under Section 230 … and our current protections from liability for content moderation decisions and third-party content posted on our platform in the United States could decrease or change, potentially resulting in increased liability … and higher litigation costs."  3–ER–199, 201.

---

[11] "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors.  Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties."  *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (concurrence).  This concentration of power "gives some digital platforms enormous control over speech."  *Id.* at 1224.

Defendant Dorsey admitted the critical importance of Section 230 in congressional testimony: "Section 230 is the Internet's most important law," 2–ER–136, and "if we didn't have those protections when we started Twitter 14 years ago, we could not start." MJN–20; *see also* MJN–180.

What Congress has given, Congress can take away. Losing Section 230 immunity would be cataclysmic for Defendants. That immunity was squarely in congressional Democrats' sights when they issued subpoenas and compelled Dorsey to testify. This was no mere inconvenience: Twitter's stock price dropped 18% during the week of the October 28, 2020 hearing and remained significantly below its October 23 level through the week of the November 17 hearing. MJN–178.

Congressional committee members openly declared that their specific aim was to pressure SMPs to censor by threatening repeal of Section 230. While space does not permit a full recitation, the highlights reel makes the point:

> Rep. Butterfield: "Congress will have to compel you, **compel you perhaps with penalties**, to make meaningful changes." MJN–26 (emphasis added).

> Senator Blumenthal: "Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media…. **Mr. Dorsey …** I **have urged … Section 230 reform, meaningful reform, including even possible repeal in large part**…." MJN–16–17 (emphasis added).

38

Rep. Pallone: **That is why you are here today … Mr. Dorsey**….
The time for self-regulation is over. **It is time we legislate to hold
you accountable.** 2–ER–140 (emphasis added).

Rep. Doyle: Your companies need to be held accountable … **Ours is
the committee of jurisdiction, and we will legislate to stop this.** 2-
ER–144.

Rep. Matsui: "[T]he companies before us today [including Twitter]
aren't doing enough … **I think Congress must revisit Section 230.**"
MJN–27 (emphasis added).

A similar barrage of threats emanated from President Biden, Vice-President
Harris, and the White House. *See supra* at 10–13. President Biden called for
Section 230 immunity repeal even before he was elected. 3–ER–336. Then-
Senator Harris called for Defendants to ban President Trump from Twitter. 3–ER–
336. The White House called on Defendants to create a "robust enforcement
strategy" to ban disfavored views, exhorted SMPs to "ensure uniformity" and
pointed out the specific narratives to be censored: "[W]e are … regularly making
sure social media platforms are aware of the latest narratives dangerous to public
health that we and many other Americans are seeing…." 3–ER–346–51. The
Surgeon General unabashedly touted the government's anti-free speech position:
"We're asking [SMPs] to monitor misinformation more closely. We're asking
them to consistently take action against misinformation … on their platforms." 3–
ER–348–49.

39

The bulk of these statements were made on the floor of Congress or from the White House. Even the few instances where that was not the case—e.g., the tweets by then-Senator Kamala Harris, 3–ER–336—constitute coercion: Informal or even illegal conduct by government officials can give rise to state action. *See, e.g., Lombard* (press-conference statements by public officials); *Classic*, 313 U.S. at 326 ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."). Surely, then, official action clothed in the formal trappings of a White House press briefing or a congressional hearing is sufficient.

Legislators may consider and propose changes in the law; that is their job. And they may discuss reasons for legislative action, as well likely consequences of any proposed amendments. But they cross the constitutional Rubicon when they use the power of their office to cow private parties into doing their bidding. *Alea iacta est*. Many of the quoted statements are threatening on their face. And reading coercion into statements demanding censorship of "misinformation," as code for disfavored content, coupled with pointed reminders that Section 230 immunity is on the chopping-block, is plausible.[12]

---

[12] If affirmative governmental acts to advance such threats were required, the issuance of multiple subpoenas summoning Defendant Dorsey constitutes such conduct.

Respected observers *did* interpret these as attempts to pressure SMPs into censoring disfavored speech. David Sacks, a Silicon Valley pioneer, co-founder of PayPal, and an early investor in Facebook, SpaceX, Uber, and Twitter, has navigated several companies from start-up phases to billion-dollar valuations. He described the market's perception of the actions aimed at SMPs as follows:

> [You have the] United States Senate basically saying: **"Nice little social network you got there. Real shame for anything to happen to it."** So that's pressure that's coming from Washington. You've got the coercion of private companies by these enormously powerful people in government who are using the levers of government power to conduct antitrust lawsuits against them, to push bills through Congress to break them up, or otherwise harm their businesses." MJN–160 (emphasis added).

Section 230 provides a fulcrum for such threats that would have been inconceivable with traditional news media. Can one imagine President Nixon coercing the press to stop reporting on Watergate? Such threats would have been laughed off because the President could not have stopped the presses from rolling. The Internet is different; much of what is published there depends on Section 230 immunity. It is the thread by which hangs the Sword of Damocles.

