No. 22-15961

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD J. TRUMP, et al.,

*Plaintiffs-Appellants*,

*v.*

TWITTER, INC. AND JACK DORSEY,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California, No. 3:21-cv-08378-JD (Donato, J.)

### BRIEF FOR APPELLEES TWITTER, INC. AND JACK DORSEY

FELICIA H. ELLSWORTH
ZAKI ANWAR
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02190
(617) 526-6000

RISHITA APSANI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ARI HOLTZBLATT
ALLISON M. SCHULTZ
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue
Washington, DC 20037
(202) 663-6000

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, California 94306
(650) 858-6000

March 15, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Twitter, Inc. discloses that it is a privately held company, and its parent corporation is X Holdings I, Inc.  No publicly held corporation owns 10 percent or more of Twitter, Inc.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...........................................................................v

INTRODUCTION .......................................................................................1

CONSTITUTIONAL AND STATUTORY PROVISIONS.....................................3

COUNTERSTATEMENT OF ISSUES ............................................................3

COUNTERSTATEMENT OF THE CASE........................................................4

    A.    Twitter And Its Content-Moderation Rules .........................................4

    B.    Plaintiffs' Twitter Accounts ...............................................................5

        1.    Mr. Trump ...............................................................................5

        2.    Naomi Wolf...............................................................................6

        3.    The Other Plaintiffs...................................................................7

    C.    Plaintiffs' Allegations About Government Officials ...........................7

    D.    Procedural History...........................................................................10

    E.    Reinstatement of Appellants' Twitter Accounts.................................14

    F.    Denial of Ms. Wolf's Rule 60(b) Motion on Mootness
        Grounds .........................................................................................15

SUMMARY OF THE ARGUMENT ...............................................................16

ARGUMENT .............................................................................................18

I.    MOST OF PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE MOOT
    AND SHOULD BE DISMISSED .........................................................18

II.  THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' FIRST
     AMENDMENT CLAIMS BECAUSE TWITTER IS A PRIVATE ENTITY
     ENTITLED TO MODERATE CONTENT ON ITS PLATFORM ................................23

     A.   Twitter Did Not Remove Plaintiffs' Accounts Pursuant
          To A State-Imposed Rule Of Conduct Or State-Created
          Right Or Privilege ................................................................25

          1.   The Amended Complaint failed to allege Twitter
               acted pursuant to a state-created right or privilege ..................25

          2.   The Amended Complaint failed to allege Twitter
               acted pursuant to a state-imposed rule of conduct ...................27

          3.   The district court correctly required Plaintiffs to
               satisfy *Lugar*'s first prong ...........................................31

     B.   The District Court Correctly Concluded Plaintiffs Failed
          To Plausibly Plead Twitter Is A State Actor .......................................33

          1.   The Amended Complaint failed to allege
               compulsion ...................................................................34

          2.   The Amended Complaint failed to allege
               significant encouragement .........................................43

          3.   Plaintiffs failed to state a claim under any joint-
               action theory.................................................................46

               a.   The Amended Complaint did not allege
                    substantial cooperation between Twitter and
                    the government regarding the challenged
                    decisions ........................................................47

               b.   The Amended Complaint did not allege a
                    conspiracy to violate Plaintiffs'
                    constitutional rights .......................................50

               c.   Twitter cannot be held liable under a joint-
                    action theory because it neither wielded nor
                    benefited from the exercise of state authority ...............52

III. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' STATE-LAW CLAMS ........................................................54

    A. Plaintiffs Failed To State A FDUTPA Claim ....................54

        1. Plaintiffs' FDUTPA claim is barred by the choice-of-law provision in Twitter's Terms of Service ......................54

        2. Plaintiffs failed to allege any deceptive conduct .....................58

    B. The District Court Correctly Dismissed Plaintiffs' SSMCA Claim Because The Challenged Conduct Occurred Before Its Enactment ...........................................59

IV. PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT ........................................................................62

    A. Twitter's Content Moderation Decisions Are Protected By The First Amendment ...................................................62

    B. Twitter's First Amendment Rights Defeat Plaintiffs' Claims ...............................................................................65

CONCLUSION ................................................................................67

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

Page(s)

*ABF Capital Corp. v. Osley*, 414 F.3d 1061 (9th Cir. 2005)......................55, 56, 57

*Abu-Jamal v. NPR*, 1997 WL 527349 (D.D.C. Aug. 21, 1997) ...........................38

*Agostini v. Felton*, 521 U.S. 203 (1997) ...................................................32

*American Family Association v. City & County of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ...........................................................35

*American Manufacturers Mutual Insurance Co. v. Sullivan*,
526 U.S. 40 (1999)...........................................................................43

*Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133 (9th Cir.
1971) ..............................................................................................66

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) ...................................38

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ..............................................38

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ........................................................44

*Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020).....................................24, 25, 31, 33

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
403 U.S. 388 (1971).........................................................................22

*Blum v. Yaretsky*, 457 U.S. 991 (1982)............................................................34, 41

*Brach v. Newsom*, 38 F.4th 6 (9th Cir. 2022) ..........................................................18

*Brack v. Omni Loan Co.*, 80 Cal.Rptr.3d 275 (Ct. App. 2008) ..............................57

*Brentwood Academy v. Tennessee Secondary School Athletic
Association*, 531 U.S. 288 (2001)....................................................31

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d
996 (9th Cir. 2010) .........................................................................57

*Brunette v. Human Society of Ventura County*, 294 F.3d 1205
(9th Cir. 2002) .................................................................46, 50, 52

*Buentello v. Boebert*, 545 F. Supp. 3d 912 (D. Colo. 2021)....................................38

*Cafasso, United States es rel. v. General Dynamics C4 Systems, Inc.*,
637 F.3d 1047 (9th Cir. 2011) ........................................................39

*Carlin Communications, Inc. v. Mountain States Telephone &
Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987)................................35, 41, 42

*Children's Health Defense v. Facebook Inc.*, 546 F. Supp. 3d 909
(N.D. Cal. 2021) ............................................................................29

*Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989)....................................31, 49

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) ................................22

*Daniels v. Alphabet Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31,
2021) ..............................................................................................38

*Denver Area Education Telecommunications Consortium, Inc. v.
FCC*, 518 U.S. 727 (1996).......................................................24, 67

*Doe v. Google LLC*, 2022 WL 17077497 (9th Cir. Nov. 18,
2022) .................................................................22, 29, 37, 38, 42

*Egbert v. Boule*, 142 S. Ct. 1793 (2022)................................................22

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002) ............................................46, 48, 50

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC),
Inc.*, 528 U.S. 167 (2000) ..............................................................19

*Fultz v. Rose*, 833 F.2d 1380 (9th Cir. 1987)..............................................19

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir.
1995) ......................................................................................48, 50

*Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022)................................31

*Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320 (9th Cir. 1982)....................53

- vi -

*Hamamoto v. Ige*, 881 F.3d 719 (9th Cir. 2018)......................................................21

*Heineke v. Santa Clara University*, 965 F.3d 1009 (9th Cir. 2020) .......................40

*Hernandez v. County of Monterey*, 70 F. Supp. 3d 963 (N.D. Cal. 2014) ...............................................................................................................23

*Howerton v. Gabica*, 708 F.2d 380 (9th Cir. 1983)............................................46, 53

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) ................................................................62, 63, 64

*In re Tobacco II Cases*, 46 Cal.4th 298 (2009) ......................................................58

*Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000)............................................53

*Janus v. American Federation of State, County, & Municipal Employees*, 138 S. Ct. 2448 (2018) ................................................................45

*Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116 (9th Cir. 2008) ...............................................................................................................58

*Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003) ...................................................32

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)..........................................5, 9, 39

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994).............................................59

*Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002) ..............................................................33

*Lombard v. Louisiana*, 373 U.S. 267 (1963) ..........................................................38

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ................. 12, 23, 24, 25, 31, 33

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) ..............................67

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019).....................................................................................1, 23, 24, 42, 54

*Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498 (9th Cir. 1996) ...........................................................................................33, 46, 47, 49

*Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429 (9th Cir. 1989) ..................................................................................... 27-28, 38, 48

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ...................... 62, 63

*Murphy v. Twitter, Inc.*, 274 Cal.Rptr.3d 360 (Ct. App. 2021) ............................... 59

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) .................................................................................................. 67

*National Rifle Association of America v. Vullo*, 49 F.4th 700 (2d Cir. 2022) .................................................................................................... 35

*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459 (1992) .......................... 55, 56

*NetChoice, LLC v. Attorney General, Florida*, 34 F.4th 1196 (11th Cir. 2022) ............................................................................... 64, 65, 66

*O'Handley v. Padilla*, 579 F. Supp. 3d 1163 (N.D. Cal. 2022) ............................. 64

*O'Handley v. Weber*, 2023 WL 2443073 (9th Cir. Mar. 10, 2023) ............................................................................................... *passim*

*Orr v. Plumb*, 884 F.3d 923 (9th Cir. 2018) ............................................................. 57

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ................................................................. 63, 65

*Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161 (9th Cir. 2021) ................................................................................ 32

*Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020) .......................... 23

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) .................................. 64

*Public Utilities Commission State of California v. FERC*, 100 F.3d 1451 (9th Cir. 1996) ........................................................................ 20

*Radcliffe v. Rainbow Construction Co.*, 254 F.3d 772 (9th Cir. 2001) .................. 52

*Railway Employees' Department v. Hanson*, 351 U.S. 225 (1956) ................. 27, 45

*Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020) .............. 33, 53

*Reitman v. Mulkey*, 387 U.S. 369 (1967). ..................................................... 26-27, 44

*Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017) .................. 32, 43, 44

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) ...................................67

*Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989) ..........................................................................................................26

*Spencer v. Kemna*, 523 U.S. 1 (1998) .....................................................18

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................................................52

*Southern Oregon Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2004) ....................................................................................19

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) ........................................................................27, 40, 42

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012)............................ 52-53

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ...........................63

*Villegas v. Gilroy Garlic Festival Association*, 541 F.3d 950 (9th Cir. 2008) ....................................................................................32

*Washington Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906 (2001) .........................................................................................55

*West v. Atkins*, 487 U.S. 42 (1988) ..................................................31, 48

*Wright v. Service Employees International Union*, 48 F.4th 1112 (9th Cir. 2022) ................................................................32, 34

*Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081 (9th Cir. 2018) ....................................................................................56

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ...............................44

*Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) ..............................64

*Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281 (11th Cir. 2007) .................59

## STATUTES AND LEGISLTIVE MATERIALS

47 U.S.C. § 230.........................................................................................44

Cal. Proposition 64, § 1, subd. (e) (2002).................................................58

Fla. Laws, ch. 32, § 7 (2021) ...................................................................59

Fla. Stat. § 501.2041 .........................................................................60, 61

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat.
§§ 501.201 *et seq.* .............................................................................3

## OTHER AUTHORITIES

13C Wright, Charles A. & Arthur R. Miller, *Federal Practice &
Procedure: Jurisdiction* (3d ed. 2022) ...........................................19

*Merriam-Webster Dictionary*, https://www.merriam-
webster.com/dictionary/apply (visited Mar. 15, 2023) .................61

Twitter, Inc., Amendment No. 13 to Schedule 13D (Form SC 13D/A)
(Oct. 27, 2022), https://tinyurl.com/mr4aspek .......................14, 20

## INTRODUCTION

Twitter suspended or restricted Plaintiffs' accounts after making an editorial decision that it no longer wished to disseminate Plaintiffs' content. Plaintiffs responded by filing this putative nationwide class-action seeking, among other things, an injunction forcing Twitter to carry Plaintiffs' speech and appointing a court-supervised monitor to oversee all of Twitter's future content-moderation decisions for the hundreds of millions of Tweets posted on its platform every day. In support of this sweeping relief, Plaintiffs assert claims that would upend bedrock principles of constitutional law and stretch Florida consumer-protection laws far beyond their geographic, temporal, and substantive limits.