A plausible inference can be drawn on this record that public officials "deliberately set about to achieve the suppression of [speech] deemed 'objectionable.'" *Bantam Books*, 372 U.S. at 67. Courts have found coercion, and thus state action, based on far less compelling records. In *Rattner v. Netburn*, 930

41

F.2d 204 (2d Cir. 1991), a mayor and town trustee wrote to a newsletter publisher asking about an anonymous article critical of local officials. Noting that the article "raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends," the mayor asked who wrote and supported the article. After receiving the letter, the publisher refused to publish content provided by the plaintiff, a local businessman. Plaintiff sued, alleging that the municipal officials' letter had violated his First Amendment rights. The district court dismissed the complaint, finding that the letter was not a veiled threat of reprisal because the officials had no authority to sanction the newsletter publisher. The Second Circuit reversed, saying that, viewed in the light most favorable to the plaintiff, "a threat was perceived." 930 F.2d at 210. Furthermore, the lower court was not entitled to "assess credibility [of the threat] as if there had been a trial." *Id.* The officials' letter, carrying no overt threat or power to exact reprisals, was far less ominous than the barefaced threats made by officials here. *See also Backpage.com*, 807 F.3d 229 (website operator alleged that county sheriff imposed prior restraint on speech by requesting that Visa and MasterCard stop processing payments for sex-related advertising; held, card companies were subject to coercion aimed at shutting down plaintiff's website, despite Visa's testimony that no threat was made or perceived); *Okwedy*, 333 F.3d 339 (president of NYC borough urged billboard company to remove anti-homosexuality billboard viewed

42

as "offensive" and "intolerant"; complaint alleging First Amendment violation dismissed for failure to state a claim; reversed because letter could be interpreted as carrying implicit threat of government retaliation if company failed to accede).

### 2. The District Court Erred in Holding That This Extensive Record Did Not Meet the Threshold for Pleading Coercion.

#### (a) The District Court Failed to Properly Credit Plaintiffs' Allegations.

The District Court gave the back of the hand to Plaintiffs' factual showing, devoting a scant two paragraphs to discussing the 86 pages alleging coercion. 1–ER–9–10. Rather than crediting Plaintiffs' showing, as required at the dismissal stage, the District Court interpreted the facts according to its own lights. In particular, the Court mischaracterized the government officials' threats regarding repeal of Section 230. Ignoring the importance of Section 230 and the stated purpose of the congressional hearings, which were thoroughly elaborated in the FAC (3–ER–335–41, 362), the Court defanged the explicit threats to repeal Defendants' Section 230 immunity as "general statements about section 230" and as expressing "general concerns and criticisms." 1–ER–11.

The Court's characterizations cannot be read as anything other than reframing Plaintiffs' allegations in a weaker light. Further, the Court said, "plaintiffs offer only ambiguous and open-ended statements to the effect that 'we may legislate' **something unfavorable** to Twitter or the social media sector."

1–ER–14 (emphasis added). Plaintiffs never characterized the official statements as "threats to legislate something unfavorable," nor were the statements "general" or "ambiguous." The threats were specific, targeted, and directly linked to whether Defendants would censor disfavored speech as the officials demanded. 3–ER–335–38. Characterizing the threats as merely involving "something unfavorable" grossly recasts Plaintiff's allegations. Repealing Defendants' Section 230 immunity would have been not merely "unfavorable" but catastrophic. The District Court's minimization of the government officials' threats runs directly contrary to the allegations and facts that Plaintiffs placed before the Court. Were there any ambiguity about whether these statements, taken together, reasonably could be viewed as coercive, such ambiguity must be resolved in Plaintiffs' favor. *Okwedy*, 333 F.3d at 344.

By failing to credit Plaintiffs' showing, the Court invaded the province of the trier of fact and committed reversible error. *Iqbal*, 556 U.S. at 662 (plaintiff only needs to allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").

### (b) The District Court Erroneously Concluded That Legislative Threats to Repeal Section 230 Could Not Constitute Coercion.

The District Court held that legislative threats to repeal Defendants' Section 230 immunity could not, by their nature, constitute coercion. Here, again, the

44

Court substituted its own views for the allegations in the FAC.  In unsupported *ipse dixit*, the Court concluded that statements by legislators could not be coercive because passage of legislation generally is difficult:  "There is no way to allege with any degree of plausibility when, if ever, the comments voiced by a handful of members of Congress might become a law, or what changes such a law might impose on social media companies like Twitter," and "[t]he fact that enacting a bill is rarely fast or easy further attenuates the plausibility of the legislative threats plaintiffs speak of."[13]  1–ER–15.

The Court also sought justification in the fact that the threats were made during congressional hearings, which (the Court implies) diminishes their coercive force.  "Much of what plaintiffs challenge fits within the normal boundaries of a congressional investigation, as opposed to threats of punitive state action."  1–ER–15.  Here again the Court mischaracterized Plaintiffs' allegations, rendering them unrecognizable:  "[T]he House Committee was making inquiries and surveying possible problems 'for the purpose of enabling the Congress to remedy them.'"  1–ER–15.  The Court's characterization is not even plausible; it is highly doubtful that Defendant Dorsey and other social media CEOs found the committee hearings

---

[13] In fact, members of Congress *did* introduce legislation to remove Section 230 immunity for platforms whose algorithms are used to amplify disfavored content. MJN–37–38.