Plaintiffs' constitutional claim turns the First Amendment on its head. Twitter is a private actor with its own constitutionally protected free-speech rights. As a private actor, Twitter can be held to constitutional scrutiny only if found to be a state actor, a purposefully demanding test intended to "protect a robust sphere of individual liberty." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). But in Plaintiffs' view, any speech by an individual legislator expressing concern about a pressing public issue or any public-private information sharing would be enough to strip private actors of their constitutionally protected right to exercise editorial control over the messages they disseminate through their communications platforms. This theory runs headlong into *O'Handley v. Weber*,

- 1 -

2023 WL 2443073, at *6 (9th Cir. Mar. 10, 2023), where this Court held that government officials may attempt to persuade "a private intermediary not to carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply."  For good reason.  Were Plaintiffs' contrary view to prevail, competing calls from political actors—some calling on Twitter to act and others simultaneously urging Twitter not to act—would deprive a private actor like Twitter of any space to exercise its own rights. After all, every private action would align with some governmental call to action and would thus be deemed an act of the state.  Precisely to guard against such an evisceration of private rights, the state action doctrine requires far more than what Plaintiffs alleged here.

Bereft of a constitutional hook for their complaints about Twitter's past content-moderation decisions, Plaintiffs seek to dictate Twitter's editorial decisions through state laws that either they agreed would not apply to Twitter's conduct or that were not even enacted at the time of the challenged decisions.  As the district court rightly determined, such laws provide no basis for judicial second-guessing of Twitter's content-moderation decisions.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

An addendum sets forth all pertinent constitutional and statutory provisions.

## COUNTERSTATEMENT OF ISSUES

1.      Whether Donald Trump, Linda Cuadros, Wayne Root, and Naomi Wolf's First Amendment claims are moot because Twitter has chosen to reinstate their accounts.

2.      Whether the district court correctly dismissed Plaintiffs' First Amendment claims on the ground that they did not plausibly allege state action.

3.      Whether the district court correctly held that Plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. §§ 501.201 *et seq.* are barred by the choice-of-law provision in Twitter's Terms of Service.

4.      Whether the district court correctly held that Plaintiffs' claims under the Stop Social Media Censorship Act ("SSMCA") fail because Plaintiffs challenged only conduct that occurred before the SSMCA's effective date.

5.      Whether Twitter's own First Amendment rights defeat Plaintiffs' claims.

- 3 -

## COUNTERSTATEMENT OF THE CASE

### A.    Twitter And Its Content-Moderation Rules

Twitter operates a global communications platform through which hundreds of millions of people share views and follow current events.  *See* 3-ER-326, 332 (¶¶2, 36).  At all times relevant to the Amended Complaint, Twitter adopted and enforced its own content-moderation policies, including the Twitter Rules, to minimize the reach of certain types of content that Twitter deemed harmful to the conversation on the platform.  SER31-54.

This appeal involves three such Rules.  Twitter's Civic Integrity Policy prohibited posting false and misleading information regarding elections and other civic processes, including "false or misleading information intended to undermine public confidence in an election."  SER39.  Twitter's COVID-19 Misleading Information Policy prohibited account holders from sharing "[c]ontent that is demonstrably false or misleading and may lead to significant risk of harm," including regarding "the efficacy and/or safety of preventative measures, treatments, or other precautions."  SER43.  And Twitter's Glorification of Violence Policy prohibited "glorify[ing], celebrat[ing], prais[ing], or condon[ing] violent crimes, violent events where people were targeted because of their membership in a protected group, or the perpetrators of such acts."  SER32.

- 4 -

Twitter made these Rules publicly available on its website, and all Twitter users, including Plaintiffs, agreed to comply with them as a condition of using the platform. 3-ER-404 (Order Granting Mot. to Transfer 1-2 (S.D. Fla. 2021), ECF No. 87). In the Terms of Service, Twitter reserved the right to remove content that violated the Twitter Rules. SER63. The Terms also provided that Twitter "may ... remove or refuse to distribute any Content," that it "may suspend or terminate your account … at any time for any or no reason," SER63, 69, and that Twitter was also free to "not monitor or control the Content posted" on its platform, SER58.[1]

## B.   Plaintiffs' Twitter Accounts

Twitter suspended, labeled, or restricted Plaintiffs' Twitter accounts, explaining to Plaintiffs that they had each violated the Twitter Rules. 3-ER-354-362 (¶¶113, 124, 129, 137, 146, 155, 167).

### 1.   Mr. Trump

Around the time of the November 2020 presidential election, Twitter labeled several of Mr. Trump's Tweets as containing "misleading [information] about an

---

[1] The Amended Complaint referenced the Terms of Service and Twitter's Rules, as well as Twitter's public reasoning for suspending Mr. Trump's account. 3-ER-332-333, 353-354. These materials were therefore integral to the allegations of the Amended Complaint and were properly considered in deciding the motion that Defendants filed under Rule 12(b)(6). *See Knievel v. ESPN*, 393 F.3d 1068, 1076-1077 (9th Cir. 2005). For the reasons set forth in Twitter's motion for judicial notice, this Court may also take judicial notice of these materials.

election or other civic process." 3-ER-353-354 (¶¶110-111). On January 7, 2021, the day after Congress convened to count electoral votes and certify the presidential election, Twitter publicly announced that, "[a]s a result of the unprecedented and ongoing violent situation in Washington, D.C.," it had required Mr. Trump to remove certain Tweets and locked his account for 12 hours. SER75. The next day, January 8, 2021, Mr. Trump posted additional Tweets that Twitter determined could encourage further violence, including: "The 75,000,000 great American Patriots who voted for me, AMERICA FIRST, and MAKE AMERICA GREAT AGAIN, will have a GIANT VOICE long into the future. They will not be disrespected or treated unfairly in any way, shape or form!!!" SER78. Shortly thereafter, he tweeted, "To all of those who have asked, I will not be going to the Inauguration on January 20th." *Id.*

In response, that same day, Twitter permanently suspended Mr. Trump's account. It explained that, read in the context of "the ongoing tensions in the United States, and an uptick in the global conversations in regards to the people who violently stormed the Capitol," Mr. Trump's statements "can be mobilized by different audiences, including to incite violence." SER78.

### 2. Naomi Wolf

Naomi Wolf has been a Twitter user since 2011. 3-ER-360 (¶157). On June 5, 2021, Twitter suspended Naomi Wolf's account for one month for violating the

COVID-19 misinformation policy in place at the time, and eventually permanently suspended her account. 3-ER-361 (¶¶159, 162); SER133.

### 3. The Other Plaintiffs

The Amended Complaint alleged that Twitter permanently suspended the accounts of four other Plaintiffs (Cuadros, Barboza, Latella, and Root) for posting election- and COVID-19-related information that Twitter deemed to violate various Twitter Rules, *see* 3-ER-356-361 (¶¶124, 132, 135-137, 142-143, 150, 159). The Complaint also alleged that the account of Plaintiff American Conservative Union ("ACU") experienced "a marked decrease in followers," without attributing the alleged decrease to any particular action by Twitter. 3-ER-357 (¶¶128-129).

### C. Plaintiffs' Allegations About Government Officials

The Amended Complaint posited that Twitter's decisions regarding Plaintiffs' accounts were not really Twitter's but were acts of the federal government—rendering Twitter's conduct state action for purposes of constitutional liability. Its sole basis for this theory was a collection of disparate statements by various members of Congress, executive branch officials, and private citizens—none joined as defendants—that supposedly pressured or encouraged Twitter to take action against Plaintiffs' accounts. Plaintiffs listed a few such statements in their Amended Complaint, 3-ER-336, and subsequently identified other statements in motions for judicial notice filed in support of their opposition to Defendants' motion to dismiss,

2-ER-116, and in support of their opening brief on appeal, Appellants' Motion for Judicial Notice, Dkt. 34-1 ("Pls.' MJN").[2]

*Statements By Non-Governmental Actors.* Some of the statements on which Plaintiffs relied are not statements by government actors at all. For example, the Amended Complaint cited to a statement by former First Lady Michelle Obama calling for "Silicon Valley companies to … permanently ban[] this man (Trump) from their platform." 3-ER-337. Plaintiffs also relied on statements from then-candidate Joe Biden, 3-ER-336, a Biden campaign advisor, *id.*, and a private venture capitalist, Exhibits to Appellants' MJN 155-162, Dkt. 34-2 ("Pls.' MJN Exs.").

*Statements By Congressmembers.* Plaintiffs also cited statements from individual legislators, such as then-Senator Kamala Harris, calling for the removal of Mr. Trump's account. 3-ER-335-337 (¶55). These included statements disapproving of Mr. Trump's Tweets and urging social media companies to act on "misinformation," "disinformation," and "extremist" content. 1-ER-121–2-ER-147; Pls.' MJN Exs. at 5-32. In a handful of instances where certain legislators expressed concern with misinformation, they vaguely stated that some kind of legislative reform may be warranted. 1-ER-139–2-ER-147.

---

[2] As explained in Appellees' Response to Certain Plaintiffs' Motion for Judicial Notice, Dkt. 42, this last set of materials should have been raised before the district court in the first instance and, in any event, are not proper subjects of judicial notice.

Plaintiffs also cited to statements made by other Congressmembers expressing the view that Section 230 of the Communications Decency Act or the antitrust laws should be amended. *See* 3-ER-335-337 (¶55). Although the Amended Complaint characterized these statements regarding Section 230 and antitrust law as "threatening" legislative consequences if Twitter did not "censor" disfavored content, none of the statements indicated that either set of laws might somehow be amended if Twitter failed to take any specific action with respect to any of Plaintiffs' accounts or even with respect to its misinformation policies generally. *Id.*

Notably, during the same congressional hearings in which Plaintiffs claim Congressmembers allegedly "coerced" Twitter to address misinformation, other Congressmembers urged Twitter (and other companies) to adopt the opposite approach: less-restrictive content moderation. Congressman Walberg, for example, disagreed with Twitter's suspension of Mr. Trump's account and questioned whether the "law should allow [Twitter] to be the arbiter[] of truth, as they have under Section 230." *See* Twitter's Mot. for Judicial Notice Ex. A at 133.[3] And Senators Grassley and Hawley criticized Twitter's relationship with the former director of the

---

[3] Plaintiffs selectively quote statements from this hearing in both motions for judicial notice. Therefore, this Court may consider the full hearing transcript under the incorporation by reference doctrine. S*ee Knievel*, 393 F.3d at 1076-1077. As set forth more fully in Twitter's motion for judicial notice, the Court may also take judicial notice of this transcript.

Department of Homeland Security's Disinformation Governance Board, whom they characterized as "a known trafficker of foreign disinformation and liberal conspiracy theories." Pls.' MJN Exs. at 70-74.

***Statements By Executive Branch Officials.*** Plaintiffs also quote various statements from the Center for Disease Control, White House press secretary Jennifer Psaki, and Surgeon General Vivek Murthy urging social media companies to act on supposed health misinformation. Most of these statements were made after Twitter suspended or restricted Plaintiffs' accounts, and many were directed exclusively at Facebook—not Twitter. 3-ER-346-354 (¶¶96-97, 112); Pls.' MJN Exs. at 41-62. On appeal, Plaintiffs also cite to emails from various governmental agencies—such as the CDC and the Cybersecurity and Infrastructure Agency—to Twitter and Facebook reporting potential instances of misinformation. Pls.' MJN Exs. at 75-143.

### D. Procedural History

Plaintiffs filed this lawsuit in the United States District Court for the Southern District of Florida claiming that Twitter's decision to suspend their accounts for violating its platform rules violated the First Amendment and various Florida state

laws. 3-ER-395.[4] Their Amended Complaint sought sweeping relief in the form of damages and a judicial order "allowing the Plaintiff and the Putative Class Members to return to the platform, compelling Defendants to honor Twitter's own Rules, and impose a monitor to ensure Defendants' compliance with this Court's order consistently to apply Defendants' own standards, [and] only apply Defendants' published standards when evaluating content on the platform." 3-ER-374-375 (¶220).

Pursuant to a motion by Twitter, the Florida court transferred the case to the Northern District of California, holding that Plaintiffs had agreed to be bound by Twitter's Terms of Service and that the forum-selection clause in those Terms required the case to be litigated in the Northern District of California. Order Granting Mot. to Transfer 1-2 (S.D. Fla. 2021), Dkt. 87; 1-ER-6.

Following transfer, Twitter moved to dismiss. The district court granted Twitter's motion to dismiss. 1-ER-20.

The district court held that Plaintiffs' First Amendment claim failed as a matter of law because "Twitter is a private company, and 'the First Amendment applies only to governmental abridgements of speech, and not to alleged

---

[4] On October 1, 2021, Plaintiff Trump also filed a motion for a preliminary injunction, which the district court dismissed as moot when granting Twitter's motion to dismiss. 1-ER-2-3.

abridgements by private companies.'" 1-ER-6. The district court held that Plaintiffs could not overcome that hurdle because "the amended complaint does not plausibly allege that Twitter acted as a government entity when it closed plaintiffs' accounts." 1-ER-16. Following the Supreme Court's decision in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), the district court applied a "two-part approach" to determine whether Twitter's suspension of Plaintiffs' accounts amounted to state action. 1-ER-8.