45

nearly so benign as they sweated and stared into the cameras while a United States Congressman threatened to "compel you, compel you perhaps with penalties, to make meaningful changes." 3–ER–338; MJN–26. Moreover, Plaintiffs have alleged that the hearings were coercive. The District Court simply refused to credit the allegations.

Twitter itself has admitted in judicial proceedings that merely being subject to a government investigation is coercive. Twitter has sued Texas Attorney General Ken Paxton, alleging that the AG is using his authority to "intimidate, harass, and target" Twitter by initiating an investigation into Twitter's content moderation policies. MJN–145. "Faced with the force of such an investigation," Twitter's complaint alleges, "'a person of ordinary firmness' would feel constrained from future exercises of [] protected activity." Although Twitter, with billions of dollars of resources and a phalanx of lawyers, is hardly an "ordinary person," this nascent investigation has "chill[ed] Twitter's speech." MJN–146. If Twitter admits to being intimidated by a state AG's investigation, one can only imagine the shock-and-awe effect of having its CEO repeatedly haled before Congress and pelted with threats before a national audience.

The agglomeration of threats coming from the most powerful officials in the federal government dramatically amplified their coercive impact. When the Speaker and ranking members of House and Senate Committees, and the future

46

President and Vice-President of the United States all speak in unison—censor disfavored content or face devastating consequences—their intimidating effect cannot be gainsaid.

The District Court's analysis is untenable at a more general level. Legislators investigate, propose legislation, or enact laws. That is all they do. Passage of legislation cannot constitute coercion because, once a law has been adopted, the government loses all leverage and thus all power to coerce. The businessman who refuses to pay protection money has no reason to pony up once his restaurant is burned down. Coercion inheres in the threat, not the completed action. The only stage of the legislative process where coercion can occur is when it was alleged here—legislators brandishing their power to repeal the vital statutory immunity they had conferred on Defendants. To say that no coercion is possible during this process—no matter who the players or what the forum—is to say that the legislative branch cannot, as a matter of law, coerce. The District Court cited no law in support of that conclusion, because none exists.

**3.  The District Court Wrongly Concluded That the Plaintiffs' Allegations Were Insufficient Compared to the Facts of *Bantam Books*, *Lombard*, *Carlin*, and *Mathis*.**

In attempting to distinguish the record here from cases on which Plaintiffs relied, the District Court made factual determinations about the coercive effect of

the government actions in those cases compared to those alleged here. This was error.

In *Bantam Books,* the Supreme Court held that a state commission violated the First Amendment by sending letters to booksellers warning that the sale of "objectionable" books could bring legal repercussions. The commission's stated duty was to "educate the public" concerning "impure" reading material; the officials who communicated the threats had no regulatory authority and lacked the "power to apply formal legal sanctions." 372 U.S. at 59, 66. Although the booksellers were "free" to ignore them, the letters included "thinly veiled threats" to institute criminal proceedings if the booksellers did not comply. *Id.* at 67–68. The Supreme Court found this was coercion. *Id.* As the Court sensibly observed, "people do not lightly disregard public officers' veiled threats." *Id.* at 68.

The District Court distinguished *Bantam Books* because (i) the letters were sent "on official Commission stationery," (ii) copies of the lists of objectionable books were sent to local police departments, and (iii) the letters were "reasonably understood to be" coercive by the booksellers. 1–ER–12. Finding a dispositive difference between the first two factors and being compelled to appear at nationally-streamed hearings and undergo repeated and prolonged badgering by powerful congresspeople would require judicial angels to dance on the head of a pin. The third factor on which the District Court relied—that the letters were

48

"reasonably understood to be coercive"—was clearly improper on a motion to dismiss. The appeal in *Bantam Books* followed the trial court's entry of a preliminary injunction *accompanied by findings of fact*. *Id.* at 63–64. How the letters there or the congressional threats here were subjectively perceived by the recipients is a question of fact, one that was properly decided in *Bantam Books* and that patently should not have been decided by the District Court below.

In *Lombard*, Black patrons were denied service at an all-White restaurant. The restaurant summoned the police after the group refused to leave; they were arrested and convicted of trespass. The Court found state action in the restaurants' actions solely because the Mayor and Police Chief of New Orleans had said at press conferences that "sit-in" demonstrations would not be tolerated in their city. These public statements, the Court held, "must be treated exactly as if [the City] had an ordinance prohibiting such conduct." 373 U.S. at 273.