With respect to the first prong, the district court concluded that the Amended Complaint did not plausibly show that Plaintiffs' "ostensible First Amendment injury was caused by 'a rule of conduct imposed by the government.'" 1-ER-9. The district court reasoned that the Amended Complaint's "grab-bag of allegations to the effect that some Democratic members of Congress wanted Mr. Trump, and 'the views he espoused,' to be banned from Twitter" are a "far cry from a 'rule of decision for which the State is responsible'" because "[l]egislators are perfectly free to express opinions without being deemed the official voice of 'the State'" and because it is "not plausible to conclude that Twitter or any other listener could discern a clear state rule in such remarks, or even determine what a legislator's 'preferred views' might be." *Id.*

The district court next concluded that Plaintiffs did not satisfy *Lugar*'s second prong—that "Twitter could fairly be deemed to be a state actor." 1-ER-10. The

district court first rejected Plaintiffs' coercion theory. It held that, "[e]ven giving plaintiffs every benefit of the doubt," statements of individual legislators calling for greater accountability for social media platforms or expressing concerns about misinformation "fall short" of the coercion mark. 1-ER-11.

With respect to the remaining state action theories, the district court concluded that "Plaintiffs' cursory mention of state 'encouragement' (through Section 230(c)) and 'joint action' are minor variations" on the coercion theory and are "unavailing for the same reasons." 1-ER-16.

Finally, the district court dismissed Plaintiffs' claims under Florida state law. The court held that the California choice-of-law provision in Twitter's Terms of Service barred Plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), 1-ER-17-19, and that Plaintiffs failed to state a claim under the Stop Social Media Censorship Act ("SSMCA") because only one of the Plaintiffs (Latella) was a Florida resident with an active account at the time the law took effect, the Amended Complaint challenged only conduct that occurred *before* the statute's effective date, and there were serious doubts as to the constitutionality of the SSMCA, 1-ER-19-20.

- 13 -

Although the district court dismissed the Amended Complaint with leave to amend, Plaintiffs advised the district court that they did not intend to file a second amended complaint. 1-ER-2. Consequently, the district court entered judgment against the Plaintiffs, *id.*, and Plaintiffs noticed this appeal.

### E. Reinstatement of Appellants' Twitter Accounts

While this appeal was pending, Twitter was acquired by X Holdings I, Inc., a corporation majority-owned and controlled by Elon R. Musk. *See* Twitter, Inc., Amendment No. 13 to Schedule 13D (Form SC 13D/A) (Oct. 27, 2022), https://tinyurl.com/mr4aspek. Mr. Musk has since made significant changes to Twitter's policies.

Relevant here, on November 18, Musk conducted a public poll asking whether he should reinstate Mr. Trump's twitter account. Holtzblatt Decl. Ex. A. The following day, Musk announced that "[t]he people have spoken" and thus "Trump will be reinstated." Holtzblatt Decl. Ex. B.

Also in November 2022, Twitter announced that it is "no longer enforcing the COVID-19 misleading information policy," Holtzblatt Decl. Ex. C—one of the policies that Plaintiffs claimed Twitter had previously enforced against them, *see*, *e.g.*, 3-ER-360-361. Then, on November 24, 2022, Twitter announced a general amnesty to reinstate certain previously suspended accounts. Holtzblatt Decl. Ex. D. Pursuant to that general amnesty, Twitter reinstated the accounts of several other

Plaintiffs, including Naomi Wolf (@naomirwolf), Linda Cuadros (@wakeupwithlinda), and Wayne Root (@RealWayneRoot). Sebhatu Decl. ¶¶3, 5, 7, 9. Twitter has not taken any new content-moderation enforcement actions against these accounts since reinstatement. *Id.*

### F. Denial of Ms. Wolf's Rule 60(b) Motion on Mootness Grounds

On August 26, 2022, Plaintiff Naomi Wolf filed a motion for an indicative ruling in the district court under Federal Rule of Civil Procedure 60(b), arguing she was entitled to relief from judgment on her First Amendment claim based on the same documents that the other Plaintiffs have sought to put before this Court in their motion for judicial notice. 3-ER-411.

On February 14, 2023, the district court denied Wolf's Rule 60(b) motion as moot. SER188-192. The district court found there was "no doubt that Wolf's First Amendment claim for an injunction restoring her Twitter account is moot" because she had "obtained all the injunctive relief she asked for in the complaint," by having her account reinstated by Twitter and not being subjected to any content moderation. SER190-191. No mootness exception applied because the changes were "not transient" but rather "part and parcel of a 'fundamentally different business vision.'" SER191.

- 15 -

## SUMMARY OF THE ARGUMENT

Plaintiffs' lead claim is that Twitter's editorial judgments not to disseminate Plaintiffs' messages violated Plaintiffs' First Amendment rights. As a threshold matter, the First Amendment claims of Donald J. Trump, Linda Cuadros, Wayne Alan Root, and Naomi Wolf should be dismissed as moot. Each of these Plaintiffs' accounts has been reinstated to Twitter's platform and therefore these Plaintiffs have received all possible relief associated with their First Amendment claims. The District Court recognized exactly that with regards to Wolf, and the same is true for Donald Trump, Linda Cuadros, and Wayne Root.

On the merits, Plaintiffs' First Amendment argument ignores both that Twitter is a private actor that is not constrained by the federal Constitution and that Twitter has its own First Amendment rights to make those judgments. Plaintiffs assert coercion and joint action theories of state action, but both are unavailing. Regarding coercion, as the district court correctly held, Plaintiffs failed to identify a specific threat of government sanction if Twitter failed to suspend their accounts, let alone one made by a person with the authority to carry though. Regardless, a private actor cannot be held liable for conduct compelled by the government; only the government can be sued on such a claim. And regarding joint action, Plaintiffs alleged only high-level communications regarding misinformation in general or public-private information sharing, neither of which amounts to the kind of close coordination

- 16 -

regarding the specific conduct challenged nor a meeting of the minds to violate the Plaintiffs' constitutional rights as required to subject Twitter to constitutional scrutiny. Moreover, a private actor can be held liable under a joint action theory only where the private actor either cloaked themselves in the power of the state or else benefited directly from the state's authority, neither of which Plaintiffs alleged here.

The district court also correctly dismissed Plaintiffs' state-law claims. Plaintiffs cannot state a FDUTPA claim because application of that Florida law is barred by the choice of California law in Twitter's Terms of Service, to which Plaintiffs agreed. And, regardless, Plaintiffs failed to allege that any reasonable consumer would be deceived by Twitter's policies into thinking that Twitter could not take content-moderation action for any reason whatsoever, given that Twitter's Terms expressly reserve that right. Plaintiffs also failed to state a claim under the SSMCA because they challenged only conduct predating its effective date, and the statute cannot be applied retroactively to Twitter's pre-enactment conduct.

Regardless of Plaintiffs' failure to state any claim on the merits, their claims are all independently barred by the First Amendment. Twitter has the First Amendment right to determine what content to permit on its platform. Even state action, successfully pleaded, cannot overcome a private actor's own First

- 17 -

Amendment rights. And Florida state law certainly cannot overcome Twitter's rights under the federal Constitution and dictate Twitter's editorial decisions.

## ARGUMENT

### I. MOST OF PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE MOOT AND SHOULD BE DISMISSED

As a threshold matter, the Court should dismiss the First Amendment claims of Donald J. Trump, Linda Cuadros, Wayne Alan Root, and Naomi Wolf. In this litigation, Plaintiffs sought "[a]n injunction and declaratory judgment ordering Twitter to immediately reinstate [their] Twitter Accounts." 3-ER-380. Pursuant to what the District Court labeled "recent, well-publicized changes in Twitter's operations and policies," SER112, each of these Plaintiffs' accounts have now been reinstated, mooting their First Amendment claims.

A matter is moot if during the course of litigation, the plaintiff ceases to be threatened with or suffer "'an actual injury [that is] traceable to the defendant,'" and that is "'likely to be redressed by a favorable judicial decision.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). Intervening events, such as changes in policies that gave rise to the alleged harm, may moot a claim for injunctive relief. *Brach v. Newsom*, 38 F.4th 6, 11 (9th Cir. 2022), *cert. denied*, 2023 WL 2124256 (U.S. Feb. 21, 2023). The plaintiff must establish "standing separately for each form of relief sought."

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Consideration of mootness in this posture is not just appropriate but required. "Mootness goes to the court's power to hear the case, and therefore may be raised at any time by the parties, or even sua sponte by the court under its independent obligation to ensure that it has authority under Article III." *Southern Oregon Barter Fair v. Jackson Cnty.*, 372 F.3d 1128, 1133 (9th Cir. 2004). "Mootness may be found by the appellate court itself [when] the facts are clear or because the facts can be resolved on affidavits without remand," as is the case here. 13C Wright & Miller, *Federal Practice & Procedure: Jurisdiction* § 3533.10.3 (3d ed. 2022); *accord, e.g.*, *Fultz v. Rose*, 833 F.2d 1380 (9th Cir. 1987) (dismissing case as moot without remand because intervening events meant the court was "no longer able to grant any effective relief from that order or to reach the merits of this appeal").

Plaintiffs' demands for injunctive relief are moot because they have already obtained the relief they sought. In their Amended Complaint, Plaintiffs sought an "injunction … ordering Twitter to immediately reinstate the[ir] Twitter accounts." 3-ER-380. Twitter has now done so for Plaintiffs Trump, Cuadros, Root, and Wolf. *See* Sebhatu Decl. ¶¶3, 5, 7, 9; Holtzblatt Decl. Exs. F, G, H, I. Plaintiffs also sought "an injunction ordering Twitter to remove its warning labels and misclassification of all [their] content … and to desist from any further warnings or classifications."

- 19 -

3-ER-380. Since being reinstated, Twitter has affixed no labels to these Plaintiffs' Tweets and has not taken any new content-moderation enforcement actions against their accounts. *See* Sebhatu Decl. ¶¶3, 5, 7, 9. As the district court recognized, "[t]he record establishes that Wolf has been restored as an active Twitter account holder without any challenged limitations on her tweets. Consequently, Wolf's Amendment claim is moot …." SER189. So, too, for Trump, Cuadros, and Root.[5]

No exception to mootness preserves this Court's jurisdiction over Plaintiffs' demands for injunctive relief. For the voluntary-cessation exception to apply, the defendant's conduct "must have arisen because of the litigation." *Public Utils. Comm'n State of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996). When the defendant's cessation is "motivated by economic/business considerations, [and] not this litigation," the voluntary cessation exception is inapplicable. *Id.*

Here, Twitter's change to its COVID-19 misinformation policy and reinstatement of Plaintiffs' accounts was motivated by "economic/business considerations." *See FERC*, 100 F.3d at 1460. On October 27, 2022, Twitter was acquired by X Holdings I, Inc., a corporation majority-owned and controlled by Elon R. Musk. *See* Twitter, Inc., Amendment No. 13 to Schedule 13D (Form SC 13D/A)

---

[5] Plaintiffs separately sought an order appointing a monitor as a remedy for their Florida state law claims, *see* 3-ER-376 (¶233), but that remedy is irrelevant to their First Amendment claims.

- 20 -

(Oct. 27, 2022), https://tinyurl.com/mr4aspek. Mr. Musk swiftly changed the strategic vision and trajectory of Twitter. One of the changes he made was to "no longer enforc[e] the COVID-19 misleading information policy." Holtzblatt Decl. Ex. C. Instead, Community Notes allow users to collaboratively add context to potentially misleading Tweets. Holtzblatt Decl. Ex. E. Another new policy is the "general amnesty," Holtzblatt Decl. Ex. D, that led Twitter to reinstate some Plaintiffs' accounts. Sebhatu Decl. ¶¶5, 7, 9. And Mr. Trump's account was reinstated pursuant to Twitter's business judgment that Twitter's users should collectively be permitted to determine the account's current status. Sebhatu Decl. ¶3; Holtzblatt Decl. Exs. A, B. Twitter's reinstatement of Plaintiffs' accounts thus reflects a different business vision articulated by the company's new ownership—a quintessential business change. The district court accordingly recognized that these "changes happened only after a new owner acquired Twitter and publicly announced new policies for users and content. This is not a situation where a wrongdoer sought to evade judgment day with an expedient change of conduct." SER191.