According to the District Court, the distinguishing feature between *Lombard* and this case is that, in the former, the city officials "threaten[ed] law enforcement action to crack down on sit-in demonstrations." 1–ER–14. But those threats were *aimed at the demonstrators, not at the restaurant owners* who were in the analogous position to Defendants here. Coercion of the restaurant owners consisted of saying publicly that sit-ins were "not in the community interest" and "would not be permitted, whatever their purpose." 1–ER–13. That rhetoric is

49

timid compared to the blunt language deployed by congressional leaders here. Moreover, the coercive impact of the *Lombard* officials' statements was determined *after trial*. The District Court wrongly engaged in a factual determination that should have been reserved for a jury.

In *Carlin*, a county attorney had "advised" a telephone company to disconnect an "adult entertainment" customer's service and threatened an obscenity prosecution if it did not comply. The District Court here made the same error as it had in analyzing *Bantam* Books and *Lombard*, pointing to language in the opinion stating that the state had "exercised coercive power" over the telephone company. 1–ER–13. But in *Carlin*, that finding was made *on a summary judgment motion*; it thus cannot serve to distinguish *Carlin* from this case. The District Court also noted that the telephone company was threatened with prosecution under a specific law. 1–ER–13. Again, there is no difference. Government officials in this case threatened to penalize Defendants by repealing Section 230. A threat of prosecution is sufficient to establish coercion, but *Carlin* nowhere said it is necessary.

*Mathis* is the only one of these cases decided on motion to dismiss, and the coercive element there was *weaker* than here. A worker at a nuclear power plant sued his employer claiming that he had been excluded from the plant without due process for alleged drug use. This Court found the requisite state action in the

50

form of warnings by the Nuclear Regulatory Commission that licensees needed to control their employees' drug use, or the NRC would do it for them. 891 F.2d at 1431–32. At the time, the NRC had not yet taken any formal action—the NRC's first policy statement on drug use was not published until a year later. Mathis alleged only that the NRC had "pressured" nuclear plant operators. *Id.* at 1432. This Court held that, despite this "bare record," "we cannot agree with the conclusion that Mathis' allegations of governmental coercion or encouragement are frivolous or wholly without substance," and allowed his claim to proceed. 891 F.2d at 1434. The District Court noted that, in *Mathis*, the standard of conduct the NRC desired was "backed up by threats of enforcement or of formal rulemaking," 1–ER–13, which only underscores how similar the cases are. There is no meaningful distinction between threats to initiate a regulatory enforcement proceeding or rulemaking, and congressional threats to pass legislation; both denote unleashing the power of the government if the target doesn't fall in line. Again, the District Court usurped the fact-finder's role and decided, based on no articulated criteria, that the former was more coercive than the latter.

The District Court closed its discussion by observing that, in each case, a "concrete and specific" threatened government action was identified, whereas here, according to the Court, Plaintiffs have identified "only ambiguous and open-ended statements." 1–ER–14. That is simply untrue. Plaintiffs alleged specific and

51

targeted threats; the District Court refused to credit their allegations. *See supra* at 44–47.

### 4.   Plaintiffs Do Not Rely on Compliance with Generally Applicable Laws.

The District Court noted in passing that "'compliance with generally applicable laws' is not sufficient to convert private conduct into state action." 1–ER–16 (citing *Heineke v. Santa Clara University*, 965 F.3d 1009, 1014 (9th Cir. 2020)). Unlike in *Heineke*, Plaintiffs do not rely on Defendants' compliance with a generally-applicable law as a basis for state action. The public officials' challenged actions here were directed either at President Trump individually or targeted a distinct group of citizens who expressed particular disfavored views. That framework aligns exactly with *Lombard* and *Mathis*. The Supreme Court had no difficulty finding state action in *Lombard* even though the governmental conduct in those cases was directed at Black Americans as a group, not specific individuals. And in *Mathis*, the NRC's informal "pressure" tactics were not directed at Mathis individually; the Commission didn't even know he existed.[14]

---

[14] *See also United States v. Ross*, 32 F.3d 1411, 1413–14 (9th Cir. 1994) (airline's search of passenger's luggage to conform to non-binding FAA guidelines was governmental action; FAA did not target any individual passenger); *United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973) (passenger search by private airline was state action due to FAA's incipient efforts to create anti-hijacking program, *(footnote continues on next page)*

### E.  Plaintiffs Also Adequately Alleged State Action by Encouragement and Joint Action.

The court denigrated Plaintiffs' treatment of these state-action theories, which took up nearly five out of 25 pages in Plaintiffs' opposition brief, as "cursory," and brushed them aside in one sentence as "minor variations on the state action theme, [which] are unavailing for the same reasons."  1–ER–16.  To the contrary, these theories provide separate grounds for finding state action.

### 1.  Encouragement

State action exists when the government provides significant encouragement, overt or covert, to the private party's conduct.  *Blum*, 457 U.S. at 1004.  The above-described official statements, coupled with Defendants' governmentally-conferred Section 230 immunity, provided "significant encouragement" to Defendants' censorship.

Defendants may have used Section 230 immunity to block content on their own, but Democratic officials were incensed that Defendants were not censoring aggressively enough.  So, the officials demanded that Defendants use their Section 230 immunity to engage in more censorship.  Thus, the government both handed Defendants the tool with which they could effectively censor and threatened to

---

*(footnote continued from previous page)*
although no federal regulation existed at the time; no claim that FAA specifically directed the particular search).

take it away if Defendants did not censor. The ultimate impact of the statute has been to "encourage and significantly involve the State in private [viewpoint-based] discrimination." *Reitman*, 387 U.S. at 376.