For the same reason, Plaintiffs' claims are not capable of repetition, yet evading review. For that exception to apply, among other things, there must be "'a reasonable expectation that the same complaining party will be subject to the same action again.'" *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018) (per curiam). As the district court explained in the context of Ms. Wolf's claims, "[t]he factors

that foreclose[] the voluntary cessation exception apply here to the same end." SER192. There is simply no evidence that the challenged conduct will reoccur: The amnesty that led to Plaintiffs' reinstatement plainly reflects a new policy by new management. Holtzblatt Decl. Ex. D.

Finally, Plaintiffs' claim for "[c]ompensatory and [p]unitive damages," 3-ER-380, should not preclude dismissal of their First Amendment claims. No statute authorizes a damages remedy for such alleged constitutional violations, meaning any claim for damages must instead rely on an implied cause of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). But intervening decisions from the U.S. Supreme Court and the Ninth Circuit make clear that Plaintiffs cannot rely on *Bivens* to recover damages against Twitter. *See Egbert v. Boule*, 142 S. Ct. 1793, 1807-1809 (2022) (holding that there is no *Bivens* cause of action for First Amendment claims); *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001) (establishing that no *Bivens* claim can be asserted against a private "corporate defendant"); *Doe v. Google LLC*, 2022 WL 17077497, at *3 (9th Cir. Nov. 18, 2022) ("Combined, *Malesko* and *Egbert* foreclose Appellants' effort to assert a First Amendment claim against Google and YouTube."). As the district

- 22 -

court recognized, "there is no legal basis for damages against Twitter." SER192. These Plaintiffs' First Amendment claims therefore must be dismissed.[6]

## II. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' FIRST AMENDMENT CLAIMS BECAUSE TWITTER IS A PRIVATE ENTITY ENTITLED TO MODERATE CONTENT ON ITS PLATFORM

On the merits, Plaintiffs' First Amendment claim "faces a formidable threshold hurdle": Twitter is a private party, not a state actor. *See Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020). When a private entity like Twitter "provides a forum for speech," it "is not ordinarily constrained by the [Constitution] because the private entity is not a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). While "a private entity can qualify as a state actor in a few limited circumstances," *id.* at 1928, the state-action doctrine is intentionally narrow in order to "'preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power,'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982).

---

[6] Twitter did not challenge Plaintiffs' reliance on *Bivens* in its original motion to dismiss below because, at the time, Plaintiffs' demand for injunctive relief was not yet moot, and ordinarily a motion to dismiss can be granted only where a plaintiff is entitled to no forms of relief on that claim. *See Hernandez v. County of Monterey*, 70 F. Supp. 3d 963, 969 (N.D. Cal. 2014) ("A court may dismiss a claim 'only if it is clear that no relief could be granted.'"). Now, with damages being the only non-moot remedy that several Plaintiffs seek, the unavailability of any *Bivens* remedy serves as an independently sufficient basis for dismissal. The district court accordingly considered and adopted this argument when it denied Wolf's motion for an indicative ruling because Wolf's First Amendment claim was moot. SER192.

These concerns are at their apex here because Plaintiffs' claims implicate Twitter's own First Amendment rights to exercise editorial control and judgment over content disseminated through its platform. *See infra* pp. 62-65. As the Supreme Court recently explained, expanding the state-action doctrine is "especially problematic in the speech context, because it could eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms." *Halleck*, 139 S. Ct. at 1932. Or put another way, "[a] court's decision that a private party … is a 'censor,' could itself interfere with that private 'censor's' freedom to speak as an editor." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737-738 (1996) (plurality op.).

In *Lugar*, the Supreme Court established a demanding, two-part test to determine whether private conduct can be deemed state action. 457 U.S. at 937. *First*, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* *Second*, even where the first prong is satisfied, "'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Id.*; *accord Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020). As the district court correctly found, the Amended Complaint failed to satisfy either prong.

- 24 -

### A. Twitter Did Not Remove Plaintiffs' Accounts Pursuant To A State-Imposed Rule Of Conduct Or State-Created Right Or Privilege

The district court correctly held that Plaintiffs' First Amendment claim fails at the outset because they cannot satisfy *Lugar*'s first prong, which mandates that the alleged constitutional "deprivation must be caused [1] by the exercise of some right or privilege created by the State or [2] by a rule of conduct imposed by the State or by a person for whom the State is responsible." 457 U.S. at 937.

### 1. The Amended Complaint failed to allege Twitter acted pursuant to a state-created right or privilege

Twitter did not "exercise … [a] right or privilege created by the State" in suspending Plaintiffs' accounts. *Belgau*, 975 F.3d at 946. In *Lugar*, the Supreme Court held that a private defendant's use of a prejudgment-attachment procedure created by state statute satisfied the first prong of the state-action test. 457 U.S. at 940-941. The Court concluded that a challenge to a "procedural scheme created by [a] statute obviously is the product of state action." *Id.* at 941. By contrast, in *O'Handley v. Weber*, 2023 WL 2443073 (9th Cir. Mar. 10, 2023), this Court held that "Twitter did not exercise a state-created right when it limited access to [a Twitter user's] posts or suspended his account" because "Twitter's right to take those actions when enforcing its content-moderation policy was derived from its user agreement …, not from any right conferred by the State." *Id.* at *4.

- 25 -

*O'Handley* is directly on point. As in *O'Handley*, Twitter reserved the right to suspend Plaintiffs' accounts in its User Agreement, which granted it the right to remove any content or permanently suspend any account "at any time for any or no reason." SER63. The source of Plaintiffs' claimed injury was thus the parties' private contract, and "no conferral of power by the State was necessary for Twitter" to suspend Plaintiffs' accounts. *See O'Handley*, 2023 WL 2443073, at *4.

Contrary to Plaintiffs' argument, Section 230 did not create any "right or privilege" that Twitter exercised when it suspended Plaintiffs' accounts. Trump Br. 32. Section 230 protects interactive computer service providers from liability for certain content-moderation decisions, but it is not the source of their authority to make such decisions. As discussed, Twitter derives that authority from its User Agreement. Plaintiffs' reliance on *Skinner v. Railway Labor Executives' Ass'n* is therefore misplaced, as that case challenged a federal law conferring on private actors the authority to conduct certain searches of railway employees. *See* 489 U.S. 602, 609-611, 615 (1989).

Moreover, Twitter did not invoke Section 230 immunity in obtaining dismissal of Plaintiffs' claims, and therefore, has not "exercise[d]" any privilege granted by that law in this litigation. The remainder of Plaintiffs' authorities are distinguishable on this ground. In *Reitman v. Mulkey*, the defendants invoked an amendment to the California constitution that granted "absolute discretion" to

- 26 -

private landowners to refuse to rent property as a basis to defeat the plaintiffs' reliance on state law banning private discrimination in housing rentals. 387 U.S. 369, 372 (1967). Likewise, in *Railway Employees' Department v. Hanson* defendants invoked the Railway Labor Act as the source of their authority to mandate union membership, claiming that the Act superseded a "right to work" law prohibiting such mandates. 351 U.S. 225, 228-232 (1956).

### 2. The Amended Complaint failed to allege Twitter acted pursuant to a state-imposed rule of conduct

The Amended Complaint also did not plausibly allege that Twitter suspended Plaintiffs' accounts pursuant to a rule of conduct imposed by the state. This Court's precedents have discerned a state-imposed rule of conduct only when the private actor's decision was dictated by a distinct government standard—such as a statute or regulation—backed by the force of law. *Sutton v. Providence St. Joseph Medical Center*, for example, held that a rule of conduct was state-imposed where regulations required employers to collect employees' social security numbers. *See* 192 F.3d 826, 835 (9th Cir. 1999). And in *Mathis v. Pacific Gas & Electric Co.*, this Court held that PG&E's decision to rescind an employee's access to its nuclear plant for drug use could "be ascribed to a governmental decision" when the Nuclear Regulatory Commission's "minimum acceptable industry plan" called for such recission, and the Commission had "backed up" that plan "by threats of enforcement

- 27 -

or of formal rulemaking." 891 F.2d 1429, 1434 (9th Cir. 1989) ("*Mathis I*"). Plaintiffs alleged nothing like that here.

First, Plaintiffs identified no discernable rule of conduct that dictated Twitter's content moderation decisions. 1-ER-9. Plaintiffs cited to disparate statements from individual Congressmembers articulating their "preferred points of view," 3-ER-338 (¶60), on topics as varied as anti-trust reform, 3-ER-335 (¶58), disinformation, 1-ER-139-153, COVID-19, 3-ER-342 (¶75); Pls.' MJN Exs. at 23, Black Lives Matter, *id.* at 24, elections, *id.* at 19, and workforce diversity, *id.* at 23-26. And while some legislators encouraged Twitter to suspend Trump's account or more proactively address election misinformation, others disapproved of those very same actions. Twitter's MJN Ex. A; Pls.' MJN Exs. at 70-74. The district court correctly reasoned that "[i]t is [] not plausible to conclude that Twitter or any other listener could discern a clear state rule in such remarks, or even determine what a legislator's 'preferred views' might be." 1-ER-9.

The same is true of statements by executive branch officials on which Plaintiffs rely. *See* Wolf Br. 1-18; Trump Br. 35. Many of these statements were directed at Facebook—not Twitter—and post-dated Plaintiffs' suspensions. *See* 3-ER-346-349 (¶¶96-97). As such, they could not possibly have supplied a "rule of conduct" for Twitter's suspension of Plaintiffs' accounts. And in any event, the statements merely express "concern" regarding misinformation, or provide

examples of what individual government actors perceive to be misinformation. 3-ER-348-350 (¶¶97-98). Such messages are far too amorphous to "be interpreted as providing a specific standard of decision that mandated" any particular actions regarding Plaintiffs' accounts. *See Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 930 (N.D. Cal. 2021) (reaching a similar conclusion regarding Facebook), *appeal pending*, No. 21-16210 (9th Cir.).

Second, none of the statements on which Plaintiffs relied are backed by the force of law and thus could not *impose* any rule of conduct on Twitter. This Court recently concluded that statements by legislators "lack [the] force of law, rendering them incapable of coercing [a private actor] to do much of anything." *Google*, 2022 WL 17077497, at *2; *infra* p. 38. And Plaintiffs have never identified any statute or regulation granting any of the executive branch officials they highlight any direct regulatory authority over Twitter. Nor do any of those officials' statements suggest that they understood themselves to have regulatory authority over Twitter, as discussed further *infra* p. 38-39. No official *directed* Twitter to take any action or purported to *impose* any rule requiring such action.

Thus, Twitter's actions with respect to Plaintiffs' accounts were taken not pursuant to any state-issued rule but Twitter's own policies. As this Court held in *O'Handley*, Twitter could not have been enforcing any state-imposed rule when it suspended certain accounts "under the terms of its own rules"—not for any violation

of law. *O'Handley*, 2023 WL 2443073, at *5. Here, the Amended Complaint conceded that Twitter invoked its own *private* authority—its platform Rules—in suspending or otherwise restricting each of Plaintiffs' accounts based on "factors specific to each account," 1-ER-10. According to the Amended Complaint, Twitter suspended Trump's account because of "the risk of further incitement of violence" and "threats to physical safety," 3-ER-354-355 (¶¶114-15); Cuadros's account "due to a post about vaccines," 3-ER-356 (¶124); Wolf's account for "vaccine misinformation," 3-ER-361 (¶162); Barboza's account "after retweeting President Trump and other conservatives on January 6, 2021," 3-ER-358 (¶137); Latella's account after he "post[ed] positive messages about Republican candidates and President Trump," 3-ER-358-359 (¶142); and Root for "messages he posted related to COVID-19 and the 2020 election results," 3-ER-360 (¶152).[7] These varied reasons do not plausibly cohere into any single governmental rule of decision that Twitter relied on to suspend Plaintiffs' accounts.