It does not matter that Section 230 does not compel Defendants to take any action. As discussed above, *see* 31-33, *supra*, the state "acts" not only when it coerces, but also when it enables discriminatory private conduct. In *Reitman*, the constitutional amendment making private discrimination immune from the legislative process *encouraged* private racial discrimination and thus violated the Equal Protection Clause. 387 U.S. at 381. In the same way, Section 230's grant of immunity encourages Defendants to block disfavored speech. And in *Skinner* the regulations protecting employers from liability for performing voluntary drug testing "removed all legal barriers" to such testing and thus were "clear indices of the Government's encouragement, endorsement, and participation" in the practice. 489 U.S. at 615–16. Section 230(c) similarly is one of several "indices of the Government's encouragement" of such censorship.

## 2. Joint Action

The joint action test looks to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). The test is satisfied by an "understanding" between private parties and government officials to accomplish

54

a common objective. *See*, *e.g.*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970) (tacit "understanding" enough to create state action). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence…." *Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999). Whether such an agreement exists is "a factual issue and should be resolved by the jury," so long as a rational jury could infer from the circumstances that Defendants and officials reached an understanding to achieve unlawful objectives. *Id.* at 1301–02.

The record brims with facts from which a jury could infer a common undertaking between government officials and Defendants to censor President Trump and others who published disfavored views. Defendant Dorsey admitted that Defendants "partnered" with the federal government to "share information" and "gather input" to "inform [Twitter's] policy and enforcement decisions" 2–ER–122, 125–26. He explicitly committed to implement Democratic legislators' censorship program:

> **Sen. Tammy Duckworth:** "So in closing, **I would like each witness to provide a personal commitment that your respective companies will aggressively identify[] and remov[e] disinformation….** Do I have that commitment from each of you gentlemen?"
>
> **Defendant Dorsey:** "We make that commitment."

MJN–10–11 (emphases added).

55

> **Sen. Blumenthal:** My question to you is **will you commit to the same kind of robust content modification playbook in this coming election**, including fact-checking, labeling, reducing the spread of misinformation, and other steps, even for politicians in the runoff elections ahead?
>
> **Defendant Dorsey: Yes, we do.**

MJN–19 (emphases added). Congressional Democrats crowed that their campaign worked: "These platforms [Twitter, YouTube, and Facebook] often **ramp up their efforts** against [conservative] content in response to social and political pressure." 2–ER–152 (emphasis added). Executive Branch officials trumpeted that they are "regularly in touch with social media platforms to censor speech that the government regards as undesirable. 3–ER–341–42, 346–48. These allegations raise a triable issue regarding Defendants' "willful participation" in the joint censorship campaign. *Sutton*, 192 F.3d at 843.

Moreover, recent astonishing revelations of close government entanglement with social media censorship, *see supra* at 15–17, unquestionably disclose joint action. Had Plaintiffs' claim been allowed to proceed, these facts and other similar information obtained through discovery would have supported a merits decision in Plaintiffs' favor. The District Court erred in rejecting Plaintiffs' joint-action theory without even superficial analysis.

## II. The District Court Erred in Applying California Law.

The District Court dismissed Plaintiffs' claim under FDUPTA, Florida's consumer protection law, on choice-of-law grounds. 1–ER–17–20. FDUPTA grants any plaintiff who has been "aggrieved" standing to seek injunctive relief. Fla. Stat. § 501.211(1). Florida law defines "aggrieved" to mean "angry or sad on grounds of perceived unfair treatment," *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 171–72 (Fla. Dist. Ct. App. 2015), without any economic injury requirement. By contrast, standing under California's Business and Professions Code Section 17200 ("Section 17200") is limited to those who "have lost money or property as a result of such unfair competition." *Californians for Disability Rights v. Mervyn's LLC*, 39 Cal. 4th 223, 227 (2006). As Florida's liberal standing requirements allow FDUTPA actions by plaintiffs otherwise foreclosed under Section 17200's economic injury requirement, this fundamental policy difference establishes Florida's materially greater interest in having its law applied.

The District Court concluded that the Florida and California statutes are not "fundamentally at odds" based on misreading of *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010). 1–ER–18–19. But the Court erroneously relied on *Clayworth's* analysis of remedies rather than its holding on standing, quoting from *Clayworth's* Section III B (entitled "Remedies"), which holds that Section 17200 allows injunctive relief even if no restitutionary recovery is available. *Id.* The Court

overlooked the immediately preceding portion of *Clayworth*, Section III A (entitled "Standing"), which clearly restricts standing to parties who "have 'lost money or property.'" *Id*. at 789.  Given that Florida allows a plaintiff who would be barred from bringing a Section 17200 claim to nonetheless sue under FDUPTA, the District Court's dismissal of Plaintiffs' FDUPTA claim on choice-of-law grounds was error.[15]

## III.    Plaintiffs Have Standing Under the SSMCA.

The District Court made two errors in concluding that Plaintiffs lacked standing under the SSMCA.  1–ER–19–20.