Plaintiffs wrongly claim that *Lugar*'s first prong can be satisfied by alleging that the constitutional deprivation was caused "by a person for whom the State is responsible." Trump Br. 27-28. But *Lugar*'s first prong sets forth two alternative

---

[7] Plaintiffs contest this analysis by arguing that under *Carlin*, "once coercion exists, the private actor's motives for acting are immaterial." Trump Br. 30. But the *Carlin* court made that comment in analyzing *Lugar*'s second prong—not the first prong. And in any event, Plaintiffs have failed to establish coercion, *infra* pp. 34-42.

options, not three. It requires a (a) state-created "right or privilege" or (b) "rule of conduct imposed by the state or by a person for whom the State is responsible." 457 U.S. at 937. To satisfy prong one, therefore, plaintiff must show that the deprivation resulted from either a "right or privilege" or "rule of conduct." *Id.* That is precisely why this Court has referred to *Lugar*'s first prong as the "state policy requirement." *Collins v. Womancare*, 878 F.2d 1145, 1151 (9th Cir. 1989).

In any event, Plaintiffs' argument fails on its own terms. Twitter and Mr. Dorsey are private persons—not persons for whom the State is responsible. The cases Plaintiffs cite do not hold otherwise. In each case, the defendants were public employees–quintessential state actors. *See West v. Atkins*, 487 U.S. 42, 54 (1988) (state-employed physician); *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022) (school board trustees), *petition for cert. filed*, No. 22-324 (U.S. Oct. 6, 2022). Not so here.

### 3. The district court correctly required Plaintiffs to satisfy *Lugar*'s first prong

Plaintiffs alternatively argue (Trump Br. 24-27) that the Supreme Court's decision in *Brentwood* overruled *Lugar*'s two-prong test, but that contention has no support in the case law. Nothing in *Brentwood* indicates that *Lugar* is no longer good law; indeed, the opinion cites *Lugar* favorably. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). Absent a clear statement,

the Supreme Court has directed that lower courts should not conclude that its "more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). This Court has accordingly continued to apply *Lugar*'s first prong after *Brentwood*, including to foreclose state-action claims for failure to satisfy that prong. *See, e.g.*, *Wright v. Service Emps. Int'l Union*, 48 F.4th 1112, 1121-1122 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 749 (U.S. 2023); *Belgau*, 975 F.3d at 946; *see also Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 838 n.7 (9th Cir. 2017); *O'Handley*, 2023 WL 2443074, at *4-5. This panel is bound by those decisions.

The cases on which Plaintiffs rely do not suggest otherwise. None of Plaintiffs' authorities squarely confront the question of whether *Brentwood* overturned *Lugar*—let alone hold that *Lugar*'s first prong is no longer required. Indeed, in all but two of the cases Plaintiffs cite, the plaintiffs failed to satisfy any of the various tests required by the second prong; therefore, this Court had no occasion to determine whether *Lugar*'s first prong was met. *See Pasadena Republican Club v. Western Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021) (joint action and symbiotic relationship tests not satisfied); *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008) (nexus test not satisfied); *Kirtley v. Rainey*, 326 F.3d 1088, 1092-1095 (9th Cir. 2003) (joint action, compulsion, and

- 32 -

nexus tests not satisfied).[8]  And in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d

742, 747-748 (9th Cir. 2020), and *Lee v. Katz*, 276 F.3d 550, 554-555 (9th Cir. 2002),

this Court found state action because the private entity at issue satisfied the public

function test by performing a traditional and exclusive state function.  In those

contexts, too, there was no need for this Court to consider whether *Lugar*'s first

prong was satisfied because a function that is "traditionally and exclusively

governmental," *Rawson*, 975 F.3d at 748, is necessarily a state-created "right or

privilege," *Lugar*, 457 U.S. at 937.  Plaintiffs offer no case that would allow this

panel to depart from *Lugar* or from this Court's decisions in *Wright* and *Belgau*.

### B.    The District Court Correctly Concluded Plaintiffs Failed To Plausibly Plead Twitter Is A State Actor

The district court also correctly held that Plaintiffs failed to satisfy *Lugar*'s

second prong—that Twitter "could be described in all fairness as a state actor."  *See*

*Belgau*, 975 F.3d at 947.  In determining whether this requirement has been satisfied,

this Court "generally utilize[s] one of four tests outlined by the Supreme Court":  the

---

[8] The court in *O'Handley* suggested that some of this Court's cases have not applied *Lugar*'s two-prong framework "rigidly."  2023 WL 2443073, at *5.  Like Plaintiffs' authorities, however, the example that *O'Handley* identified—*Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498, 502 (9th Cir. 1996) ("*Mathis II*")—had no occasion to consider whether *Lugar*'s first prong had also been met because the plaintiffs in that case failed to satisfy any of the various tests required by the second prong.  Moreover, *O'Handley* emphasized that a plaintiff that cannot satisfy the first step is, at a minimum, "much less likely" to "satisfy the second."  2023 WL 2443073, at *5.

public function test, the state compulsion test, the joint action test, and the governmental nexus test. *Wright*, 48 F.4th at 1122. Plaintiffs relied on the compulsion and joint action tests, but the district court correctly concluded that the Amended Complaint satisfied neither.

### 1. The Amended Complaint failed to allege compulsion

To establish compulsion sufficient to convert private conduct into state action, a plaintiff must plausibly allege that the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004-1005 (1982). Plaintiffs failed to satisfy this test for at least three reasons. *First*, mere attempts by public officials to persuade private actors cannot amount to coercion, and Plaintiffs alleged no statement threatening to sanction Twitter unless it suspended Plaintiffs' accounts. *Second*, the statements lacked specificity. Apart from Mr. Trump and Ms. Wolf, none of the alleged statements—which called on social media platforms to moderate amorphous categories of information—can be construed as requesting the removal of Plaintiffs' content specifically. *Third*, Plaintiffs sued the wrong party. Under this Court's precedents, Plaintiffs cannot hold a private actor like Twitter liable for the government's alleged coercion.

**No threatened sanction.** "In deciding whether the government may urge a private party to remove (or refrain from engaging in) protected speech," this Court

- 34 -

has "drawn a sharp distinction between attempts to convince and attempts to coerce." *O'Handley*, 2023 WL 2443073, at \*6. Accordingly, this Court has held that "government officials do not violate the First Amendment when they request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." *Id.* (citing *American Family Ass'n. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1125 (9th Cir. 2002)). In *American Family Association*, for example, this Court held that official resolutions adopted by the City of San Francisco urging television stations not to air a religious organization's purportedly anti-gay advertisements did not violate the organization's First Amendment rights because the resolutions never intimated "sanctions, denial of funding, or some affirmative consequence" for espousing a particular view. 277 F.3d at 1125; *accord National Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 717-718 (2d Cir. 2022) (governmental "[g]uidance [l]etters" urging boycott of the National Rifle Association not coercive). By contrast, in the rare circumstances when this Court has upheld a coercion theory, a law enforcement official or other executive branch actor with the power to impose sanctions threatened punitive measures if a private actor failed to follow the official's preferred course of action. *See, e.g.*, *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) (threatened criminal prosecution).

- 35 -

Applying these principles, this Court held in *O'Handley* that a government official's message to Twitter with a "specific request" to remove a Twitter user's Tweet did not amount to coercion because there was "no intimation that Twitter would suffer adverse consequences if it refused the request (or receive benefits if it complied)." 2023 WL 24430736, at *6. Absent that threat, it was "immaterial" that Twitter's content moderation decisions aligned with the preferences of government officials because a "private party can find the government's stated reasons for making a request persuasive, just as it can be moved by any other speaker's message." *Id.* As the district court correctly concluded, Plaintiffs' alleged statements reveal only advocacy, not any threat. 1-ER-10-11. As to Mr. Trump, the Amended Complaint pointed to statements by members of Congress expressing disapproval of Mr. Trump's Tweets and calling for the suspension of Mr. Trump's account. 3-ER-336-337. But none threatened punitive measures if Twitter failed to act. The Amended Complaint, for example, alleged that then-Senator Kamala Harris called for Twitter to suspend Mr. Trump's Twitter account, 3-ER-335-336 (¶¶53, 55), but "conspicuously missing is any threatening remark directed at Twitter," 1-ER-10.

Plaintiffs alleged even less as to the remaining Plaintiffs, quoting only general statements by individual Congresspersons urging social media companies to act against broad categories of information such as "disinformation" or discriminatory

content but not threatening concrete legislative action if Twitter failed to act. *See* 1-ER-10-11; 3-ER-335-337 (¶¶54-56); Pls.' MJN Exs. at 23, 27-31. Some of the remarks from Congressional hearings on which Plaintiffs rely did not concern content moderation at all, and therefore, could not have coerced Twitter into removing Plaintiffs' accounts. *See* Pls.' MJN Exs. at 24-26 (discussing social media companies' hiring practices); *see also Google*, 2022 WL 17077497, at *2 (hearings on antitrust reform were "only tangentially related to YouTube's content moderation decisions"). And in the rare instances where Congresspersons intimated any desire for Twitter to take action, their comments were (in the words of the district court) nothing more than "ambiguous and open-ended statements to the effect that 'we may legislate' something unfavorable to Twitter or the social media sector." 1-ER-14.

Nor could Plaintiffs conjure a threat by pointing to other statements made at other times by other members of Congress calling for revisions to Section 230 or antitrust laws. As the district court explained, the statements cited were all "untethered to any substance that might have conveyed any threat or punishment tied to any specific action by Twitter." 1-ER-10-11; *see also* 3-ER-336-337. For example, Plaintiffs repeatedly referenced House Speaker Nancy Pelosi's statement that "it is not out of the question that [Section 230] could be removed." 3-ER-336. But that statement does not tie legislative changes to Twitter removing Plaintiffs' (or anyone else's) content.

- 37 -

Moreover, individual legislators, however powerful, cannot single-handedly amend or repeal Section 230 or any other law. That is because individual legislators are not "the State"; they exercise power only when they act in concert through actions that have the force of law. 1-ER-9. "[L]ack[ing] force of law," statements made by individual legislators are thus "incapable of coercing Defendants to do much of anything." *Google*, 2022 WL 17077497, at *2; *accord Buentello v. Boebert*, 545 F. Supp. 3d 912, 919 (D. Colo. 2021); *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *6 (N.D. Cal. Mar. 31, 2021); *Abu-Jamal v. NPR*, 1997 WL 527349, at *6 (D.D.C. Aug. 21, 1997), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998).

Plaintiffs fare no better in attempting to piece together certain statements by executive branch officials with inapposite case law. Unlike the prosecutor in *Carlin*, the sheriff in *Backpage.com, LLC v. Dart*, 807 F.3d 229, 236 (7th Cir. 2015), the Commission in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 63 (1963), the mayor in *Lombard v. Louisiana*, 373 U.S. 267, 270-271 & n.2 (1963), or the administrative agency in *Mathis I*, 891 F.2d at 1434, Press Secretary Psaki, the Center for Disease Control, and Surgeon General Murthy had no power to unilaterally initiate an investigation, threaten prosecution, or pursue regulatory action against Twitter. And the Cybersecurity and Infrastructure Agency's emails expressly disclaimed any regulatory authority. Pls.' MJN Exs. at 124-125. That is why the alleged communications from these various officials were limited to making

- 38 -

"recommendations" and "asking" social media companies to "monitor" and or "take action against misinformation." 3-ER-343-354 (¶¶78-112); Pls.' MJN Exs. at 79-133. None threatened to sanction Twitter if it failed to accede to the government's request.

Contrary to what Plaintiffs contend (Trump Br. 49-50), the district court faithfully applied the federal pleading standard in accurately characterizing these various statements as "ambiguous and open-ended" and in concluding that none demonstrate coercion. The court had the full statements before it. *Twombly* and *Iqbal* required the court to accept that the statements had been made. It did not require the court to accept Plaintiffs' legal conclusion that such statements rose to the high level of government coercion. *Compare Knievel v. ESPN*, 393 F.3d 1068, 1073-1075 (9th Cir. 2005) (deciding at the motion to dismiss stage whether certain statements were "reasonably capable" of sustaining a defamatory meaning). As this Court has repeatedly emphasized, courts must draw on "judicial experience and common sense" and "consider 'obvious alternative explanations'" in evaluating the plausibility of plaintiffs' allegations—just as the court did here. *Cafasso, U.S. ex rel. v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011).