The SSMCA applies to any user who "resides or is domiciled in [Florida] and . . . *has an account* on a social media platform."  Fla. Stat. § 501.2041(1)(h) (emphasis added).  The District Court held that Plaintiffs lacked standing because their Twitter accounts were closed prior to July 1, 2021.  1–ER–19.  The Court misread the FAC.  The accounts of several Plaintiffs, including Mr. Trump, were

---

[15] The District Court also suggested, without holding, that Plaintiffs have not plausibly alleged deceptive conduct by Defendants because, under their Terms of Service, Defendants may terminate or suspend an account "at any time for any or no reason."  1–ER–19.  Not only is this interpretation inconsistent with Defendants' 140-plus page User Agreement, it effectively renders the User Agreement illusory.  Whether under California or Florida law, a court should avoid an interpretation that nullifies a substantial part of the instrument.  *In re Crystal Prop., Ltd.*, 268 F.3d 743, 748 (9th Cir. 2001); *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. Sup. Ct. 2000).

suspended, not closed. 3–ER–356–59, 361. Nothing in the SSMCA forecloses standing to a user with a suspended account. The SSMCA only requires that a user "resides or is domiciled in [Florida] and . . . has an account on a social media platform." Fla. Stat. § 501.2041(1)(h).[16]

The District Court further erred in concluding that Plaintiffs lacked standing because the FAC alleges that Defendants' wrongful actions occurred prior to the SSMCA's effective date, July 1, 2021. 1–ER–19–20. But Twitter maintained the suspensions and other penalties imposed on Plaintiffs, which itself is wrongful. Moreover, as a private-attorney-general statute, the SSMCA grants standing to users even when *another* user has been injured by a platform's inconsistent treatment. Fla. Stat. § 501.2041(6). Accordingly, all Florida Plaintiffs with suspended or active accounts have standing to bring an SSMCA action for the inconsistent application of Twitter's standards as detailed in the FAC.[17] 3–ER–369–74.

---

[16] Plaintiffs Trump, Barbosa, Cuadros, and Latella are Florida residents. 3–ER–329.

[17] After the District Court's Order, the Eleventh Circuit vacated in part and affirmed in part an injunction barring governmental enforcement of the SSMCA. The Court vacated the injunction pertaining to the provision requiring SMPs to publish their censorship standards but affirmed it as to the consistent-application provision. *NetChoice, LLC v. Attorney General, Florida*, 34 F.4th 1196, 1209–10 (11th Cir. 2022). These contradictory rulings were the result of the Court's erroneous focus on how platforms curate content. *Id.* at 1204–05. By ignoring *(footnote continues on next page)*

## CONCLUSION

The judgment of the District Court should be reversed, and the case remanded for further proceedings consistent with this Court's decision.

Date: December 9, 2022          Law Office of Andrei D. Popovici, P.C.

*s/ Marie L. Fiala* _____
Marie L. Fiala

*Attorneys for Appellants*
*Donald J. Trump, American Conservative*
*Union, Rafael Barbosa, Linda Cuadros,*
*Dominick Latella, and Wayne Allyn Root*

JOHN P. COALE
2901 Fessenden Street NW
Washington, DC 20008
Telephone:  (202) 255-2096
Email:  johnpcoale@aol.com

RICHARD POLK LAWSON
GARDNER BREWER HUDSON
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone:  (813) 221-9600
Facsimile:  (813) 221-9611
Email:  rlawson@gardnerbrewer.com

ALEX KOZINSKI
719 Yarmouth Road Suite 101
Palos Verdes Estates, CA 90274
Telephone:  (310) 541-5885
Email:  alex@kozinski.com

FRANK C. DUDENHEFER , JR.
THE DUDENHEFER LAW FIRM
L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone:  (504) 616-5226
Email:  fcdlaw@aol.com

---

*(footnote continued from previous page)*
SMPs' primary function of hosting third-party content, the Court failed to recognize that the consistent-application provision is the necessary complement to the publication requirement, and thus a codification of the common-law prohibition against unfair discrimination by common carriers.  *Id.* at 1220–22.

60

JOHN Q. KELLY
MICHAEL J. JONES
RYAN TOUGIAS
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Compliance

**9th Cir. Case Number:  No. 22–15961**

I am the attorney or self-represented party.

**This brief contains 13,790 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1, including Cir. R. 32-1(f).

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature:**  */s/ Marie L. Fiala*        **Date:**  December 9, 2022
             Marie L. Fiala

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number:  No. 22–15961**

The undersigned attorney or self-represented party states the following:

[  ] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[**X**] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Children's Health Defense v. Facebook, Inc., et al.*, No. 21–16210

The appeal in the *Children's Health Defense* case raises some legal issues closely related to those in the instant appeal, but the issues arise on different factual records.  Not all the legal issues raised in this appeal are closely related to those raised in *Children's Health Defense*.