There is, moreover, nothing "untenable" about the district court's conclusion that statements by legislators are especially unlikely to rise to the level of coercion. *See* Trump Br. 47-48. Private actors routinely face competing calls from legislators

attempting to persuade them to act or not act in conflicting ways. Any constitutional rule triggered by such calls could not coherently be applied. This case is illustrative. As explained, *supra* pp. 8-10, while some members of Congress encouraged Twitter to suspend Mr. Trump and address misinformation, others disapproved of the very same actions. Under Plaintiffs' theory, Twitter would become a state actor no matter what it did because either way its actions would align with views expressed by some handful of legislators. Such a rule would not only be impossible to apply consistently, but it would also expand state action far beyond its traditional boundaries to transform every private action that happens to be consistent with the remarks of one or more legislators into an action of the state.[9]

**Lack of specificity.** Plaintiffs' coercion theory fails for yet another reason: Coercion requires "the government [to] direct[] a specific entity to take a specific (allegedly unconstitutional) action against a specific person." *Sutton*, 192 F.3d at 843; *accord Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020)

---

[9] The district court's conclusion that individual legislators' statements cannot amount to coercion is entirely consistent with Twitter's position "that merely being subject to a government investigation is coercion" in its litigation challenging Texas Attorney General Paxton's investigation. Unlike individual Congressmember statements, Attorney General Paxton has authority—on his own accord—to take legal action against the company. Pls.' MJN Exs. at 145-146 (describing issuance of retaliatory Civil Investigative Demand seeking volumes of highly confidential documents).

(coercion requires that the "government commanded a particular result in, or otherwise participated in, [plaintiff's] specific case").

As to all Plaintiffs other than Mr. Trump and Ms. Wolf, Plaintiffs did not allege any statements that even mention those Plaintiffs or their content, much less pressure Twitter to act on their accounts. They therefore could not be construed as demanding removal of *their content*. Compare the broad policy statements at issue here with the coercive statements in *Carlin*, where a state prosecutor threatened to bring criminal charges against a specific entity if it did not terminate a different specific entity's adult-message service. 827 F.2d at 1295. By contrast, the statements on which Plaintiffs rely merely call on social media companies to moderate content in categories as amorphous as "misinformation," "disinformation," or "extremist content," and indicate that lawmakers may legislate something unfavorable to Twitter. 2-ER-139-140; 3-ER-337 (¶55); Pls.' MJN Exs. at 25. Such vague demands cannot strip a private party of discretion to decide, for itself, how to act. *See Blum*, 457 U.S. at 1004.[10]

---

[10] Though not properly before this Court, Wolf's reference to an email from the CDC to Twitter flagging one of her Tweets as an "example" of an "issue[] [the CDC was] seeing a great deal of misinfo about," Dist. Ct. Dkt. 177, at 6, still does not demonstrate coercion. The CDC's email does not (and could not) threaten any government sanction if Twitter failed to take down Wolf's content. *See supra* pp. 34-40.

- 41 -

**Wrong Party.**  Plaintiffs' coercion theory also fails because they sued the wrong party.  Even if Plaintiffs could show compulsion, that would entitle them only to bring a First Amendment claim against the government, not against Twitter.

In *Sutton*, this Court explained that "'something more' than state compulsion" is required "to hold a private defendant liable" on a coercion theory.  *Sutton*, 192 F.3d at 838).  And in *Doe v. Google*, this Court once again held that a coercion theory only allows the "plaintiffs to hold the *government* liable for a private entity's conduct and does not support a claim against the private entity itself."  2022 WL 17077497, at *2 (citing *Halleck*, 139 S. Ct. at 1928) (emphasis added).  For good reason.  When the government compels a private party to act, that party generally "is 'left with no choice of [its] own' and consequently should not be deemed liable."  *Sutton*, 192 F.3d at 838.  Here, too, it makes little sense to doubly punish Twitter—the victim (under Plaintiffs' theory) of the alleged coercion—by holding it liable for the allegedly unconstitutional acts of the government.  The only appropriate remedy is to remove the compulsion while leaving the private party free to make its own choice—even if that means making precisely the same choice as before.  *See, e.g.*, *Carlin*, 827 F.2d at 1293, 1295-1297 (vacating injunction against private party and noting that once the prosecutor's threats had been removed the private party may "thereafter decide independently" to stay the course).

### 2. The Amended Complaint failed to allege significant encouragement

Plaintiffs' argument (Trump Br. 53) that Section 230 provides "significant encouragement" for Twitter to "censor[]" their accounts is similarly meritless. As this Court recently held, for significant encouragement to transform a private party into a state actor, the government's "use of positive incentives" must "overwhelm the private party and essentially compel the party to act in a certain way." *O'Handley*, 2023 WL 2443073, at *6. "Action taken by private entities with the mere approval or acquiescence of the State" comes nowhere close to meeting that high bar. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

In *Roberts*, this Court made clear that laws that give federal protection for and "'mere approval of private action'" do not create the kind of "'significant encouragement'" required to transform private conduct into state action. 877 F.3d at 844-845. In that case, this Court held the FAA did not provide the kind of "'significant encouragement'" required to transform AT&T's enforcement of the arbitration agreement into state action because the Act did not *require* private parties to sign arbitration agreements; it merely enforced those voluntary contractual arrangements. *Id.* at 836, 844-845. Indeed, the FAA "could also be seen as state *inaction*—the government's decision not to interfere with private parties' choices to arbitrate." *Id.* at 845.

- 43 -

So too Section 230. Like the FAA, Section 230 does not require private entities to do *anything*—let alone require Twitter to take down specific content. It simply protects actions interactive service providers take to publish or remove third-party content. And the statute does not "encourage" removal in any way; its protections apply just as much to Twitter's decisions to leave Tweets up as its decision to remove them. *See Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Section 230's neutrality accords with its legislative purpose to "'keep government interference in [Internet communications] to a minimum.'" *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003), s*uperseded on other grounds by statute as recognized in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759 (9th Cir. 2017); *see also* 47 U.S.C. § 230(b). As in *Roberts*, Section 230 reflects state inaction: "the government's decision not to interfere with private parties'" content moderation decisions. 877 F.3d at 845.

None of the cases on which Plaintiffs rely (Trump Br. 32-33) suggest otherwise. In *Skinner*, the Supreme Court found that private drug testing was state action when the Federal Railroad Administration's regulations "prohibit[ed] railroad companies from negotiating away their right to conduct tests, punish[ed] employees who refused to submit to testing, and authoriz[ed] the government to obtain testing results." *Roberts*, 877 F.3d at 836, 844-845. *Reitman*, too, involved a law with the "design and intent" to promote unconstitutional discrimination. 387 U.S. at 374. By

contrast, Section 230 does not express any preference either way; it equally protects decisions to remove or not remove content. Plaintiffs' reliance on *Hanson* is also misplaced. *Hanson* addressed only the constitutionality of a federal law, not whether that law provided a basis upon which to hold private actors liable for constitutional violations. *See* 351 U.S. at 230-233, 238. And though the Supreme Court there held a federal law authorizing union-shop agreements and preempting prohibitory state laws sufficient to raise justiciable First and Fifth Amendment concerns even though the law was only "permissive" in nature, *id.* at 231-232, that Court has since clarified that *Hanson*'s analysis was "debatable" as far back as 1977, and in light of intervening state-action cases, is "even more questionable today." *See Janus v. American Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2479 n.24 (2018).[11]

---

[11] Plaintiffs cite two Tweets by Mr. Musk (Trump Br. 6), but those statements do nothing to advance Plaintiffs' First Amendment claim. The statement in Mr. Musk's second Tweet that "Twitter acting by itself to suppress free speech is not a 1st amendment violation" fully accords with the well-settled legal proposition that a private entity's moderation of speech on its platform does not violate the First Amendment unless those actions can be attributed to the state. *See supra* Part II. And the opinion expressed in Mr. Musk's first Tweet about whether prior management of Twitter correctly determined that Trump's Tweets violated the Terms of Service did not say anything about whether the government played any role—let alone a coercive role—in Twitter's decision to suspend Trump's account. It said even less about the other Plaintiffs' accounts. Neither statement supports Plaintiffs' coercion theory: Not only have Plaintiffs failed to identify any actionable threat by any government official, but they also cannot hold Twitter—a private party—liable for the government's alleged coercion.

### 3. Plaintiffs failed to state a claim under any joint-action theory

Pleading joint action is a high bar. Joint action exists only where governmental "officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (quotation marks omitted). It requires substantial cooperation with respect to the "particular decision challenged," *Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 503-504 n.4 (9th Cir. 1996) ("*Mathis II*"), or a "conspiracy to violate [the plaintiff's constitutional] rights in particular," *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1212 (9th Cir. 2002). Additionally, a private actor may not be held liable under a joint-action theory unless the private actor "deliberately cloaked themselves with the authority of the state in effecting" the particular deprivation at issue. *Howerton v. Gabica*, 708 F.2d 380, 384-385 (9th Cir. 1983). Here, Plaintiffs did not state a joint-action claim because they did not plausibly allege either substantial cooperation in the decisions at issue, a conspiracy to violate Plaintiffs' constitutional rights, or that Twitter wielded the power of the government in carrying out the challenged content-moderation decisions.

- 46 -

**a.** *The Amended Complaint did not allege substantial cooperation between Twitter and the government regarding the challenged decisions*

As this Court recently reaffirmed, the joint action "test is intentionally demanding," requiring that "the State 'significantly involves itself in the private parties' actions and decisionmaking' in a 'complex and deeply intertwined process.'" *O'Handley*, 2023 WL 2443073, at *7 (quoting *Rawson*, 975 F.3d at 753) The facts of *Mathis II* illustrate just how high the joint-action bar is. There, a contractor alleged joint action in the decision to bar him from a private PG&E plant due to drug-related activities on the ground that PG&E had uncovered those activities through an investigation carried out "in close cooperation with [a government] Task Force." 75 F.3d at 503-504. This Court held, however, that even the "close cooperation" in the investigation leading up to PG&E's decision did not establish joint action because the particular deprivation of rights—the ultimate decision to exclude the plaintiff from the PG&E plant—was made by PG&E, even if "facilitated" by the governmental "Task Force." *Id.* at 504.

Here, as in *Mathis II*, Plaintiffs' claim failed because the Amended Complaint alleged no coordination in any specific decision regarding Plaintiffs' Twitter accounts. Rather, the Amended Complaint alleged only the kind of general, high-level communication that suggests, at most, a "common goal" of addressing misinformation rather than "concerted action" with respect to Plaintiffs in particular.

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1455 (10th Cir. 1995) (cited in *Franklin*, 312 F.3d at 445). For example, the Amended Complaint alleged that the CDC generally "works with 'social media partners,' including Twitter, to 'curb the spread of vaccine misinformation,'" 3-ER-343 (¶78), and that executive branch officials were "in regular touch with … social media platforms" and "proposed that [social media platforms] create a robust enforcement strategy," 3-ER-347 (¶96). Similarly, the supplemental materials on which Plaintiffs (other than Wolf) seek to rely show only governmental actors asking questions about how social media companies address misinformation, Pls.' MJN Exs. 23, 27-28; expressing a general interest in content moderation on social media, *id.* at 43, 57-62; asking social media companies to generally take action to address misinformation, *id.* at 10-11, 19, 47; or Twitter explaining to governmental actors how Twitter responds to misinformation, *id.* at 33-35, 81.

Absent is any allegation of any governmental participation in any specific action with respect to any particular user (let alone Plaintiffs). And, crucially, the communications on which Plaintiffs rely leave the specifics of any "robust enforcement strategy" to Twitter. As in *Mathis I*, "[t]he requisite nexus to the government is absent when the decisions [at issue] are 'based on independent professional judgments'" without direct government participation. 891 F.2d at 1432 (quoting *West*, 487 U.S. at 52 n.10 (emphasis omitted)).