**Signatur**e:  */s/ Marie L. Fiala*          **Date:**  December 9, 2022
Marie L. Fiala

# ADDENDUM

# TABLE OF CONTENTS

**Page**

U.S. Const. amend. I ............................................................ Add.1

47 U.S. Code § 230 ............................................................. Add.2

Calif. Bus. & Prof. Code § 17200 ....................................... Add.7

Calif. Bus. & Prof. Code § 17203 ....................................... Add.7

Calif. Bus. & Prof. Code § 17204 ....................................... Add.8

Fla. Stat. § 501.211(1) ........................................................ Add.9

Fla. Stat. § 501.2041 ......................................................... Add.10

## U.S. Const. amend. I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**47 U.S. Code § 230**

(a) **Findings**

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) **Policy**

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

Add.2

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(c) **Protection for "Good Samaritan" blocking and screening of offensive material**

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

(d) **Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental

Add.3

control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

(e) **Effect on other laws**

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(5) No effect on sex trafficking law

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

Add.4

(A) any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

(B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

(C) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

(f) **Definitions**

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider

Add.5

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

    (A) filter, screen, allow, or disallow content;

    (B) pick, choose, analyze, or digest content; or

    (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

## Calif. Bus. & Prof. Code § 17200

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

\* \* \*

## Calif. Bus. & Prof. Code § 17203

Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.   The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.

\* \* \*

Add.7

## Calif. Bus. & Prof. Code § 17204

Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or ᴇ district attorney or by ᴇ county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or f}ᴇ city attorney of a city having a population in excess of 750,000, or by a city attorney in ᴇ city and county sᴠ, with the consent of the district attorney, by a city prosecutor in ᴇ city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of ᴇ board, officer, person, corporation, or association, or by ᴇ person who has suffered injury in fact and has lost money or property as a result of the unfair competition.

## Fla. Stat. § 501.211(1)

Other individual remedies.—

(1)   Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

(2)   In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105. However, damages, fees, or costs are not recoverable under this section against a retailer who has, in good faith, engaged in the dissemination of claims of a manufacturer or wholesaler without actual knowledge that it violated this part.

(3)   In any action brought under this section, upon motion of the party against whom such action is filed alleging that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may, after hearing evidence as to the necessity therefor, require the party instituting the action to post a bond in the amount which the court finds reasonable to indemnify the defendant for any damages incurred, including reasonable attorney's fees. This subsection shall not apply to any action initiated by the enforcing authority.

## Fla. Stat. § 501.2041

Unlawful acts and practices by social media platforms.—

(1)   As used in this section, the term:

(a)   "Algorithm" means a mathematical set of rules that specifies how a group of data behaves and that will assist in ranking search results and maintaining order or that is used in sorting or ranking content or material based on relevancy or other factors instead of using published time or chronological order of such content or material.

(b)   "Censor" includes any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. The term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform.

(c)   "Deplatform" means the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days.

(d)   "Journalistic enterprise" means an entity doing business in Florida that:

1.   Publishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users;

Add.10

2.    Publishes 100 hours of audio or video available online with at least 100 million viewers annually;

3.    Operates a cable channel that provides more than 40 hours of content per week to more than 100,000 cable television subscribers; or

4.    Operates under a broadcast license issued by the Federal Communications Commission.

(e)    "Post-prioritization" means action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results. The term does not include post-prioritization of content and material of a third party, including other users, based on payments by that third party, to the social media platform.

(f)    "Shadow ban" means action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform. This term includes acts of shadow banning by a social media platform which are not readily apparent to a user.

(g)    "Social media platform" means any information service, system, Internet search engine, or access software provider that:

1.    Provides or enables computer access by multiple users to a computer server, including an Internet platform or a social media site;

2.    Operates as a sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity;

3.    Does business in the state; and

4.    Satisfies at least one of the following thresholds:

a.    Has annual gross revenues in excess of $100 million, as adjusted in January of each odd-numbered year to reflect any increase in the Consumer Price Index.

b.    Has at least 100 million monthly individual platform participants globally.

The term does not include any information service, system, Internet search engine, or access software provider operated by a company that owns and operates a theme park or entertainment complex as defined in s. 509.013.

(h)    "User" means a person who resides or is domiciled in this state and who has an account on a social media platform, regardless of whether the person posts or has posted content or material to the social media platform.

(2)    A social media platform that fails to comply with any of the provisions of this subsection commits an unfair or deceptive act or practice as specified in s. 501.204.

Add.12

(a)   A social media platform must publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban.

(b)   A social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform.

(c)   A social media platform must inform each user about any changes to its user rules, terms, and agreements before implementing the changes and may not make changes more than once every 30 days.

(d)   A social media platform may not censor or shadow ban a user's content or material or deplatform a user from the social media platform:

1.   Without notifying the user who posted or attempted to post the content or material; or

2.   In a way that violates this part.

(e)   A social media platform must:

1.   Provide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts.

2.   Provide, upon request, a user with the number of other individual platform participants who were provided or shown content or posts.