- 48 -

Similarly insufficient are allegations that governmental actors sometimes "flag[ged]" inaccurate information and "ma[de] sure social media platforms [we]re aware of the latest narratives dangerous to public health."  3-ER-349 (¶98); *see also* Pls.' MJN Exs. at 80, 92-93, 97-127, 129.  As this Court recently held, allegations that governmental actors "flagged for Twitter's review posts that potentially violated the company's content-moderation policy" do not plausibly suggest state action even where the government flag's the plaintiff's own content and where the "flag[s]" occur "on a repeated basis" through a dedicated, "priority pathway."  *O'Handley*, 2023 WL 2443073, at *8.  Where the ultimate decision "how to utilize th[e] information" reported by the government is left to private actors, there is no state action.  *Id.*; *accord Collins*, 878 F.2d at 1156.  And that is precisely what Plaintiffs' supplemental materials show: upon receiving a report of possible misinformation, Twitter independently "review[ed]" the relevant content, Pls.' MJN Exs. at 93, and removed it only if Twitter determined that the content "violate[d] our policies," *id.* at 104.[12]

---

[12] Though not properly before this Court, Wolf's reference to an email from the CDC to Twitter flagging one of her Tweets as an "example" of an "issue[] [the CDC was] seeing a great deal of misinfo about," Dist. Ct. Dkt. 177, at 6, fails to suggest joint action for the same reasons.  As discussed, even if the CDC email "facilitate[d]" Twitter's decision to remove the Tweet in question by bringing it to Twitter's attention, such "information sharing" does not amount to state action where the ultimate decision to remove a Tweet, or not, lies with Twitter.  *Mathis II*, 75 F.3d at

- 49 -

**b.** *The Amended Complaint did not allege a conspiracy to violate Plaintiffs' constitutional rights*

The Complaint also did not state a claim under the conspiracy theory of joint action because it did not plausibly allege any meeting of the minds to violate Plaintiffs' constitutional rights. The conspiracy theory of joint action requires that the private actor and governmental actors shared a "goal of violating a plaintiffs' constitutional rights." *Franklin*, 312 F.3d at 445. "[G]eneralized allegation[s] of a wink and a nod understanding … do[] not amount to an agreement or a conspiracy to violate [plaintiffs'] rights in particular." *Brunette*, 294 F.3d at 1212. Nor does a "common goal" to achieve some other end. *Gallagher*, 49 F.3d 1455. Because that is the most the complaint alleged, it failed to state a claim under the coercion theory of joint action.

As this Court recently held in *O'Handley*, allegations of a general "partnership" between governmental actors and social media platforms to address "misinformation," including a dedicated portal for reporting possible instances of misinformation, "establish, at most, a meeting of the minds to promptly address election misinformation, not a meeting of the minds to violate constitutional rights." *O'Handley*, 2023 WL 2443073, at *3, *7. "There is nothing wrongful about

---

504. And notably, the only action contemplated in the CDC's email was the CDC "post[ing] something shortly to address vaccine shedding," not Twitter removing any Tweet. Dist. Ct. Dkt. 177, at 6.

Twitter's desire to uphold the integrity of civic discourse on its platform," and nothing "illicit in seeking support from outside actors, including government officials, to achieve this goal." *Id.* at *7. Where content-moderation decisions are ultimately made by private actors to achieve their "own mission," there is no joint action. *Id.*

Here, Plaintiffs failed to allege a conspiracy for the same reasons. Even assuming a generalized agreement to try to "curb the spread of vaccine misinformation," 3-ER-343 (¶78), or the removal of content also identified by the government as false, *see* 3-ER-344-346 (¶¶83-94), there can be no joint action absent an agreement specifically to violate Plaintiffs' rights—which, in the First Amendment context, would require an agreement to allow the government to dictate Twitter's content-moderation decisions. But, as discussed, even Plaintiffs' own allegations show that decisions whether, when, and how to take any particular enforcement action were left to Twitter. *See* Pls.' MJN Exs. at 93, 104; *see also id.* at 33-35, 81 (Twitter explaining its content-moderation policies to governmental actors).

Indeed, even if it could be inferred that a governmental communication triggered Twitter's internal review and subsequent action with respect to any of the Plaintiffs, that would still fail to allege state action under this Court's precedent. "A relationship of cause and effect" between the reporting of information between

- 51 -

governmental and private actors and subsequent action "is not sufficient" to suggest a conspiracy to violate a plaintiff's rights. *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783 (9th Cir. 2001). In *Radcliffe*, a private business owner did not merely report information to the government but executed citizen arrests for trespass. *Id.* at 777-778. After the district attorneys' office declined to prosecute, the business owner sought reconsideration directly with the district attorney, who said she would personally review the matter. *Id.* at 779. The district attorney then prosecuted the individuals arrested who, following their acquittal, sued the business owner and state officials for violating their civil rights. *Id.* This Court held that the arrests and the district attorney's promise, at the business owner's request, to look into the matter were insufficient to show a "meeting of the minds to violate [the plaintiffs'] constitutional rights," as required to establish joint action. *Id.* at 783-784. Thus, even a causal relationship between public-private information sharing and subsequent action is insufficient to allege joint action. Any other rule would infringe Twitter's constitutionally protected "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

> **c.** *Twitter cannot be held liable under a joint-action theory because it neither wielded nor benefited from the exercise of state authority*

Joint action requires "mutual benefits" to the governmental and private actors from the allegedly joint conduct. *Brunette*, 294 F.3d at 1212; *accord Tsao v. Desert*

*Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). And, as the cases on which Wolf relies on (at 10-11) in fact show, holding a private actor constitutionally liable under a joint-action theory requires that the private actor herself either wielded state authority or otherwise benefitted from the clout conferred by the state's imprimatur. In *Howerton*, for example, the private defendants "deliberately cloaked themselves with the authority of the state in effecting repossession" of a rental property by repeatedly calling on a uniformed police officer to carry out "every step" of an eviction. 708 F.2d at 384-385. In *Rawson*, private mental-health professionals were "clothed with the authority of state law when they detained and forcibly treated" the plaintiff as "part of a team … jointly responsible" for involuntarily detaining individuals pursuant to state law. 975 F.3d at 752-754. Similarly, in *Jensen v. Lane County*, private and public mental-health professionals participated in "a complex and deeply intertwined process of evaluating and detaining individuals" pursuant to state law. 222 F.3d 570, 575 (9th Cir. 2000). And in *Goichman v. Rheuban Motors, Inc.*, a private towing company acted at the sole direction of a police officer in carrying out a state "statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws." 682 F.2d 1320, 1322 (9th Cir. 1982). Each case involved not only close collaboration specifically regarding the challenged decision, but also private actors cloaked with the state's authority, either because

- 53 -

they wielded statutory authority or called upon the power of the state to enforce their actions.

Nothing close was alleged here. Rather, as Plaintiffs alleged, Twitter acted to enforce its own policies, not federal law. *See* 3-ER-343, 353-354 (¶¶81, 111). And Twitter did not call upon the power of the state to carry out its content-moderation decisions. "[T]he state-action doctrine protects a robust sphere of individual liberty," *Halleck*, 139 S. Ct. at 1928, and thus even governmental attempts to meddle in private affairs could not unwittingly convert Twitter into a state actor where Twitter did not wield or benefit from state authority.

## III. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' STATE-LAW CLAIMS[13]

### A. Plaintiffs Failed To State A FDUTPA Claim

#### 1. Plaintiffs' FDUTPA claim is barred by the choice-of-law provision in Twitter's Terms of Service

The district court correctly held that the California choice-of-law provision in Twitter's Terms of Service bars Plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Plaintiffs do not dispute that the choice-

---

[13] These claims are addressed with respect to Plaintiffs Trump, Cuadros, Barbosa, and Latella only. Plaintiffs ACU, Root, and Wolf are not Florida residents, *see* 3-ER-329-330 (¶¶ 20, 23, 24)) and have not disputed that they therefore cannot state any claim under either FDUTPA or SSMCA, *see* SER23, 27, 106-109; Trump Br. 57-59; *see also generally* Wolf Br. (not challenging dismissal of state-law claims).

of-law clause is valid and encompasses the FDUTPA claim; they contend only that Florida law should govern because the application of California law would violate a fundamental Florida policy. That is both wrong and insufficient to negate the parties' choice of California law because Plaintiffs did not (and still do not) even attempt to show that Florida has a materially greater interest in the matter.

Under California law, a choice-of-law clause is enforceable if the "chosen state has a substantial relationship to the parties or their transaction" or if "there is any other reasonable basis for the parties' choice of law." *Washington Mut. Bank, FA v. Superior Court*, 24 Cal.4th 906, 916 (2001). If either test is met, the parties' choice of law will be enforced unless the party seeking to nullify the choice establishes *both* that application of the chosen law would be "'contrary to a *fundamental* policy'" of the state whose law would otherwise apply *and* that the other state "has a materially greater interest than the chosen state in resolution of the issue." *ABF Cap. Corp. v. Osley*, 414 F.3d 1061, 1066 (9th Cir. 2005) (emphasis in original) (quoting *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 466 (1992)). This test recognizes the strong policy in favor of enforcing contractual choice-of-law provisions. *Id.* at 1065.

The district court correctly held that "[t]here is no reasonable doubt that California has a substantial relationship to this case." 1-ER-18. Plaintiffs have not even attempted to argue otherwise, and for good reason: Twitter's corporate

headquarters and principal place of business is in San Francisco, California. Thus, a "substantial relationship exists" because Twitter "is domiciled … in the chosen state." *ABF Cap.*, 414 F.3d at 1065.

The district court was also correct that Florida law cannot apply here because Plaintiffs failed to meet their burden of establishing either a conflict between California law and fundamental Florida policy or that Florida has a materially greater interest in the matter. 1-ER-18-19. First, to establish a policy conflict, Plaintiffs must show not merely that Florida and California law differ, but that the application of California law would undermine a fundamental policy of Florida's. *Nedlloyd Lines*, 3 Cal.4th at 465. And to identify a fundamental policy, Plaintiffs must "point to a [Florida] statute or judicial decision that clearly states such a strong public policy." *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1090 (9th Cir. 2018). But Plaintiffs contend only that Florida law differs from California law because the former allows any "aggrieved" person to seek injunctive relief even absent economic injury while the latter limits relief to only "those who have lost money or property." Trump Br. 59 (quotation marks omitted). They offer no argument, and certainly point to no statute or judicial opinion establishing, that Florida has a fundamental policy interest in allowing any aggrieved person to seek injunctive relief.

- 56 -

The mere fact that the Florida legislature enacted a law that would allow Plaintiffs' claim to proceed (assuming other necessary elements were plausibly alleged) while California law categorically bars their claim does not establish a fundamental policy conflict. In *ABF Capital*, for example, this Court enforced a contractual choice of New York law even though New York law, unlike California law, prohibited parties from waiving statutes of limitations and so barred the plaintiff's untimely claim. 414 F.3d at 1066. Thus, Plaintiffs' identification of different standing requirements between Florida and California law is insufficient to carry their burden.

Second, Plaintiffs have forfeited the opportunity to argue that Florida has a materially greater interest in the resolution of their claim by failing to raise this point in front of the district court. *See* SER106-107. They should not be permitted to address the issue "for the first time on appeal." *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018).

In any event, Plaintiffs' appellate brief fails to establish that Florida has a materially greater interest in the resolution of their claim. This inquiry focuses on "'which state, in the circumstances presented, will suffer the greatest impairment of its policies if the other state's law is applied.'" *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) (quoting *Brack v. Omni Loan Co.*, 80 Cal.Rptr.3d 275, 287 (Ct. App. 2008)). Here, California has a significant

interest in protecting its corporate residents (and courts) from the burdens of lawsuits filed by individuals who cannot show that they have "'been injured in fact.'" *In re Tobacco II Cases*, 46 Cal.4th 298, 316-317 (2009) (quoting Prop. 64, § 1, subd. (e)). Plaintiffs do not even attempt to explain why Florida's interest is *materially greater* than that of California's. Rather, Plaintiffs offer only the circular argument that the purported "fundamental policy difference" between California and Florida "establishes Florida's materially greater interest in having its law applied." Trump Br. 59. Plaintiffs cannot establish that they meet a two-prong test simply by stating twice that they have made their showing on the first prong.

### 2. Plaintiffs failed to allege any deceptive conduct

Regardless of the choice-of-law clause, the district court correctly recognized that dismissal of Plaintiffs' FDUTPA claim is alternatively appropriate because the complaint alleged no deceptive conduct. *See* 1-ER-19. This Court can affirm dismissal on this alternative basis. *See, e.g.*, *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) ("[W]e may affirm based on any ground supported by the record."). Plaintiffs alleged that Twitter acted deceptively by failing to disclose that it removes content based on "political favoritism." SER107-108; 3-ER-368 (¶206). As the district court reasoned, that theory fails because Twitter's Terms of Service unambiguously disclose that Twitter may suspend or terminate accounts "at any time for any or no reason." 1-ER-19; SER63. Thus,

"[t]he express terms of [Twitter's Terms of Service] undermine [Plaintiffs'] claim" because no reasonable consumer could read the Terms to mean that Twitter lacks discretion to remove content for any reason. *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1285 (11th Cir. 2007). And contrary to Plaintiffs' suggestion otherwise (Trump Br. 60 n.17), the term granting Twitter discretion to remove accounts for any reason is valid and enforceable. *See Murphy v. Twitter, Inc.*, 274 Cal.Rptr.3d 360, 377-378 (Ct. App. 2021). Plaintiffs thus failed to allege that any reasonable consumer could have been deceived into thinking that Twitter would never suspend accounts for reasons other than those expressly stated in its policies.