(f)   A social media platform must:

Add.13

1.    Categorize algorithms used for post-prioritization and shadow banning.

2.    Allow a user to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content.

(g)    A social media platform must provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning and reoffer annually the opt-out opportunity in subparagraph (f)2.

(h)    A social media platform may not apply or use post-prioritization or shadow banning algorithms for content and material posted by or about a user who is known by the social media platform to be a candidate as defined in s. 106.011(3)(e), beginning on the date of qualification and ending on the date of the election or the date the candidate ceases to be a candidate. Post-prioritization of certain content or material from or about a candidate for office based on payments to the social media platform by such candidate for office or a third party is not a violation of this paragraph. A social media platform must provide each user a method by which the user may be identified as a qualified candidate and which provides sufficient information to allow the social media platform to confirm the user's qualification by reviewing the website of the Division of Elections or the website of the local supervisor of elections.

(i)    A social media platform must allow a user who has been deplatformed to access or retrieve all of the user's information, content, material, and data for at least 60 days after the user receives the notice required under subparagraph (d)1.

(j)    A social media platform may not take any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast. Post-prioritization of certain journalistic enterprise content based on payments to the social media platform by such journalistic enterprise is not a violation of this paragraph. This paragraph does not apply if the content or material is obscene as defined in s. 847.001.

(3)    For purposes of subparagraph (2)(d)1., a notification must:

(a)    Be in writing.

(b)    Be delivered via electronic mail or direct electronic notification to the user within 7 days after the censoring action.

(c)    Include a thorough rationale explaining the reason that the social media platform censored the user.

(d)    Include a precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable.

(4)    Notwithstanding any other provisions of this section, a social media platform is not required to notify a user if the censored content or material is obscene as defined in s. 847.001.

(5)    If the department, by its own inquiry or as a result of a complaint, suspects that a violation of this section is imminent, occurring, or has occurred, the department may investigate the suspected violation in accordance with this part. Based on its investigation, the department may bring a civil or administrative action under this part. For the purpose of bringing an action pursuant to this section, ss. 501.211 and 501.212 do not apply.

(6)    A user may only bring a private cause of action for violations of paragraph (2)(b) or subparagraph (2)(d)1. In a private cause of action brought under paragraph (2)(b) or subparagraph (2)(d)1., the court may award the following remedies to the user:

(a)    Up to $100,000 in statutory damages per proven claim.

(b)    Actual damages.

(c)    If aggravating factors are present, punitive damages.

(d)    Other forms of equitable relief, including injunctive relief.

(e)    If the user was deplatformed in violation of paragraph (2)(b), costs and reasonable attorney fees.

Add.16

(7)    For purposes of bringing an action in accordance with subsections (5) and (6), each failure to comply with the individual provisions of subsection (2) shall be treated as a separate violation, act, or practice. For purposes of bringing an action in accordance with subsections (5) and (6), a social media platform that censors, shadow bans, deplatforms, or applies post-prioritization algorithms to candidates and users in the state is conclusively presumed to be both engaged in substantial and not isolated activities within the state and operating, conducting, engaging in, or carrying on a business, and doing business in this state, and is therefore subject to the jurisdiction of the courts of the state.

(8)    In an investigation by the department into alleged violations of this section, the department's investigative powers include, but are not limited to, the ability to subpoena any algorithm used by a social media platform related to any alleged violation.

(9)    This section may only be enforced to the extent not inconsistent with federal law and 47 U.S.C. s. 230(e)(3), and notwithstanding any other provision of state law.

(10)(a)    All information received by the department pursuant to an investigation by the department or a law enforcement agency of a violation of this section is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State

Constitution until such time as the investigation is completed or ceases to be active. This exemption shall be construed in conformity with s. 119.071(2)(c).

(b)   During an active investigation, information made confidential and exempt pursuant to paragraph (a) may be disclosed by the department:

1.   In the performance of its official duties and responsibilities; or

2.   To another governmental entity in performance of its official duties and responsibilities.

(c)   Once an investigation is completed or ceases to be active, the following information received by the department shall remain confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution:

1.   All information to which another public records exemption applies.

2.   Personal identifying information.

3.   A computer forensic report.

4.   Information that would otherwise reveal weaknesses in a business's data security.

5.   Proprietary business information.

(d)   For purposes of this subsection, the term "proprietary business information" means information that:

1.   Is owned or controlled by the business;

2.   Is intended to be private and is treated by the business as private because disclosure would harm the business or its business operations;

3.   Has not been disclosed except as required by law or a private agreement that provides that the information will not be released to the public;

4.   Is not publicly available or otherwise readily ascertainable through proper means from another source in the same configuration as received by the department; and

5.   Includes:

a.   Trade secrets as defined in s. 688.002.

b.   Competitive interests, the disclosure of which would impair the competitive advantage of the business that is the subject of the information.

(e)   This subsection is subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2026, unless reviewed and saved from repeal through reenactment by the Legislature.