### B. The District Court Correctly Dismissed Plaintiffs' SSMCA Claim Because The Challenged Conduct Occurred Before Its Enactment

The district court rightly held that Plaintiffs could not state a claim under the SSMCA because they "challeng[ed] only conduct that occurred after the SSMCA effective date." 1-ER-19. "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). To protect "settled expectations," a statute may not "attach[] new legal consequences to events completed before its enactment" absent a "clear" expression of legislative intent. *Id.* at 266, 269-270.

The SSMCA did not become effective until July 1, 2021. *See* Fla. Laws, ch. 32, § 7 (2021). The SSMCA purports, among other things, to require that social

media platforms "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." Fla. Stat. § 501.2041(2)(b). Plaintiffs alleged that Twitter violated the SSMCA by suspending their accounts while taking no action against other purportedly similar accounts. *See* 3-ER-369-374. But the only conduct alleged in the complaint predates the SSMCA. Twitter's alleged actions with respect to Plaintiffs' own accounts all occurred on or before June 5, 2021. *See* 3-ER-354-362 (¶¶113-167). And the only purportedly inconsistent applications of Twitter's rules alleged are based on Twitter's alleged inaction with respect to Tweets from between 2014 and 2020, years before the SSMCA's effective date. 3-ER-369-372 (¶¶213-214). The Amended Complaint also alleged that the Twitter accounts of Venezuelan dictator Nicolas Maduro and Nation of Islam leader Louis Farrakhan remain active, but did not allege that either account issued any Tweets that violated Twitter's polices. *See* 3-ER-372-374 (¶¶215-216). Because the Amended Complaint failed to allege any inconsistent application of Twitter's policies after the SSMCA became effective on July 1, 2021, it failed to state a claim under that statute.

Plaintiffs' counterarguments are unpersuasive. Plaintiffs contend that (1) they have standing under the SSMCA because "several Plaintiffs" still have Twitter accounts, even if suspended, and that that is all the SSMCA requires, Trump Br. 58-59; (2) Twitter has violated the SSMCA post-July 1, 2021 by "maintain[ing] the

suspensions and other penalties imposed on Plaintiffs," Trump Br. at 59; and (3) Twitter has violated the SSMCA post-July 1, 2021, by applying its standards inconsistently to other users, *id.* To the first point, standing is irrelevant because, as discussed, Plaintiffs' have alleged no violative conduct after the SSMCA's effect date. And Plaintiffs' second and third points fail to establish any such conduct. Plaintiffs' second point fails because the SSMCA requires that social media companies "apply" their standards consistently, Fla. Stat. § 501.2041(2)(b), *i.e.* that they "put [their standards] into operation or effect" consistently, *Apply*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/apply (visited Mar. 15, 2023). The SSMCA thus focuses on the initial application of content-moderation policies, not subsequent maintenance of prior decisions. And, third, Plaintiffs' arguments regarding Twitter's post-enactment conduct cannot save their claim because, as already discussed, the Amended Complaint does not in fact allege any post-enactment conduct purportedly inconsistent with either Twitter's maintenance after July 2021 of Plaintiffs' suspensions or Twitter's treatment of other, unspecified users. The only examples of Twitter's allegedly inconsistent application of its policies contained in the Amended Complaint predate the SSMCA's enactment. Plaintiffs have not, therefore, stated a claim for relief.

## IV. PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT

Rather than guaranteeing Plaintiffs' use of Twitter's private platform to propagate their speech, the First Amendment instead provides an independent basis to affirm dismissal of plaintiffs' claims: Twitter's own right to exercise its editorial discretion and to control the content it disseminates on its platform. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Any effort to punish or control those decisions would violate Twitter's own constitutional rights. Although the district court did not reach this defense below, it provides an alternative basis for affirmance of dismissal.

### A. Twitter's Content Moderation Decisions Are Protected By The First Amendment

The exercise of "editorial control and judgment" is protected by the First Amendment. *Miami Herald*, 418 U.S. at 258. As the Supreme Court has explained, "[t]he choice of material to go into a newspaper … and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" protected by the First Amendment. *Id.*

And the right to refrain from hosting other people's messages is not "restricted to the [traditional] press." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 574 (1995). The Supreme Court has accordingly held that a private utility cannot be forced to include third-party speech in its billing

envelopes, *Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986) (plurality op.); that cable companies' exercise of editorial discretion over stations and programs is entitled to First Amendment protection, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994); and that a private parade organizer cannot be forced to include a group whose message it disapproves, *Hurley*, 515 U.S. at 574-576. In so holding, the Court observed that "the presentation of an edited compilation of speech generated by other persons … fall[s] squarely within the core of First Amendment security" and that the "selection of contingents" to make up that compilation "is entitled to similar protection." *Hurley*, 515 U.S. at 570.

These principles apply directly to Twitter's content moderation decisions. When Twitter adopts and enforces editorial policies concerning how to disseminate content or to host certain speakers or speech, the First Amendment protects those decisions. That exercise of editorial control mirrors a newspaper editor's deciding that the paper would not publish certain articles, editorials, or advertisements, *see Miami Herald*, 418 U.S. at 258, and a parade organizer's decision to exclude participants whose message would have conflicted with the organizer's own, *Hurley*, 515 U.S. 557.

For these reasons, numerous other courts have recognized that online platforms' content-moderation decisions are protected First Amendment expression. The Eleventh Circuit recently held that "[w]hen platforms choose to remove users

- 63 -

or posts, deprioritize content in viewers' feeds or search results, or sanction breaches of their community standards, they engage in First-Amendment-protected activity." *NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196, 1213 (11th Cir. 2022), *petition for cert. filed*, No. 22-393 (U.S. Oct. 24, 2022). And district courts in this Circuit and elsewhere have reached the same conclusion. *See, e.g.*, *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186 (N.D. Cal. 2022), *aff'd*, 2023 WL 2443073 (9th Cir. Mar. 10, 2023); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014).

Plaintiffs' responses are unavailing. Plaintiffs argued below that the "sheer volume of material" that Twitter hosts "rebuts any claim that Defendants have a carefully curated institutional message that would be upset by Plaintiffs' Tweets." SER109. But that ignores that "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit [them] to isolate an exact message" because "a narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley*, 515 U.S. at 569.

Similarly fruitless is Plaintiffs suggestion, relying on *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), that Twitter could redress any constitutional harm by "affixing a disclaimer to the content" with which it disagrees, SER109. Though the Supreme Court in *PruneYard* did observe that the plaintiff there "could disclaim any sponsorship" of third-party messages on its property, 447 U.S. at 87,

the Supreme Court has since made clear that *PruneYard*'s reasoning is limited to circumstances in which a plaintiff does not actually "object[] to the content" of the third-party communications. *Pacific Gas*, 475 U.S. at 12 (plurality op.). Here, where Twitter's policies made clear it did object to the contents of Plaintiffs' Tweets, Twitter had the First Amendment right to remove them.

### B.    Twitter's First Amendment Rights Defeat Plaintiffs' Claims

Twitter's First Amendment rights independently foreclose each of Plaintiffs' claims. Plaintiffs' claims attack Twitter's decision to remove Plaintiffs' speech from Twitter's platform. *See supra* pp. 10-11. Those decisions plainly expressed Twitter's opposition to the messages contained in Plaintiffs' Tweets and are squarely within the scope of editorial expression that the Supreme Court has recognized is protected by the First Amendment. Accordingly, as was true in *Miami Herald*, *Hurley*, and *Pacific Gas*, the First Amendment prohibits holding Twitter liable for, or countermanding, those decisions.

*1. State Law Claims.* As to Plaintiffs' state law claims, Twitter's federal **constitutional right to moderate its platform preempts and thus defeats any state law** that would penalize Twitter for exercising that right. Plaintiffs' FDUTPA claim seeks to hold Twitter liable for its decisions to remove "disfavored" content or users. *See* 3-ER-367-368. But Twitter has the First Amendment right to "exercise editorial judgment" by "removing or deprioritizing content or users." *NetChoice*, 34

F.4th at 1222.  Twitter's SSMCA claim, in turn, seeks to hold Twitter liable for the alleged "inconsistent application of [its content-moderation] standards." 3-ER-375. But the First Amendment precludes such an intrusion on Twitter's "right to make editorial judgments on a case-by-case basis or to change the types of content [it will] dissemination—and, hence, the messages [it] express[es]." *Netchoice*, 34 F.4th at 1222.  Indeed, that is precisely why the Eleventh Circuit held that the SSMCA's consistency requirements were likely unconstitutional and could not be enforced. *See id.* at 1222, 1229.

   *2. First Amendment Claims.*  Plaintiffs' First Amendment claims likewise cannot overcome Twitter's First Amendment rights.  That would be true even if Plaintiffs could establish that Twitter's challenged conduct in fact amounted to state action.  This Court has long recognized that "[e]ven if state action [is] present" in a private publisher's editorial decisions, the private entity "still [has] the freedom to exercise subjective editorial discretion" over the speech it disseminates. *Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 135 (9th Cir. 1971).  That is because "[t]he right to freedom of speech does not open every avenue to one who desires to use a particular outlet for expression." *Id.*

   *3. Remedies.*  Plaintiffs' requested remedies demonstrate that their legal theories would run roughshod over Twitter's own First Amendment rights. Plaintiffs ask for damages and an order forcing Twitter to reinstate their accounts

and promulgate their messages against its will, and for "impos[ition of] a monitor" to oversee and override Twitter's editorial decisions in perpetuity. 3-ER-374-375. Such orders would not only constitute government-compelled speech, *see National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018), but would also unduly intrude on Twitter's internal editorial deliberations. Courts routinely refuse to treat one person's rights as a basis to trammel another's protected expression under the First Amendment, and subject remedies that would infringe on such rights to the strictest scrutiny. *See Denver Area*, 518 U.S. at 746-747; *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *Sindi v. El-Moslimany*, 896 F.3d 1, 30-32 (1st Cir. 2018).

As explained above, and as the district court found, Plaintiffs' claims fail on their own merits. But the implications of their arguments and requested relief for Twitter's First Amendment rights would doom those claims, even if adequately stated.

## CONCLUSION

This Court should affirm dismissal of Plaintiffs' claims.

Respectfully submitted,

/s/ <em>Ari Holtzblatt</em>

| | |
|---|---|
| FELICIA H. ELLSWORTH | ARI HOLTZBLATT |
| ZAKI ANWAR | ALLISON M. SCHULTZ |
| WILMER CUTLER PICKERING | WILMER CUTLER PICKERING |
|    HALE AND DORR LLP |    HALE AND DORR LLP |

- 67 -

60 State Street
Boston, MA 02190
(617) 526-6000

RISHITA APSANI
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

2100 Pennsylvania Avenue
Washington, DC 20037
(202) 663-6000

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, California 94306
(650) 858-6000

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, I state the following:

I am aware of one related case currently pending in this Court. The case

number is:

*Children's Health Defense v. Facebook, Inc., et al.*, No. 21-16210.


The appeal in *Children's Health Defense* raises related legal issues regarding whether and the circumstances under which a private social-media company may be held constitutionally liable for its content-moderation decisions.


/s/ *Ari Holtzblatt*
ARI HOLTZBLATT

March 15, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | No. 22-15961

I am the attorney or self-represented party.

**This brief contains** | 15,357 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.

  ☒ a party or parties are filing a single brief in response to multiple briefs.

  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [               ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Ari Holtzblatt | **Date** | March 15, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**     *Rev. 12/01/22*

# ADDENDUM

# Addendum
## Table of Contents

Page

47 U.S.C. § 230(b) ...............................................................Add.1

Florida Stat. § 501.2041(2)(b) ...........................................Add.2

**47 U.S.C. § 230(b)**

**§ 230. Protection for private blocking and screening of offensive material**

\* \* \*

**(b) Policy**

It is the policy of the United States--

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking and harassment by means of computer.

\* \* \*

## Florida Stat. § 501.2041(2)(b)

### 501.2041. Unlawful acts and practices by social media platforms

\* \* \*

(2) A social media platform that fails to comply with any of the provisions of this subsection commits an unfair or deceptive act or practice as specified in s. 501.204.

(a) A social media platform must publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban.

(b) A social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform.

\* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Ari Holtzblatt*
ARI HOLTZBLATT

March 15, 2023