**No. 22-15961**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD J. TRUMP, et al.,

*Plaintiffs-Appellants*,

*v.*

TWITTER, INC. AND JACK DORSEY,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California, No. 3:21-cv-08378-JD (Donato, J.)

**SUPPLEMENTAL EXCERPTS OF RECORD**
**VOLUME 1 OF 1 (SER1-SER192)**

FELICIA H. ELLSWORTH
ZAKI ANWAR
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02190
(617) 526-6000

RISHITA APSANI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ARI HOLTZBLATT
ALLISON M. SCHULTZ
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue
Washington, DC 20037
(202) 663-6000

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, California 94306
(650) 858-6000

March 15, 2023

## SUPPLEMENTAL EXCERPTS OF RECORD
## TABLE OF CONTENTS

Page

Defendants' Notice of Motion and Motion to Dismiss; Memorandum
and Points of Authorities in Support Thereof, filed December 9,
2021 (Dkt. 138) .......................................................................... SER4

    Exhibit B: Twitter's Glorification of Violoence Policy
        (Mar. 2019) (Dkt. 138-3) ........................................... SER31

    Exhibit C: Twitter's Civic Integrity Policy (Jan. 2021)
        (Dkt. 138-4) ............................................................... SER37

    Exhibit E: Twitter's COVID-19 Misleading Information Policy
        (Nov. 2021) (Dkt. 138-6) .......................................... SER42

    Exhibit F: Twitter Terms of Service (eff. June 18, 2020)
        (Dkt. 138-7) ............................................................... SER55

    Exhibit J: Twitter Safety Thread (Jan. 6, 2021) (Dkt. 138-11) ............ SER74

    Exhibit K: Twitter Blog, Permanent Suspension of
        @realDonaldTrump (Jan. 8, 2021) (Dkt. 138-12) ...................... SER77

Plaintiffs' Opposition to Defendants' Motion to Dismiss, filed January
10, 2022 (Dkt. 145) .................................................................... SER80

Order to Show Cause, filed January 4, 2023 (Dkt. 185) ............................... SER111

Response to Order to Show Cause Regarding Plaintiff Naomi Wolf's
Motion for an Indicative Ruling Under Rule 60 of the FRCP,
filed January 11, 2023 (Dkt. 186) ............................................... SER113

    Declaration of Dr. Naomi Wolf (Dkt. 186-1) ...................................... SER118

Defendants' Response to Order to Show Cause Regarding Plaintiff
Naomi Wolf's Motion for an Indicative Ruling, filed January
27, 2023 (Dkt. 189) ............................................................................ SER122

Declaration of Shishay Sebhatu in Support of Defendants'
Response to Order to Show Cause Regarding Plaintiff
Naomi Wolf's Motion for an Indicative Ruling
(Dkt. 189-1) ................................................................................. SER132

Declaration of Ari Holtzblatt in Support of Defendants'
Response to Order to Show Cause Regarding Plaintiff
Naomi Wolf's Motion for an Indicative Ruling
(Dkt. 189-2) ................................................................................. SER136

Exhibit A: @elonmusk Twitter Thread (Nov. 23, 2022)
(Dkt. 189-3) ...................................................................... SER139

Exhibit B: @naomirwolf Twitter Posts (Jan. 26, 2023)
(Dkt. 189-4) ...................................................................... SER141

Exhibit C: Twitter's Blog Post Regarding its COVID-19
Misleading Information Policy (Jan. 26, 2023)
(Dkt. 189-5) ...................................................................... SER150

Exhibit D: Twitter's Help Center, About Community
Notes on Twitter (Jan. 27, 2023) (Dkt. 189-6) .............. SER182

Order re Rule 60(b) Motion, filed February 13, 2023 (Dkt. 190) ................. SER188

CERTIFICATE OF SERVICE

1  PATRICK J. CAROME (*pro hac vice*)
   patrick.carome@wilmerhale.com
2  ARI HOLTZBLATT (*pro hac vice*)
   ari.holtzblatt@wilmerhale.com
3  WILMER CUTLER PICKERING
      HALE AND DORR LLP
4  1875 Pennsylvania Avenue, NW
   Washington, D.C. 20006
5  Telephone: (202) 663-6000
   Facsimile: (202) 663-6363
6

7  THOMAS G. SPRANKLING
   CA Bar No. 294831
8  thomas.sprankling@wilmerhale.com
   WILMER CUTLER PICKERING
9     HALE AND DORR LLP
10 2600 El Camino Real, Suite 400
   Palo Alto, CA 94306
11 Telephone: (650) 858-6062
   Facsimile: (650) 858-6100
12

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

13 *Attorneys for Defendants Twitter, Inc.*
   *and Jack Dorsey*

14

15                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
16                      **SAN FRANCISCO DIVISION**

17

18 DONALD J. TRUMP, et al.,                    Case No. 21-cv-08378-JD

19                 Plaintiffs,                 **DEFENDANTS' NOTICE OF MOTION**
                                               **AND MOTION TO DISMISS;**
20       v.                                    **MEMORANDUM AND POINTS OF**
                                               **AUTHORITIES IN SUPPORT**
21 TWITTER, INC., et al.,                      **THEREOF**

22                 Defendants.                 Hearing Date: February 24, 2022
                                               Courtroom: 11, 19th Floor
23                                             Time: 10:00 a.m.
                                               Judge: Hon. James Donato
24

25

26

27

28

                                                            **SER4**

# **TABLE OF CONTENTS**

Page(s)

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................... 1

STATEMENT OF REQUESTED RELIEF ............................................................................... 1

    A.    Twitter And Its Content-Moderation Policies ......................................................... 2

    B.    Plaintiffs' Twitter Accounts ..................................................................................... 3

    C.    Plaintiffs' Allegations About Government Officials ................................................. 4

STANDARD OF REVIEW ...................................................................................................... 5

ARGUMENT ............................................................................................................................ 5

I.    Plaintiffs Fail To State A First Amendment Claim Because The Defendants Are Private Parties, Not State Actors .......................................................................................... 6

    A.    Plaintiffs Fail To Plausibly Allege Government Compulsion ................................. 7

    B.    Section 230 Does Not Make Twitter And Mr. Dorsey State Actors ........................ 9

    C.    The Complaint Fails To Allege Joint Action ......................................................... 10

II.    Plaintiffs Cannot Obtain A Declaration That Section 230 Is Unconstitutional .............. 12

    A.    This Suit Against Private Parties Is Not A Vehicle For A Constitutional Attack ............... 12

    B.    Section 230 Is Not Unconstitutional ..................................................................... 13

III. The Complaint Fails To State A Claim Under FDUPTA Section 501.211(1) ................... 14

    A.    Plaintiffs' FDUTPA Claim Is Barred By The Applicable Choice-Of-Law Provision ......... 14

    B.    Plaintiffs Root, Wolf, And ACU Cannot Invoke FDUTPA ................................. 15

    C.    Plaintiffs Have Failed To Allege An Actionable FDUTPA Claim ....................... 15

IV. Plaintiffs' Claim Under Florida SB 7072 Fails Because That Law Was Not In Effect When The Challenged Content Moderation Occurred (Count IV) ...................................................... 18

V.    Plaintiffs' Claims Are Barred By The First Amendment ............................................... 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abu-Jamal v. National Public Radio*, 1997 WL 527349 (D.D.C. 1997) ...................................8

*American Freedom Defense Initiative v. Lynch*, 217 F. Supp. 3d 100 (D.D.C. 2016), *aff'd*, 697 F. App'x 7 (D.C. Cir. 2017) ................................................................................... 12

*American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999) ................... 10

*Asghari v. Volkswagen Group of America, Inc.*, 42 F. Supp. 3d 1306 (C.D. Cal. 2013) .............................. 17, 18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................5

*Atkinson v. Meta Platforms, Inc.,* 2021 WL 5447022 (9th Cir. Nov. 22, 2021) ...................9

*Bank of America, N.A. v. Zaskey*, 2016 WL 2897410 (S.D. Fla. 2016) ............................... 15

*Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009) ........................................................... 12, 14

*Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020) ................................................................... 10

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ............................................................................. 7, 9

*Buentello v. Boebert*, 2021 U.S. Dist. LEXIS 117825 (D. Colo. 2021) .................................7

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ............................................................... 14

*Children's Health Defense v. Facebook Inc.*, 2021 WL 2662064 (N.D. Cal. 2021) ....................................... *passim*

*Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) ............................................... 20

*Daniels v. Alphabet Inc.*, 2021 WL 1222166 (N.D. Cal. 2021) .................................... 7, 8, 12

*Davis v. Powertel, Inc.*, 776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ................................ 15, 18

*Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015) ..................... 12

*Divino Group LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. 2021) ............................... 9, 13

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. 2021) ............................................ 7, 8, 12

*Easter v. American West Financial*, 381 F.3d 948 (9th Cir. 2004) ....................................... 13

*Federal Agency of News, LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295 (N.D. Cal. 2019) ....................................6

*Federal Agency of News, LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................ 11

*Florida Insurance Guaranty Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187 (Fla. 2011) ........................ 18, 19

**SER6**

*Green v. AOL*, 318 F.3d 465 (3d Cir. 2003) ................................................................ 13, 14

*Hanes Corp. v. Millard*, 531 F.2d 585 (D.C. Cir. 1976) .................................................. 13

*Heineke v. Santa Clara University*, 965 F.3d 1009 (9th Cir. 2020) ..................................9

*Herssein Law Group v. Reed Elsevier, Inc.*, 2014 WL 11370411 (S.D. Fla. 2014) ............ 15

*Hope Clinic v. Ryan*, 249 F.3d 603 (7th Cir. 2001) (per curiam) ..................................... 12

*Howard v. AOL*, 208 F.3d 741 (9th Cir. 2000) ..................................................................6

*Ixcot v. Holder*, 646 F.3d 1202 (9th Cir. 2011) ............................................................. 19

*Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827 (1990) ........................... 18

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ..............................................................2

*La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981 (S.D. Tex. 2017) ........................... 13, 19

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ................................................ 18, 19

*Levine v. Vilsack*, 587 F.3d 986 (9th Cir. 2009) ............................................................ 12

*Lewis v. Google LLC*, 461 F. Supp. 3d 938 (N.D. Cal. 2020) ......................................... 12

*Lewis v. Google LLC*, 851 F. App'x 723 (9th Cir.), *cert. denied*, 2021 WL 5043635 (U.S.
      2021) ...................................................................................................... 13, 14

*Librizzi v. Ocwen Loan Services, LLC*, 120 F. Supp. 3d 1368 (S.D. Fla. 2015).............. 15, 16

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ....................................................... 10

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) ...................................... 20

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ........................ 6, 7

*Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429 (9th Cir. 1989) ............................. 10

*Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498 (9th Cir. 1996) .............................. 7, 10

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) .....................................................5

*Meyer v. Aabaco Small Business, LLC*, 2018 WL 306688 (N.D. Cal. 2018) .................... 16

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ...................................... 19

*Murphy v. Twitter*, 60 Cal. App. 5th 12 (2021) .............................................................. 16

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ............ 20

*NetChoice LLC v. Moody*, 2021 WL 269087 (N.D. Fla. 2021), *appeal filed sub. nom. NetChoice,
      LLC v. Att'y Gen.*, No. 21-12355 (11th Cir.)......................................... 18, 19, 20

*NetChoice, LLC v. Paxton*, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) .................................................. 18, 19

*Newman v. Google, LLC*, 2021 WL 2633423 (N.D. Cal. 2021) ......................................................... 13, 17

*Palomino v. Facebook, Inc.*, 2017 WL 76901 (N.D. Cal. 2017) ................................................................ 15

*Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161 (9th Cir. 2021) .............................. 10

*Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 667 (S.D. Fla. 2008) ................................................... 16

*Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020) ..........................................6, 12, 18

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................................... 20

*Reno v. ACLU*, 521 U.S. 844 (1997) ................................................................................................ 19

*Rutenburg v. Twitter, Inc.*, 2021 WL 1338958 (N.D. Cal. 2021) ..............................................................6

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) ........................................................................... 20

*Snyder v. Phelps*, 562 U.S. 443 (2011) ........................................................................................... 19

*Standing Committee on Discipline of U.S. District Court for Central District of California v. Yagman*,
    55 F.3d 1430 (9th Cir. 1995) ............................................................................................ 18

*Sutton v. Providence St. Joseph Medical Center*, 192 F. 3d 826 (9th Cir. 1999) ....................................9

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) ................................................................................. 11

*Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018) ................................................ 14, 15

*Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) ........................................................... 19

*Zimmerman v. Facebook, Inc.*, 2020 WL 5877863 (N.D. Cal. 2020) ......................................................6

*Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281 (11th Cir. 2007) ............................................ 16, 17

## STATUTES, RULES, AND REGULATIONS

47 U.S.C. § 230 .......................................................................................................................... *passim*

Fed. R. Civ. P. 9.................................................................................................................... 15, 17

Fed. R. Civ. P. 12(b)(6) .......................................................................................................... 1, 2

Fla. Laws, ch. 32, § 7 (2021) ....................................................................................................... 19

## OTHER AUTHORITIES

13A Charles A. Wright & Arthur R. Miller et al., Federal Practice & Procedure § 3531.5
    (3d ed. 2021) ................................................................................................................... 12

10B Fed. Prac. & Proc. Civ. § 2758 (4th ed.) ................................................................................. 13

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on February 24, 2022 at 10:00 a.m., in Courtroom 11 of the U.S. District Court for the Northern District of California, this Motion to Dismiss filed by Defendants Twitter, Inc. ("Twitter") and Jack Dorsey will be heard. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants hereby move this Court to dismiss all claims with prejudice. This Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities, and the Sprankling Declaration.

## STATEMENT OF REQUESTED RELIEF

Defendants request that the Court dismiss Plaintiffs' Amended Complaint (hereinafter "Complaint") in its entirety and with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs—like all Twitter account holders—agreed to abide by Twitter's Rules, and yet proceeded to repeatedly violate those Rules. When Twitter responded by suspending or restricting their accounts, Plaintiffs filed this putative nationwide class-action seeking, among other things, an injunction forcing Twitter to carry Plaintiffs' speech and appointing a court-supervised monitor to oversee *all* of Twitter's future content-moderation decisions for the hundreds of millions of Tweets posted on its platform every day. In support of such unprecedented relief, Plaintiffs assert four claims that would upend bedrock principles of constitutional law, disregard standing and other procedural limitations, and stretch Florida consumer protection laws far beyond their geographic, temporal, and substantive limits.

Each of Plaintiffs' claims is defective for multiple reasons. To summarize just a few: Plaintiffs' lead claim—that Twitter's editorial judgments not to disseminate their messages violated Plaintiffs' First Amendment rights—ignores both that Twitter is a private actor that is not constrained by the federal constitution and that Twitter has its own First Amendment rights to make those judgments. Plaintiffs' invitation for this Court to invalidate a decades-old federal statute (47 U.S.C. § 230) as violative of the First Amendment fails both because they have no standing to assert such a claim and because their suggestion that the statute is unconstitutional is frivolous. Plaintiffs' claim under the general consumer protection provision of the Florida Unfair and Deceptive Trade Practices Act ("FDUPTA") founders both because that provision does not apply in this case due to a binding contractual choice-of-law clause and because the Complaint alleges no facts that support Plaintiffs' theories of consumer deception. And

**SER9**

Plaintiffs' claim under a new (and recently enjoined) Florida statute that purports to regulate content moderation by certain social media companies (Florida SB 7072) fails at the threshold because all of the conduct challenged in the Complaint occurred *before* the statute took effect. Plaintiffs' claims should all be dismissed with prejudice.

## BACKGROUND

### A. Twitter And Its Content-Moderation Policies

Twitter operates an Internet communications platform through which hundreds of millions of people share views and follow current events. *See* Compl. ¶¶ 2, 36. Each day, approximately 500 million Tweets are posted to the Twitter platform. Compl. ¶ 2. As explained in more detail in Twitter's opposition to Mr. Trump's preliminary injunction (hereinafter "Opp."), Twitter has adopted and enforces its own content-moderation policies, including the Twitter Rules, to minimize the reach of certain categories of misinformation Twitter deems harmful and to otherwise foster healthy conversations on its platform. *See* Twitter, *The Twitter Rules*, Sprankling Decl. Ex. A.[1]

Twitter's Civic Integrity Policy, for example, prohibits posting false and misleading information regarding elections and other civic processes, including "false or misleading information intended to undermine public confidence in an election." *See* Twitter, *Civic Integrity Policy*, Sprankling Decl. Ex. C. Similarly, Twitter's COVID-19 Misleading Information Policy prohibits account holders from sharing "[c]ontent that is demonstrably false or misleading and may lead to significant risk of harm," including "the efficacy and/or safety of preventative measures, treatments, or other precautions." Twitter, *COVID-19 Misleading Information Policy*, Sprankling Decl. Ex. E. And Twitter's Glorification of Violence Policy prohibits "glorify[ing], celebrat[ing], prais[ing], or condon[ing] violent crimes, violent events where people were targeted because of their membership in a protected group, or the perpetrators of such acts." Twitter, *Glorification of Violence Policy*, Sprankling Decl. Ex. B.

As a condition of using the Twitter platform, individuals agree to Twitter's User Agreement, which incorporates the Twitter Terms of Service (herein, "Terms") and Twitter Rules and Policies (herein,

---

[1] The Complaint references the Terms of Service and Twitter's Rules, such as the Civic Integrity Policy, as well as Twitter's public reasoning for suspending Mr. Trump's account; these materials are therefore integral to the allegations of the Complaint and may be considered in deciding this motion under Rule 12(b)(6). *See Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005). For the Court's convenience, Defendants attach these materials to the accompanying declaration of Thomas G. Sprankling.

"Rules").  Order Granting Mot. to Transfer 1-2 (S.D. Fla. 2021), ECF No. 87.  In the Terms, Twitter reserves its right to remove content that violates its Rules.  Twitter, *Terms of Service*, Sprankling Decl. Ex. F.  At the same time, the Terms also provide that Twitter "may ... remove or refuse to distribute any Content," that it "may suspend or terminate your account … at any time for any or no reason," and that Twitter is also free to "not monitor or control the Content posted" on its platform.  *Id.*

### B. Plaintiffs' Twitter Accounts

Twitter allegedly suspended or restricted Plaintiffs' Twitter accounts for violating the Twitter Rules.  Compl. ¶¶ 113, 124, 129, 137, 146, 155, 167.

**1.  *Plaintiff Trump.*** Following the November 2020 presidential election, Mr. Trump repeatedly violated Twitter's Civic Integrity Policy by tweeting false information concerning the election results.  Opp. 3; *see also* Compl. ¶ 110.  Pursuant to its Rules, Twitter initially responded to these violations by labeling the offending Tweets as "misleading" (but left them available for viewing).  *Id.* ¶ 111.  Mr. Trump nevertheless continued to post violative content.  On January 6, 2021, the day a large mob stormed the United States Capitol as Congress met to count electoral votes, Mr. Trump posted three Tweets that again violated Twitter's Civic Integrity Policy. @TwitterSafety (Jan. 6, 2021), Sprankling Decl. Ex. J.  As Twitter publicly explained at the time, "[a]s a result of the unprecedented and ongoing violent situation in Washington, D.C.," Twitter removed the three Tweets for "repeated and severe violations of our Civic Integrity policy."  *Id.*  Twitter also locked Mr. Trump's account for 12 hours and warned that future violations of its Rules would result in his "permanent suspension."  *Id.*

Two days later, Mr. Trump yet again posted Tweets that Twitter determined could encourage further violence.  *See* Twitter, *Permanent suspension of @realDonaldTrump*, Sprankling Decl. Ex. K.  That same day, true to its warning, Twitter permanently suspended Mr. Trump's account.  It immediately and publicly explained its reasoning, noting that Mr. Trump's most recent Tweets, particularly in the context of "the ongoing tensions in the United States" and in light of "the people who violently stormed the Capitol," could "be mobilized by different audiences, including to incite violence."  *Id.*[2]

---

[2] The Complaint also refers to Twitter's policies concerning misleading information about COVID-19 and to Tweets from Mr. Trump saying that "COVID-19 originated in a laboratory in Wuhan, China" and advocating for "the use of hydroxychloroquine."  Compl. ¶¶ 89-91.  But it does not allege that Twitter's challenged actions with respect to *Mr. Trump's* account pertained to those Tweets or those policies.

**2. *The Other Plaintiffs.*** The Complaint alleges that Twitter permanently suspended the accounts of five other Plaintiffs (Cuadros, Barboza, Latella, Root, and Wolf) for posting election- and COVID-19-related information that Twitter deemed to violate various Twitter Rules, *see* Compl. ¶¶ 124, 132, 135-137, 142-43, 150, 159. The Complaint also alleges that the account of Plaintiff American Conservative Union ("ACU") experienced "a marked decrease in followers," without attributing the alleged decrease to any particular action by Twitter. *Id.* ¶¶ 128-129.

**C. Plaintiffs' Allegations About Government Officials**

The Complaint posits that Twitter's decisions regarding Plaintiffs' accounts were not really Twitter's but were actually acts of *the federal government*. Its sole basis for this theory is a disparate collection of statements by various members of Congress, executive branch officials, and private citizens—none joined as defendants—that supposedly put pressure on Twitter to take action against Plaintiffs' accounts.

The Complaint implies, for example, that Twitter was pressured to take action against Plaintiffs' accounts by statements of various lawmakers and non-government actors calling for Congress to amend Section 230 of the Communications Decency Act, 47 U.S.C. § 230, or contemplating antitrust reform. Compl. ¶ 55. None of those statements mentioned Mr. Trump's or any other Plaintiffs' use of Twitter's platform, much less did they indicate that the future of Section 230 might somehow change if Twitter took some action with respect to any of their accounts. The Complaint also points to other statements that mention Trump's Twitter use, none of which threatened any regulatory or legislative action. Compl. ¶¶ 53, 55. As to the other Plaintiffs, the Complaint does not allege a single statement by anyone, federal office holder or otherwise, calling for Twitter to remove any of them (or their content) from its platform. Indeed, many of the statements on which the Complaint relies were made *after* Twitter's suspensions of Mr. Trump's and the other Plaintiffs' accounts. Compl. ¶¶ 55 (last four bullets), 96-97, 105-110.

Finally, the Complaint quotes various statements by public health and other officials regarding the federal government's COVID-19 response, all of which were made after all of the content-moderation decisions referenced in the Complaint. Compl. ¶¶ 96-97, 112. It also references an October 2019 statement from the Centers for Disease Control and Prevention (before the COVID-19 pandemic and during Mr. Trump's term as President) that simply noted that the CDC was "engaging … partners," including Twitter, to "curb the spread of vaccine misinformation." *Id.* ¶ 78.

**SER12**

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must "plausibly (not merely conceivably) entitle plaintiff to relief." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067–68 (9th Cir. 2011). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

Each of the four counts in the Complaint fails to state a valid claim. Count I, which asserts that Twitter's enforcement of its Rules violated Plaintiffs' First Amendment rights, runs headlong into a legion of cases holding that private enterprises like Twitter are not subject to constitutional constraints. Plaintiffs try to circumvent this bedrock principle by asserting that statements made by people within the government—expressing concern about misinformation online—somehow transformed Twitter's own editorial decisions into acts of the government. But this hodgepodge of statements does not establish the sort of coercion or entwinement that would be necessary to convert private conduct into "state action."

Count II—which seeks a declaration that Section 230 of the federal Communications Decency Act, 47 U.S.C. § 230, is unconstitutional—fails for several reasons, not least of which is that Plaintiffs are suing Twitter rather than the federal government. Plaintiffs have no standing, nor any cause of action to assert a facial challenge to a federal statute in this case against a non-government actor. In any event, every court to address the question has held that Section 230 is constitutional.

Counts III and IV, which allege that Twitter violated two Florida consumer-protection statutes, similarly fail as a matter of law. These Counts attempt to cast Twitter's content-moderation decisions as unfair commercial practices on the theory that the decisions were allegedly inconsistent either with Twitter's public statements about its platform (Count III) or with how Twitter did (or did not) moderate content originating from other people who use the platform (Count IV). Count III fails both in light of the California choice-of-law provision in the Twitter Terms of Service and because the Complaint fails to allege any act or practice that would deceive a reasonable consumer. Count IV fails because the Florida statute on which it relies did not take effect until after every content-moderation decision challenged in the Complaint and because that statute, as one court has already recognized, violates the First Amendment rights of platform operators like Twitter.

**SER13**

Finally, Plaintiffs ignore that the First Amendment protects Twitter's decisions to exercise editorial control and judgment over what content is and is not published through its communications platform. The government (and courts) cannot force the private operator of an online platform, such as Twitter, to disseminate speech with which the operator disagrees. This basic principle independently requires dismissal of all of Plaintiffs' claims.

## I. PLAINTIFFS FAIL TO STATE A FIRST AMENDMENT CLAIM BECAUSE THE DEFENDANTS ARE PRIVATE PARTIES, NOT STATE ACTORS

In Count I of the Complaint, Plaintiffs claim that Twitter's enforcement actions against them violated the First Amendment. This claim fails as a matter of law because neither Defendant is a state actor subject to the First Amendment.[3] When a private entity like Twitter "provides a forum for speech," it "is not ordinarily constrained by the [Constitution] because the private entity is not a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). The Ninth Circuit made that clear in *Prager University v. Google LLC*, holding that YouTube is not a state actor and cannot be sued under the First Amendment for its editorial decisions about whether to display content on its private platform. 951 F.3d 991, 997 (9th Cir. 2020). A long and unbroken line of cases—before and after *Prager*—have rejected similar attempts to turn the First Amendment on its head through claims against private online service providers. *See, e.g.*, *Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000); *Rutenburg v. Twitter, Inc.*, 2021 WL 1338958, at *2 (N.D. Cal. 2021); *Zimmerman v. Facebook, Inc.*, 2020 WL 5877863, at *2 (N.D. Cal. 2020); *Fed. Agency of News, LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1308-1314 (N.D. Cal. 2019) ("*FAN I*").

Plaintiffs attempt to circumvent these precedents by arguing that Twitter was transformed into a "state actor" under the so-called compulsion and joint-action tests, *see* Compl. ¶ 3, two of the "few limited circumstances" in which a private entity can qualify as a "state actor" and therefore be constitutionally constrained, *see Halleck*, 139 S. Ct. at 1928. But these tests are demanding. The state action doctrine is designed to "protect[] a robust sphere of individual liberty," especially where private actors are exercising First Amendment-protected "editorial control over the speech and speakers on their properties or platforms." *Id.* at 1932, 1934. Plaintiffs' allegations concerning Twitter's enforcement of its own Rules—

---

[3] Plaintiffs appear to treat these allegations as a basis for deeming Mr. Dorsey a state actor as well. Private individuals, like private entities, are not state actors subject to the First Amendment. Plaintiffs' First Amendment claim as to Mr. Dorsey therefore fails, at a minimum, for the same reasons. **SER14**

1    decisions "made by [a] private part[y] according to professional standards that are not established by the

2    State"—fall far short of any plausible assertion of state action. *Blum v. Yaretsky*, 457 U.S. 991, 1008 (1982).

3    **A. Plaintiffs Fail To Plausibly Allege Government Compulsion**

4    For compulsion to convert private conduct into state action, a plaintiff must plausibly allege that

5    the state "has exercised coercive power or has provided such significant encouragement, either overt or

6    covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004-1005. Courts

7    in this District have repeatedly held that analogous, and even identical, statements to those alleged here

8    do not meet this standard.

9    None of the statements the Complaint attributes to government officials threatened adverse

10   regulatory or legislative action against Twitter unless it took a specific action with respect to any of the

11   Plaintiffs' accounts. Not one of the statements attributed to individual legislators could have—or even

12   purported to—speak on behalf of even their entire Chamber, let alone the entire Congress. As Judge

13   DeMarchi has held, "[t]he publicly expressed views of individual members of Congress—regardless of

14   how influential—do not constitute 'action' on the part of the federal government." *Daniels v. Alphabet Inc.*,

15   2021 WL 1222166, at *6 (N.D. Cal. 2021); *see Buentello v. Boebert*, 2021 U.S. Dist. LEXIS 117825, at *13 (D.

16   Colo. 2021) ("Congress, not its individual members, commands the federal government, and it is that

17   body that the First Amendment sought to constrain."). And Plaintiffs' allegations (Compl. ¶¶ 55, 57-59)

18   that members of Congress convened hearings or expressed interest in Section 230 reform at some

19   undefined time in the future evince, at most, some "regulatory interest in a problem," and that is simply

20   not enough to "transform[] any subsequent private efforts to address the problem … into state action."

21   *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996); *see also Doe v. Google LLC*, 2021 WL 4864418,

22   at *3-4 (N.D. Cal. 2021).

23   Judges in this District have repeatedly dismissed nearly identical First Amendment claims against

24   other online platforms (specifically, YouTube and Facebook). In *Children's Health Defense v. Facebook Inc.*,

25   2021 WL 2662064 (N.D. Cal. 2021) ("*CHD*"), for example, a non-profit organization alleged that

26   Facebook's removal of certain health-related content was state action because individual members of

27   Congress had made statements (including some identical to those cited here) implying Facebook would

28   face regulation and revocation of Section 230 unless it did more to block and remove "COVID-19

**SER15**

disinformation" and "fraudulent or illicit" content more generally. *Id.* at *15 n.10. Judge Illston disposed of that argument, reasoning that such statements were "too general and amorphous to constitute coercive action with respect to the specific challenged actions." *Id.* at *15 & n.10. Confronting some of the very same statements by government officials, Judge DeMarchi likewise held in *Daniels v. Alphabet* that allegations that state actors "wanted certain kinds of [content] removed and that [plaintiff's content] fell within that category … do not reflect the kind of governmental involvement" that would be needed to transform the content-moderation decisions of YouTube into state action. 2021 WL 1222166, at *7.

And in *Doe v. Google*, Judge Freeman dismissed the theory that "broad lawmaker proclamations regarding 'misinformation' or 'QAnon-related speech' … are sufficient to show that the government 'commanded' the suspension of [the p]laintiffs' accounts." 2021 WL 4864418, at *3. There, plaintiffs alleged that YouTube removed their videos and suspended their accounts in response to the purported threat of "various government penalties" that Plaintiffs also rely on here: "the repeal of CDA Section 230 protections, 'show trials' in front of the U.S. Senate, and a DOJ antitrust suit." *Id.*; *see* Compl. ¶ 55. Judge Freeman held that these types of threats were not coercive and therefore did not transform YouTube's content-moderation into state action. *Id.* at *3-4. *See also Abu-Jamal v. Nat'l Pub. Radio*, 1997 WL 527349, at *5 (D.D.C. 1997) (rejecting theory that "public statements by a [U.S.] Senator and the Fraternal Order of Police condemning a decision by NPR to air [the plaintiff]'s commentaries could be considered government … compulsion" even though individual members of Congress had specifically targeted plaintiff's content and NPR received funding from Congress).

Plaintiffs allege no facts that would justify a different outcome here. As to Mr. Trump, the Complaint points to statements by a member of Congress that called for Twitter to suspend Mr. Trump's Twitter account but did not threaten any sanctions against Twitter for failure to do so. Compl. ¶¶ 53, 55. It alleges even less as to the remaining Plaintiffs, quoting only general statements—none mentioning those Plaintiffs—urging Twitter to act on misinformation. *See id.* ¶¶ 54-56. The Complaint's reliance on an assortment of other statements on topics as varied as misinformation, antitrust, and Section 230 (many of which do not even concern Twitter) do nothing to further Plaintiffs' compulsion theory. As in *CHD*, *Daniels*, and *Doe*, none of these statements levied an actionable threat of regulatory action premised on Twitter's failure to remove Plaintiffs' content. *See id.* ¶ 55.

**SER16**

And there is yet another problem with Plaintiffs' compulsion theory: They cannot clear the additional barriers to holding a *private* actor like Twitter liable for the *government*'s allegedly coercive acts. The paradigmatic compulsion cases are brought against the government, challenging actions carried out through private parties. *See, e.g., Blum*, 457 U.S. at 1003 ("This case is obviously different from those cases in which the defendant is a private party…."); *see also Sutton v. Providence St. Joseph Med. Ctr.*, 192 F. 3d 826, 838 (9th Cir. 1999) (ordinarily "only the state actor, and not the private party should be held liable for the constitutional violation that resulted from the state compulsion"). Under Ninth Circuit law, the plaintiff must allege "something more" than government coercion to hold a private actor like Twitter liable on a compulsion theory. *Sutton*, 192 F. 3d 838. Plaintiffs here have not even alleged coercive government acts, *supra* pp. 7-8, let alone "something more" that could warrant imposing liability on the private defendants.

### B. Section 230 Does Not Make Twitter And Mr. Dorsey State Actors

Unable to identify any coercive government acts targeting Twitter, Plaintiffs contend that the mere existence of a decades-old federal statute—Section 230—transformed Twitter's content-moderation decisions into state action. Compl. ¶¶ 65-77. Plaintiffs' theory seems to be that because Section 230 protects Twitter's content-moderation decisions from liability, all of its editorial decisions aimed at mitigating misinformation should be deemed to have been "significant[ly] encourage[d]" or compelled by the government. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).

This gambit fails. As the Complaint concedes (¶ 70), Section 230 "does not require private parties to do anything," *Divino Grp. LLC v. Google LLC*, 2021 WL 51715, at *6 (N.D. Cal. 2021). Rather, it reflects a "deliberate *absence* of government involvement in regulating online speech." *Id.* That is why the Ninth Circuit and multiple judges in this District have rejected precisely this theory, and why no judge anywhere has held otherwise. *See Atkinson v. Meta Platforms, Inc.,* No. 20-17489, 2021 WL 5447022, at *2 (9th Cir. Nov. 22, 2021) ("Section 230 of the Communications Decency Act does not independently transform Meta Platforms into a government actor for First Amendment purposes."); *Divino*, 2021 WL 51715, at *6 (rejecting theory that Section 230 transformed YouTube's content-moderation decisions into state action); *CHD*, 2021 WL 2662064, at *14 (rejecting argument that protections afforded to online platforms by Section 230, when combined with "pressure" on Facebook from a Congressmember to act on vaccine misinformation, turned Facebook's private decisions into state action). The same result is required here.

**SER17**

**C. The Complaint Fails To Allege Joint Action**

Plaintiffs fare no better in trying to allege that Twitter's content-moderation decisions were state action under a "joint action" theory. That theory requires that "the claimed constitutional deprivation" "result[] from the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state." *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020); *accord Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Joint action thus does not exist where the governing "statutory and regulatory scheme leaves the challenged decisions to the judgment of [private actors]." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 58 (1999). The theory also requires that the private entity's "particular actions [be] inextricably intertwined with those of the government," and that there be "'substantial coordination' and 'significant financial integration' between the private party and government." *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1167-68 (9th Cir. 2021) (citation omitted). Plaintiffs allege nothing of the sort.

To start, the Complaint does not identify any government-created right or rule of conduct that mandated the content-moderation decisions they challenge. This alone dooms Plaintiffs' joint action theory. Plaintiffs explicitly acknowledge that Twitter makes content-moderation decisions based on its own Rules—not on the basis of any law or government regulation. Compl. ¶¶ 37-40 (describing these Rules). And while Plaintiffs point to general statements from the CDC and other government officials relating to vaccine and COVID-19 misinformation, *id.* ¶¶ 78-79, 96, and to the fact that Twitter removed certain content regarding the origins of COVID-19 and the efficacy of vaccines that was contrary to views expressed by public health officials, *see id.* ¶¶ 87, 90, that does not advance their cause. The government's general guidance on COVID-19 is not mandatory and certainly does not dictate how Twitter implements its platform Rules. *See Mathis*, 75 F.3d at 502 ("generalized federal concern with drug use at nuclear … plants" did not dictate plant's decision to discharge employee for alleged drug transaction); *CHD*, 2021 WL 2662064, at *12 ("express[ing] … concern" regarding vaccine misinformation to Facebook cannot "be interpreted as providing a specific standard of decision that mandated" Facebook's actions). If anything, allegations that Twitter relied in part on CDC guidance suggests, at most, that it exercised independent judgment and chose to look to information from public health authorities when moderating content. *See Mathis*, 891 F.2d at 1432 ("The requisite nexus to the government is absent when the decisions are 'based on *independent professional judgments* and were not subject to state direction.'").

**SER18**

Further, statements by the CDC that it "work[s] with" social media companies to promote "trustworthy vaccine information," and by other officials that the government "engage[s]" social media platforms regarding COVID-19 misinformation, fall far short of "substantial coordination" or "significant financial integration" between Twitter and government actors. Such statements suggest, at most, a general alignment to promote accurate health information and not misinformation. A private entity's mere sharing of the government's goals raises no plausible inference of any coordination with the government to remove any content—let alone any of the Plaintiffs' content in particular. *See Taylor v. List*, 880 F.2d 1040, 1048 (9th Cir. 1989). That is especially so as to the July 2021 statements contained in the Complaint, which mostly concern the White House's coordination with Facebook—not Twitter—and which post-date all of the conduct alleged in the Complaint. *See* Compl. ¶ 96; *Fed. Agency of News, LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1125 (N.D. Cal. 2020) ("*FAN II*") (noting that statements by the government that "Facebook is 'working more closely' with the U.S. government and law enforcement" were not probative of joint action when they "post-date[d] the relevant conduct that allegedly injured [p]laintiffs").

*CHD* is, again, directly on point. The plaintiff in *CHD* alleged that Facebook's decisions to label, remove, and/or demote its vaccine-related content satisfied the joint action test based, in part, on the *same* CDC statement alleged in the Complaint here—that the CDC "works with" social media companies. *See* 2021 WL 2662064, at *4; Compl. ¶ 78. Judge Illston rejected that argument, reasoning that "general statements by the CDC and [Facebook's CEO] about 'working together'" are too amorphous to raise a plausible inference that "the government was a 'joint participant in the challenged activity.'" *CHD*, 2021 WL 2662064. at *11. She further reasoned that even if Facebook had "relied on CDC information about vaccines to determine what information is 'misinformation,'" that would not be enough to show that the CDC had supplied the "standard of decision" for Facebook's content-moderation decisions. *Id.* at *12 (citation omitted). That is because such allegations fail to establish a "'link' connecting the government 'standard of decision' to the allegedly unconstitutional act*." Ibid.* Plaintiffs' Complaint here relies on similar—if not identical—allegations of cooperation and also fails to plausibly allege joint action. *See also Doe*, 2021 WL 4864418, at *4-5; *Daniels*, 2021 WL 1222166, at *7.[4]

---

[4] Any argument that state action exists because Mr. Trump's Twitter account was a "public forum," Compl. ¶¶ 44-49, is foreclosed by *Prager*, in which the Ninth Circuit held that private corporations do not become public fora merely by hosting speech that is generally accessible to the public. 951 F.3d at 997.

## II. PLAINTIFFS CANNOT OBTAIN A DECLARATION THAT SECTION 230 IS UNCONSTITUTIONAL

Count II of the Complaint—which asks this Court to declare that Section 230 of the Communications Decency Act, 47 U.S.C. § 230, is unconstitutional on its face and as applied—is both procedurally improper and substantively frivolous.

### A. This Suit Against Private Parties Is Not A Vehicle For A Constitutional Attack

Plaintiffs' constitutional challenge to Section 230 is procedurally improper because Plaintiffs did not sue any government actor charged with enforcing Section 230 and because Defendants, at this stage, have not invoked Section 230 as a defense against their claims.

Where a person seeks to bring a pre-enforcement challenge to a statute, he must sue the relevant official charged with enforcing the law against him. *See Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 105 (D.D.C. 2016) (collecting authority), *aff'd*, 697 F. App'x 7 (D.C. Cir. 2017). But because Section 230 confers immunity and is not a law enforced against Plaintiffs, there is no such actor and a pre-enforcement challenge is barred. *See id.*; *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015) ("[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, … standing requires the named defendants to possess authority to enforce the complained-of provision."); *Hope Clinic v. Ryan*, 249 F.3d 603, 606 (7th Cir. 2001) (per curiam); 13A Charles A. Wright & Arthur R. Miller et al., Federal Practice & Procedure § 3531.5 (3d ed. 2021).

Because there is no threat of enforcement against them, Plaintiffs lack standing. They cannot demonstrate that Section 230 has caused or will imminently cause them injury. Section 230 simply immunizes online platforms from claims seeking to hold them liable for acting as a "publisher or speaker" of content submitted by another, § 230(c)(1), or for moderating content they deem objectionable, § 230(c)(2). *See generally Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009). As such, Section 230 neither requires nor forbids Plaintiffs from doing anything, and therefore does not injure them. *See Lewis v. Google LLC*, 461 F. Supp. 3d 938, 952 (N.D. Cal. 2020); *Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009) (regulation or lack of regulation of a third party is insufficient to establish standing).

Plaintiffs' only alleged injury—their inability to post on Twitter's platform—is traceable not to Section 230 but to Twitter and its own independent (and First-Amendment-protected) editorial decisions. *Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) ("[S]tanding requires a plaintiff to demonstrate …

**SER20**

traceability, i.e., a causal connection between the injury and the actions complained of."). "Section 230 does not apply to [Plaintiffs'] conduct or provide a mechanism for sanctions that could affect [them]"; instead, their alleged injuries "all arose from the actions of a private entity [Twitter], as it enforced its own standards." *Lewis v. Google LLC*, 851 F. App'x 723, 723-24 (9th Cir.), *cert. denied*, 2021 WL 5043635 (U.S. 2021). For these reasons, a judicial declaration that Section 230 is unconstitutional would not require Twitter to reinstate Plaintiffs' accounts and would not remedy their injury. They thus have no standing.

To the extent Plaintiffs stake their standing on potential future application of Section 230 to bar their claims, it is improper to "use[] the Declaratory Judgment Act to anticipate an affirmative defense." *Divino*, 2021 WL 51715, at *11. Section 230 is an affirmative defense that Twitter can invoke—if and when Twitter chooses. Absent such invocation, it cannot be challenged in this suit, as numerous courts in this District have concluded in rejecting claims like Plaintiffs'. *See id.*; *Newman v. Google, LLC*, 2021 WL 2633423, at *14 (N.D. Cal. 2021); *see also Hanes Corp. v. Millard*, 531 F.2d 585, 592–93 (D.C. Cir. 1976); 10B Fed. Prac. & Proc. Civ. § 2758 (4th ed.).

### B. Section 230 Is Not Unconstitutional

Plaintiffs' theory as to why Section 230 is unconstitutional—that it "induce[s] … social media companies to … censor … protected speech," *id.* ¶¶ 195-197, and has been applied to "furnish[] immunity to social media companies for … block[ing] … constitutionally protected speech," *id.* ¶ 192—is wrong for much the same reasons that it is improper. Namely, Section 230 does not govern their conduct or dictate whether or how online platforms moderate their content or accounts, and therefore does not violate their rights. Courts have uniformly rejected similar constitutional challenges to Section 230, which courts in this District and elsewhere have applied for more than a quarter century. *See, e.g.*, *Green v. AOL*, 318 F.3d 465, 472 (3d Cir. 2003) (Section 230 does not violate the First Amendment); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 994-995 (S.D. Tex. 2017) (same). As the Third Circuit reasoned in *Green*, "Section 230(c)(2) does not require [online platforms] to restrict speech; rather it allows [them] to establish standards of decency without risking liability for doing so." 318 F.3d at 472; *Lewis*, 851 F. App'x at 724 n.2. It thus protects private, voluntary self-regulation, precisely to "promote the free exchange of information and ideas over the Internet," *Barnes*, 570 F.3d at 1099-1100, and to avoid the threat of *government* censorship. Such protection does not violate anyone's rights.

**SER21**

Also meritless is any attempt by Plaintiffs to invoke the private non-delegation doctrine.  *See* Compl. ¶¶ 13, 238 (mentioning in passing that Section 230(c) is an "unconstitutional delegation" of authority).  That doctrine prohibits the government from handing off its own regulatory power to a private entity.  *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).  But Section 230 does not confer any governmental power at all upon Twitter or any other private company; it merely limits liability for certain acts service providers may take (or fail to take) in self-regulating their own platforms.

## III.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER FDUPTA SECTION 501.211(1)

### A.  Plaintiffs' FDUTPA Claim Is Barred By The Applicable Choice-Of-Law Provision

Count III, which is asserted under Section 501.211(1) of Florida's general consumer protection statute (FDUTPA), must be dismissed because the Twitter Terms provide that "[t]he laws of the State of California … will govern these Terms and any dispute that arises between [users] and Twitter."  *Terms of Service*, Sprankling Decl. Ex. F.  As Judge Scola already held in enforcing this forum-selection clause in this case, each Plaintiff is bound by the Twitter Terms, which has long included this choice-of-law provision.  Order Granting Mot. to Transfer 4-7, ECF No. 87.  Indeed, in opposing Twitter's motion to transfer to this Court, Plaintiffs conceded that enforcing the forum-selection clause would also require enforcing the choice-of-law provision.  Pls.' Opp. 14, ECF No. 58; *see also* Pls.' Mot. to Consolidate 5, *Trump v. YouTube*, No. 21-cv-08009 (N.D. Cal. 2021), ECF No. 125 (stating that if the choice-of-law provision is enforced, the Complaint must "be amended to assert claims under California's Unfair Competition Law").  Thus, there can be no question that California, not Florida, law presumptively governs this dispute.

Plaintiffs have no basis for overcoming the presumptive application of this choice-of-law provision to Count III because California "has a substantial relationship to the parties" and application of California law with respect to the sort of claim Plaintiffs assert in this count is not "contrary to a fundamental policy" of Florida.  *See Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018) (citation and quotation marks omitted).  To the first point, because Twitter is a California corporation with its principal place of business in San Francisco, "California has an obvious substantial relationship to the parties and a reasonable basis to enforce its choice of law.'"  *Id.*; *see also* Compl. ¶ 25.  And application of California law will not be contrary to any fundamental policy of Florida because "California … has its own robust body of consumer protection law that strives to prevent consumer deception by prohibiting

**SER22**

unlawful business practices," including "fraudulent business practices." *Palomino v. Facebook, Inc.*, 2017 WL 76901, at *4 (N.D. Cal. 2017). Plaintiffs' FDUTPA claim should therefore be dismissed. *See id.* at *5; *Herssein Law Grp. v. Reed Elsevier, Inc.*, 2014 WL 11370411, at *9 (S.D. Fla. 2014) ("[A] choice-of-law provision for the application of non-Florida law precludes a claim under the FDUTPA.").

### B. Plaintiffs Root, Wolf, And ACU Cannot Invoke FDUTPA

The FDUTPA claim on behalf of Plaintiffs ACU, Root, and Wolf independently must be dismissed because they are not Florida residents, *see* Compl. ¶¶ 20, 23, 24, and they do not allege any pertinent conduct that occurred in Florida. To invoke FDUTPA, a plaintiff must either be a Florida resident or allege "conduct [that] took place predominantly or entirely in Florida." *Bank of Am., N.A. v. Zaskey*, 2016 WL 2897410, at *9 (S.D. Fla. 2016). They do not, and cannot, make such an allegation.

### C. Plaintiffs Have Failed To Allege An Actionable FDUTPA Claim

In any event, all Plaintiffs have failed to state a FDUTPA claim. Under FDUPTA, to state a claim for equitable relief—which is the only form of relief Plaintiffs seek on this claim—a plaintiff must allege that she has been aggrieved by an act or practice that is "likely to deceive a consumer acting reasonably in the same circumstances." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974-975 (Fla. Dist. Ct. App. 2000). And where, as here, such a claim sounds in fraud, it must also satisfy Rule 9(b)'s heightened pleading bar by setting forth with particularity the circumstances of the alleged deception, including "the manner in which [the allegedly deceptive act or practice] misled the plaintiff." *Librizzi v. Ocwen Loan Serv., LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Fed. R. Civ. P. 9(b) applies to FDUTPA claims sounding in fraud). Though the precise premise of the claim is difficult to discern, Plaintiffs seem to be trying to assert three theories of deception: (1) that Twitter applies its content-moderation rules inconsistently, Compl. ¶ 212; (2) that Twitter "omit[ted]" saying that it sometimes removes content "because government actors desire its removal," *id.* ¶ 206; and (3) that Twitter's content-moderation practices deceived other users into thinking that Plaintiffs' content violated the platform rules, *see id.* ¶ 208. Each theory fails.

The first theory fails because the Complaint does not allege, let alone with the requisite particularity, either the specific statement alleged to be deceptive or "the manner in which" any reasonable person would be deceived into thinking that Twitter applies its content-moderation policies with perfect uniformity and consistency, *Librizzi*, 120 F. Supp. 3d at 1381. Indeed, Twitter's Glorification of Violence

**SER23**

policy and COVID-19 Misleading Information Policy each states just the opposite, explaining that the consequences for violating those policies will vary "depend[ing] on the severity of the violation and the account's previous history of violations." *Glorification of Violence Policy*, Sprankling Decl. Ex. B; *COVID-19 Misleading Information Policy*, Sprankling Decl. Ex. E. Moreover, Twitter's Terms of Service expressly state that Twitter may take enforcement action against accounts or content for any reason or no reason at all. *See* Sprankling Decl. Ex. F at 8; *see also Murphy v. Twitter*, 60 Cal. App. 5th 12, 35-38 (2021) (holding this provision of Twitter's Terms is enforceable). And those Terms also grant Twitter exclusive discretion in determining whether and when to engage in content moderation, stating both that that Twitter "*may*" take such action when "we reasonably believe" an account holder has violated the User Agreement (among other reasons) and, more broadly, that Twitter "*may not* monitor or control" the content others post. *Terms of Service*, Sprankling Decl. Ex. F at 3. (emphases added). Such discretion is indispensable in the context of online speech, where Twitter could not possibly predict *ex ante* all forms of violative content and their appropriate consequences. As a matter of law, no reasonable consumer could understand Twitter's policies to mean that Twitter takes the same action against any and all content that could conceivably be considered to violate those policies. *See Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1285 (11th Cir. 2007) (affirming dismissal at the 12(b)(6) stage of FDUTPA claim where "[t]he express terms of the [applicable] agreement undermine[d] [plaintiff's] claim"); *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 667, 685 (S.D. Fla. 2008); *accord Meyer v. Aabaco Small Business, LLC*, 2018 WL 306688, at *3 (N.D. Cal. 2018) (dismissing analogous UCL claim at the 12(b)(6) stage where terms of service stated Defendant could, at any time, "discontinue, temporarily or permanently, the Services").

Another reason why Plaintiffs' first theory of deception fails is that the Complaint does not allege that Plaintiffs were aggrieved by the supposedly deceptive act or practice. Plaintiffs do not allege that more consistent application of its policies would have resulted in Twitter not removing their content or not suspending their accounts; rather, they appear to complain that Twitter should have also suspended the accounts of other people. *See* Compl. ¶¶ 213-216. But Plaintiffs do not and cannot allege that they have been aggrieved by Twitter's alleged non-removal of someone else's content or non-suspension of someone else's account. Having failed to allege that they have been injured by any deceptiveness in Twitter's alleged inconsistent enforcement of its policies, Plaintiffs cannot succeed on this theory of

1  deception.  *See Newman*, 2021 WL 2633423, at *12.

2      Plaintiffs' second theory fails because they have not plausibly alleged any content-moderation

3  practice that Twitter deceptively failed to disclose.  Under FDUTPA and Rule 9(b), to state an omission-

4  based claim, a plaintiff must specifically set forth both an omission likely to mislead reasonable consumers,

5  *Zlotnick*, 480 F.3d at 1284, and "*why* [the] omission complained of was false and misleading," *Asghari v.*

6  *Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013) (emphasis added).  The Complaint

7  alleges Twitter omitted to inform consumers that it removes content when "government actors desire its

8  removal," but fails to allege Twitter ever took any enforcement action at the government's direction.  *See*

9  *supra* pp. 6-11.  Moreover, as above, given the express language of Twitter's Terms of Service, no

10  reasonable person would think either that Twitter removes content only under certain narrow and

11  objectively defined circumstances or that it always and completely removes all content that could violate

12  one of its Rules.  *See supra* p. 16.  The Complaint therefore fails to specifically allege any deceptive omission.

13      Plaintiffs' third theory fails because the Complaint does not allege that any reasonable person

14  could be deceived by Twitter's content-moderation actions themselves.  *See Zlotnick*, 480 F.3d at 1284 (a

15  deceptive act or practice must be likely to mislead reasonable consumers).  Though this theory of

16  deception is not well-articulated—itself fatal under Rule 9(b)—Plaintiffs seem to allege that consumers

17  would be deceived by Twitter's enforcement action against certain content into falsely thinking that that

18  content violated a Twitter policy.  *See* Compl. ¶¶ 208-211.  But no Plaintiff other than Mr. Trump has

19  alleged that Twitter made any public statements at all about why it removed or demoted their content or

20  suspended their accounts.  Instead, these Plaintiffs seem to suggest that others using Twitter would have

21  noticed that Plaintiffs' content was no longer on the platform and surmised that it must have been

22  removed for violating a particular content-moderation policy.  That is insufficient to allege how or why

23  Twitter's content-moderation actions were themselves "likely to deceive a consumer acting reasonably"

24  in the circumstances.  *Davis*, 776 So. 2d at 974.  Indeed, the Ninth Circuit has already rejected this theory

25  holding that content-moderation actions themselves "do[] not imply any specific representation about"

26  the relevant content.  *Prager*, 951 F.3d at 1000.  And as to Mr. Trump, the Complaint nowhere alleges that

27  his Tweets did not violate Twitter's Glorification of Violence Policy, only that Twitter did not similarly

28  enforce that Policy against others.  *See* Compl. ¶¶ 212-216.  But that is insufficient to explain how or why

**SER25**

Twitter's application of its policies as to Mr. Trump could possibly deceive a reasonable consumer. *Asghari*, 42 F. Supp. 3d at 1325. And in any event, Twitter's public explanation of its decision to suspend Mr. Trump provided a detailed explanation of the facts supporting the conclusion that he violated the Policy. The statement thus implied no "false assertion of fact" and is not actionable. *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995).

For all these reasons, the Complaint alleges no actionable deception stemming from Twitter's content-moderation actions with respect to any of the Plaintiffs.

## IV. PLAINTIFFS' CLAIM UNDER FLORIDA SB 7072 FAILS BECAUSE THAT LAW WAS NOT IN EFFECT WHEN THE CHALLENGED CONTENT MODERATION OCCURRED (COUNT IV)

Dismissal is also required for Plaintiffs' claim under Florida SB 7072, a statute that purports to restrict whether and how social media companies may enforce their content-moderation policies. That statute is a dead letter because it violates the First Amendment, as one federal court has already held. *See NetChoice LLC v. Moody*, 2021 WL 269087 (N.D. Fla. 2021), *appeal filed sub. nom. NetChoice, LLC v. Att'y Gen.*, No. 21-12355 (11th Cir.); *see also NetChoice, LLC v. Paxton*, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) (enjoining similar Texas law); *see infra* p. 20. But this Court need not reach the statute's constitutionality for a simple reason: These Plaintiffs cannot invoke SB 7072 because it was not in effect when Twitter took the actions challenged in the Complaint.

It is "deeply rooted in our jurisprudence" that laws may not have retroactive effect absent express legislative directive. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 270 (1994). The presumption, instead, is that conduct "'be assessed under the law that existed when the conduct took place.'" *Id.* at 265 (*quoting Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)); *accord Florida Ins. Guar. Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 195 (Fla. 2011) ("The presumption against retroactive application is a well-established rule of statutory construction that is appropriate in the absence of an express statement of legislative intent . . . ."). These principles also sound in due process; imposing liability against Twitter for conduct that was lawful at the time would violate the requirement that legal restrictions give governed entities sufficient notice of what conduct is prohibited. *See Landgraf*, 511 U.S. at 266; *Ixcot v. Holder*, 646 F.3d 1202, 1213 (9th Cir. 2011).

All of the conduct challenged in the Complaint occurred before the effective date of SB 7072. The law did not become effective until July 1, 2021, Fla. Laws, ch. 32, § 7 (2021), and all of Twitter's

content-moderation decisions respecting Plaintiffs' accounts happened before June 6, 2021. *See* Comp. ¶ 113 (Trump suspended on January 7, 2021), ¶¶ 121-22 & 124 (Caudros suspended in 2019 and 2020), ¶¶ 128-29 (ACU "notic[ed] a reduction in engagement" between 2017 and January 2021), ¶¶ 132 & 135 (Barboza suspended on January 8, 2021), ¶¶ 142-143 (Latella suspended in 2018), ¶ 150 (Root suspended on February 6, 2021), ¶¶ 158-59 (Wolf suspended on June 5, 2021). SB 7072 therefore did not govern the Twitter actions challenged, and those actions could not have violated it. *See Florida Ins.*, 67 So. 3d at 195. Dismissal is also independently necessary as to Plaintiffs Root, ACU, and Wolf because they are not Florida residents, allege no conduct in Florida, and thus cannot invoke SB 7072. *See supra* p. 15.

## V. PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT

All of Plaintiffs' claims fail for yet another reason: Granting any of the relief the Complaint seeks would impermissibly infringe on Twitter's First Amendment right to "exercise … editorial control and judgment" over what content it disseminates through its communications platform. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257-58 (1974). That right applies with full force on the Internet. *Reno v. ACLU*, 521 U.S. 844, 870 (1997) ("Our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."). Accordingly, it is well established that the First Amendment safeguards online platforms' decisions about what content to moderate, filter, promote, or restrict. *See, e.g.*, *Paxton*, 2021 WL 5755120, at *7 ("Social media platforms have a First Amendment right to moderate content disseminated on their platforms."); *La'Tiejira*, 272 F. Supp. 3d at 991; *Moody*, 2021 WL 2690876, at *7; *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 440-441 (S.D.N.Y. 2014). And Twitter's First Amendment rights are at their apex here because the editorial decisions Plaintiffs attack—which were intended to address societal harms such as interference with democratic processes, potential incitement of violence threatening the peaceful transfer of power from one President to the next, and the spread of deadly misinformation during a global pandemic—self-evidently pertained to "matters of public concern." *Snyder v. Phelps*, 562 U.S. 443, 452-453 (2011).

Each of Plaintiffs' claims seeks to control or countermand Twitter's exercises of editorial judgment, thereby infringing on Twitter's First Amendment rights. Plaintiffs' state-law claims, for example, are primarily based on allegations that Twitter failed to give identical treatment to similar content. This type of "equal treatment" requirement is a quintessential content-based restriction on speech. By

**SER27**

19

asking this Court to require Twitter to moderate some content in certain ways based on the views or messages it communicates, including vis-à-vis other content, both claims seek to impose an impermissible viewpoint- and content-based restriction on speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (laws that cannot be applied "without reference to the content of the regulated speech" are content-based). And any stated desire to level the playing field between different viewpoints cannot constitute a compelling governmental interest sufficient to satisfy the strict scrutiny that applies to such restrictions. *See id.* at 171 (content-based restrictions "can stand only if they survive strict scrutiny, 'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest'"). For that reason, the state laws that Plaintiffs invoke cannot be applied to punish Twitter for taking action against Plaintiffs' accounts while not taking action against others'. Indeed, it is precisely for this reason that another court recently held SB 7072 to be facially invalid and preliminarily enjoined its enforcement. *See Moody,* 2021 WL 2690876, at *7.

Finally, as explained more fully in Twitter's opposition to Mr. Trump's motion for preliminary injunction, the relief Plaintiffs seek on all their claims would itself be unconstitutional; indeed Count III seeks only injunctive relief. Plaintiffs ask the Court for an order forcing Twitter to reinstate their accounts and promulgate their messages against its will, and for "impos[ition of] a monitor" to oversee and override Twitter's editorial decisions in perpetuity. Compl. ¶ 220. Such orders would not only constitute government-compelled speech, *see Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018), but also unduly intrude on Twitter's internal editorial deliberations, *see Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) (requiring showing of heightened need to permit discovery into editorial processes). Such an extreme and overbroad infringement on Twitter's rights would be patently unconstitutional. *See Sindi v. El-Moslimany*, 896 F.3d 1, 30-32 (1st Cir. 2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764–66 (1994).

## CONCLUSION

For the reasons stated, the Court should dismiss Plaintiffs' Complaint with prejudice.

**SER28**

Dated: December 9, 2021 Respectfully submitted,

/s/ *Patrick J. Carome*

PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-6000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile:  (650) 858-6100

*Attorneys for Defendants Twitter, Inc.*
  *and Jack Dorsey*

**SER29**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2021, I electronically filed the above document and the accompanying declaration of Thomas G. Sprankling and proposed order with the Clerk of the Court using CM/ECF which will send electronic notification of these filings to all registered counsel.


Dated:    December 9, 2021                        By:    /s/ Patrick J. Carome
                                                         PATRICK J. CAROME

**SER30**

# EXHIBIT B

SER31

# Glorification of violence policy

# Overview

**March 2019**

**You may not threaten violence against an individual or a group of people. We also prohibit the glorification of violence.**

Glorifying violent acts could inspire others to take part in similar acts of violence. Additionally, glorifying violent events where people were targeted on the basis of their protected characteristics (including: race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease) could incite or lead to further violence motivated by hatred and intolerance. For these reasons, we have a policy against content that glorifies acts of violence in a way that may inspire others to replicate those violent acts and cause real offline harm, or events where members of a protected group were the primary targets or victims.

# What is in violation of this policy?

Under this policy, you can't glorify, celebrate, praise or condone violent crimes, violent events where people were targeted because of their membership in a protected group, or the perpetrators of such acts. We define glorification to include praising, celebrating, or condoning statements, such as "I'm glad this happened", "This person is my hero",

**SER32**

"I wish more people did things like this", or "I hope this inspires others to act".

Violations of this policy include, but are not limited to, glorifying, praising, condoning, or celebrating:

- violent acts committed by civilians that resulted in death or serious physical injury, e.g., murders, mass shootings;

- attacks carried out by terrorist organizations or violent extremist groups (as defined by our terrorism and violent extremism policy); and

- violent events that targeted protected groups, e.g., the Holocaust, Rwandan genocide.

# What is not a violation of this policy?

Our focus is on preventing the glorification of violence that could inspire others to replicate violent acts, as well as violent events where protected groups were the primary targets or victims. Exceptions may be made for violent acts by state actors, where violence was not primarily targeting protected groups.

# Who can report violations of this policy?

SER33

Anyone can report potential violations of this policy, whether they have a Twitter account or not.

# How can I report violations of this policy?

**In-app**

You can report this content for review in-app as follows:

1. Select **Report Tweet** from the icon.
2. Select **It's abusive or harmful**.
3. Select **Threatening violence or physical harm**.
4. Select the relevant option depending on who you are reporting on behalf of.
5. Select up to 5 Tweets to report for review.
6. Submit your report.

**Desktop**

You can report this content for review via desktop as follows:

1. Select **Report Tweet** from the icon.
2. Select **It's abusive or harmful**.

3. Select **Threatening violence or physical harm**.
4. Select the relevant option depending on who you are reporting on behalf of.
5. Select up to 5 Tweets to report for review.
6. Submit your report.

**Report form**

You can also report this content for review via our abusive behavior reporting form, by selecting the **Harassment** option.

# What happens if you violate this policy?

The consequences for violating our glorification of violence policy depends on the severity of the violation and the account's previous history of violations.

The first time you violate this policy, we will require you to remove this content. We will also temporarily lock you out of your account before you can Tweet again. If you continue to violate this policy after receiving a warning, your account will be permanently suspended. If you believe that your account was suspended in error, you can submit an appeal.

**SER35**

# Additional resources

Learn more about our range of enforcement options and our approach to policy development and enforcement.

To learn about the link between glorifying violent acts and offline harm, you can refer to the research of Susan Benesch: *Countering Dangerous Speech: New Ideas for Genocide Prevention* and the Dangerous Speech Project.

**Share this article**

**Tweet**

**SER36**

# EXHIBIT C

SER37

# Civic integrity policy

## Overview
**January 2021**

**You may not use Twitter's services for the purpose of manipulating or interfering in elections or other civic processes. This includes posting or sharing content that may suppress participation or mislead people about when, where, or how to participate in a civic process. In addition, we may label and reduce the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context.**

The public conversation occurring on Twitter is never more important than during elections and other civic events. Any attempts to undermine the integrity of our service is antithetical to our fundamental rights and undermines the core tenets of freedom of expression, the value upon which our company is based.

We believe we have a responsibility to protect the integrity of those conversations from interference and manipulation. Therefore, we prohibit attempts to use our services to manipulate or disrupt civic processes, including through the distribution of false or misleading information about the procedures or circumstances around participation in a civic process. In instances where misleading information does not seek to directly manipulate or disrupt civic processes, but leads to confusion on our service, we may label the Tweets to give additional context.

## What is a civic process?
Twitter considers civic processes to be events or procedures mandated, organized, and conducted by the governing and/or electoral body of a country, state, region, district, or municipality to address a matter of common concern through public participation. Some examples of civic processes may include:

- Political elections
- Censuses
- Major referenda and ballot initiatives

## What is in violation of this policy?
This policy addresses 4 categories of misleading behavior and content:

**Misleading information about how to participate**

We will label or remove false or misleading information about how to participate in an election or other civic process. This includes but is not limited to:

- misleading information about procedures to participate in a civic process (for example, that you can vote by Tweet, text message, email, or phone call in jurisdictions where these are not a possibility);
- misleading information about requirements for participation, including identification or citizenship requirements;
- misleading claims that cause confusion about the established laws, regulations, procedures, and methods of a civic process, or about the actions of officials or entities executing those civic processes; and
- misleading statements or information about the official, announced date or time of a civic process.

**Suppression and intimidation**

We will label or remove false or misleading information intended to intimidate or dissuade people from participating in an election or other civic process. This includes but is not limited to:

- misleading claims that polling places are closed, that polling has ended, or other misleading information relating to votes not being counted;
- misleading claims about police or law enforcement activity related to voting in an election, polling places, or collecting census information;
- misleading claims about long lines, equipment problems, or other disruptions at voting locations during election periods;
- misleading claims about process procedures or techniques which could dissuade people from participating; and
- threats regarding voting locations or other key places or events (note that our violent threats policy may also be relevant for threats not covered by this policy).

**Misleading information about outcomes**

We will label or remove false or misleading information intended to undermine public confidence in an election or other civic process. This includes but is not limited to:

- disputed claims that could undermine faith in the process itself, such as unverified information about election rigging, ballot tampering, vote tallying, or certification of election results; and
- misleading claims about the results or outcome of a civic process which calls for or could lead to interference with the implementation of the results of the process, e.g. claiming victory before election results have been certified, inciting unlawful conduct to prevent the procedural or practical implementation of election results (note that our violent threats policy may also be relevant for threats not covered by this policy).

**False or misleading affiliation**

You can't create fake accounts which misrepresent their affiliation, or share content that falsely represents its affiliation, to a candidate, elected official, political party, electoral authority, or government entity. Read more about our parody, commentary, and fan account policy.

## What is not a violation of this policy?

Not all false or untrue information about politics or civic processes constitutes manipulation or interference. In the absence of other policy violations, the following are generally not in violation of this policy:

- inaccurate statements about an elected or appointed official, candidate, or political party;
- organic content that is polarizing, biased, hyperpartisan, or contains controversial viewpoints expressed about elections or politics;
- discussion of public polling information;
- voting and audience participation for competitions, game shows, or other entertainment purposes; and
- using Twitter pseudonymously or as a parody, commentary, or fan account to discuss elections or politics.

## Who can report violations of this policy?

Accurate reporting of suspected violations of this policy requires information and knowledge specific to an election or civic process. Therefore, we enable reporting of false or misleading information about civic processes in advance of major events, for people located in the relevant countries and locations. We also work with select government and civil society partners in these countries to provide additional channels for reporting and expedited review.

For civic processes with multiple stages or parts, such as primary elections or lengthy campaigns, reporting will be enabled leading up to the first officially-sanctioned event associated with the civic process.

## How can I report violations of this policy?

If the reporting option for this policy is enabled in your country at the relevant time, you can report this content in-app or on desktop.

**In-app**

You can report this content for review in-app as follows:

1. Select **Report Tweet** from the  icon.
2. Select **It's misleading about a political election or other civic event**.
3. Select the option that best tells us how the Tweet is misleading about voting or participation in civic processes.
4. Submit your report.

**Desktop**

You can report this content for review on desktop as follows:

1. Select **Report Tweet** from the  icon.
2. Select **It's misleading about a political election or other civic event**.
3. Select the option that best tells us how the Tweet is misleading about voting or participation in a civic process.
4. Submit your report.

## What happens if you violate this policy?

The consequences for violating our civic integrity policy depends on the severity and type of the violation and the accounts' history of previous violations. In instances where accounts repeatedly violate this policy, we will use a strike system to determine if further enforcement actions should be applied. We believe this system further helps to reduce the spread of potentially harmful and misleading information on Twitter, particularly for high-severity violations of our rules.

The actions we take may include the following:

**Tweet deletion**

For high-severity violations of this policy, including (1) misleading information about how to participate, and (2) suppression and intimidation, we will require you to remove this content. We will also temporarily lock you out of your account before you can Tweet again. Tweet deletions accrue 2 strikes.

**Profile modifications**

If you violate this policy within your profile information (e.g., your bio), we will require you to remove this content. We will also temporarily lock you out of your account before you can Tweet again. If you violate this policy again after your first warning, your account will be permanently suspended.

**Labeling**

In circumstances where we do not remove content which violates this policy, we may provide additional context on Tweets sharing the content where they appear on Twitter. This means we may:

SER40

- Apply a label and/or warning message to the content where it appears in the Twitter product;
- Show a warning to people before they share or like the content;
- Turn off people's ability to reply, Retweet, or like the Tweet;
- Reduce the visibility of the content on Twitter and/or prevent it from being recommended;
- Provide a link to additional explanations or clarifications, such as in a Twitter Moment or relevant Twitter policies; and/or
- Turn off likes, replies, and Retweets.

In most cases, we will take all of the above actions on Tweets we label. In some instances, we'll also turn off your ability to reply, Retweet, or like the Tweet. We prioritize producing Twitter Moments in cases where misleading content on Twitter is gaining significant attention and has caused public confusion on our service. Labels applied to Tweets accrue 1 strike.

**Account locks and permanent suspension**

For severe or repeated violations of this policy, accounts will be permanently suspended.

Repeated violations of this policy are enforced against on the basis of the number of strikes an account has accrued for violations of this policy:

- 1 strike: No account-level action
- 2 strikes: 12-hour account lock
- 3 strikes: 12-hour account lock
- 4 strikes: 7-day account lock
- 5 or more strikes: Permanent suspension

If you believe that your account was locked or suspended in error, you can submit an appeal.

**SER41**

# EXHIBIT E

# COVID-19 misleading information policy

## Overview
## November 2021

**You may not use Twitter's services to share false or misleading information about COVID-19 which may lead to harm.**

Even as scientific understanding of the COVID-19 pandemic continues to develop, we've observed the emergence of persistent conspiracy theories, alarmist rhetoric unfounded in research or credible reporting, and a wide range of false narratives and unsubstantiated rumors, which left uncontextualized can prevent the public from making informed decisions regarding their health, and puts individuals, families and communities at risk.

Content that is demonstrably false or misleading and may lead to significant risk of harm (such as increased exposure to the virus, or adverse effects on public health systems) may not be shared on Twitter. This includes sharing content that may mislead people about the nature of the COVID-19 virus; the efficacy and/or safety of preventative measures, treatments, or other precautions to mitigate or treat the disease; official regulations, restrictions, or exemptions pertaining to health advisories; or the prevalence of the virus or risk of infection or death associated with COVID-19.

SER43

# What is in violation of this policy?

In order for content related to COVID-19 to considered violative under this policy, it must:

- advance a claim of fact, expressed in definitive terms;
- be demonstrably false or misleading, based on widely available, authoritative sources; and
- be likely to impact public safety or cause serious harm

**Tweet Removal**

We may require customers to delete Tweets that are found to violate this policy and are severely harmful. We may also temporarily lock you out of your account before you can Tweet or share information again. These tweets will accrue **2 strikes** in accordance with our strike policy stated below. We will require the deletion of Tweets that contain, for example:

1. False claims about COVID-19 that invoke a deliberate conspiracy by malicious and/or powerful forces, such as:
   - The pandemic is a hoax, or part of a deliberate attempt at population control, or that 5G wireless technology is causing COVID-19.

https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy

**SER44**

- COVID-19 is not a real virus.

- Immunizations are part of a global surveillance, population control or depopulation effort.

- Vaccines (in general) are dangerous and the adverse effects that have been covered up by governments/the medical industry.

- Vulnerable groups (such as pregnant women, the elderly, or children) are being experimented on.

- That COVID-19 vaccines are causing magnetic reactions in individuals who have been vaccinated.

- That vaccines approved by health agencies (such as Pfizer's Comirnaty vaccine in the United States) did not actually receive full approval/authorization, and therefore that the vaccines are untested, "experimental" or somehow unsafe.

2. Claims that specific groups or people (or other demographically-identifiable identity) are more or less prone to be infected or to develop adverse symptoms

on the basis of their membership in that group;

3. False or misleading claims about potentially harmful and unapproved treatments or preventative measures, for example, that chlorine dioxide or Povidone-iodine can be used as a prophylactic or in the treatment of COVID-19.

4. False or misleading information about official regulations, restrictions, or exemptions pertaining to health advisories.

5. Any efforts to promote, advertise, facilitate the sale of, or provide instructions on how to create fraudulent vaccination cards (or other digital records) or "exemption cards."

6. False information about widely accepted testing methodologies, such as that PCR tests are unable to detect the virus.

7. False claims that suggest that vaccines contain deadly and severely harmful ingredients.

8. False affiliation - Accounts which misrepresent their affiliation, or share content that falsely represents its affiliation to a medical practitioner, public health official or agency, research institution, or

that falsely suggests expertise on COVID-19 issues.

## Tweet Label

When Tweets include misleading information about COVID-19, we may place a label on those Tweets that includes corrective information about that claim. In cases where we determine there is potential for harm associated with the misleading claim, we will disable the ability for others to Retweet, Quote Tweet, or engage in other ways to prevent the spread of the misleading information. These tweets will accrue **1 strike** in accordance with our strike policy stated below.

In some cases we may also add labels to provide context in situations where authoritative (scientific or otherwise) opinion might change or is changing over time, in situations where local context is important, or when the potential for harm is less direct or imminent. We may also apply labels on Tweets linking to content from a third-party website that would otherwise violate our policies if the content were posted directly on Twitter. Tweets with labels that meet this criteria will receive a label that provides credible and authoritative information, but **will not accrue a strike** in accordance with our strike policy stated below.

We may apply labels to Tweets that contain, for example:

1. False or misleading information about preventative measures one can take to avoid infection, such as claims that face masks cause hypoxia or bacteria pneumonia, or do not work to reduce transmission or to protect against COVID-19.

2. False or misleading information suggesting that unapproved treatments can be curative of COVID-19.

3. False or misleading information regarding the safety or science behind approved or authorized COVID-19 vaccines, such as:

   - The vaccines will cause you to be sick, spread the virus, or would be more harmful than getting COVID-19.

   - Tweets that incite fear or misrepresent the ingredients or contents of COVID-19 vaccines.

   - Tweets that mischaracterize the nature and science behind mRNA vaccines, and how they work.

   - Tweets that claim vaccines alter genetic code.

   - Tweets that misrepresent or misuse official reporting tools/statistics.

   - False or misleading claims that people who have received the vaccine can spread or shed the virus (or symptoms, or immunity) to unvaccinated people.

4. False or misleading information that misrepresent the protective effect of

vaccines, to make claims contrary to health authorities. Claims that misrepresent research or statistical findings pertaining to the severity of the disease, prevalence of the virus, or effectiveness of widely accepted preventative measures, treatments, or vaccines.

When a label is applied to a Tweet, this typically entails:

- Presenting a warning message on the Tweet

- Showing an additional prompt to warn people before sharing or liking the Tweet;

- Reducing the visibility of the Tweet on Twitter and/or preventing it from being recommended;

- Turning off likes, replies, and Retweets; and/or

- Providing a link to additional explanations or clarifications, such as in a curated landing page or relevant Twitter policies.

# What is not a violation of this policy?

We seek to protect robust, public debate about the response to COVID-19, and recognize that the state of scientific knowledge about certain aspects of the pandemic and public response to it (including the

https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy

**SER49**

development of vaccines) is still evolving. In the absence of other policy violations, the following are generally not in violation of this policy:

- **Strong commentary, opinions, and/or satire,** provided these do not contain false or misleading assertions of fact.
- **Campaigns against official advisories or recommendations.** People are entitled to organize and campaign around matters that are important to them, so long as they're not advancing false and harmful misinformation in the process.
- **Counterspeech.** We allow for direct responses to misleading information which seek to undermine its impact by correcting the record, amplify credible information, and educate the wider community about the prevalence and dynamics of misleading information.
- **Personal anecdotes or first-person accounts.** We do not enforce the COVID-19 misinformation policy on reports or first-person accounts of side-effects, injury, or harm alleged to have been caused by COVID-19 vaccines, or other matters pertaining to COVID-19.
- **Public debate about the advancement of COVID-19 science and research,** including debate about research related to COVID-19, such as the effectiveness of treatments and mitigation measures, so long as the

claims don't intentionally misrepresent research findings.

# Who can report violations of this policy?

While we have recently launched a customer report feature in some countries, we primarily enforce this policy in close coordination with trusted partners, including public health authorities, NGOs and governments, and continue to use and consult with information from those sources when reviewing content.

We also leverage proactive detection using a combination of keyword heuristics and machine learning models to identify harmful forms of COVID-19 related misleading information.

# What happens if you violate this policy?

### Strike system

The consequences for violating our COVID-19 misleading information policy depend on the severity and type of the violation and the account's history of previous violations. In instances where accounts repeatedly violate this policy, we will use a strike system to determine if further enforcement actions should be applied. We believe this system further helps to reduce the spread of potentially harmful and

SER51

misleading information on Twitter, particularly for high-severity violations of our rules.

Repeated violations of this policy are enforced against on the basis of the number of strikes an account has accrued for violations of this policy:

- 1 strike: No account-level action
- 2 strikes: 12-hour account lock
- 3 strikes: 12-hour account lock
- 4 strikes: 7-day account lock
- 5 or more strikes: Permanent suspension

If you believe that your account was locked or suspended in error, you can submit an appeal.

## Reducing Visibility of Content Related to COVID-19 Misinformation

We may reduce the visibility of tweets or accounts that we believe with high confidence to be in violation of the COVID-19 misinformation policy. Limitations on the visibility of Tweets and/or accounts resulting from this framework expire automatically after a limited period of time, but may be re-applied (either manually or automatically) if we determine that the accounts have continued to violate the policy. We may reduce the visibility by:

- Making Tweets and Retweets from those accounts ineligible to appear in certain parts of the Twitter product (such as top Search results)

SER52

- Displaying Replies from the account in a lower position in conversations

- Excluding Tweets by the account and/or the actual account in email or in-product recommendations

**Permanent Suspension**

We may immediately permanently suspend accounts that represent the following violative behaviors:

**False affiliation:** If the account is determined to misrepresent their affiliation, or share content that falsely represents its affiliation as a medical practitioner, public health official or agency, research institution, or that falsely suggests expertise on COVID-19 issues.

**Repeated Violations:** If we determine that the account repeatedly violates the COVID-19 misinformation policy over a 30-day time period, or if we have determined that the account has been set up for the expressed purpose of Tweeting false or misleading information about COVID-19.

# Additional resources

Learn more about our work to fight misleading information about COVID-19 here, and our expanded approach to COVID-19 vaccine misleading information here.

COVID-19 misleading information policy

Learn more about <u>our range of enforcement options</u> and <u>our approach to policy development and enforcement</u>.

**SER54**

# EXHIBIT F

SER55

**Twitter Terms of Service**

# Twitter Terms of Service

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the Twitter User Agreement comprises these Terms of Service, our Privacy Policy, the Twitter Rules and Policies, and all incorporated policies

**If you live in the European Union, EFTA States, or the United Kingdom,** the Twitter User Agreement comprises these Terms of Service, our Privacy Policy, the Twitter Rules and Policies, and all incorporated policies.

## Twitter Terms of Service

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States**

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

- **1. Who May Use the Services**

SER56

- **2. Privacy**

- **3. Content on the Services**

- **4. Using the Services**

- **5. Disclaimers and Limitations of Liability**

- **6. General**

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with Twitter and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://www.twitter.com/privacy) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by Twitter and its affiliates.

2

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations and https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.twitter.com/forms/dmca) or contacting our designated copyright agent at:

Twitter, Inc.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca
Email: copyright@twitter.com
(for content on Twitter)

Twitter, Inc.
Attn: Copyright Agent - Periscope

SER58

1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca
Email: copyright@pscp.tv
(for content on Periscope)

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for Twitter to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by Twitter, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

Twitter has an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

SER59

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant Twitter the license described above.

# 4. Using the Services

Please review the Twitter Rules and Policies (and, for Periscope, the Periscope Community Guidelines at https://www.pscp.tv/content), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for Twitter granting you access to and use of the Services, you agree that Twitter and its third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, Twitter's computer systems, or the technical delivery systems of Twitter's providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by Twitter (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with Twitter (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without the prior consent of Twitter is expressly prohibited); (iv)

**SER60**

forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. Twitter does not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/docs/twitter-for-websites/overview), Twitter Cards (https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started), Public API (https://developer.twitter.com/en/docs), or Sign in with Twitter (https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Twitter Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms. If you are a security researcher, you are required to comply with the rules of the Twitter Vulnerability Reporting Program (https://hackerone.com/twitter). The requirements set out in the preceding paragraph may not apply to those participating in Twitter's Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms).

If you use Super Hearts, Coins, or Stars on Periscope, you must agree to our Super Hearts Terms (https://legal.twitter.com/en/periscope/super/terms.html).

# Your Account

SER61

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Ending These Terms

You may end your legal agreement with Twitter at any time by deactivating your accounts and discontinuing your use of the Services.
See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-

SER62

account (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: II, III, V, and VI. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/forms/general?subtopic=suspended). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Disclaimers and Limitations of Liability

# The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "Twitter Entities" refers to Twitter, its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE TWITTER ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS,

SER63

WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The Twitter Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the Twitter Entities or through the Services, will create any warranty or representation not expressly made herein.

# Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE TWITTER ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE TWITTER ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID TWITTER, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE TWITTER ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

# 6. General

SER64

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos, will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and Twitter. All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of California (excluding choice of law).

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Twitter's failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

These Terms are an agreement between you and Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103 U.S.A. If you have any questions about these Terms, please contact us.

**Effective:** June 18, 2020

Archive of Previous Terms

## Twitter Terms of Service

**If you live in the European Union, EFTA States, or the United Kingdom**

SER65

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

- **1. Who May Use the Services**

- **2. Privacy**

- **3. Content on the Services**

- **4. Using the Services**

- **5. Limitations of Liability**

- **6. General**

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with Twitter and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

SER66

Our Privacy Policy (https://www.twitter.com/privacy) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by Twitter and its affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations and https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.twitter.com/forms/dmca) or contacting our designated copyright agent at:

Twitter, Inc.
Attn: Copyright Agent

**SER67**

1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca
Email: copyright@twitter.com
(for content on Twitter)

Twitter, Inc.
Attn: Copyright Agent - Periscope
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca
Email: copyright@pscp.tv
(for content on Periscope)

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for Twitter to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by Twitter, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

SER68

Twitter has an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant Twitter the license described above.

# 4. Using the Services

Please review the Twitter Rules and Policies (and, for Periscope, the Periscope Community Guidelines at https://pscp.tv/content), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for Twitter granting you access to and use of the Services, you agree that Twitter and its third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, Twitter's computer systems, or the technical delivery systems of Twitter's providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to

SER69

access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by Twitter (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with Twitter (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without the prior consent of Twitter is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. Twitter does not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/docs/twitter-for-websites/overview), Twitter Cards (https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started), Public API (https://developer.twitter.com/en/docs), or Sign in with Twitter (https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Twitter Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms. If you are a security researcher, you are required to comply with the rules of the Twitter Vulnerability Reporting Program (https://hackerone.com/twitter). The requirements set out in the preceding paragraph may not apply to those participating in Twitter's Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms).

SER70

If you use Super Hearts, Coins, or Stars on Periscope, you agree to our Super Hearts Terms (https://legal.twitter.com/en/periscope/super/terms.html).

# Your Account

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

**SER71**

# Ending These Terms

You may end your legal agreement with Twitter at any time by deactivating your accounts and discontinuing your use of the Services.
See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: II, III, V, and VI. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/forms/general?subtopic=suspended). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that Twitter, its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

# 6. General

**SER72**

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos, will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Twitter's failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

These Terms are an agreement between you and Twitter International Company, (Co. number 503351, VAT number IE9803175Q), an Irish company with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. If you have any questions about these Terms, please contact us.

**Effective:** June 18, 2020

SER73

# EXHIBIT J

SER74





# EXHIBIT K

SER77

Case: 3:21-cv-08378-JD Document 178-2, Filed 12/09/21, Page 2 of 3
Case: 3:21-cv-08378-JD Document 26758-2, Filed 01/09/21, Page 2 of 93
Permanent suspension of @realDonaldTrump

## Blog

Company

# Permanent suspension of @realDonaldTrump

By Twitter Inc.

Friday, 8 January 2021

—

After close review of recent Tweets from the @realDonaldTrump account and the context around them — specifically how they are being received and interpreted on and off Twitter — we have permanently suspended the account due to the risk of further incitement of violence.

In the context of horrific events this week, we made it clear on Wednesday that additional violations of the Twitter Rules would potentially result in this very course of action. Our public interest framework exists to enable the public to hear from elected officials and world leaders directly. It is built on a principle that the people have a right to hold power to account in the open.

However, we made it clear going back years that these accounts are not above our rules entirely and cannot use Twitter to incite violence, among other things. We will continue to be transparent around our policies and their enforcement.

The below is a comprehensive analysis of our policy enforcement approach in this case.

**Overview**

On January 8, 2021, President Donald J. Trump Tweeted:

*"The 75,000,000 great American Patriots who voted for me, AMERICA FIRST, and MAKE AMERICA GREAT AGAIN, will have a GIANT VOICE long into the future. They will not be disrespected or treated unfairly in any way, shape or form!!!"*

Shortly thereafter, the President Tweeted:

*"To all of those who have asked, I will not be going to the Inauguration on January 20th."*

Due to the ongoing tensions in the United States, and an uptick in the global conversation in regards to the people who violently stormed the Capitol on January 6, 2021, these two Tweets must be read in the context of broader events in the country and the ways in which the President's statements can be mobilized by different audiences, including to incite violence, as well as in the context of the pattern of behavior from this account in recent weeks. After assessing the language in these Tweets against our Glorification of Violence policy, we have determined that these Tweets are in violation of the Glorification of Violence Policy and the user @realDonaldTrump should be immediately permanently suspended from the service.

**Assessment**

We assessed the two Tweets referenced above under our Glorification of Violence policy, which aims to prevent the glorification of violence that could inspire others to replicate violent acts and determined that they were highly likely to encourage and inspire people to replicate the criminal acts that took place at the U.S. Capitol on January 6, 2021.

This determination is based on a number of factors, including:

- President Trump's statement that he will not be attending the Inauguration is being received by a number of his supporters as further confirmation that the election was not legitimate and is seen as him disavowing his previous claim made via two Tweets (1, 2) by his Deputy Chief of Staff, Dan Scavino, that there would be an "orderly transition" on January 20th.
- The second Tweet may also serve as encouragement to those potentially considering violent acts that the Inauguration would be a "safe" target, as he will not be attending.
- The use of the words "American Patriots" to describe some of his supporters is also being interpreted as support for those committing violent acts at the US Capitol.
- The mention of his supporters having a "GIANT VOICE long into the future" and that "They will not be disrespected or treated unfairly in any way, shape or form!!!" is being interpreted as further indication that President Trump does not plan to facilitate an "orderly transition" and instead that he plans to continue to support, empower, and shield those who believe he won the election.
- Plans for future armed protests have already begun proliferating on and off-Twitter, including a proposed secondary attack on the US Capitol and state capitol buildings on January 17, 2021.

Permanent suspension of @realDonaldTrump

As such, our determination is that the two Tweets above are likely to inspire others to replicate the violent acts that took place on January 6, 2021, and that there are multiple indicators that they are being received and understood as encouragement to do so.

https://blog.twitter.com/en_us/topics/company/2020/suspension

**SER79**

JOHN P. COALE (*pro hac vice*)
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY (*pro hac vice*)
MICHAEL J. JONES (*pro hac vice*)
RYAN TOUGIAS (*pro hac vice*)
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER , JR. (*pro hac vice*)
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

Attorneys for Plaintiffs

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI,
P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON (*pro hac vice*)
GARDNER BREWER MARTINEZ
MONFORT
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC. et al., <br><br> Defendants. | Case No: 21-cv-08378-JD <br><br> **PLAINTIFFS'OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Hearing Date: February 24, 2022 <br> Time: 10:00 a.m. <br> Place: Courtroom 11, 19th Floor <br> Judge: Hon. James Donato |

# **TABLE OF CONTENTS**

I.      **INTRODUCTION** ........................................................................................ 1

II.     **STATEMENT OF FACTS** ........................................................................ 2

    A.    Procedural Background ................................................................................ 2

    B.    Factual Allegations ...................................................................................... 3

III.    **ARGUMENT** .............................................................................................. 5

    A.    Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True ................. 5

    B.    The State Action Issue Is Inherently Unsuited for Disposition on a Motion to Dismiss. 6

    C.    Plaintiffs Have Pleaded State Action by Means of Compulsion ...................................... 7

      1.    Origins of the Compulsion Theory .................................................................... 7

      2.    The Specificity Issue:  Plaintiffs Belong to a Class of Citizens Targeted by the Government. ................................................................................................... 9

         (a)     Laws of General Applicability—No State Action ................................ 9

         (b)     State Action That Targets Identified Groups—This Case .................... 10

         (c)     The "Particular Case" Fallacy—*Doe*, *Daniels*, and *CHD* .................... 11

      3.    Plaintiffs Have Amply Alleged Coercive Statements by State Actors. ....................... 13

      4.    Threats by Individual Officials Suffice to Create State Action. .................................. 16

      5.    Plaintiffs Have Pleaded the "Something More" Needed to Maintain a Claim Against a Private Party. ................................................................................................ 17

    D.    Section 230(c) Provides Government Encouragement of Defendants' Conduct. .......... 17

      1.    State Action Can Consist of Enabling Discriminatory Private Conduct. ...................... 18

      2.    The State Also "Acts" When It Allocates Property Rights. ..................................... 19

      3.    Defendants' Cases Are Inapposite ................................................................... 20

    E.    Joint Action Also Is Sufficiently Pleaded ........................................................... 20

    F.    Plaintiffs Have Standing to Challenge the Constitutionality of Section 230. .............. 21

    G.    Plaintiffs' Claims Under Florida Law Are Viable. .............................................. 22

      1.    The Choice of Law Provision Does Not Foreclose the FDUTPA Claim. ...................... 22

      2.    Defendants' Failure to Disclose Material Information Is Actionable. .......................... 23

      3.    Plaintiffs' Allegations in Count IV Are Sufficient. ................................................ 24

      4.    The First Amendment Is Not a Defense to FDUTPA. ............................................ 24

IV.    **CONCLUSION** ........................................................................................ **25**

# **TABLE OF AUTHORITIES**

Cases

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 .......................................................................... 13, 23

*Ahern v. Mayo Clinic*, 180 So.3d 165 (1st DCA 2015) .................................................................. 25

*American Family Ass'n v. City of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) ....................... 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 6

*Atkinson v. Meta Platforms*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021) .................................... 23

*Backpage.com v. Dart*, 807 F.3d 229 (7th Cir. 2015) .................................................................. 18

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963) ........................................................ 1, 3, 17, 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................................. 6, 18, 24

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) .................................................................. 16

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ....................................................... 13

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ................................................................................. passim

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ............................ 8

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009) ....................................................................... 18

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1962) ............................................................ 2

*Callahan v. Equifax Information Services LLC*, 2013 WL 4425852 (N.D. Cal. Aug. 15, 2013) .. 25

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164 (4th DCA 2015) ................................................................................................................................ 26

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) ......... 10

*Central Hudson v. Public Service Comm'n*, 447 U.S. 557 (1980) ................................................ 27

*Children's Health Defense v. Facebook Inc.* ("*CHD*"), 2021 WL 2662064 (N.D. Cal. June 29, 2021) ...................................................................................................................................... passim

*Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989) ............................................................... 23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ................................. 7, 20

*Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ............................. passim

*Divino Group LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ....................... 20, 22

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021 ......................................... passim

*Doe v. Twitter*, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021) ..................................................... 24

*Donald J. Trump, et al., v. Facebook Inc, et al.*, Civ. 4:21-cv-09044-JSW ................................... 3

*Donald J. Trump, et al., v. YouTube, LLC, et al.*, Civ. No: 4:21-cv-08009-JSW ............................ 3

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................ 11

*Fed. Agency of News, LLC v. Facebook, Inc.*, 395 F.Supp.3d 1295 (N.D. Cal. 2019) ............ 17, 24

*Fed. Trade Comm'n v. Gratz*, 253 U.S. 421 (1920) ................................................................... 27

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ........................................... 16

*Heineke v. Santa Clara University*, 965 F.3d 1009 (2020) ......................................... 11, 14, 15, 16

*Howard v. AOL*, 208 F.3d 741 (9th Cir. 2000) ............................................................................... 17

*Howey v. U.S.*, 481 F.2d 1187 (9th Cir. 1973) ............................................................................... 28

*In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp.3d 1155 (N.D. Cal. 2016) .... 25

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738 (N.D. Cal. May 9, 2011) ............................................................................................................................................. 7

*Investors Research Company*, *v. U.S. Dist. Ct.*, 877 F.2d 777 (9th Cir. 1989) ............................... 3

*Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239 (1931) ..................................................... 19

*Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018) ............................................................................... 7

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ............................................................................ 5

*Knight First Amendment Inst. et al v. Trump, et al.*, 928 F.3d 226 (2d Cir. 2019) ......................... 2

*Lavigne v. Herbalife, Ltd.* 2019 WL 6721619 (C.D. Cal. Oct. 22, 2019) ..................................... 25

*Lombard v. Louisiana*, 373 U.S. 267 (1963) ......................................................................... passim

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982) ......................................................... 7, 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................... 24

*Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989) ................................. 13, 17, 18

*Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999) ..................................... 23

*Miami Herald v. Tornillo*, 418 U.S. 241 (1974) ........................................................................... 27

*Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646 (9th Cir. 1988) ...................................................... 5

*Netchoice v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021) ............................................. 27

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) ....................................................................... 18

*Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730 (2017) ......................................... 1

*Pennie v. Twitter, Inc.*, 281 F.Supp.3d 874 (N.D. Cal. 2017) ....................................................... 24

*Peterson v. City of Greenville*, 370 U.S. 935 (1963) ............................................................. 8, 9, 12

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ............................................................. 27

*Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956) ........................................................ 21

*Reitman v. Mulkey*, 387 U.S. 369 (1967) ......................................................................... 8, 20, 21

*Reno v. ACLU*, 521 U.S. 844 (1997) ............................................................................................... 1

*Robinson v. Florida*, 378 U.S. 153 (1964) ............................................................................... 9, 12

*Romer v. Evans*, 517 U.S. 620 (1996) ............................................................................................ 8

*Rutenburg v. Twitter, Inc.*, 2021 WL 1338958 (N.D. Cal. 2021) .................................................. 17

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F.Supp.3d 1088 (N.D. Cal. 2015) .............. 25

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) ....................................... 21, 22

*Starbuck v. City & County of San Francisco*, 556 F.2d 450 (9th Cir. 1977) ............................... 11

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) ................ 9, 12, 19

*Terry v. Adams*, 345 U.S. 461 (1952) .......................................................... 19

*Townsend v. Univ. of Alaska*, 543 F.3d 478 (9th Cir. 2008).......................................... 28

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) .......................................... 23

*Tuttle v. Sky Bell Asset Management, LLC*, 2011 WL 2224535 (N.D. Cal. June 8, 2011)........... 25

*United States v. Classic*, 313 U.S. 299 (1941)................................................... 19

*United States v. Davis*, 482 F.2d 893 (9th Cir. 1973) ............................................ 13

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ............................................ 5

*United States v. Ross*, 32 F.3d 1411 (9th Cir. 1994)............................................. 13

*Willis v. City of Fresno*, 2014 WL 4211087 (E.D. Cal. Aug. 26, 2014)............................... 11

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................................. 27

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ................................................ 17

*Zimmerman v. Facebook, Inc.*, 2020 WL 5877863 (N.D. Cal. 2020) .............................. 17


Statutes

15 U.S.C. §1 ................................................................................. 6

42 U.S.C. § 1983 ............................................................................ 21

47 U.S.C. § 230(c) ........................................................................... 1

Cal. Bus. & Prof. Code §§ 17200 et seq. ...................................................... 24

Cal. Bus. & Prof. Code §§ 17204 ............................................................. 24

F.S. § 501.2041 et seq. ...................................................................... 25

F.S. § 501.2041(2)(a) & (b) .................................................................. 25

Fla. Deceptive and Unfair Trade Prac. Act, F.S. §§ 501.201 et seq. ................................. 3, 24, 25

Fla. Stat. § 501.211(a)...................................................................... 24


Rules

Fed. R. Civ. P. 12(b)(6)...................................................................... 6, 7, 13

Fed. R. Civ. P. 42 ........................................................................... 3

Fed. R. Civ. P. 8(a)(2)....................................................................... 6

> *"It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments … [T]he freedoms of expression must be ringed about with adequate bulwarks."*
>
> – Justice Brennan in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963).

## I.    INTRODUCTION

This case raises one of the most important First Amendment issues of the current era:  Can the government coerce or co-opt a private, multi-billion dollar social media company to achieve a goal—the censorship of disfavored political speech—that the Constitution prohibits it from achieving directly?  Social media platforms are "the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730, 1735 (2017).  The Twitter platform boasts nearly 400 million users.  Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c), protects Defendants from liability for, *inter alia*, content they choose to ban from their platform.  Enacted in 1996, Section 230 was originally a federal subsidy to facilitate the growth of the Internet in its infancy, but its beneficiaries have since overtaken large segments of the economy.  Twitter's market capitalization now exceeds $32 billion; this value is directly attributable to this congressional grace.[1]  Twitter ostensibly is an ordinary privately-owned, privately-operated company.  However, beholden as they are to this multi-billion-dollar federal subsidy, Defendants must adhere to the preferences of their government overseers, who hold the power to dismantle, not just their business model, but the entire industry.

Defendants permanently banned then-President Trump from their platform for engaging in constitutionally protected speech, in his official capacity, on a government account with millions of active participants—an account that, as the Second Circuit has held, constituted a public forum. *Knight First Amendment Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot*, 141 S.Ct. 1220 (2021).  Defendants' overtly partisan censorship resulted in the prior restraint of millions of Americans' freedom to participate in the public discourse, contrary to First

---

[1] *See* Plaintiffs' Request for Judicial Notice ("RJN"), filed herewith, ¶ 6.

1  Amendment principles that are deeply rooted in American history and law.

2  Against this sweeping backdrop, this Court need only answer a limited question—whether

3  Plaintiffs' exhaustively detailed First Amended Complaint ("FAC") contains sufficient

4  allegations to make out the claims pleaded.  Plaintiffs have alleged in great detail that the federal

5  government's entanglement with Defendants' "content moderation" program (a euphemism

6  Orwell would have loved) creates state action and thus makes Defendants' actions subject to First

7  Amendment limitations.[2]  More specifically, state action exists by virtue of (1) government

8  coercion, including directing Defendants and other social media platforms to target then-President

9  Trump and his supporters; (2) substantial encouragement of Defendants' censorship by official

10  exhortations coupled with threatened withdrawal of Section 230 immunity; and (3) as Defendants

11  have admitted, joint action with the government to suppress disfavored speech.  Plaintiffs' claims

12  are consistent with and supported by decades of Supreme Court and Ninth Circuit jurisprudence

13  holding that even officials' informal statements urging private entities to discriminate against

14  classes of citizens give rise to state action, whether or not specific individuals were targeted by

15  name.  *See, e.g.*, *Lombard v. Louisiana*, 373 U.S. 267 (1963).

16  This is a quintessentially fact-intensive inquiry.  "Only by sifting facts and weighing

17  circumstances can the nonobvious involvement of the State in private conduct be attributed its

18  true significance."  *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1962).  Plaintiffs

19  have alleged ample facts demonstrating that public officials "deliberately set about to achieve the

20  suppression of [speech] deemed 'objectionable.'"  *Bantam Books*, 372 U.S. at 68.  That is enough

21  for this case to move forward.

22  **II.    STATEMENT OF FACTS**

23  **A.    Procedural Background**

24  This case was filed on July 7, 2021, in the Southern District of Florida, simultaneously

25  with virtually identical cases against YouTube and Facebook.  The FAC was filed on July 27,

26  

---

27  [2] Plaintiffs also allege that Section 230 is unconstitutional as applied and that, by enforcing
content-removal policies in an inconsistent and discriminatory manner, Defendants have violated

28  state laws against unfair and deceptive business practices.

2021.  Dkt. 21.  Plaintiffs, who seek to represent a nationwide class, allege that government officials coerced, encouraged, and/or collaborated with Defendants to censor Plaintiffs' speech.  *See, e.g.*, FAC ¶¶ 27-167.  As a result, Defendants' censorship is subject to constitutional constraints by virtue of the state action doctrine.  Accordingly, Defendants violated the First Amendment when they banned Plaintiffs from their platform.  Plaintiffs further allege that Section 230(c) of the Communications Decency Act is unconstitutional as applied and that Defendants' conduct is unlawful under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Plaintiff Trump filed a motion for preliminary injunction on October 2, 2021.  Dkt. 62.  This case was transferred to this Court on October 26, 2021.[3]

### B.  Factual Allegations

The FAC details a litany of events in which members of Congress and the Executive Branch coerced Defendants to censor disfavored speech on pain of catastrophic legal and/or regulatory consequences.  *See* FAC ¶¶ 51-64 (detailing officials' statements).  Legislators publicly threatened to take punitive measures against the Defendants if they continued to provide a platform for President Trump and those who espoused his views.  In particular, these public officials made it clear that they wanted then-sitting President Trump permanently banned from Twitter.  *See, e.g.*, FAC ¶ 55 ("Look, let's be honest, @realDonaldTrump's Twitter account should be suspended."  Sen. Kamala Harris, Sept. 30, 2019).  The threatened sanctions for Defendants' noncompliance included increased regulation, antitrust scrutiny, and repeal of the Defendants' Section 230 immunity.  *See, e.g., id.* ("But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed."  House Speaker Nancy Pelosi, Apr. 12, 2019); ("Section 230 should be revoked, immediately should be revoked, number one.  For Dorsey and other platforms."

---

[3] The *YouTube* and *Facebook* cases also were transferred to this District and assigned to the Hon. Jeffrey White.  *Donald J. Trump, et al., v. YouTube, LLC, et al.*, Civ. No: 4:21-cv-08009-JSW; *Donald J. Trump, et al., v. Facebook Inc, et al.*, Civ. 4:21-cv-09044-JSW.  Plaintiffs have filed a motion in *YouTube* to consolidate the three cases pursuant to *Investors Research Company, v. U.S. Dist. Ct.*, 877 F.2d 777 (9th Cir. 1989) ("The district court has broad discretion under [Rule 42] to consolidate cases pending **in the same district**.") (emphasis added).

1    President-elect Joe Biden, *New York Times,* Jan. 19, 2020).

2           Legislators also held hearings to which Twitter's CEO was summoned, during which

3    legislators threatened to impose regulations and strip Twitter of its Section 230 immunity.  The

4    coercive, viewpoint discriminatory statements by legislators at these official proceedings shock

5    the conscience of any American concerned with the erosion of First Amendment rights:

> The time has come to hold online platforms accountable for their part in the rise of
> disinformation and extremism. … [T]herefore, **it is time for Congress and this
> Committee to legislate and realign these companies' incentives** to effectively deal with
> disinformation and extremism. … So when a company is actually promoting this harmful
> content, **I question whether existing liability protections should apply**.  Members on
> this Committee have suggested legislative solutions and introduced bills.  The Committee
> is going to consider all these options so that we can finally align the interests of these
> companies with the interests of the public and hold the platforms, and their CEOs,
> accountable when they stray.  That is why you are here today, Mr. Zuckerberg, Mr. Pichai,
> and Mr. Dorsey. …**The time for self-regulation is over.  It is time we legislate to hold
> you accountable**.  FAC ¶ 58; "Disinformation Nation: Social Media's Role in Promoting
> Extremism and Misinformation": Hearing before H. Comm. on Energy and Com., 117th
> Cong. (2021) (Opening Stmt. of Comm. Chairman Frank Pallone, Jr. (Dem.)) (emphasis
> added); RJN ¶ 2.[4]

> Your companies need to be held accountable—we need rules, regulations, technical
> experts in government, and audit authority of your technologies.  Ours is the committee of
> jurisdiction, and **we will legislate to stop this**.  *Id*. (Opening Stmt. of Rep. Mike Doyle
> (Dem)); (emphasis added); RJN ¶ 3.

> What our witnesses need to take away from this hearing is that self-regulation has come to
> the end of its road, and that this democratically elected body **is prepared to move
> forward with legislation and regulation**.  Misinformation regarding the election dropped
> by 73% across social media platforms after Twitter permanently suspended Trump ….
> The question is, what took so long? *Id*. (Opening Stmt. of Rep. Janice D. Schakowsky
> (Dem.)); (emphasis added); RJN ¶ 4.

21          These efforts bore fruit.  Defendant Dorsey admitted in congressional testimony that

22   Defendants "partnered" with the federal government to "share information" and "gather input" to

23   "inform [Twitter's] policy and enforcement decisions."[5]  And according to an official House

---

[4] A court may consider judicially noticeable materials without converting a motion to dismiss into
a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Mir
v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).  Furthermore, under the
"incorporation by reference" doctrine, a court may "take into account documents 'whose contents
are alleged in a complaint and whose authenticity no party questions, but which are not physically
attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[5] FAC ¶¶ 57-58; "Breaking the News: Censorship, Suppression, and the 2020 Election": Hearing
before S. Comm. on the Judiciary, 116th Cong. (2020) (testimony of Jack Dorsey); RJN ¶ 1.

1   source, "These platforms [Twitter, YouTube, and Facebook] often **ramp up their efforts** against

2   [conservative] content in response to social **and political** pressure."[6]  Officials in the Executive

3   Branch, including the current President and leaders of federal agencies, have publicly stated that

4   they have coordinated with Defendants and other social media platforms to censor speech that the

5   government regards as undesirable, including former President Trump's views on election fraud

6   and the origin of, and treatments for, COVID.  *Id*.  ¶¶ 78-79.  The White House has officially

7   confirmed that Executive Branch officials regularly "engage" with social media platforms at the

8   highest levels to promote speech preferred by the government, including creating a "robust

9   enforcement strategy" to ban contrary views:  "There are also proposed changes that we have

10  made to social media platforms … we have recommended [] that they create a robust enforcement

11  strategy." *Id*. ¶ 96.  The White House made clear that bans should be implemented consistently

12  across platforms: "You shouldn't be banned from one platform and not others if you—for

13  providing misinformation out there." *Id*. ¶ 98.  The White House has gone so far as to point out

14  specific narratives to be censored:  "So we are . . . regularly making sure social media platforms

15  are aware of the latest narratives dangerous to public health that we and many other Americans

16  seeing …." *Id*.  Defendants banned President Trump from their platform on January 7, 2021.

17  Due to sustained government pressure, the ban continues to this day.  FAC ¶ 6.  In effect, the

18  government has acted as a "Ministry of Truth" and has conscripted and/or enlisted Defendants to

19  act as its agents in blocking disfavored speech.

20  **III.    ARGUMENT**

21      **A.      Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True.**

22          Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain

23  statement of the claim showing that the pleader is entitled to relief."  As the Supreme Court

24  explained in *Ashcroft v. Iqbal*, "the pleading standard Rule 8 announces does not require 'detailed

25  factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-

26  _____

27  [6] FAC ¶ 58; "Disinformation Nation: Social Media's Role in Promoting Extremism and
    Misinformation": Hearing before H. Comm. on Energy and Com., 117th Cong. (Mar. 22, 2021)

28  (Memo. from Chairman Pallone prepared by Staff) (emphasis added); RJN ¶ 5.

me accusation." 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).[7] On this motion, all well-pleaded allegations of material fact are taken as true and construed most favorably to the non-moving party. *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018). Moreover, "plaintiffs should be given the full benefit of their proof **without tightly compartmentalizing the various factual components** and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (emphasis added); *see In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *10-11 (N.D. Cal. May 9, 2011) (applying *Cont'l Ore* on motion to dismiss).

Despite having moved under Rule 12(b)(6), Defendants repeatedly interject extraneous and impermissible factual assertions into their argument. *See, e.g.*, MTD at 1 (Plaintiffs "repeatedly violated" Twitter's rules); *id*. at 3 (President Trump tweeted "false information"; Twitter determined the President's tweets "could encourage further violence"); *id*. at 10 (Twitter "exercised independent judgment" when censoring Plaintiffs' speech). The Court not only should, but must, disregard Defendants' factual assertions when deciding this motion.

## B. The State Action Issue Is Inherently Unsuited for Disposition on a Motion to Dismiss.

In determining whether state action exists, the Court must engage in a nuanced and "necessarily fact-bound" inquiry, *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982), to which no single rubric can supply the answer. "[T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which '[t]his Court has never attempted.'" *Burton*, 365 U.S. at 722 (citation omitted). *See also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (existence of state action "is a matter of normative judgment, and the criteria lack rigid simplicity … [no] one

---

[7] *Ashcroft* and *Twombly* are frequently erroneously cited by defendants, and even some courts, for the proposition that, to survive a Rule 12(b)(6) motion, a complaint must be "plausible on its face." *See* MTD at 5. That is incorrect. In both of those cases, the Supreme Court applied the "plausibility" standard in assessing the viability of Sherman Act § 1 *conspiracy* allegations. *See, e.g., Twombly*, 550 U.S. at 556 (pleading a Section 1 claim requires complaint to provide "plausible grounds to infer an agreement"). That rule makes sense in a cartel case that otherwise could sweep defendants into years of litigation, with the threat of treble damages, based on a bare allegation of what could be lawful parallel conduct. It has no application here.

1    fact can function as a necessary condition across the board ... nor is any set of circumstances

2    absolutely sufficient").  The state's entanglement can consist solely of "winks and nods."  *Id.* at

3    301.  The weighing of the opposing values and interests found in different cases will lead to

4    different results.  This inquiry is ill-suited to a Rule 12(b)(6) motion.

5         **C.**     **Plaintiffs Have Pleaded State Action by Means of Compulsion.**

6         Under the compulsion theory, a private decision has sufficiently received the imprimatur

7    of government as to make it state action where the state has exercised coercive power to shape

8    private conduct.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  The requisite nexus between the

9    State and the challenged private actions has been found in a wide variety of circumstances,

10   ranging from the State expressly mandating odious distinctions by private entities, *Peterson v.*

11   *City of Greenville*, 370 U.S. 935 (1963) (requiring racial separation in restaurants), to removing

12   legal barriers that would have kept private parties from trampling on constitutional rights,

13   *Reitman v. Mulkey*, 387 U.S. 369 (1967) (state law repealed legal barrier prohibiting private

14   actors from discriminating in housing sales and rentals).  *Cf. Romer v. Evans*, 517 U.S. 620

15   (1996) (state law precluding any government action designed to protect persons based on sexual

16   orientation violated Equal Protection Clause).  Plaintiffs' allegations fit comfortably on the

17   spectrum of fact patterns which the courts have found to constitute compulsion, and thus state

18   action.[8]

19        **1.**     **Origins of the Compulsion Theory**

20        The Supreme Court's compulsion theory cases amply support its application on the facts

21   alleged here.  The doctrine had its genesis in three civil rights cases where the interplay of

22   government and private businesses maintained racial segregation.  Finding state action in

23   *Peterson,* 370 U.S. 935, was easy.  A private lunch counter had barred Black customers in

24   compliance with a city ordinance requiring segregation in restaurants.  The Supreme Court found

---

[8] *Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020), is irrelevant.  Plaintiff in *Prager* argued that YouTube is a state actor because it performs a "public function," one of four categories of state action.  *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999).  Plaintiffs here do not invoke the public function theory; they allege state action only by means of government compulsion and joint action.

that the private actor's conduct violated the Equal Protection Clause because the State had commanded that particular result. Notably, the Court did not require that the targets of state action be identified *specifically and individually*. It was enough that the ordinance targeted a broad and undifferentiated, but identifiable, class of citizens.

In *Robinson v. Florida*, 378 U.S. 153 (1964), again, a restaurant denied service to Black customers. While segregated dining was not mandated by law, health regulations required separate restroom facilities in any establishment serving both races. Defendants, Black restaurant patrons who refused to leave, were arrested and convicted of trespass; they challenged their conviction as a violation of Equal Protection. The Supreme Court reasoned that, while the restroom regulations did not forbid integrated service, "they certainly embody a state policy putting burdens upon any restaurant which serves both races." *Id.* at 156-57. This government entanglement, although indirect, rendered otherwise private conduct as state action. Again, the offending regulation did not specifically target any individual.

Most significantly for present purposes, *Lombard*, 373 U.S. 267, involved *no formal governmental action* at all. Black patrons were denied service at an all-White restaurant. The restaurant manager summoned the police after the group refused to leave, they were arrested and convicted of trespass. The *Lombard* Court located no government ordinance condoning or encouraging segregation. Nevertheless, the Supreme Court found state action in the fact that the Mayor and Police Chief of New Orleans had given speeches declaiming that "sit-in" demonstrations would not be tolerated. The Court reasoned that these public statements "must be treated exactly as if [the City] had an ordinance prohibiting such conduct," *id.* at 273, and found the statements sufficient to render the resulting discrimination state action. Even though no law or other official act had required segregation, the public officials had encouraged private discriminatory practices, and thus participated in segregation of public accommodations.

Ninth Circuit law is in accord. *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987), cited *Peterson* as support for finding state action where a county attorney had "advised" the telephone company to disconnect a customer's service or face prosecution if it did not comply. *Carlin* confirms that the state action inquiry focuses on the

substance of government coercion rather than the form.

## 2. The Specificity Issue: Plaintiffs Belong to a Class of Citizens Targeted by the Government.

Defendants urge this Court to follow a trio of recent district court decisions holding that, for state action to exist, the government must have compelled or encouraged the unconstitutional treatment in *a specific plaintiff's particular case*. *Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021; *Children's Health Defense v. Facebook Inc.* ("*CHD*"), 2021 WL 2662064 (N.D. Cal. June 29, 2021); *Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021); MTD at 7-9.[9] To the extent that these cases require the targeting of specific individuals as a prerequisite to finding state action, they are contrary to the Supreme Court and Ninth Circuit precedents on which they relied.

It is undisputed that a private actor's mere compliance with a generally applicable law is not enough to constitute state action. But that is not the case Plaintiffs have alleged. The public officials' coercive conduct here was directed at former President Trump individually, and also at an identifiable group—speakers who publicly supported President Trump's views on election fraud or the COVID-19 pandemic. Such government conduct compelling Defendants to censor a distinct group of citizens is state action, just as if officials had exhorted Defendants to ban all Republicans, or women, or LGBTQ people from their platform. And silencing a group based on their political beliefs is the core evil the First Amendment was designed to avert. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976).

### (a) Laws of General Applicability—No State Action

To the extent the state action doctrine incorporates a "specificity" requirement, it is no more than that "compliance with **generally applicable laws** [is not] sufficient to convert private conduct into state action." *Heineke v. Santa Clara University*, 965 F.3d 1009, 1014 (2020)

---

[9] CHD is currently on appeal to the Ninth Circuit (No. 21-16210). Moreover, "[i]t is axiomatic that district court decisions do not create binding precedent on other district courts." *Willis v. City of Fresno*, 2014 WL 4211087, at *2 n.1 (E.D. Cal. Aug. 26, 2014), citing *Starbuck v. City & County of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977).

(emphasis added) (citing *Sutton*, 192 F.3d 826). *Sutton* explains the common sense reason behind this requirement:

> To accept [that] argument would be to convert every employer—whether it has one employee or 1,000 employees—into a governmental actor every time it complies with a presumptively valid, generally applicable law, such as an environmental standard or a tax-withholding scheme. Private employers would then be forced to defend those laws and pay any consequent damages, even though they bear no real responsibility for the violation of rights arising from the enactment of the laws.

192 F.3d at 838-39. That scenario bears no resemblance to the facts here. Plaintiffs do not rely on the existence of a "generally applicable law" as the source of state compulsion.

### (b) State Action That Targets Identified Groups—This Case

The public officials' challenged actions here were either directed at then-President Trump individually, or else targeted a distinct and identifiable group of citizens—those who echoed his views—for censorship. *See, e.g.,* FAC ¶¶ 55-60, 75, 84-98, 101-08. As to then-President Trump, he clearly was identified individually, and thus was the subject of state action even under the overly restrictive "particular case" test applied in *Doe, Daniels,* and *CHD*. As to the other groups of targeted speakers, they were identified with the particularity required by the Supreme Court civil rights cases discussed above, as well as subsequent decisions. The Supreme Court had no difficulty finding state action in *Robinson*, *Peterson*, and *Lombard* even though the governmental conduct had not targeted any specific individuals by name. The conduct in each of those cases was directed at a particular group—Black Americans—and not at identified individuals. *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 195-96 (Brennan, J., concurring) (state law leaving decision whether to serve any individual to unfettered discretion of private restaurants imbues private decision with state action).

Later Ninth Circuit decisions have found state action based on similar fact patterns. For example, in *Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989), a worker at a nuclear power plant brought a *Bivens*[10] suit claiming that he had been excluded from the plant without due process for alleged drug use. The Ninth Circuit found the requisite state action

---

[10] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

existed in the form of warnings by the Nuclear Regulatory Commission that nuclear licensees needed to control their employees' drug use, or the NRC would do it for them. At the time, the NRC had not yet taken any formal action—the NRC's first policy statement on drug use was not published until a year later. Mathis alleged only that the NRC had "pressured" nuclear plant operators. The NRC's informal actions were not directed at Mathis individually; the Commission didn't even know he existed. The Ninth Circuit held that, despite this "bare record," "we cannot agree with the conclusion that Mathis' allegations of governmental coercion or encouragement are frivolous or wholly without substance," and allowed his claim to proceed. *Id.* at 1434. *See also United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973) (passenger search by private airline was state action due to FAA's incipient efforts to create anti-hijacking program, although no federal regulation existed at the time; no claim that FAA specifically directed the particular search); *United States v. Ross*, 32 F.3d 1411, 1413-14 (9th Cir. 1994) (airline's search of passenger's luggage to conform to non-binding FAA guidelines was governmental action; FAA did not mandate searching this or any other individual passenger).[11] As in these cases, Plaintiffs have alleged government involvement in censorship aimed at a particular group, defined by political viewpoint instead of race, employment, or travel.

### (c)    The "Particular Case" Fallacy—*Doe*, *Daniels*, and *CHD*

*Doe* and *Daniels* purport to take their "treatment of a specific plaintiff" formulation from *Blum* and *Heineke*. *See Doe*, 2021 WL 4864418, at *3; *Daniels*, 2021 WL 1222166, at *6. *CHD*, in turn, relies on *Daniels* for the same proposition, 2021 WL 2662064, at *15, and thus its provenance traces back to the same sources. But *Blum* and *Heineke* stand for no such rule.

The claims in *Blum* and *Heineke* were challenges to the impact of generally-applicable laws on particular individuals. *Blum* concerned a private nursing home that participated in the

---

[11] *See also U.S. v. $124,570 U.S. Currency*, 873 F.2d 1240, 1246 (9th Cir. 1989) (government provided $250 reward when TSA agents reported finding currency or drugs while conducting X-ray scan for weapons; search held to be unconstitutional: "the policy of 'work[ing] hand-in-hand with [U.S. Customs] regarding the detection and reporting of drugs and U.S. currency' will very likely influence [TSA] officers to conduct more searches, and more intrusive searches, than if they focus on air safety alone.").

1    Medicaid program and thus was heavily regulated by the state. Medicaid regulations required
2    nursing-home physicians to periodically assess patients as to what level of care they required. If
3    the physicians found patients who no longer needed nursing home care, the regulations required
4    the nursing home to downgrade or discharge them. Plaintiffs, who had been downgraded to a
5    lower level of care, sued the state officials in charge of the Medicaid program, seeking to hold
6    those officials liable for the physicians' decisions. *Blum* held that the relevant question was not
7    whether the nursing home was regulated, but whether the state's regulations encouraged the
8    nursing home to downgrade the plaintiffs' care without affording due process. The Court
9    emphasized that the decision about the necessary level of medical care was entirely in the
10   physician's discretion, noting, "[t]here is no suggestion that those decisions were emphasized in
11   any degree by [the Medicaid regulations]." 457 U.S. at 1005. Because the state did not coerce or
12   encourage making the care decision as to any particular patient, the state was not a participant in
13   the alleged due process deprivation. *Id*. at 1007-12. Plaintiff in *Heineke* was a professor at a
14   private university who was terminated for sexually harassing a student. He claimed that the
15   university had deprived him of due process, and had done so as a result of government coercion
16   by conditioning the university's receipt of federal funds on its compliance with anti-
17   discrimination laws. The court held that the university did not become a state actor merely
18   because it was subject to these general laws. 965 F.3d at 1013-14.

19          In both these cases, the private entity was subject to, and in turn enforced, laws or
20   regulations that applied broadly to all similarly situated private entities—nursing homes in *Blum*,
21   and universities in *Heineke*. The courts in those cases could choose only between two fact
22   patterns: either everyone affected by a regulation, or the specific result for an individual plaintiff.
23   The former was not enough to create state action, and neither plaintiff succeeded in showing the
24   latter. Neither case said that actions taken in response to government coercion aimed an
25   identifiable group, but not identifying any group members by name, were unredressable. The
26   courts' statements regarding "particular case" must be read as distinguishing the facts before them
27   from simply enforcing a law of general applicability. *Daniels*, *Doe*, and *CHD* plucked these
28   unexceptionable holdings out of context and transmogrified them into a much broader, and

1  insupportable rule—that state action can only exist where the government has compelled the

2  allegedly unlawful result in a specific plaintiff's individual case.  The fallacy of their holdings is

3  easily demonstrated by returning to the Supreme Court's civil rights decisions.[12]

4          The infirmity of the "particular case" test adopted by *Doe*, *Daniels*, and *CHD* is evident

5  when mapping it onto, e.g., the *Lombard* facts.  In *Lombard*, no law, regulation, or municipal

6  ordinance required or encouraged segregation.  The mayor and police chief had simply made

7  speeches inveighing against sit-in protests.  If *Doe*, *Daniels*, and *CHD* correctly stated the law,

8  the courts would have been compelled to dismiss the *Lombard* case because the government

9  officials had not identified the affected individuals in their public statements.  The only difference

10  here is that the targeted speakers were identified by their political viewpoint rather than their race.

11          Neither *Blum* nor *Heineke* addressed this issue of group identification.  Because the

12  plaintiffs in those cases sued as individuals and not as members of groups, the courts did not need

13  to, and did not, consider the question of the requisite granularity of identification where

14  government action incentivized a private entity to target an identifiable group for discrimination.

15  For that reason, *Blum* and *Heineke* do not compel the result Defendants advocate here.

16          **3.      Plaintiffs Have Amply Alleged Coercive Statements by State Actors.**

17          Defendants also argue that government officials' extensive pronouncements demanding

18  that social media platforms, including Defendant Twitter, censor then-President Trump and those

19  who supported his views do not rise to the level of coercion as a matter of law.  But this is an

20  extremely fact-intensive issue.  Statements made by public officials "require courts to draw fine

21  lines between permissible expressions of personal opinion and implied threats to employ coercive

22  state power to stifle protected speech."  *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39

23

24  _____

[12] In addition to this fatal defect, all three of these courts disregarded the Rule 12(b)(6) standards
25  and instead resolved factual issues at the pleadings stage or held that plaintiffs' claims failed as an
    evidentiary matter.  *See Daniels* at *6 (allegations of government actions do not amount to
26  "coercion" or "encouragement"); *id*. at *7 (facts alleged "do not reflect the kind of government
    involvement" sufficient to support state action); *id*. at *21 (CHD did not "establish" that
27  defendants money from CHD); *Doe* at *3 ("The Court disagrees" that statements by federal
    lawmakers are sufficient to show state coercion or encouragement; alleged threatened penalties
28  are "insufficient" to convert private to state action).

1   (2d Cir. 1983). A court's decision whether such a statement is "sufficiently coercive" to

2   constitute state action depends on a factual judgment: can "the comments of governmental

3   officials [] reasonably be interpreted as intimating that some form of punishment or adverse

4   regulatory action will follow failure to accede to the officials' request." *Id*. That judgment

5   cannot be made based on a few snippets quoted out of context in Defendants' brief. Instead, the

6   Court must consider the entirety of the Defendants' words and actions in determining whether

7   they could reasonably be interpreted as an implied threat. *See Bantam Books,* 372 U.S. at 67

8   (court must "look through forms to the substance" to assess whether "coercion, persuasion, and

9   intimidation" by state amounted to impermissible "informal censorship"); *see also Bennett v.*

10  *Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005) (explaining that "adverse effect" in a retaliation

11  claim "depends on context"). A number of factors bear on this inquiry, including: (1) the

12  defendants' regulatory or other decision-making authority over the targeted entities; (2) the

13  language of the allegedly threatening statements; (3) allegedly retaliatory exercises of regulatory

14  authority over the targeted entities; and (4) the perception of a threat by the targeted entities and

15  their response. *Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007). The FAC contains numerous

16  allegations relevant to this analysis, all of which eventually must be weighed by the Court to

17  determine whether Plaintiffs have proven a First Amendment claim—but not on this motion.

18      The line between mere government expression and intimidation is crossed when there is

19  an "actual or threatened imposition of government power or sanction." *American Family Ass'n v.*

20  *City of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002). The threat need not be explicit; an

21  indirect threat suffices. In *Bantam Books,* the Supreme Court held that state officials violated the

22  First Amendment by sending letters to booksellers warning that the sale of "objectionable" books

23  could bring legal repercussions. It made no difference that the officials who communicated the

24  threats lacked the "power to apply formal legal sanctions." 372 U.S. at 68. Nor did it matter that

25  the letters were framed as mere "exhort[ation]" or that booksellers were "free" to ignore them.

26  As the Court sensibly observed, "people do not lightly disregard public officers' veiled threats."

27  *Id*. at 66-68. The coercion alleged in *Mathis*, which the Court found sufficient to invoke state

28  action, was even more diffuse. Mathis made only "bare" allegations that he had been injured due

1  to NRC pressure on power plant operators to screen out drug users. That was enough to tie the

2  NRC to his dismissal and preserve his *Bivens* claim. *Mathis*, 891 F.2d at 1434.[13]

3        There can be no doubt that a plausible inference can be drawn from Plaintiffs' allegations

4  that the public officials "deliberately set about to achieve the suppression of [speech] deemed

5  'objectionable.'" *Bantam Books*, 372 U.S. at 68. As detailed in the FAC and summarized above,

6  some of the most powerful legislators and Executive Branch officials, with the power to make

7  good on their threats, repeatedly called for social media to undertake a coordinated campaign to

8  quash what officials deemed to be unacceptable speech—including in statements made at

9  congressional hearings and from the West Wing. *See supra* at 3-5. Defendants argue that they

10  made their own independent "content-moderation decisions." MTD at 10. To the contrary,

11  Defendant Dorsey admitted in testimony before the Senate that Twitter "partnered" with federal

12  government to "share information" and "gather input" to "inform [Twitter's] policy and

13  enforcement decisions." *See supra* at 3-5. The Biden White House's explicit call for social

14  media companies to "ensure uniformity" in banning speech further contradicts Defendants' self-

15  serving assertions. FAC ¶¶ 98, 105. Defendants are asking the Court to accept Defendants'

16  version of events over Plaintiffs' allegations, an argument that cannot be countenanced on a

17  motion to dismiss. Moreover, "[t]he mere fact that [a defendant] might have been willing to act

18  without coercion makes no difference if the government did coerce." *Mathis*, 891 F.2d at 1434.[14]

19  Indeed, the restaurants in *Peterson, Robinson* and *Lombard* may have been perfectly happy to

20

21  [13] None of Defendants' cited cases, MTD at 6, impair the state action argument here. Plaintiffs in
   *Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000), presented no evidence of state action; rather,
22  the court rejected the theory that AOL should be treated as a "quasi-public utility," which is not
   alleged here. *Rutenburg v. Twitter, Inc.*, 2021 WL 1338958, at *2 (N.D. Cal. 2021), rejected
23  plaintiff's argument that Twitter was a state actor solely because it "administered" Mr. Trump's
   account. In *Zimmerman v. Facebook, Inc.*, 2020 WL 5877863, at *2 (N.D. Cal. 2020), plaintiff
24  argued state action premised on the theory that Facebook was a "digital town square" and
   provided a "public speech forum," an argument that is not made here and which the court rejected
25  based on *Prager*. Finally, *Fed. Agency of News, LLC v. Facebook, Inc.*, 395 F.Supp.3d 1295,
   1308-1314 (N.D. Cal. 2019), also relied on *Prager* to reject a "public forum" claim. While
26  plaintiff also pleaded state action based on joint action, the only facts alleged in support of that
   theory were Facebook's provision of information to the federal government. The court held that
27  "supplying information [to the state] alone does not amount to" joint action. *Id.* at 1312.
   [14] *See also Backpage.com v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (state action exists even
28  where threatened party denies they perceived or were moved by government threat).

segregate; they may have appreciated the government's cover for doing so.  It made no

difference.  Plaintiffs have alleged far more than "unadorned, the-defendant-unlawfully-harmed-

me accusation[s]."  *Twombly*, 550 U.S. at 555.  This issue can only be resolved conclusively after

evidence is introduced, not now.[15]

### 4. Threats by Individual Officials Suffice to Create State Action.

Defendants also argue that Plaintiffs' First Amendment claim must be dismissed because

government officials were not speaking on behalf of Congress or the Executive Branch when they

called for then-President Trump and those who supported his views to be censored.  MTD at 7-8.

To the contrary, the bulk of the statements identified in the FAC were made *ex cathedra*—on the

floor of Congress or from the White House.  *See supra* at 3-5.  Even if that were not the case,

however, what Plaintiffs have alleged is enough.  Informal conduct by state actors can give rise to

state action.  *See Lombard* (speeches by public officials).  Not even the fact that the actions of the

state agents are *illegal* makes the action unattributable to the state for purposes of the Fourteenth

Amendment.  "Misuse of power, possessed by virtue of state law and made possible only because

the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state

law."  *United States v. Classic*, 313 U.S. 299, 326 (1941).  *See also Iowa-Des Moines Nat'l Bank

v. Bennett*, 284 U.S. 239, 246 (1931) ("[A]cts done 'by virtue of public position under a State

government . . . and . . . in the name and for the State' . . . are not to be treated as if they were the

acts of private individuals, although in doing them the official acted contrary to an express

command of the state law.") (Brandeis, J.)

Justice Frankfurter put this canard to rest when he wrote,

[t]he State, in these situations, must mean … those clothed with the authority and the
influence which official position affords. … This phrase [state action] gives rise to a false
direction in that it implies some impressive machinery or deliberative conduct normally
associated with what orators call a sovereign state.  The vital requirement is State
responsibility—**that somewhere, somehow, to some extent, there be an infusion of**

---

[15] Should the Court conclude that the governmental statements described in the FAC appear
ambiguous, the Court is required on this motion to draw a reasonable inference of coercion in
Plaintiffs' favor.  *See Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003), cited with approval
in *Brodheim v. Cry*, 584 F.3d 1262, 1279 (9th Cir. 2009).

conduct by officials, panoplied with State power, into any scheme [to deny protected rights].

*Terry v. Adams*, 345 U.S. 461, 473 (1952) (concurring) (emphasis added). If even misuse or unlawful use of state power by those clothed with state authority can be state action, then official action clothed in the formal trappings of a White House press briefing or a congressional hearing is sufficient.

### 5. Plaintiffs Have Pleaded the "Something More" Needed to Maintain a Claim Against a Private Party.

Defendants claim that the compulsion theory is available only when the government itself is a defendant. MTD at 9 (citing *Blum* and *Sutton*). This argument misses the mark by a country mile. It is true that, in order to hold a private party, rather than the government, liable, a plaintiff must show "something more." But *Sutton* held that the "something more" required to hold a private party liable could be any of four fact patterns, including *governmental compulsion or coercion*, and *joint action*. These are precisely the categories of "something more" that Plaintiffs have alleged and will prove. *See id.* at 835 (other two categories are "public function" and "governmental nexus"); *accord Lugar*, 457 U.S. at 938-39.

### D. Section 230(c) Provides Government Encouragement of Defendants' Conduct.

Private conduct also becomes state action when the government provides significant encouragement, either overt or covert, to the private party's initiatives. *Blum*, 457 U.S. at 1004. The above-described official statements amount to coercion as well as constituting "significant encouragement." In addition, Defendants' censorship has been significantly encouraged by Section 230(c), which immunizes Defendants from liability for imposing a prior restraint on constitutionally protected speech. As such, the state has taken affirmative steps designed to make censorship of protected speech legally possible—indeed, risk-free. Thus, the ultimate impact of the statute has been to "encourage and significantly involve the State in private [viewpoint based] discrimination." *Reitman*, 387 U.S. at 376 . Read as a whole "without tightly compartmentalizing the various factual components," *Cont'l Ore.*, 370 U.S. at 699, these allegations plead encouragement.

PLAINTIFFS' OPP. TO MOT. TO DISMISS—17

Case No: 21-cv-08378-JD

**1.      State Action Can Consist of Enabling Discriminatory Private Conduct.**

Defendants argue that Section 230 has no impact on the state action analysis because "it does not require private parties to do anything."  MTD at 9, citing *Divino Group LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021).  But the state "acts" not only when it coerces, but also when it permits.  In *Reitman*, California voters passed an amendment to the California Constitution prohibiting the state from enacting laws forbidding racial discrimination in private housing.  The amendment left private actors free to discriminate without fear of interference from state laws.  In the Court's words, "[t]he right to discriminate is now one of the basic policies of the State."  387 U.S. at 381.  Plaintiffs, who had been denied housing on account of their race, sued the property owners, who in turn cited the amendment as a defense.  The Supreme Court acknowledged that the amendment on its face, and thus the state, had done nothing to encourage the discrimination.  But, by making private discriminatory practices immune from the ordinary legislative process, the amendment impermissibly encouraged private racial discrimination and thus violated the Equal Protection Clause.  *Id*.  In just the same way, Section 230's grant of immunity impermissibly encourages social media platforms to block disfavored speech, free not merely from official restraint but private lawsuits as well.

The Supreme Court also has held that federal laws which, like Section 230, immunized private conduct from liability, convert such conduct into state action.  In *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 232 (1956), the Court found state action in private employers' union shop agreement because, under a federal statute, such agreements could not be "made illegal" by any state law.  Like Section 230, the federal law was permissive; it did not compel employers to enter into union shop agreements; it only prohibited states from banning them.  And in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), the Court found state action in drug testing conducted on private railroad employees after the federal government enacted regulations immunizing the private employers from liability if they performed such tests.  Once again, these regulations did not compel the testing, but merely immunized it from private lawsuits—just like Section 230.  *Id*. at 611.  The Court held that the regulations infused private employer's conduct with state action because the regulations "removed all legal barriers" to such

1    testing and thus provided "clear indices of the Government's encouragement, endorsement, and

2    participation" in the practice.  *Id*. at 615-16.  Similarly, Section 230(c) removed all legal barriers

3    to Defendants' censorship and thus is one of several "clear indices of the Government's

4    encouragement" of such censorship.

5            **2.**        **The State Also "Acts" When It Allocates Property Rights.**

6           The state actions here that met the "encouragement" test also can be understood as re-

7    allocating property rights.  Prior to passage of the California constitutional amendment in

8    *Reitman*, fair housing laws had granted the public the right to access housing without regard to

9    race.  The amendment stripped the public of that right and, instead, granted property owners the

10   power to refuse housing because of race—a right the prior law had denied them.  Either there was

11   a duty not to discriminate in the housing market on the basis of race, or there was no duty.  In

12   *Hanson*, railways and employees either had the "right to work" without joining a union, or they

13   did not.  According to the Supreme Court, "private rights [were] being invaded" and "the federal

14   statute is the source of the power and authority by which [] private rights [were] lost or

15   sacrificed."  351 U.S. at 232.  In *Skinner*, employees either were free from private drug testing, or

16   were not.  And under Section 230, private parties either retain their common law and statutory

17   rights to sue social media companies (like all other companies), or they do not.  Affirmatively

18   granting private parties the freedom to deny housing, maintain a union shop, drug test employees,

19   or censor otherwise protected speech involves the state in diminishing the other party's rights.

20   These laws embody choices about how to allocate conflicting rights that cannot co-exist.  When

21   the state takes overt action to allocate those rights among private parties, it necessarily encourages

22   the kind of conduct that its action favors.  Indeed, there would be no point in re-allocating such

23   rights if the government did not expect private parties to act in accordance with the new

24   allocation.

25          Under Section 230, Defendants are free to engage in invidious discrimination and the state

26   has granted them the right to do so free from liability; the state is delegating to them the power to

27   choke off speech the state disfavors.  Telling a class of speakers that they have no legal recourse

28   if the social media platforms do not wish to treat them as equal citizens puts the coercive power

PLAINTIFFS' OPP. TO MOT. TO DISMISS—19                    Case No: 21-cv-08378-JD

of the state squarely on the side of viewpoint-based exclusion. State action is always present when the state acts through the legal system to allocate property rights, and private-actor partners violate the Constitution when the state allocates property rights so as to allow some parties to discriminate without fear of legal repercussions.

### 3. Defendants' Cases Are Inapposite

Defendants argue that the courts have rejected the notion that Section 230 contributes to government "encouragement" of their activities sufficiently to create state action. MTD at 9. Their cited cases are inapposite and, more importantly, cannot trump the Supreme Court and Ninth Circuit authorities discussed above. In *Divino*, 2021 WL 51715 at *5, the Magistrate Judge rejected a similar Section 230 argument, in part on the ground that plaintiffs could not challenge a federal law under Section 1983. The court further held that state action might exist "when the government compels the private entity to take a particular action," citing *Blum*, and found no state action on the facts presented because "nothing about Section 230 is **coercive**." The court overlooked the "encouragement" portion of the state action test. *Id.* at *6 (emphasis added). The Ninth Circuit's decision *Atkinson v. Meta Platforms*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021) (unpub.), is even further afield. The Court upheld dismissal because, again, plaintiff had pleaded an improper Section 1983 claim challenging a federal law, and had not adequately pleaded federal coercion or joint action. That decision does not even mention the word "encourage."

### E. Joint Action Also Is Sufficiently Pleaded

Defendants' actions also constitute state action under the joint action test, pursuant to which a private entity acts under color of state law if it is "a willful participant in joint action with the state or its agents." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989). The joint action test asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). The test is satisfied by an "agreement" or "understanding" between the private party and governmental officials to accomplish a common objective. *See, e.g., Adickes*, 398 U.S. at 158-59 (allegation of tacit "understanding" between restaurant worker and police officer sufficient to create state action). "Such an agreement need not be overt, and may be inferred on

1   the basis of circumstantial evidence such as the actions of the defendants." *Mendocino Env. Ctr.*

2   *v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999). Whether defendants were involved in

3   such an agreement "is generally a factual issue and should be resolved by the jury, 'so long as

4   there is a possibility that the jury can "infer from the circumstances" that [defendants] …reached

5   an understanding' to achieve [their unlawful] objectives." *Id*. at 1301-02.

6       Plaintiffs' allegations are more than adequate to plead joint action under these standards.

7   The record is replete with facts from which a jury could infer a common understanding between

8   the government and Defendants to censor President Trump and those who echoed his views on

9   election fraud and/or the origins of, and treatments for, COVID-19. Defendant Dorsey admitted

10  in congressional testimony that Twitter "shared information" and "sought input" from the

11  government to "inform [Twitter's] enforcement decisions." The government, for its part, overtly

12  incentivized social media to coordinate the censorship of disfavored speech. And the White

13  House admitted that social medial platforms respond to political pressure by ramping up their

14  "enforcement" efforts. *See supra* at 5. These allegations would survive a Rule 12(b)(6) challenge

15  even under the more rigorous standard applied to antitrust conspiracy claims. *Twombly*, 550 U.S.

16  at 556.

17       **F.    Plaintiffs Have Standing to Challenge the Constitutionality of Section 230.**

18       Defendants argue that (i) Plaintiffs lack standing to claim that Section 230 is

19  unconstitutional, and (ii) the statute is not unconstitutional. MTD at 12-13. The second argument

20  raises a purely merits issue that should not be adjudicated on this record. As to the first, Plaintiffs

21  have standing to challenge Section 230 as applied because it has been used to enable government-

22  sponsored censorship of Plaintiffs' speech. Section 230 immunity confers an immensely valuable

23  benefit on Defendants, with concomitant harm to Plaintiffs. The government's repeated threats to

24  repeal the immunity if social media companies don't toe the line is a sword overhanging

25  Defendants' heads, and the weapon government wields to enforce their compliance. The statute

26  affords the government leverage to promulgate viewpoint discrimination via its social media

27  partners. Plaintiffs have standing to challenge Section 230 because, as manifested by the

28  statements made in congressional hearings and by the White House, the possibility of repeal has

1  been explicitly used by state actors as a mechanism to compel censorship of Plaintiffs' speech.

2  Defendants banned former President Trump and speakers who support his views from the Twitter

3  platform in direct response to these threats.  The ban will remain in place so long as Section 230

4  remains as a cudgel government actors can use to menace social media companies.  That is

5  sufficient causation and injury to confer standing on Plaintiffs to bring this claim.  *Lujan v.*

6  *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (for standing, plaintiff must show injury in

7  fact, causal connection between injury and the conduct complained of, and likelihood that injury

8  will be redressed by a favorable decision).

9      Beyond that, social media companies repeatedly have availed themselves of Section 230

10  to escape liability for blocking speech on their online platforms.[16]  Defendants have carefully

11  avoided raising Section 230(c) as a defense in this case *thus far* but, if their motion to dismiss is

12  unsuccessful, they doubtless will do the same here.  This ploy—initially refraining from raising

13  the statutory immunity so as to be able to challenge standing—is a classic Catch-22.  Should the

14  Court determine that Plaintiffs lack standing in the present circumstances, Plaintiffs respectfully

15  request that the Court hold the motion to dismiss Count II in abeyance until after Defendants have

16  pleaded their affirmative defenses.[17]

17      **G.    Plaintiffs' Claims Under Florida Law Are Viable.**

18          **1.    The Choice of Law Provision Does Not Foreclose the FDUTPA Claim.**

19      A choice-of-law provision will not be enforced when it is contrary to the fundamental

20  policy of another state.  *In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp.3d

21  1155 (N.D. Cal. 2016) (holding Illinois' biometric law reflected state policy that "will suffer a

22  complete negation . . . if California law is applied").  Thus enforcement of the choice-of-law

23

---

24  [16] *See, e.g., Doe v. Twitter*, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021); *Federal Agency of News LLC v. Facebook, Inc.*, 395 F.Supp.3d 1295 (N.D. Cal. 2019); *Pennie v. Twitter, Inc.*, 281

25  F.Supp.3d 874 (N.D. Cal. 2017); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F.Supp.3d 1088 (N.D. Cal. 2015).

26  [17] The Court has authority to hold this portion of the motion to dismiss in abeyance until it

27  becomes clear whether Defendants intend to raise Section 230 as a defense in this case.  *Callahan v. Equifax Information Services LLC*, 2013 WL 4425852, at *1 (N.D. Cal. Aug. 15, 2013); *Tuttle*

28  *v. Sky Bell Asset Management, LLC*, 2011 WL 2224535, at *3 (N.D. Cal. June 8, 2011).

---

1    provision does not depend on Twitter's Terms of Service ("TOS"), but whether—as it does—

2    Florida has a fundamental policy at odds with California's Unfair Competition Law ("UCL").

3    Unlike California, Florida's legislature designed FDUTPA so that injunctive relief could be

4    obtained without financial injury. Fla. Stat. § 501.211(a); *Ahern v. Mayo Clinic*, 180 So.3d 165,

5    172 (1st DCA 2015). Under the UCL, a plaintiff is required to show that he "has lost money . . .

6    as a result of the unfair competition." Cal. Bus. & Prof. Code §§ 17204. As the UCL's narrow

7    standing requirements undermine Florida's policy allowing any aggrieved person to seek

8    injunctive relief, the choice of law provision should be rejected.[18]

9            **2.      Defendants' Failure to Disclose Material Information Is Actionable.**

10    Defendants have violated their own TOS and deceived users by failing to disclose that

11    they put a "thumb on the scale" in determining what content to remove. FAC ¶¶ 10, 55, 217.

12    This failure to disclose is a material omission under FDUTPA. In *Caribbean Cruise Line, Inc. v.*

13    *Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164. 167 (4th DCA 2015), plaintiff

14    alleged that the local BBB chapter posted deceptive information to its website about the criteria

15    used to grade businesses. The court held that this allegation properly established a deception by

16    omission claim under FDUTPA. Defendants claim that their TOS give them the flexibility to

17    enforce, or not, their announced standards for moderation, and that they may use undisclosed

18    standards. MTD at 16. This goes directly to the harms addressed in *Caribbean* by demonstrating

19    that the standard for moderation is the caprice and whim of Defendants, not the announced

20    standards relied on by users. Plaintiffs have been aggrieved in that they expected Defendants'

21    platform to apply their stated policies, and not moderate content to block disfavored political

22    views. FAC ¶ 219. Had Plaintiffs and other members of the class known that Defendants'

23    "standard" for moderation was political, they would not have engaged with the platform.[19]

24    _____

25    [18] To the extent Defendants' motion concedes that Plaintiffs have standing under the UCL, Plaintiffs have pleaded a UCL claim for injunctive relief for deceptive omissions. *See Lavigne v.*

26    *Herbalife, Ltd.* 2019 WL 6721619, at \*11 (C.D. Cal. Oct. 22, 2019) ("Where California and not Florida law applies … the court may consider the [FDUTPA] claim ... under California's …

27    Unfair Competition Law").

[19] Defendants incorrectly claim that FDUTPA would require perfect uniformity and consistency

28    in applying their TOS. Count III is not based on a failure to apply the TOS in any particular

### 3.　Plaintiffs' Allegations in Count IV Are Sufficient.

Florida's Stop Social Media Censorship Act ("SSMCA") requires subject companies to publish the standards by which they censor, deplatform, or shadow ban a user, and that they apply their standards in a consistent manner.  F.S. § 501.2041(2)(a) & (b).  The SSMCA does not impose any requirement on Defendants as to what content they may censor, deplatform, or shadow ban; it merely requires disclosure and consistency if they do so.  A plaintiff under the SSMCA only needs to be a user of the service, not the party affected by the inconsistent treatment; accordingly Plaintiffs' claims are not based on Defendants' treatment of them, but Defendants' failure to consistently apply their standards after the effective date.  FAC ¶¶ 213-216.  Such disclosure requirements, designed to combat deceptive practices, have long been held to be consistent with First Amendment protections.  *See Central Hudson v. Public Service Comm'n*, 447 U.S. 557, 563 (1980); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650-651 (1985).  Defendants assert that the phrase "consistent manner" is unconstitutionally vague, but the "consistent manner" at issue is the Defendants' application of their own standards.  The SSMCA is housed within FDUTPA, which itself is patterned on the Federal Trade Commission Act ("FTCA").  "Unfairness" as used under the FTCA has survived constitutional scrutiny for more than a century.  *Fed. Trade Comm'n v. Gratz*, 253 U.S. 421 (1920).  If "unfair" activity is not impermissibly vague, then certainly "consistent manner" provides fair notice as to what conduct runs afoul of the law.[20]  Finally, any constitutional infirmity in other provisions is immaterial as the SSMCA contains a severability clause.  Senate Bill 7072, § 6.

### 4.　The First Amendment Is Not a Defense to FDUTPA.

Defendants argue that they may moderate content as they see fit, citing *Miami Herald v. Tornillo*, 418 U.S. 241 (1974).  The facts here could not be more different.  *Tornillo* rested on the

---

(… cont'd)

manner; it is based on Defendants' failure to disclose a material aspect of the TOS—political favoritism.

[20] Defendants reference a recent decision affecting the SSMCA, *Netchoice v. Moody*, 2021 WL 2690876, at *11 (N.D. Fla. June 30, 2021).  That order is directed only to government actors.  As to vagueness, the court stated that the "order need not and does not decide whether vagueness would provide an independent ground for a preliminary injunction."

---

SER108

fact that a statute imposed an obligation on the *Herald* to carry content that could be contrary to the *Herald's* own positions. *Id*. at 256-58. Some 500 million Tweets are hosted by Twitter each day. FAC ¶ 2. This sheer volume of material rebuts any claim that Defendants have a carefully curated institutional message that would be upset by Plaintiffs' Tweets. In any event, this concern could be accommodated easily by affixing a disclaimer to the content. *See Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980); *Prager*, 951 F.3d 991. Defendants make the spurious claim that the FDUTPA consumer protections standards are content-based regulations; they overlook that the only regulations at issue are their very own TOS. Plaintiffs merely seek to have Defendants say what they mean and mean what they say; they do not ask this Court impose a standard for content appearing on the Twitter platform.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully submit that the motion to dismiss should be denied. In the event of dismissal, justice requires that leave to amend be granted.[21]

Dated: January 10, 2022         Respectfully submitted,

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI, P.C.

By:    */s/ Marie L. Fiala*
          Marie L. Fiala


JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

---

[21] *See Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008). None of the factors that would militate against granting leave to amend exist here. *Howey v. U.S.*, 481 F.2d 1187, 1190 (9th Cir. 1973) (factors include undue delay, bad faith, futility of amendment, and prejudice to opposing party).

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

RICHARD POLK LAWSON (*pro hac vice*)
GARDNER BREWER MARTINEZ
MONFORT
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com

*Attorneys for Plaintiffs*

SER110

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DONALD J. TRUMP, et al.,

        Plaintiffs,

      v.

TWITTER INC., et al.,

        Defendants.

Case No. 3:21-cv-08378-JD

**ORDER TO SHOW CAUSE**

      Plaintiffs Naomi Wolf, former President Donald J. Trump, four other individuals, and the American Conservative Union, sued Twitter on behalf of themselves and a putative class of Twitter users for being "de-platformed" and "censored." Dkt. No. 21 ¶¶ 8, 18. Plaintiffs alleged First Amendment claims in connection with a state action theory of liability. The Court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) with leave to amend. Dkt. No. 165. Plaintiffs elected not to amend, and judgment was entered against them. Dkt. No. 168.

      Plaintiffs filed an appeal in the Ninth Circuit. Dkt. No. 169. Although the appeal is pending, Wolf has asked the Court for an "indicative ruling" under Federal Rule of Civil Procedure 62.1 on whether the Court would set aside the judgment under Rule 60(b)(2) in light of newly discovered evidence. Dkt. No. 176.

      Wolf's request raises a question of mootness as a threshold matter. To start, the Rule 62.1 motion is procedurally sound. "The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam). But even when an appeal is pending, a party may seek relief from a final judgment or order by filing a Rule 60(b) motion in the district court with a request for an indicative ruling on the motion under Rule 62.1. The district court may: "(1) defer

United States District Court
Northern District of California

considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a).

The salient question is whether Wolf's claims are moot in light of recent, well-publicized changes in Twitter's operations and policies. "[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002). "An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002). A matter is moot if at any time during the course of litigation, the plaintiff ceases to be threatened with or suffer "an actual injury [that is] traceable to the defendant," and that is "likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation and citation omitted).

Publicly available information suggests that circumstances may have changed with respect to Wolf's claims and Twitter's current practices. Consequently, Wolf is directed to show cause in writing why her claims present a live controversy, and whether her request for an injunction, which is the main remedy she seeks, is tenable. A response is due by January 23, 2023.

**IT IS SO ORDERED.**

Dated: January 4, 2023

_____
JAMES DONATO
United States District Judge

SER112

JOHN W. HOWARD (SBN 80200)
MICHELLE D. VOLK (SBN 217151)
JW Howard/ Attorneys, Ltd.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel (619) 234-2842; Fax (619) 234-1716
Email: johnh@jwhowardattorneys.com
        michelle@jwhowardattorneys.com

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

Attorneys for Plaintiff,
DR. NAOMI WOLF

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| DONALD J. TRUMP, et al., | Case No. 3:21-cv-08378-JD |
|---|---|
| Plaintiffs, | Hon. James Donato |
| vs. | |
| TWITTER, INC., et al., | **RESPONSE TO ORDER TO SHOW CAUSE REGARDING PLAINTIFF NAOMI WOLF'S MOTION FOR AN INDICATIVE RULING UNDER RULE 60 OF THE FRCP** |
| Defendants. | |
| | Action Filed: July 7. 2021 |

///

///

///

///

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Dr. Naomi Wolf submits the following response to the Order to Show Cause the Court issued regarding Dr. Wolf's motion for an indicative ruling under Rule 60 of the Federal Rules of Civil Procedure.

The OSC suggests that Dr. Wolf's claims may have become moot given the sale of Twitter to Elon Musk. Mr. Musk has made many changes to Twitter's policies, including restoring the accounts that belonged to people like Drs. Robert Malone and Peter McCullough who were previously banned, and he has opened Twitter's internal files to reporters to show how former Twitter employees worked with the federal government, including public health and intelligence officials, to silence people who disagreed with the government's position on certain issues, including Covid-19. Declaration of Dr. Naomi Wolf, dated Jan. 9, 2023 ("Wolf Decl."), ¶ 2.

"Mootness is the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1509 (9th Cir.1994) (cleaned up). But neither that principle nor the recent developments at Twitter justify dismissal of Dr. Wolf's First Amendment claim as moot.

*First*, the amended complaint did not only seek injunctive relief restoring Dr. Wolf's Twitter account. It also sought compensatory damages. ECF 21 (¶¶ 40.) The prayer for relief specifically requested "[a]n award of Compensatory and Punitive damages to the Plaintiff and the Class in an amount to be determined at trial …." *Id.* The complaint also included detailed allegations about the harm that Dr. Wolf suffered because of Twitter's unconstitutional actions. *Id.* (¶¶ 156-167). And it claimed that, "[a]s a result of Defendants' actions, Dr. Wolf has lost over half of her business model, investors in her business, and other sources of income." *Id.* (¶ 167). These allegations matter because a claim for damages precludes dismissal of a case on mootness grounds. *See Wilson v. State of Nev.*, 666 F.2d 378, 381 (9th Cir. 1982).

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

This principle reflects the general rule that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979).

That rule applies here. The amended complaint did not identify the amount of monetary damages Dr. Wolf suffered because of Twitter's actions but they exceed $1 million. Wolf Decl. ¶ 5. The amount does not matter, though, as "[a] live claim for [even] nominal damages will prevent dismissal for mootness." *Bernhardt v. City of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002). "This is true even where related claims for injunctive relief and compensatory damages have been rendered moot." *Durst v. Oregon Educ. Ass'n*, 450 F. Supp. 3d 1085, 1089 (D. Or. 2020) (citing cases).

The exceptions to this rule do not apply here. The Supreme Court has held that a case is moot, despite the general rule discussed above, if the defendant voluntarily ceases its allegedly unlawful conduct and the Court determines that "(1) the alleged violation will not recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation …." *Id.* (citing *Davis*, 440 U.S. at 632). That has not happened. Twitter has not compensated Dr. Wolf for the monetary damages she suffered because of its action; it has not even offered to do that (although it did for others). Wolf Decl. ¶¶ 3-4. It has not even restored her account: Dr. Wolf continues to get locked out of her verified Twitter account and she is often re-directed to an account she did not create, and which has virtually no reach. *Id.* ¶ 3.

For that reason, Dr. Wolf's claims for prospective relief should also proceed, as the harm she suffered due to Twitter's action is capable of repetition yet evading review. *See Stott Outdoor Advert. v. Cnty. of Monterey*, 601 F. Supp. 2d 1143, 1151 (N.D. Cal. 2009) (discussing this doctrine). This case is not like those, including *Stott*, in which a governmental body changed the law to ensure that the harm the plaintiff suffered does not happen again. *See id.* (explaining that it would be impossible for plaintiff to suffer harm based on government's exercise of discretion because "new

RESPONSE TO OSC RE MOTION FOR INDICATIVE RULING     CASE NO. 20-CV-09300-AGT

**SER115**

1  billboards will be prohibited as a matter of local law rather than as a matter of

2  discretion"). Despite Mr. Musk's purchase and effort to change Twitter's policies, Dr.

3  Wolf continues to be censored, sometimes for short periods of time and, in her belief,

4  at the direction of government officials who wish to silence her.

5       Therefore, Dr. Wolf's First Amendment claim is not moot, and she respectfully

6  requests that the Court indicate that it would consider her motion for relief under Rule

7  60. In the alternative, if the Court concludes that her claim is moot, Dr. Wolf asks that

8  the Court indicate that it would grant her relief under Rule 60 and modify the

9  judgment—at least as to her—to base its dismissal order solely on the mootness

10  doctrine.

11

12  DATED:  January 11, 2023        JW HOWARD/ATTORNEYS, LTD.

13

14

15

16                        By:  _____

17                           Scott J. Street
                           Attorneys for Plaintiff,
18                           DR. NAOMI WOLF

19

20

21

22

23

24

25

26

27

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

## PROOF OF SERVICE

I, the undersigned, do declare that I am employed in the county aforesaid, that I am over the age of [18] years and not a party to the within entitled action; and that I am executing this proof at the direction of the member of the bar of the above entitled Court. The business address is:

JW Howard Attorneys LTD
600 West Broadway, Suite 1400
San Diego, California 92101

☐   MAIL. I am readily familiar with the business' practice for collection and processing of correspondence for mailing via the United States Postal Service and that the correspondence would be deposited with the United States Postal Service for collections that same day.

■   ELECTRONIC. I am readily familiar with the business' practice for collection and processing of documents via electronic system and said documents were successfully transmitted via Court's transmission that same day.

On the date indicated below, I served the within:

## RESPONSE TO ORDER TO SHOW CAUSE REGARDING PLAINTIFF NAOMI WOLF'S MOTION FOR AN INDICATIVE RULING UNDER RULE 60 OF THE FRCP

TO:

| | |
|---|---|
| John P. Coale: johnpcoale@aol.com | Peter W. Homer: PHomer@homerbonner.com |
| Andrei Dan Popovici: andrei@apatent.com | Ari Holtzblatt: ari.holtzblatt@wilmerhale.com |
| Frank C. Dudenhefer, Jr.: fedlaw@aol.com | Felicia Ellsworth: felicia.ellsworth@wilmerhale.com |
| John Q. Kelly: jqkelly@ibolaw.com | Patrick J. Carome: Patrick.carome@wilmerhale.com |
| Marie L. Fiala: marie@apatent.com | Thomas G. Sprankling: Thomas.sprankling@wilmerhale.com |
| Michael J. Jones: mjones@ibolaw.com | Joshua Kolsky: Joshua.kolsky@usdoj.gov |
| Richard Polk Lawson: rlawson@gardnerbrewer.com | Indraneel Sur: indraneel.sur@usdoj.gov |
| Rowland A. Paul: rpaul@ibolaw.com | |

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and was *EXECUTED* on January 11, 2023, at San Diego, CA.

_____/s/ Dayna Dang_____
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com

JOHN W. HOWARD (SBN 80200)
MICHELLE D. VOLK (SBN 217151)
JW Howard/ Attorneys, Ltd.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel (619) 234-2842; Fax (619) 234-1716
Email: johnh@jwhowardattorneys.com
      michellev@jwhowardattorneys.com

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

Attorneys for Plaintiff
DR. NAOMI WOLF

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD J. TRUMP, et al., | Case No. 3:21-cv-08378-JD |
| Plaintiffs, | Hon. James Donato |
| vs. | |
| TWITTER, INC., et al., | **DECLARATION OF DR. NAOMI WOLF** |
| Defendants. | |
| | Action Filed: July 7. 2021 |

///
///
///
///
///

1

**SER118**

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# DECLARATION OF NAOMI WOLF

I, Dr. Naomi Wolf, declare as follows:

1.      I am over the age of 18 and a plaintiff in this action. I am submitting this declaration in response to the Order to Show Cause the Court issued regarding my motion for an indicative ruling under Rule 60 of the Federal Rules of Civil Procedure. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so.

2.      The OSC suggests that my claims may have become moot given the sale of Twitter to Elon Musk. Mr. Musk has made many changes to Twitter's policies, including restoring the accounts that belonged to people like Drs. Robert Malone and Peter McCullough, and he has opened Twitter's internal files to reporters to show how former Twitter employees worked with the federal government, including public health and intelligence officials, to silence people who disagreed with the government's position on certain issues, including Covid-19.

3.      Those changes have not affected me yet. I am the CEO of a digital platform and therefore recognize that there are many ways to silence a user via changes to the back end that limit the user's range and access but without utilizing the more obvious methods of suspension and de-platforming. Those methods appear to have been used in my case. For example, although I was told that my account had been reopened, I am usually re-directed to an account in my name that I did not create and which has virtually no followers. Posts that I make to 179,000 followers often receive no response. Occasionally, I am unable to post to the verified, blue-check account that I used before Twitter suspended me and which had 150,000 followers. At times I am not allowed to log in at all.

4.      Moreover, news outlets continue to report that Twitter banned me for spreading false information. As recently as December 6, 2021, the *Yale Daily News* published an article that (falsely) referred to me being removed from Twitter for

DECLARATION OF DR. NAOMI WOLF                                    CASE NO. 20-CV-09300-AGT

**SER119**

spreading misinformation. Twitter has not corrected the record or apologized to me for its actions, although the company did apologize to and correct the record for Alex Berenson, another journalist who was improperly suspended from Twitter and who sued in response. Mr. Berenson used his public settlement with Twitter to repair some of the damage that had been done to his career. Unless and until Twitter does the same for me, I will continue to seek relief in the courts.

5.     I have also suffered significant financial harm, at least $1 million, because of Twitter's actions. I am seeking to recover monetary damages related to that harm in this lawsuit.

Under penalty of perjury, under the laws of the United States of America, I declare that the foregoing is true and correct. Executed this 9th day of January 2023, at Santa Barbara, California.

_____
Dr. Naomi Wolf

DECLARATION OF DR. NAOMI WOLF

CASE NO. 20-CV-09300-AGT

**SER120**

**PROOF OF SERVICE**

I, the undersigned, do declare that I am employed in the county aforesaid, that I am over the age of [18] years and not a party to the within entitled action; and that I am executing this proof at the direction of the member of the bar of the above entitled Court. The business address is:

JW Howard Attorneys LTD
600 West Broadway, Suite 1400
San Diego, California 92101

☐       MAIL. I am readily familiar with the business' practice for collection and processing of correspondence for mailing via the United States Postal Service and that the correspondence would be deposited with the United States Postal Service for collections that same day.

■       ELECTRONIC. I am readily familiar with the business' practice for collection and processing of documents via electronic system and said documents were successfully transmitted via Court's transmission that same day.

On the date indicated below, I served the within:

**DECLARATION OF DR. NAOMI WOLF**

TO:

| | |
|---|---|
| John P. Coale: johnpcoale@aol.com | Peter W. Homer: PHomer@homerbonner.com |
| Andrei Dan Popovici: andrei@apatent.com | Ari Holtzblatt: ari.holtzblatt@wilmerhale.com |
| Frank C. Dudenhefer, Jr.: fedlaw@aol.com | Felicia Ellsworth: felicia.ellsworth@wilmerhale.com |
| John Q. Kelly: jqkelly@ibolaw.com | Patrick J. Carome: Patrick.carome@wilmerhale.com |
| Marie L. Fiala: marie@apatent.com | Thomas G. Sprankling: Thomas.sprankling@wilmerhale.com |
| Michael J. Jones: mjones@ibolaw.com | Joshua Kolsky: Joshua.kolsky@usdoj.gov |
| Richard Polk Lawson: rlawson@gardnerbrewer.com | Indraneel Sur: indraneel.sur@usdoj.gov |
| Rowland A. Paul: rpaul@ibolaw.com | |

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and was **EXECUTED** on January 11, 2023, at San Diego, CA.

_____/s/ Dayna Dang_____
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com

4

DECLARATION OF DR. NAOMI WOLF                                    CASE NO. 20-CV-09300-AGT

**SER121**

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, D.C. 200037
Telephone: (202) 663-6000
Facsimile:  (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile: (650) 858-6100

*Attorneys for Defendants Twitter, Inc.
  and Jack Dorsey*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DONALD J. TRUMP, et al., | Case No. 21-cv-08378-JD |
| Plaintiffs, | **DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE REGARDING PLAINTIFF NAOMI WOLF'S MOTION FOR AN INDICATIVE RULING** |
| v. | |
| TWITTER, INC., et al., | |
| Defendants. | |

**SER122**

# TABLE OF CONTENTS

I.   Wolf's Demands For Injunctive Relief Are Moot ................................................................. 1

II.  No Cause Of Action Permits Wolf To Pursue Damages Under For Purported First
     Amendment Violations ........................................................................................................ 5

CONCLUSION ............................................................................................................................... 6

**SER123**

This Court has ordered the parties to address whether Plaintiff Naomi Wolf's First Amendment claim—and her request for injunctive relief, in particular—is moot "in light of recent, well-publicized changes in Twitter's operations and policies." Dkts. 185, 187. In November 2022, Twitter announced that it is "no longer enforcing the COVID-19 misleading information policy," Holtzblatt Decl. Ex. 3—the policy that Ms. Wolf claims Twitter had previously enforced against her, *see* Dkt. 176 at 3, 5. Then, on November 24, 2022, Twitter announced a general amnesty to reinstate certain previously suspended accounts. Holtzblatt Decl. Ex. A. Pursuant to that general amnesty, Twitter reinstated Ms. Wolf's Twitter account on December 16, 2022. *See* Sebhatu Decl. ¶ 3. Since then, Wolf has used her Twitter account extensively. Holtzblatt Decl. Ex. B. By delivering the relief that she had sought, Twitter's policy announcements and reinstatement of Wolf's account has indeed mooted her demands for injunctive relief. And although this did not moot Wolf's demands for damages, intervening decisions from the U.S. Supreme Court and the Ninth Circuit make clear that she cannot rely on *Bivens* (as she must) to obtain such damages. These recent developments thus provide additional reasons beyond those set forth in Twitter's prior briefing (*see* Dkt. 181) to deny Wolf's motion for an indicative ruling.

## I. WOLF'S DEMANDS FOR INJUNCTIVE RELIEF ARE MOOT

A matter is moot if during the course of litigation, the plaintiff ceases to be threatened with or suffer "an actual injury [that is] traceable to the defendant," and that is "likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). Intervening events, such as changes in policies that gave rise to the alleged harm, may moot a claim for injunctive relief. *Brach v. Newsom*, 38 F.4th 6, 11 (9th Cir. 2022), *petition for cert. docketed,* No. 22-250 (U.S. Sept. 16, 2022). The plaintiff must establish the existence of a "case or controversy for each form of relief sought." *Moyle v. Cnty. of Contra Costa*, 2007 WL 4287315, at *12 (N.D. Cal. Dec. 5, 2007) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

Wolf's demands for injunctive relief are moot because she has already obtained the relief she sought. In the Amended Complaint, Wolf sought an "injunction … ordering Twitter to immediately reinstate [her] Twitter account[]." Am. Compl. at 56, Dkt. 21. Twitter has now done so, and Wolf is Tweeting prolifically. *See* Sebhatu Decl. ¶ 3; Holtzblatt Decl. C; *see also* Wolf Decl. ¶ 3, Dkt. 186-1 (acknowledging that she has been "told that my account had been reopened"). Wolf also sought "an

injunction ordering Twitter to remove its warning labels and misclassification of all [her] content and to desist from any further warnings or classifications." Am. Compl. at 56. Twitter has now announced that it is "no longer enforcing the COVID-19 misleading information policy," Holtzblatt Decl. Ex. C, that Wolf has claimed Twitter enforced against her, *see* Dkt. 176 at 3, 5. And since being reinstated, Twitter has affixed no labels to Wolf's Tweets and has not enforced any of its content moderation rules against her account. *See* Sebhatu Decl. ¶ 3. Wolf herself identifies no examples since her reinstatement of Twitter labeling or restricting her account for violations of any Twitter policy. *See* Wolf Decl. ¶¶ 1-5. Because Wolf sought no other forms of injunctive relief on her First Amendment claim, her demands for injunctive relief are now moot.[1]

No exception to mootness preserves this Court's jurisdiction over Wolf's demands for injunctive relief. Wolf contends (at 3) that her request for an injunction remains live under the voluntary cessation doctrine, which dictates that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Brach,* 38 F.4th at 12. The Ninth Circuit has made clear, however, that "for this exception to apply, the defendant's voluntary cessation must have arisen because of the litigation." *Pub. Utils. Comm'n of State of Cal. v. FERC,* 100 F.3d 1451, 1460 (9th Cir. 1996); *accord Nickler v. Cnty. of Clark*, 2021 WL 3057063, at *1 (9th Cir. 2021). When the defendant's cessation is "motivated by economic/business considerations, [and] not this litigation," the voluntary cessation exception is inapplicable. *Id.*

Here, Twitter's announcement regarding its COVID-19 misinformation policy and Twitter's reinstatement of Wolf's account was motivated by "economic/business considerations." *See FERC*, 100

---

[1] Wolf argues that her claim is not moot because Twitter has not issued a "public apology" for suspending her account. Wolf Decl. ¶ 4. But Wolf did not request an apology from Twitter in the Amended Complaint. *See* Am. Compl. at 56. The Amended Complaint also sought an "injunction imposing a monitor to ensure Defendants' compliance with this Court's Order consistently to apply Defendants' own standards, and only apply Defendants' published standards when evaluating content on its platform," Am. Compl. at 56, but that relief is relevant to only Plaintiffs' two Florida state law claims, *id.* ¶¶220-234. Wolf is not entitled to assert either of those claims because she is not a Florida resident. Am. Compl. ¶¶20, 23-24. Wolf has never disputed that she cannot assert any claim under either FDUTPA or SSMCA. *See* Dkt. 138, Twitter's Mot. to Dismiss at 15, 19; Dkt. 145, Plaintiffs' Opp. at 22-25. Presumably for that reason, Wolf does not address this Court's dismissal of the state law claims on appeal, *see* Opening Br., No. 22-15961 (9th Cir. Nov. 14, 2022), Dkt. 35, and is not now seeking an indicative ruling on those claims, *see* Dkts. 176, 182 (addressing only First Amendment claim).

**SER125**

F.3d at 1460.  On October 27, 2022, Twitter was acquired by X Holdings I, Inc., a corporation majority-owned and controlled by Elon R. Musk.  *See* Twitter, Inc., Amendment No. 13 to Schedule 13D (Form SC 13D/A) (Oct. 27, 2022) https://tinyurl.com/mr4aspek.  As Wolf concedes, "Mr. Musk has made many changes to Twitter's policies."  Wolf Decl. ¶ 2.  One of those changes is Twitter's announcement that it is "no longer enforcing the COVID-19 misleading information policy."  Holtzblatt Decl. Ex. C.  Instead, Community Notes allow users to collaboratively add context to potentially misleading Tweets.  Holtzblatt Decl. Ex. D.  Another new policy is the "general amnesty," Holtzblatt Decl. Ex. A, that led Twitter to reinstate Wolf's account.  Sebhatu Decl. ¶ 3.  Twitter's announcement regarding its COVID-19 misinformation policy and Wolf's reinstatement thus reflect a different business vision articulated by the company's new ownership—a quintessential business change.  *See In re Hain Celestial Seasonings Prods. Consumer Litig.*, 2017 WL 11633199, at *3 (C.D. Cal. June 20, 2017) (holding that voluntary cessation exception did not apply to false advertising claim when company ceased using allegedly false "100% Natural" labels on products for "marketing reasons"); *see also Certified Nutraceuticals, Inc. v. Clorox Co.*, No. 3:18-CV-744-W-KSC, 2022 WL 2803118, at *6 (S.D. Cal. July 18, 2022) (voluntary cessation exception did not apply when company ceased challenged conduct to engage in "uniform messaging across their product profile" and to take an approach that would "resonate better with consumers").

Twitter's litigation conduct only underscores the point:  Twitter vigorously defended against Wolf's suit and refused to reinstate Wolf for nearly eighteen months, Dkt. 138, 139, 181, announcing a new approach to its COVID-19 misinformation policy and a "general amnesty" and reinstating Wolf's account only after the change in ownership.  This timing makes clear that new ownership was the "motivating force" behind these changes, and not a strategic attempt to evade judicial review.  *See Hamidi v. Serv. Emps. Int'l Union Loc. 1000*, 386 F. Supp. 3d 1289, 1295–96 (E.D. Cal. 2019) (holding that the "timing" of the government's cessation of allegedly unconstitutional conduct indicated that it was motivated by an intervening Supreme Court decision and not the plaintiff's suit, when the government "vigorously defended against th[e] lawsuit" until the Supreme Court's decision), *aff'd*, No. 19-17442, 2021 WL 4958855 (9th Cir. Oct. 26, 2021), *appeal filed*, No. 22-55752 (9th Cir. Aug. 10, 2022).

Despite acknowledging the "many changes" to Twitter's policies, Wolf suggests that her demand for an injunction remains live because she is "[o]ccasionally" unable to post or access her account and her

**SER126**

Tweets purportedly do not always receive the engagement she expects.  Wolf Decl. ¶¶ 2, 3.  It is not at all clear what Wolf believes Twitter is doing to her account.  As noted, she identifies no examples of Twitter labeling or restricting her account for violations of any Twitter policy.  Beyond that, Wolf did not—and could not—seek to prevent Twitter from ever taking any action with respect to her account.  She sought to reverse a specific decision under a specific content moderation policy that she claimed had been prompted by government interference and to prevent Twitter from succumbing to such government interference in moderating her account in the future.  Thus, to avoid mootness, Wolf must show that whatever Twitter is supposedly doing to her account is traceable to the *government*.  *See Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1293, 1295-97 (9th Cir. 1987) (noting that once the prosecutor's threats had been removed a private party may "thereafter decide independently" to make its own decisions, even if similar to those taken previously).  On that critical score, Wolf's declaration is completely silent.  And her brief (at 3) offers only a speculative assertion that "in her belief" Twitter is restricting her account "at the direction of government officials."  That bare and conclusory assertion by litigation counsel, unsupported by any evidence, is too "remote and speculative to serve as a firm foundation for jurisdiction."  *See Brach*, 38 F.4th at 14.

Equally meritless is Wolf's argument (at 4) that her demand for an injunction is not moot because the challenged action is "capable of repetition[,] yet evading review."  That exception applies only where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018).  "[T]he burden for showing a likelihood of recurrence is firmly on the plaintiff."  *Sample v. Johnson*, 771 F.2d 1335, 1342 (9th Cir. 1985).  Wolf satisfies neither requirement.  First, Wolf's suspension is not the kind of action that is "too short to be fully litigated prior to cessation or expiration."  *See Ige*, 881 F.3d at 722.  For a controversy to be "too short to be fully litigated prior to cessation," it must be of "inherently limited duration," *ProtectMarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (citation omitted), such as a permit with a short expiration date, or a term-limited appointment, 13C Fed. Prac. & Proc. Juris. § 3533.8 (3d ed.).  The limited duration of the controversy must be "clear at the action's inception."  *Bowen*, 752 F.3d at 836.  Nothing about Wolf's suspension indicated it was temporary at this lawsuit's inception, and Wolf does not attempt to argue

**SER127**

otherwise, Wolf. Br. 2-4. Second, Wolf has not shown any reasonable expectation that actions by the government will lead Twitter to suspend her in the future. "The mere power to reenact a challenged policy is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists. Rather, there must be evidence indicating that the challenged policy likely will be reenacted." *Brach*, 38 F.4th at 14 (9th Cir.) (internal citation and alterations omitted). As explained, the amnesty that led to Wolf's reinstatement plainly reflected a new policy by new management, and Wolf has offered only vague speculation to support her "belief" that Twitter is restricting her account "at the direction of government officials." *See* Wolf Br. at 4.

## II. NO CAUSE OF ACTION PERMITS WOLF TO PURSUE DAMAGES FOR PURPORTED FIRST AMENDMENT VIOLATIONS

Wolf's primary contention is that her First Amendment claim is not moot because she also sought to recover damages for the alleged violation of her constitutional rights as a result of influence by federal officials over Twitter's decisions. *See* Wolf Br. 2-3; *see also* Am. Compl. at 56. Although Wolf's demand for damages is not moot, that cannot preserve a live controversy here. No statute authorizes Wolf to pursue damages for such alleged violations of her constitutional rights. Any claim for damages must instead rely on an implied caused of action under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). But intervening decisions from the U.S. Supreme Court and the Ninth Circuit make clear that Wolf cannot rely on *Bivens* to recover damages against Twitter. *See Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (affirming dismissal when a plaintiff's claim for injunctive relief was moot and he was not entitled to damages).

*Bivens* impliedly created a "cause of action under the Fourth Amendment" for damages against certain federal officers. 403 U.S. at 397. At the time Twitter filed its motion to dismiss the claims in this case, the Ninth Circuit had extended *Bivens* to similarly fashion a damages remedy under the First Amendment. *See Boule v. Egbert*, 998 F.3d 370 (9th Cir. 2021), *rev'd*, 142 S. Ct. 1793 (2022). In *Egbert v. Boule*, however, the Supreme Court reversed the Ninth Circuit and held for the first time that there is no *Bivens* cause of action for First Amendment claims. *See* 142 S. Ct. at 1797. *Egbert* thus bars Wolf from relying on *Bivens* to pursue damages on her First Amendment claim. Further, the Supreme Court's decision in *Correctional Servs. Corp. v. Malesko* establishes that no *Bivens* claim can be asserted against a private

**SER128**

1  "corporate defendant" like Twitter.  *See* 534 U.S. 61, 71 (2001).  Applying these two cases, the Ninth

2  Circuit recently held that *Egbert* and *Malesko* "foreclose" a plaintiff from seeking damages against Google

3  and YouTube for alleged First Amendment violations similar to the theory advanced by Wolf here.  *Doe*

4  *v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *3 (9th Cir. Nov. 18, 2022).  Wolf's demand for

5  damages is likewise foreclosed.

6  Twitter did not challenge Wolf's reliance on *Bivens* in its original motion to dismiss or in response

7  to Wolf's motion for indicative ruling because when Twitter filed those submissions Wolf's demand for

8  injunctive relief was not moot, and ordinarily a motion to dismiss can be granted only where a plaintiff is

9  entitled to no forms of relief on that claim.  *See Hernandez v. Cnty. of Monterey*, 70 F. Supp. 3d 963, 969

10  (N.D. Cal. 2014) ("A court may dismiss a claim only if it is clear that no relief could be granted.") (internal

11  quotation marks and citation omitted).  Now, with damages being the only non-moot remedy that Wolf

12  seeks, the unavailability of any *Bivens* remedy serves as an independently sufficient basis for dismissal.

13  Moreover, it would make little sense for this Court or the Ninth Circuit to continue adjudicating the merits

14  of Wolf's First Amendment claim when the claim is clearly doomed to fail under *Egbert*, *Malesko*, and *Doe*.

15  Because Wolf lacks any cause of action to pursue her only remaining form of relief—damages—this Court

16  should deny her motion for an indicative ruling.  *See Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833

17  F.2d 208, 211 (9th Cir. 1987) (Rule 60(b) motion based on newly discovered evidence should only be

18  granted when the evidence would have been "likely to change the disposition of the case").

19  ## CONCLUSION

20  Wolf's claims for injunctive relief are moot, and she lacks a cause of action to pursue damages

21  against Twitter.  This Court should thus deny Wolf's motion for an indicative ruling.

**SER129**

1    Dated: January 27, 2023                Respectfully submitted,

2

3                                           /s/   Ari Holtzblatt
4                                           ARI HOLTZBLATT (*pro hac vice*)
                                            ari.holtzblatt@wilmerhale.com
5                                           WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
6                                           1875 Pennsylvania Avenue, NW
                                            Washington, D.C. 20006
7                                           Telephone:  (202) 663-6000
                                            Facsimile: (202) 663-6363
8

9                                           FELICIA H. ELLSWORTH (*pro hac vice*)
                                            felicia.ellsworth@wilmerhale.com
10                                          WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
11                                          60 State Street
                                            Boston, MA 02109
12                                          Telephone: (617) 526-6000
                                            Facsimile: (617) 526-6000
13

14                                          THOMAS G. SPRANKLING
                                            CA Bar No. 294831
15                                          thomas.sprankling@wilmerhale.com
                                            WILMER CUTLER PICKERING
16                                            HALE AND DORR LLP
                                            2600 El Camino Real, Suite 400
17                                          Palo Alto, CA 94306
                                            Telephone: (650) 858-6062
18                                          Facsimile: (650) 858-6100

19
                                            *Attorneys for Defendants Twitter, Inc.*
20                                            *and Jack Dorsey*

21

22

23

24

25

26

27

28

                                                                          **SER130**

DEFENDANTS' RESPONSE TO ORDER                    7              Case No. 21-cv-08378-JD
TO SHOW CAUSE

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2023 I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of these filings to all registered counsel.

Dated:   January 27, 2023                          By:    /s/  Ari Holtzblatt
                                                                ARI HOLTZBLATT

**SER131**

ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, D.C. 200037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

FELICIA H. ELLSWORTH (*pro hac vice*)
felicia.ellsworth@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

THOMAS G. SPRANKLING
CA Bar No. 294831
thomas.sprankling@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6062
Facsimile: (650) 858-6100

*Attorneys for Defendants Twitter, Inc.
  and Jack Dorsey*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DONALD J. TRUMP, et al., | Case No. 21-cv-08378-JD |
| Plaintiffs, | **DECLARATION OF SHISHAY SEBHATU IN SUPPORT OF DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE REGARDING PLAINTIFF NAOMI WOLF'S MOTION FOR AN INDICATIVE RULING** |
| v. | |
| TWITTER, INC., et al., | |
| Defendants. | |

**SER132**

## DECLARATION OF SHISHAY SEBHATU

I, Shishay Sebhatu, declare as follows:

1.      I am a litigation paralegal at Twitter, Inc. ("Twitter").  Based upon my review of Twitter's business records, which I regularly access in my capacity as a Twitter employee, I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      Twitter permanently suspended Naomi Wolf's Twitter account (@naomirwolf) on June 5, 2021.

3.      On December 16, 2022, Wolf's Twitter account (@naomirwolf) was reinstated pursuant to the amnesty program announced by Elon Musk on November 24, 2022.  Since Wolf's account was reinstated, Twitter has not enforced any of its content moderation policies against her account.

        I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 27th day of January 2023 in Ethiopia.


                              By:         /s/  Shishay Sebhatu
                                          Shishay Sebhatu

## SIGNATURE ATTESTATION

I am the ECF User whose identification and password are being used to file the foregoing. Pursuant to Civil Local Rule 5-1(i), I hereby attest that the other signatories have concurred in this filing.

Dated: January 27, 2023                    By:    /s/ Ari Holtzblatt
                                                   Ari Holtzblatt

**SER134**

1

### CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023 I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of these filings to all registered counsel.

Dated:    January 27, 2023                    By:    /s/   *Ari Holtzblatt*
                                                                     ARI HOLTZBLATT

**SER135**

1   ARI HOLTZBLATT (*pro hac vice*)          FELICIA H. ELLSWORTH (*pro hac vice*)
    ari.holtzblatt@wilmerhale.com           felicia.ellsworth@wilmerhale.com
2   WILMER CUTLER PICKERING                  WILMER CUTLER PICKERING
       HALE AND DORR LLP                        HALE AND DORR LLP
3   2100 Pennsylvania Avenue, NW             60 State Street
    Washington, D.C. 200037                  Boston, MA 02109
4   Telephone: (202) 663-6000                Telephone: (617) 526-6000
    Facsimile:  (202) 663-6363               Facsimile: (617) 526-5000
5

6   THOMAS G. SPRANKLING
    CA Bar No. 294831
7   thomas.sprankling@wilmerhale.com
8   WILMER CUTLER PICKERING
       HALE AND DORR LLP
9   2600 El Camino Real, Suite 400
    Palo Alto, CA 94306
10  Telephone: (650) 858-6062
    Facsimile: (650) 858-6100
11

12  *Attorneys for Defendants Twitter, Inc.
      and Jack Dorsey*

13

14              **UNITED STATES DISTRICT COURT**
15              **NORTHERN DISTRICT OF CALIFORNIA**
                **SAN FRANCISCO DIVISION**
16

17  DONALD J. TRUMP, et al.,              Case No. 21-cv-08378-JD

18                  Plaintiffs,           **DECLARATION OF ARI HOLTZBLATT**
                                          **IN SUPPORT OF DEFENDANTS'**
19         v.                             **RESPONSE TO ORDER TO SHOW**
                                          **CAUSE REGARDING PLAINTIFF**
20  TWITTER, INC., et al.,                **NAOMI WOLF'S MOTION FOR**
                                          **AN INDICATIVE RULING**
21                  Defendants.

22

23

24

25

26

27

28
                                                        **SER136**

DECLARATION OF ARI HOLTZBLATT                          Case No. 21-cv-08378-JD
IN SUPPORT OF DEFENDANTS' RESPONSE

## DECLARATION OF ARI HOLTZBLATT

I, Ari Holtzblatt, declare and state as follows:

1.     I am an attorney licensed to practice law in Washington, D.C. and am one of the counsel of record for Defendants Twitter, Inc. ("Twitter") and Jack Dorsey in this action.  I submit this Declaration in support of Defendants' Response to this Court's Order to Show Cause Dkts. 185, 187.

2.     **Exhibit A** is a true and accurate copy of Elon Musk's Tweet announcing an amnesty for certain suspended accounts, as downloaded on January 26, 2023 from Twitter's website at https://twitter.com/elonmusk/status/1595869526469533701.

3.     **Exhibit B** is a true and accurate copy of recent Tweets posted by Naomi Wolf, as downloaded on January 26, 2023 from Twitter's website at https://twitter.com/naomirwolf.

4.     **Exhibit C** is a true and accurate copy of Twitter's blog post regarding its COVID-19  misleading information policy, as downloaded on January 26, 2023 from Twitter's website at https://blog.twitter.com/en_us/topics/company/2020/covid-19.

5.     **Exhibit D** is a true and accurate copy of Twitter's help center page titled "About Community Notes on Twitter," as downloaded on January 27, 2023 from Twitter's website at https://help.twitter.com/en/using-twitter/community-notes.

    I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 27th day of January 2023 in Washington, D.C.

By:    */s/ Ari Holtzblatt*
             Ari Holtzblatt

**SER137**

1

<u>**CERTIFICATE OF SERVICE**</u>

2

3        I hereby certify that on January 27, 2023 I electronically filed the above document with the Clerk

of the Court using CM/ECF which will send electronic notification of these filings to all registered

4    counsel.

5    Dated:    January 27, 2023                    By:    _/s/  Ari Holtzblatt_____
                                                         ARI HOLTZBLATT
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER138**

# EXHIBIT A

SER139

Case 2:15-cv-01085-JDJ Document 167 589-3 Filed 01/27/23 Page 2 of 2



← **Thread**

**Mr. Tweet** ✔ @elonmusk · Nov 23, 2022 ···
Should Twitter offer a general amnesty to suspended accounts, provided that they have not broken the law or engaged in egregious spam?

| Yes | **72.4%** |
| No | 27.6% |

3,162,112 votes · Final results

💬 60.4K   🔁 75.9K   ♡ 263.3K   📊   ⬆

**Mr. Tweet** ✔ ···
@elonmusk

The people have spoken.

Amnesty begins next week.

Vox Populi, Vox Dei.

2:58 PM · Nov 24, 2022

**33.3K** Retweets   **11.6K** Quote Tweets   **292.9K** Likes

💬   🔁   ♡   ⬆

**SER140**

# EXHIBIT B

SER141



SER142



SER143

# Dr Naomi Wolf ✓
443.6K Tweets

**Follow**

Explore

Settings



tl Dr Naomi Wolf Retweeted

**Samael** @luciferumrex · Jan 24 · · ·
Replying to @AllBiteNoBark88

That's Spain,people is asking Pedro Sánchez resignation after he went to Davos and apparently joined the globalist agenda . They are calling him a traitor .

O 17    tl 200    ♡ 1,514    ılı 32.7K    ↑

tl Dr Naomi Wolf Retweeted

**Erik Wedin (Internet Journalism and Lawtube ...** @Aktivar... · Jan 24 · · ·
Replying to @AllBiteNoBark88

Context: Their president is in Davos and they are pissed.

**Jayne Zirkle** @JayneZirkle · Jan 21
WATCH: Thousands gather in Madrid, Spain to protest leftist globalist government and call for Prime Minister Pedro Sanchez's impeachment. Sanchez recently spoke at the World Economic Forum in Davos.

1:18  119.8K views

O 31    tl 1,014    ♡ 3,135    ılı 142.3K    ↑

tl Dr Naomi Wolf Retweeted

**Alberto deZunzunegui** @AdeZunzunegui · Jan 24 · · ·
Replying to @AllBiteNoBark88

CONTEXT: happened in Madrid (Spain), on Sat. January 21st 2023. The demonstration was supported by almost 100 associations and organizations from the civil society under the slogan "For Spain, the democracy and the Constitution" and against the current social-comunist government.

O 4    tl 50    ♡ 269    ılı 16.3K    ↑

tl Dr Naomi Wolf Retweeted

**Junk-eras** @Pablo37577521 · Jan 24 · · ·
Replying to @AllBiteNoBark88

That's Madrid, where I live. MSM and communist government keeps saying we were 31k people.
The truth is that were closer to 500k
@La_SER

O 35    tl 313    ♡ 2,739    ılı 52.3K    ↑

**SER144**



**Dr Naomi Wolf** ✓
146.0K Tweets

# Explore

⚙ Settings

Follow

⇄ Dr Naomi Wolf Retweeted



**Steve Kirsch** ✓ @stkirsch · Jan 25          ···

A new survey (peer-reviewed) was just published January 24, 2023. 13.4% reported **SEVERE** adverse reactions after getting their vaccine. Whoa!!! That's not safe.



infogame.substack.com
New survey finds shockingly high rate of side effects
Both unvaccinated and vaccinated respondents observed significant side effects due to the covid-19 vaccines in their social circles

○ 156      ⇄ 2,755      ♡ 6,182      �ɪl 221.7K      ⬆

⇄ Dr Naomi Wolf Retweeted



**Robert W Malone, MD** ✓ @RWMaloneMD · 18h          ···
New diagnosis codes for COVID-19 immunization status
Just what does ICD code Z28.310: Unvaccinated for COVID-19 mean?

Substack at RWMaloneMD
Please share with any who care about protecting their medical information from prying eyes



rwmalonemd.substack.com
New diagnosis codes for COVID-19 immunization status
Just what does ICD code Z28.310: Unvaccinated for COVID-19 mean?

○ 251      ⇄ 3,141      ♡ 6,029      ɪl 519.4K      ⬆

**SER145**



**Dr Naomi Wolf** ✔
143.6K Tweets

**Follow**

# Explore

⚙ Settings

---

⇄ Dr Naomi Wolf Retweeted


**Steve Kirsch** ✔ @stkirsch · 21h          ···

This article shows that we can assess the likelihood that cardiac injury was created by the vaccine by the presence of spike protein in blood.

Why hasn't Damar Hamlin's blood been tested so we can rule out the vaccine as the cause of his cardiac arrest?


> thefp.com
> The Epidemic of #DiedSuddenly
> Why is the public turning to a single, ominous explanation for tragedies like Damar Hamlin's …

💬 285      ⇄ 1,486      ♡ 5,037      ᶴ 207.9K      ᐱ

---

⇄ Dr Naomi Wolf Retweeted


**Etana Hecht** 🔲 🇺🇸 ✔ @EtanaHechtDC · Jan 25          ···
Replying to @VikiLovesFACS

It's true.

The massive amounts of misinformation that's emerged from the CDC, FDA and white house have created an environment where some parents will never get themselves or their kids vaccinated ever again.

The CDC has no one to blame but themselves. And Pfizer, probably.

💬 22      ⇄ 71      ♡ 398      ᶴ 6,429      ᐱ

---

⇄ Dr Naomi Wolf Retweeted


**Craig Chamberlin** ✔ @CraigChamberlin · 14h          ···
Replying to @Project_Veritas and @pfizer

Two major takeaways:
1. Gain of function seems acceptable in the halls of Big Pharma if its called "Directed Evolution"
2. Our regulation and safety protocols against pharmaceutical companies have been compromised.

What is Congress and our President going to do about it?

💬 122      ⇄ 428      ♡ 1,984      ᶴ 63.1K      ᐱ

---

⇄ Dr Naomi Wolf Retweeted


**InsiderHCW** ⚕🧬 @InsiderHCW · 14h          ···
Replying to @Project_Veritas and @pfizer
In light of Project Veritas' release.

> 🔵 **InsiderHCW** ⚕🧬 @InsiderHCW · Dec 14, 2022
> Anyone else find it odd that the RSV strain this year is quite virulent just as Pfizer announced their vaccine entered Phase 3?
>
> Any virologist out there want to analyze this strain to see if it has Fauci's fingerprints?

**SER146**



**Dr Naomi Wolf** ✓
143.6K Tweets



**Gregg Re** ✓ @gregg_re · 12h

Replying to @Project_Veritas and @pfizer

never been more obvious why they did this (and why every corrupt outlet from @cnn to @nytimes to @washingtonpost to @politico cheered it)



**@Project_Veritas**

**Account suspended**

Twitter suspends accounts which violate the Twitter Rules

○ 8        ⟲ 52        ♡ 494        �ↆl 50.6K        ⬆

⟲ **Dr Naomi Wolf Retweeted**



**Kevin McKernan** ✓ @Kevin_McKernan · 14h

Replying to @Project_Veritas and @pfizer

If you were following my Substack,
You would have learned about directed evolution over a year ago.



anandamide.substack.com
Directed Evolution
when applied to people is eugenics

**SER147**

○ 22        ⟲ 156        ♡ 582        �ↆl 38.2K        ⬆





**Dr Naomi Wolf** ✓
143.6K Tweets

<label>Follow</label>Follow

# Explore

⚙ Settings

⮂ Dr Naomi Wolf Retweeted

**Chief Nerd** ✓ @TheChiefNerd · 13h
Replying to @Project_Veritas and @pfizer
Related?

> 🏛 **Chief Nerd** ✓ @TheChiefNerd · 13h
>
> 🤔 (Dec 2021) Albert Bourla on How Pfizer Constructs Viruses Identical to COVID Variants
>
> "The data that we received are...from what we call a pseudo-virus. So it's not the real virus - it is a virus we have constructed in our labs and it is identical with the Omicron virus."



**BREAKING NEWS**
PFIZER VACCINE VS. OMICRON
- 3 doses neutralize variant in preliminary lab studies
- Booster dose antibody levels similar to 2 doses vs older strain
- 2 doses may still protect against severe disease

BREAKING NEWS | PFIZER: ADVANCING DEVELOPMENT OF OMICRON-SPECIFIC VACCINE     CHIEFNERD
0:28  25.7K views     CNBC

💬 9     🔁 140     ♡ 334     📊 51K     ⬆

⮂ Dr Naomi Wolf Retweeted



**The Right To Bear Memes** ✓ @grandoldmemes · 13h
Replying to @Project_Veritas and @pfizer



💬 95     🔁 922     ♡ 7,784     📊 227.2K     ⬆

⮂ Dr Naomi Wolf Retweeted



**Ellen Kinnally** @ellen_kinnally · 14h
Replying to @VigilantFox and @naomirwolf
Here's the link kids! It's 🧻 time! Mind you it's not funny but at least they got busted!

SER148

Case 23-21560-088785 2021 Document 1854, Filed 01/22/23, page 90 of 193



**Dr Naomi Wolf** ✔
143.6K Tweets

**Follow**

# Explore

⚙ Settings

⇄ Dr Naomi Wolf Retweeted



**The Vigilant Fox** 🦊 ✔ @VigilantFox · 14h
Pfizer Director Gets Caught Wanting to Mutate COVID to Profiteer on Future Injections [FULL VIDEO]

Jordon Trishton Walker: "Why don't we just mutate it ourselves so we could preemptively develop new vaccines, right?"

Via Project Veritas: youtube.com/watch?v=ywlpAr...



*Pfizer*

Jordon Trishton Walker, Pfizer Director of Research and Development - Strategic Operations and mRNA Scientific Planning:

**Don't tell anyone this by the way, you have to promise you won't tell anyone.**

9:49  37.2K views    SUPPORT OUR WORK ◇ DONATE NOW ◇ PROJECTVERITAS.COM /DONATE

  ○ 69        ⇄ 987        ♡ 1,994        �_ 107K        ↑

**Dr Naomi Wolf** ✔ @naomirwolf · 14h
This is the biggest story and Project Veritas deserves the world's thanks. Mind blown. But what they uncovered fits right in with the genocidal experiments in the Pfizer documents that our team also uncovered. No way to excuse this as blundering, it's just plain mass murder now.

> 🔵 **Eric Spracklen**🇺🇸 @EricSpracklen · 17h
> Who do you want to hear weigh in on our @pfizer bombshell during the @Project_Veritas Twitter Space tonight?
>
> @JamesOKeefeIII, @RWMaloneMD, @naomirwolf, Pfizer 'fetal cell' whistleblower @MelissaMcAtee92, and more already coming!
>
> It's gonna be big.

  ○ 108        ⇄ 1,220        ♡ 3,068        �_ 103.3K        ↑

⇄ Dr Naomi Wolf Retweeted



**Eric Spracklen**🇺🇸 @EricSpracklen · 17h
Who do you want to hear weigh in on our @pfizer bombshell during the @Project_Veritas Twitter Space tonight?

@JamesOKeefeIII, @RWMaloneMD, @naomirwolf, Pfizer 'fetal cell' whistleblower @MelissaMcAtee92, and more already coming!

It's gonna be big.

  ○ 52        ⇄ 191        ♡ 634        ⑆ 128.8K        ↑

**SER149**


# EXHIBIT C

 Blog

Back

highTint

# Coronavirus: Staying safe and informed on Twitter

By
Twitter Inc.
Tuesday, 12 January 2021



Link copied successfully

*Effective November 23, 2022, Twitter is no longer enforcing the COVID-19 misleading information policy.*

# As the global community faces the COVID-19 pandemic together, Twitter is helping people find reliable information, connect with others, and follow what's happening in real time.

# Click through the menu below to find the latest updates on our critical work.

*Editorial note: This blog was first posted on Friday, 3 April 2020 and last updated Tuesday, 12 January 2021, to reflect updated proactive enforcement metrics.*

## 1. Helping people find reliable information

- COVID-19 tab in Explore
- COVID-19 account verification
- Global expansion of the COVID-19 search prompt
- A dedicated COVID-19 event page
- Launch of a new dedicated #KnowTheFacts search prompt
- Direct engagement with organizations working to contain the threat

## 2. Protecting the public conversation

- Clarifying how we assess misleading information
- Updating our approach to misleading information
- Broadening our guidance on unverified claims
- Our ads policy for COVID-19
- Broadening our definition of "harm"
- An update on our content moderation work
- Automated technology and what to expect if you file a report
- Additional triage, quality assurance, and ongoing review of Twitter's rules
- Our zero-tolerance approach to platform manipulation

## 3. Partnering with organizations and public engagement

- Resources for those battling substance abuse disorders, in recovery
- #WorldHealthDay: Clapping for our healthcare heroes
- #WorldHealthDay: Twitter Q&A with the World Health Organization
- #AsktheGov and #AsktheMayor Q&As hosted on Twitter
- Supporting the #BuildforCovid19 Hackathon
- Protecting and supporting journalists
- Working together with industry peers to keep people safe
- Promoting proper handwashing with the #SafeHands emoji
- Building partnerships to protect the public conversation
- #AdsForGood support and additional protections
- Furthering our partnerships
- Donation matching

## 4. Empowering Research of COVID-19 on Twitter

- Enabling study of the public conversation in a time of crisis

## 5. Ensuring site reliability

- How we're keeping the service running and the Tweets flowing
- How we're working differently, and what it means for you

## 6. Keeping our employees and partners safe

- #LoveWhereverYouWork
- Mandatory work from home and supporting our employees
- Suspending noncritical business travel and events

## 7. Sharing Twitter's metrics

- Updated proactive enforcement metrics
- An update to our proactive enforcement and metrics on elevated credible information
- An update on our proactive enforcement and spam detection
- Our platform usage
- Quantifying our efforts to reduce misleading and potentially harmful content

# 1. Helping people find reliable information

***May 18, 2020***
**COVID-19 tab in Explore**

We've added a [new tab (https://twitter.com/explore/tabs/covid-19)](https://twitter.com/explore/tabs/covid-19) in Explore so it's easier to find the latest information on COVID-19. The tab will include curated pages highlighting the latest news such as public service announcements, Tweets from public health experts and journalists, as well as stories about how people are coping and helping each other.

This is available in Argentina, Australia, Brazil, Canada, Colombia, Egypt, India, Ireland, Japan, Mexico, New Zealand, Saudi Arabia, Spain, United Arab Emirates, United Kingdom, and United States for people on twitter.com, iOS, and Android.

*March 20, 2020*

**COVID-19 account verification**

*March 4, 2020*

**Global expansion of the COVID-19 search prompt**

Launched six days before the official designation of the virus in January 2020, we continue to expand our dedicated search prompt feature to ensure that when you come to the service for information about COVID-19, you are met with credible, authoritative content at the top of search. We have been consistently monitoring the conversation on the service to make sure keywords — including common misspellings — also generate the search prompt.

In each country where we have launched the initiative, we have partnered with the national public health agency or the World Health Organization ([@WHO (https://twitter.com/WHO)](https://twitter.com/WHO)) directly. The proactive search prompt is in place with official local partnerships in more than 70 countries around the world.

They include: Australia, Austria, Belgium, Brazil, Brunei, Cambodia, Canada, Cyprus, Denmark, Egypt, Estonia, Finland, France, Germany, Hong Kong, Iceland, India, Indonesia, Ireland, Italy, Japan, Jordan, Korea, Laos, Latvia, Lebanon, Malaysia, Mongolia, Myanmar, Netherlands, New Zealand, Norway, Paraguay, Philippines, Poland, Singapore, Spain, Sri Lanka, Sudan, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Kingdom, United States, Uruguay, Vietnam, and Yemen.

**A dedicated COVID-19 event page**

We have also ensured the Events feature contains credible information about COVID-19 (https://twitter.com/i/events/1219057585707315201) and is available at the top of the Home timeline for everyone in 30+ countries.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/stepping-up-our-work-to-protect-the-public-conversation-around-covid-19.html)

*January 29, 2020*
**Launch of a new dedicated #KnowTheFacts search prompt**

As the global conversation continues around the spread of COVID-19, we want to share the work we're doing to surface the right information, to promote constructive engagement, and to highlight credible information on this emerging issue. We've seen tens of millions of Tweets on this topic in the past four weeks and that trend looks set to continue.

Given the rapidly evolving nature of the issue and the growing international response, we've launched a new dedicated search prompt to ensure that when you come to the service for information about the #coronavirus, you're met with credible, authoritative information first. In addition, we're halting any auto-suggest results that are likely to direct individuals to noncredible content on Twitter. This is an expansion of our **Know the facts** (https://blog.twitter.com/en_us/topics/company/2019/helping-you-find-reliable-public-health-information-on-twitter.html) prompt, which we specifically put in place for the public to find clear, credible information on immunization and vaccination health.

Our official #coronavirus (https://twitter.com/hashtag/coronavirus) partnerships are now in place in Australia, Austria, Belgium, Brazil, Brunei, Cambodia, Canada, Cyprus, Denmark, Egypt, Estonia, Finland, France, Germany, Hong Kong, Iceland, India, Indonesia, Ireland, Italy, Japan, Jordan, Korea, Laos, Latvia, Lebanon, Malaysia, Mongolia, Myanmar, Netherlands, New Zealand, Norway, Paraguay, Philippines, Poland, Singapore, Spain, Sri Lanka, Sudan, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Kingdom, United States, Uruguay, Vietnam, and Yemen.



**Direct engagement with organizations working to contain the threat**

Finally, our Global Public Policy team is proactively seeking ways to integrate the product with organizations involved in the effort to contain the threat. Experts, NGOs, and governments play a pivotal public service role, using Twitter to reach people with the right information when they need it. We're committed to playing our part to amplify authoritative, official content across the globe.

For more, please follow @TwitterGov (https://twitter.com/TwitterGov) and @Policy (https://twitter.com/Policy), where we will provide updates as appropriate.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-about-novel-coronavirus.html)

**Back to top**

**2. Protecting the public conversation**

*July 14, 2020*

**Clarifying how we assess misleading information**

Today we are further clarifying our rules against potentially misleading information about COVID-19.  This update includes additional details on what factors we take into account when considering content for removal.

**SER156**

Our primary goal with addressing misleading information about COVID-19 has not changed. We will continue to remove demonstrably false or potentially misleading content that has the highest risk of causing harm. However, we are providing additional details about our framework for evaluating a potentially misleading claim, including when we would or would not require Tweets to include an explicit call to action (e.g. "everyone should stop wearing masks!") in order to take action.

When evaluating whether or not to remove the most harmful misinformation on our platform, we consider three criteria:

## 1. Is the content advancing a claim of fact regarding COVID-19?

For a Tweet to qualify as a misleading claim, it must be an assertion of fact (not an opinion), expressed definitively, and intended to influence others' behavior. Some examples include information about:

- the origin, nature, and characteristics of the virus;
- preventative measures, treatments/cures, and other precautions;
- the prevalence of viral spread, or the current state of the crisis;
- official health advisories, restrictions, regulations, and public-service announcements;
- how vulnerable communities are affected by/responding to the pandemic.

## 2. Is the claim demonstrably false or misleading?

Under this policy, we consider claims to be false or misleading if (1) they have been confirmed to be false by subject-matter experts, such as public health authorities; or (2) they include information which is shared in a way that could confuse or deceive people. Some of the factors we consider include:

- Whether the content of the Tweet, including media, has been significantly altered, manipulated, doctored, or fabricated;
- Whether claims are presented improperly or out of context;
- Whether claims shared in a Tweet are widely accepted by experts to be inaccurate or false.

## 3. Would belief in this information, as presented, lead to harm?

We will not be able to take enforcement action on every Tweet that contains incomplete or disputed information about COVID-19. Our focus in the COVID-19 policy is narrowed to address those claims that could adversely impact an individual, group, or community. We are most concerned with misleading information that:

- May increase the likelihood of exposure to the virus;
- May have adverse effects on the public health system's capacity to cope with the crisis;
- Could lead to discrimination and avoidance of communities and/or places of business based on their perceived affiliation with protected groups.

**COVID-19 related content that meet all three of the criteria defined above**—i.e. that are claims of fact, demonstrably false or misleading, and likely to cause harm— **may not be shared on Twitter and are subject to removal**. Accounts that break this rule repeatedly may be permanently suspended. Further details about some of the most common types of misleading claims which we will remove under this policy are provided below. (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#moderation)

We may label or place a warning on tweets (https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information.html) to provide additional context in situations where the risks of harm associated with a Tweet are less severe but where people may still be confused or misled. This will make it easier to find facts and make informed decisions about what people see on Twitter. In line with our existing enforcement approach, (https://help.twitter.com/en/safety-and-security/tweet-visibility) Tweets that are labeled under this expanded guidance will have reduced visibility across the service. Reducing the visibility of Tweets means that we will not amplify the Tweets on a number of surfaces across Twitter. However, anyone following the account will still be able to see the Tweet and Retweet.

The world has changed since this pandemic was first declared and public health experts, medical professionals, scientists and researchers now know more about how we can best stay safe and healthy. As the situation evolves and as global health advisories shift to cope with the pandemic, we are committed to ensuring our rules and enforcement actions reflect that evolution.
*May 11, 2020*

**Updating our approach to misleading information**

Case: 3:21-cv-00317-JD Doc #: 40-25 Filed: 01/27/23 Page: 9 of 32

In serving the public conversation, our goal is to make it easy to find credible information on Twitter and to limit the spread of potentially harmful and misleading content. Starting today, we're introducing new labels and warning messages that will provide additional context and information on some Tweets containing disputed or misleading information related to COVID-19. For more information see the full update to our approach on misleading information _here._
(https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information.html)
_**April 22, 2020**_

**Broadening our guidance on unverified claims**

Going forward and specific to COVID-19, unverified claims that have the potential to incite people to action, could lead to the destruction or damage of critical infrastructure, or cause widespread panic/social unrest may be considered a violation of our policies. Examples include, "The National Guard just announced that no more shipments of food will be arriving for two months — run to the grocery store ASAP and buy everything" or "5G causes coronavirus — go destroy the cell towers in your neighborhood!".

# _April 2, 2020_

**Our ads policy for COVID-19**

In response to the shifting advertising landscape, and in order to support helpful causes during this time, we're now allowing managed clients and partners to advertise content containing implicit or explicit reference to COVID-19 in the following use cases, with restrictions:

- Adjustments to business practices and/or models in response to COVID-19
- Support for customers and employees related to COVID-19

The following restrictions apply to these use cases:

Case: 3:21-cv-08378-JD Document 1-13, Filed 01/27/23 Page 161 of 32

- Distasteful references to COVID-19 (or variations) are prohibited
- Content may not be sensational or likely to incite panic
- Prices of products related to COVID-19 may not be inflated
- The promotion of certain products related to COVID-19 may be prohibited. We currently prohibit the advertising of medical facemasks and alcohol hand sanitizers. Please note that other products may be added to this list and enforcement can be retroactive.
- The mention of vaccines, treatments and test kits is permitted, only in the form of information, from news publishers which have been exempted under the Political Ads Content (https://business.twitter.com/en/help/ads-policies/prohibited-content-policies/political-content.html) policy.

Read more about the policy (https://business.twitter.com/en/help/ads-policies/prohibited-content-policies/inappropriate-content.html).
For more COVID-19 Twitter resources for advertisers, visit marketing.twitter.com/covid19 (http://marketing.twitter.com/covid19).

*April 1, 2020*
**Broadening our definition of "harm"**

We have broadened our definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information. Rather than reports, we are enforcing this in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content.

- We'll continue to prioritize removing content when it has a clear call to action that could directly pose a risk to people's health or well-being, but we want to make it clear that we will not be able to take enforcement action on every Tweet that contains incomplete or disputed information about COVID-19. This is not meant to limit good faith discussion or expressing hope about ongoing studies related to potential medical interventions that show promise.

- Since introducing these policies on March 18, we have removed more than 1,100 Tweets containing misleading and potentially harmful content from Twitter. Additionally, our automated systems have challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors. We will continue to use both technology and our teams to help us identify and stop spammy behavior and accounts.

- We may also apply the public interest notice (https://blog.twitter.com/en_us/topics/company/2019/worldleaders2019.html) in cases where world leaders (https://blog.twitter.com/en_us/topics/company/2019/publicinterest.html) violate the COVID-19 guidelines.

**Automated technology and what to expect if you file a report**

How are we using automated technology during this time?

- To help us review reports more efficiently by surfacing content that's most likely to cause harm and should be reviewed first.
- To help us proactively identify rule-breaking content before it's reported. Our systems learn from past decisions by our review teams, so over time, the technology is able to help us rank content or challenge accounts automatically.
- For content that requires additional context, such as misleading information around COVID-19, our teams will continue to review those reports manually.

What you can expect if you file a report during this time:

- If you've reported an account or Tweet to us, it will take longer than normal for us to get back to you. We appreciate your patience as we continue to make adjustments.
- Because these automated systems don't have all of the context and insight our team has, we'll make mistakes. If you think we've made a mistake, you can let us know and appeal here (https://help.twitter.com/forms/general).

We appreciate your patience as we work to keep our teams safe, while also making sure we're protecting everyone on Twitter. You can always continue to use hide replies, mute, block, reply filters, and the other tools we offer (https://help.twitter.com/en/a-

Case: 3:21-cv-08378-JD Doc: 40-3 Filed: 01/27/23 Page: 162 of 193

safer-twitter) you to control conversations on the service.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.html)
*March 27, 2020*

## An update on our content moderation work

We have broadened our definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information. Rather than reports, we are enforcing this in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content.

Under this guidance, we will require people to remove Tweets that include:

**SER162**

- Statements which are intended to influence others to violate recommended COVID-19 related guidance from global or local health authorities to decrease someone's likelihood of exposure to COVID-19, such as: "social distancing is not effective," or "now that it's summertime, you don't need a mask anymore, so don't wear your mask!"
- *Note: We will not require the removal of Tweets that include information about or encouragement to participate in demonstrations or protests.*
- Misleading claims that unharmful but ineffective methods are cures or absolute treatments for COVID-19, such as "Coronavirus is vulnerable to UV radiation - walking outside in bright sunlight will prevent COVID-19."
- Description of harmful treatments or preventative measures which are known to be ineffective or are being shared out of context to mislead people, such as "drinking bleach and ingesting colloidal silver will cure COVID-19."
- Denial of established scientific facts about transmission during the incubation period or transmission guidance from global and local health authorities, such as "COVID-19 does not infect children because we haven't seen any cases of children being sick."
- False or misleading information that would allow the reader to diagnose themselves as either having or not having COVID-19, such as "If you can hold your breath for 10 seconds, you don't have coronavirus."
- Unverified claims that have the potential to incite people to action, could lead to the destruction or damage of critical infrastructure, or could lead to widespread panic/social unrest may be considered a violation of our policies. Examples include, "The National Guard just announced that no more shipments of food will be arriving for two months — run to the grocery store ASAP and buy everything" or "5G causes coronavirus — #BURN5G."
- Tweets offering the sale or facilitation of non-prescription treatments/cures for COVID-19, or those which advertise cures or treatments for COVID-19 that require a prescription or physician consultation.
- Specific and unverified claims made by people impersonating a government or health official or organization such as a parody account of official public health advisors claiming that hydroxychloroquine will prevent COVID-19.
- Claims that specific groups or nationalities are never susceptible to COVID-19, such as "people with dark skin are immune to COVID-19 due to melanin production" or are more susceptible, such as "avoid businesses owned by Chinese people as they are more likely to have COVID-19."

*March 16, 2020*

**Our use of automated technology**

We have increased our use of machine learning and automation to take a wide range of actions on potentially abusive and manipulative content. We want to be clear: while we work to ensure our systems are consistent, they can sometimes lack the context that our teams bring, and this may result in us making mistakes. As a result, we will not permanently suspend any accounts based solely on our automated enforcement systems. Instead, we will continue to look for opportunities to build in human review checks where they will be most impactful. We appreciate your patience as we work to get it right — this is a necessary step to scale our work to protect the conversation on Twitter.

**Additional triage, quality assurance, and our ongoing review of Twitter Rules**

Here are a few more things we are doing to protect the public conversation:

**SER164**

- Building systems that enable our team to continue to enforce our rules remotely around the world.
- We're also increasing our employee assistance and wellness support for everyone involved in this critical work, and ensuring people's privacy and security stay a top priority.
- Instituting a global content severity triage system so we are prioritizing the potential rule violations that present the biggest risk of harm and reducing the burden on people to report them.
- Executing daily quality assurance checks on our content enforcement processes to ensure we're agile in responding to this rapidly evolving, global disease outbreak.
- Engaging with our partners around the world to ensure escalation paths remain open and urgent cases can be brought to our attention.
- Continuing to review the Twitter Rules (https://help.twitter.com/en/rules-and-policies/twitter-rules) in the context of COVID-19 and considering ways in which they may need to evolve to account for new behaviors.
- As we've said on many occasions, our approach to protecting the public conversation is never static. That's particularly relevant in these unprecedented times. We intend to review our thinking daily and will ensure we're sharing updates here on any new clarifications to our rules or major changes to how we're enforcing them.
- Finally, we're encouraged that our service is being used around the world to provide free, authoritative health information, and to ensure that everyone has access to the conversations they need to protect themselves and their families. For more, our dedicated COVID-19 Event page (https://twitter.com/i/events/1219057585707315201) has the latest facts right at the top of your timeline, and we'll continue to share updates @TwitterSafety (https://twitter.com/TwitterSafety) and @TwitterSupport (http://twitter.com/twittersupport).

*March 4, 2020*

**Our zero-tolerance approach to platform manipulation**

The power of a uniquely open service during a public health emergency is clear. The speed and borderless nature of Twitter presents an extraordinary opportunity to get the word out and ensure people have access to the latest information from expert sources around the world.

To support that mission, our global Trust & Safety team is continuing its zero-tolerance approach to platform manipulation and any other attempts to abuse our service at this critical juncture. At present, we're not seeing significant coordinated platform manipulation efforts around these issues. However, we will remain vigilant

**SER165**

Case: 3:21-cv-60083-JD Document 85-1, filed 01/26/23, Page 16 of 32

and have invested substantially in our proactive abilities to ensure trends, search, and other common areas of the service are protected from malicious behaviors. As ever, we also welcome constructive and open information sharing from governments and academics to further our work in these areas — we're in this together.

*January 29, 2020*

**Preventing platform manipulation**

As the global conversation continues around the spread of COVID-19, we want to share the work we're doing to surface the right information, to promote constructive engagement, and to highlight credible information on this emerging issue.

At present, we're not seeing significant coordinated attempts to spread disinformation at scale about this issue. However, we will remain vigilant and have invested significantly in our proactive abilities to ensure trends, search, and other common areas of the service are protected from malicious behaviors. As ever, those who engage in these practices will be removed from our service. We do not permit platform manipulation and we encourage people to think before sharing or engaging in deliberate attempts to undermine the public conversation.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-about-novel-coronavirus.html)

**Back to top**

# 3. Partnering with organizations and public engagement

*April 10, 2020*

**Resources for those battling substance abuse disorders, in recovery**

As people across the country and around the world #StayHome to slow the spread of #COVID19, it's imperative we think about the significant impact these measures have on those experiencing substance use disorders and those in recovery.

In partnership with Center for Safe Internet Pharmacies (https://twitter.com/safemedsonline), Twitter is building on its collaboration with Google (http://www.twitter.com/google), Facebook (https://twitter.com/Facebook), and Microsoft (https://twitter.com/Microsoft) to

**SER166**

showcase a variety of resources on TechTogether.co (http://techtogether.co) to support the #RecoveryMovement (https://twitter.com/hashtag/RecoveryMoment). The site is a collection of resources to help those experiencing a substance use disorder and the associated stigma.

*April 7, 2020*
#WorldHealthDay (https://twitter.com/hashtag/WorldHealthDay)

**Clapping for our healthcare heroes**

**Twitter Q&A with the World Health Organization**

*April 2, 2020*
**#AsktheGov & #AsktheMayor Twitter Q&As**

State and local elected officials across America are using Twitter to consistently provide factual information and resources to their constituents and the broader public around #COVID19 (https://twitter.com/hashtag/COVID19). To optimize and elevate this work, Twitter organized two nationwide events where governors and mayors answered constituent questions through Twitter Q&As. These #AsktheGov (https://twitter.com/hashtag/AsktheGov) and #AsktheMayor (https://twitter.com/hashtag/AsktheMayor) events provided an opportunity for hundreds of Americans to receive direct answers from their elected leaders and allowed millions of people to access those critical resources and information.

*March 24, 2020*
**Supporting the #BuildforCovid19 Hackathon**

Twitter supports the COVID-19 Global Hackathon (https://covid-global-hackathon.devpost.com/), an opportunity for developers to build software solutions that drive social impact with the aim of tackling some of the challenges related to the current coronavirus (COVID-19) pandemic.

# March 24, 2020
# Protecting and supporting journalists

All around the world, we've seen our service connecting people with the authoritative health information they need to protect themselves and their loved ones. That work can only be successful if people have access to the news and information they need.

Right now, every journalist is a COVID-19 journalist. From the stories of healthcare workers on the front lines, to analysis of the real human and economic cost of the pandemic, reporters around the world are still writing, still exposing themselves to harm, still giving us the facts. Journalism is core to our service and we have a deep and enduring responsibility to protect that work. This week we're contributing to two critical organizations that are working tirelessly to uphold the fundamental values of a free press during this pandemic.

We're donating 1 million dollars evenly distributed between the Committee to Protect Journalists and the International Women's Media Foundation. These funds will be used to ensure these organizations can continue their work in the face of new economic strains and to directly support journalists. Their shared efforts to advocate for the rights of vulnerable reporters and to guarantee an equal share of voice for women in the industry has never been more relevant or important.

> We are grateful for Twitter's generous support. Our efforts at CPJ are focused on ensuring that journalists around the world have the information and resources they need to cover the COVID-19 pandemic safely. And we are pushing back against governments that are censoring the news, and restricting the work of the press. We need timely, accurate information flowing within countries and across borders so that political leaders, health policy experts, and the public at large can make informed decisions at this critical moment.

Joel Simon

Executive Director, Committee to Protect Journalists (CPJ)

@Joelcpj (https://twitter.com/Joelcpj)

> Right now, there is a great need to support our community of journalists covering, and dealing with, this global pandemic. Based on our decades of work with journalists who operate in dangerous and difficult environments, the IWMF understands the critical role that safety and security plays in the industry. Thanks to the incredible support of Twitter, the IWMF will be able to address the needs of our community of journalists more deeply and robustly. By supporting journalists from diverse communities, together we can support the most representative news possible in this evolving time.

Case: 3:21-cv-00083-EMC Document 1 Filed 01/27/23 Page 62 of 92

Elisa Lees Muñoz

Executive Director, International Women's Media Foundation (IWMF)

@ElisaLeesMunoz (https://twitter.com/ElisaLeesMunoz)
COVID-19 has been with us for months but the power of the virus is now being felt on all corners of the globe. We're witnessing real-time public conversation on an issue that connects us all on a core human level and our purpose has never been stronger. We will continue to work with our partners as the crisis evolves and are grateful for their journalistic leadership and commitment to the power of the pen.

For more, please follow @TwitterForGood (https://twitter.com/TwitterForGood), @pressfreedom (https://twitter.com/pressfreedom), and @IWMF (https://twitter.com/IWMF).

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/giving-back-covid-19.html)

### March 16, 2020
**Working together with government and industry peers to keep people safe**

We're working with our peer companies and fellow industry leaders in the US to keep people safe and stop the spread of COVID-19. Through this collaboration, we're working to elevate authoritative health information and provide resources for the most vulnerable populations. To see a hub of online resources and an overview of the work from Internet Association members, visit covid19.internetassociation.org (https://covid19.internetassociation.org/industry/response/).

Here's more on our collaboration with peer companies and the government:

### March 13, 2020
**Promoting proper handwashing with the #SafeHands emoji**

### March 4, 2020
**Building partnerships to protect the public conversation**

Our entire company is stepping up its internal and external efforts to build partnerships, protect the public conversation, help people find authoritative health information, raise relief funds, and contribute pro bono advertising support to ensure people are getting the right message, from the right source.

**SER169**

With a critical mass of expert organizations, official government accounts, health professionals, and epidemiologists on our service, our goal is to elevate and amplify authoritative health information as far as possible.

**Global expansion of the COVID-19 search prompt**

Launched six days before the official designation of the virus in January (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-about-novel-coronavirus.html), we continue to expand our dedicated search prompt feature to ensure that when you come to the service for information about COVID-19, you are met with credible, authoritative content at the top of your search experience. We have been consistently monitoring the conversation on the service to make sure keywords — including common misspellings — also generate the search prompt.

In each country where we have launched the initiative, we have partnered with the national public health agency or the World Health Organization (@WHO (https://twitter.com/WHO)) directly. The proactive search prompt is in place with official local partnerships in more than 70 countries around the world.

They include: Australia, Austria, Belgium, Brazil, Brunei, Cambodia, Canada, Cyprus, Denmark, Egypt, Estonia, Finland, France, Germany, Hong Kong, Iceland, India, Indonesia, Ireland, Italy, Japan, Jordan, Korea, Laos, Latvia, Lebanon, Malaysia, Mongolia, Myanmar, Netherlands, New Zealand, Norway, Paraguay, Philippines, Poland, Singapore, Spain, Sri Lanka, Sudan, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Kingdom, United States, Uruguay, Vietnam, and Yemen.

**#AdsForGood support and additional protections**

Based on our Inappropriate Content Policy (https://business.twitter.com/en/help/ads-policies/prohibited-content-policies/inappropriate-content.html), we will halt any attempt by advertisers to opportunistically use the COVID-19 outbreak to target inappropriate ads. Government entities that want to disseminate public health information will be permitted to promote ads on COVID-19. In the case of COVID-19, we have put additional safeguards into place in order to facilitate the sharing of trusted public health information and to reduce potential harm to users. We are currently prohibiting the promotion of all medical masks and alcohol hand sanitizers due to strong correlation to COVID-19 and instances of inflated prices globally.

In addition, we're committing Ads for Good credits to nonprofit organizations to ensure they can build campaigns to fact-check and get reputable health information to the widest possible audiences. For example, as part of the International Fact-

Checking Network (IFCN/@factchecknet (https://twitter.com/factchecknet)), we have supported the Spanish organization @maldita_es (https://twitter.com/maldita_es) and @malditobulo (https://twitter.com/malditobulo), which focuses on mitigating the impact of disinformation on public discourse through fact-checking and data journalism techniques. In Asia, we have partnered with the Taiwan Fact Checking Center (@taiwantfc (https://twitter.com/taiwantfc)), which has been using Twitter to connect with IFCN fact checkers around the world via #CoronavirusFacts (https://twitter.com/hashtag/CoronavirusFacts). They are working in real time to find credible information and debunk rumors in Chinese.

**Furthering our partnerships**

Our Global Public Policy team has open lines of communication with relevant multinational stakeholders, including the World Health Organization, numerous global government and public health organizations, and officials around the world, to ensure they can troubleshoot account issues, get their experts verified, and seek strategic counsel as they use the power of Twitter to mitigate harm.

We're also in close contact with our industry peers and will attend all relevant cross-functional meetings. As a uniquely open service, our data is being used in research every day and our researchers hub (https://developer.twitter.com/en/use-cases/academic-researchers) is publicly available. We welcome applications for the use of Twitter data to support research on COVID-19. We will also explore further #DataForGood (https://twitter.com/hashtag/dataforgood) partnerships to assess how our data products can enhance academic and NGO understanding of public health emergencies now and into the future.

**Donation matching**

We've set up a dedicated internal COVID-19 campaign page through our employee donation matching program to support humanitarian response and relief efforts around the world. Any Twitter employee can donate to relevant nonprofit organizations, and Twitter will match donations up to $2,000 per employee.

**What can you do?**

Looking for advice on how best to use Twitter in a time like this? Follow @WHO (https://twitter.com/WHO?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor) and your local health ministry — seek out the authoritative health information and ignore the noise. See something suspicious or abusive, report it (https://help.twitter.com/en/rules-and-policies/twitter-report-violation) to us immediately. Most importantly, think before you Tweet.

Through Twitter Moments (https://twitter.com/i/moments?lang=en), we have curated longer-form content that helps tell the full story of what's happening around COVID-19 globally. For educators and parents, consult our media literacy guide, which was built in partnership with @UNESCO (https://twitter.com/UNESCO), here (https://blog.twitter.com/en_us/topics/company/2019/twitter-launches-new-media-literacy-handbook-for-schools.html).

We're absolutely committed to playing our part and will continue to provide substantive updates as this situation evolves. For more, follow @TwitterSafety (https://twitter.com/TwitterSafety) and @Policy (https://twitter.com/Policy).

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html)

**Back to top**

## 4. Empowering Research of COVID-19 on Twitter

*April 29, 2020*

**Enabling study of the public conversation in a time of crisis**

To further support Twitter's ongoing efforts to protect the public conversation, and help people find authoritative health information around COVID-19, we're releasing a new endpoint into Twitter Developer Labs (https://developer.twitter.com/en/labs) to enable approved developers and researchers to study the public conversation about COVID-19 in real-time.

The COVID-19 stream endpoint provides access to COVID-19 and Coronavirus related public Tweets in real-time as defined by the criteria (https://developer.twitter.com/en/docs/labs/overview/whats-new/annotations) used to power this topic on Twitter. This is a unique dataset that covers many tens of millions of Tweets daily and offers insight into the evolving global public conversation surrounding an unprecedented crisis. Making this access available for free is one of the most unique and valuable things Twitter can do as the world comes together to protect our communities and seek answers to pressing challenges.

You can read more about this endpoint and the application process on our developer blog (https://blog.twitter.com/developer/en_us/topics/tools/2020/covid19_public_conversation_data.html).

Case: 221-59608 3731 JD 20 Doc. #: 4-6 1/7/2947, Filed: 01/27/23 Page: 724 of 132

**5. Ensuring site reliability**

## March 27, 2020

**How we're keeping the service running and the Tweets flowing**

Keeping the service running and the Tweets flowing is one of our top priorities in these difficult times. Our work has never been more critical and our service has never been in higher demand. In the past few weeks, we have seen more and more people turn to Twitter to participate in the public conversation and follow what's happening in real time.

- The global conversation about COVID-19 and ongoing product improvements are driving up total monetizable DAU (mDAU) (https://www.prnewswire.com/news-releases/twitter-withdraws-q1-guidance-due-to-covid-19-impact-301028477.html), with quarter-to-date average total mDAU reaching approximately 164 million, up 23% from 134 million in Q1 2019 and up 8% from 152 million in Q4 2019.
- We've also seen a 45% increase in our curated events page (https://twitter.com/i/events/1219057585707315201) usage and a 30% increase in Direct Message (DM) usage since March 6.

While many of our teams are transitioning to working from home (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html), some of our infrastructure teams have physical responsibilities that are critical to keeping our data centers, and Twitter, up and running. These teams are operating under the "essential services" provisions dedicated in City, County, and State orders to ensure business continuity. We couldn't keep the Tweets flowing without their daily dedication and hard work.

The combination of the new work environment and the increased load on our platform has placed unique stresses on our operations, requiring our engineering teams to work more closely together than ever to respond to new demands, and to plan for the future. From our IT, Network, and Product Engineering teams to our Infrastructure and Data Center teams, we have collectively mobilized to ensure we are able to stay safe and productive under the stress of the new levels of traffic we're seeing on our service.

Case: 3:21-cv-06035-JD Document 154, filed 01/26/23 Page 725 of 132

The effects of COVID-19 on Twitter have already surpassed any event we've seen, and it's possible that as the pandemic continues, we will see additional stress on our service. Beyond Twitter, COVID-19 has also had a far-sweeping impact on our supply chain partners. Whereas normally we'd have months of lead time to add hardware capacity for expected growth, in this case, manufacturing delays in China have compromised the supply chain, resulting in delays in deliveries to our data centers. Our Data Center, SiteOps, Supply Chain, Hardware Engineering, and Mission Critical teams continue to manage the physical infrastructure that underlies the service — expertly innovating to unlock additional capacity in existing supply.

Our teams are actively addressing areas where we need to add capacity to critical services, looking at how we can optimize existing technology to perform better, and planning for how we might adjust to the way people are using Twitter during this time.

It's critical for Twitter to stay up and running through this global crisis. Our teams are focused, and as we make changes to our systems to meet these new demands, we will communicate openly. We will share what we've done, what we've learned, and if we see incidents, what we will do to recover as quickly as possible. Follow @TwitterEng (http://twitter.com/twittereng) to stay up to date.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.html)
*March 16, 2020*
**How we're working differently, and what it means for you**

**Back to top**

## 6. Keeping our employees and partners safe

*May 12, 2020*

**#LoveWhereverYouWork**

Twitter was one of the first companies to go to a work from home model in the face of COVID-19, but we don't anticipate being one of the first to return to offices.

We were uniquely positioned to respond quickly and allow folks to work from home given our emphasis on decentralization and supporting a distributed workforce capable of working from anywhere. The past few months have proven we can make that work. So if our employees are in a role and situation that enables them to work from home and they want to continue to do so forever, we will make that happen. If not, our offices will be their warm and welcoming selves, with some additional precautions, when we feel it's safe to return.

Here's how we're thinking about the next few months:

- Opening offices will be our decision, when and if our employees come back, will be theirs.
- With very few exceptions, offices won't open before September. When we do decide to open offices, it also won't be a snap back to the way it was before. It will be careful, intentional, office by office and gradual.
- There will also be no business travel before September, with very few exceptions, and no in-person company events for the rest of 2020. We will assess 2021 events later this year.

We're proud of the early action we took to protect the health of our employees and our communities. That will remain our top priority as we work through the unknowns of the coming months.

*#LoveWhereverYouWork*

## *March 11, 2020*

**Mandatory work from home and supporting our employees**

Our top priority remains the health and safety of our Tweeps, and we also have a responsibility to support our communities, those who are vulnerable, and the healthcare providers who are on the front lines of this pandemic. To continue this push, we are moving beyond our earlier guidance of "strongly encouraging work from home" provided on March 2 and have now informed all employees globally they must work from home.

We understand this is an unprecedented step, but these are unprecedented times. And we will continue to do all that we can to support our Tweeps, including:

**Paying our contractors, vendors and hourly workers**

For contractors and hourly workers who are not able to perform their responsibilities from home, Twitter will continue to pay their labor costs to cover standard working hours while Twitter's work-from-home guidance and/or travel restrictions related to their assigned office are in effect.

**Additional resources to support parents**

As part of our ongoing global benefits support, Twitter is stepping in to ease additional expenses parents may be experiencing when their normal daycare closes due to COVID-19 by providing reimbursement for the additional daycare expenses incurred.

**Helping Tweeps set up their at-home offices**

All employees, including hourly workers, will receive reimbursement toward their home office set up expenses, and we are working with our vendors to ensure our contractors' work-from-home needs are met as well. We listened to employee feedback and expanded our policy to include home office equipment, such as desks, desk chairs, and ergonomic chair cushions. We're also allowing Tweeps to expense online fees while working from home.

**#FlockTalk**

Last year, we introduced #FlockTalk (https://blog.twitter.com/en_us/topics/company/2019/inclusion-and-diversity-report-september-2019.html), a program activated when Tweeps want to come together during difficult times to share what's going on with them, find community, and be heard by our leaders. News around COVID-19 is impacting people in a number of different ways — from schools and offices being closed, to serious health concerns, to racism toward communities, we're all dealing with a lot. The Twitter Inclusion & Diversity team (@TwitterTogether (https://twitter.com/TwitterTogether)), in partnership with @TwitterAsians (https://twitter.com/TwitterAsians), will host a virtual #FlockTalk that acknowledges there's a direct correlation between conversations between us, the health of our workplace, and the health of our service.

**Resource guides to make the work-from-home transition easier**

Working from home can be a challenging transition, so we've provided a variety of resource guides to help our employees continue to get the job done. We're listing them here as well because at times like this, sharing insights and learning is so

Case: 3:21-cv-08378-JD Document 163-47 Filed 01/23/23 Page 28 of 32

important. We're all in this together and we want to help others outside of Twitter make their transitions to working outside of their offices easier.

- Working-from-home best practices: We have shared the factors to consider to make sure Tweeps are ready to be productive and healthy. Some factors include workspace, communication, self-care, and logging hours. Overall, working from home doesn't change your day-to-day work, it just means you'll be doing it from a different environment.
- Managing a distributed team: Being a people manager means providing a consistent and positive employee experience for everyone on your team, regardless of location. This manager resource guide highlights the three key pillars of management: strategy, growth and care. So what changes when your team is fully distributed? The good news — not much! These pillars still apply whether you manage a distributed or co-located team.
- Virtual interview guide: All interviews at Twitter will be done via video conferencing. A completely virtual interview has its benefits. It is ideal for introducing candidates to remote work cultures, and it is a great opportunity for candidates who will work remotely to get a sense for the experience of interacting with other team members remotely. While this virtual interview guide is not a holistic interview guide, it instead focuses on the aspects of interviewing candidates remotely that differ from interviewing candidates in-person.
- We have also shared guides for working across time zones, using collaboration tools to stay connected, and ergonomic tips for working from home and on-the-go.

We'll continue sharing information as we navigate these changes. It's all in dedication to keeping our Tweeps and everyone around us healthy. We're all in this together!

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html)

*March 2, 2020*
**Encouraging employees to work from home**

In addition to the travel, event, and visitor restrictions that we previously shared, today we provided additional guidance as we look to protect the health and safety of our workforce. Beginning today, we are strongly encouraging all employees globally to work from home if they're able. Our goal is to lower the probability of the spread of the COVID-19 for us — and the world around us. We are operating out of an abundance of caution and the utmost dedication to keeping our Tweeps healthy.

Case: 3:21-cv-06008-JD Document 54 Filed 01/27/23 Page 29 of 32

We are working to make sure internal meetings, all hands, and other important tasks are optimized for remote participation. We recognize that working from home is not ideal for some job functions. For those employees who prefer or need to come into the offices, they will remain open for business. Our Real Estate & Workplace team is increasing deep-cleaning and sanitizing in all spaces, as well as more visual reminders for personal hygiene best practices and prepackaged, precomposed, and preplated food options.

Working from home will be mandatory for employees based in our Hong Kong, Japan, and South Korea offices due in part to government restrictions. Our criteria will evolve over time as we get more information, and we will communicate to affected Tweeps as appropriate.

While this is a big change for us, we have already been moving toward a more distributed workforce that's increasingly remote. We're a global service and we're committed to enabling anyone, anywhere, to work at Twitter.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html)
*March 1, 2020*
**Suspending noncritical business travel and events**

We recently shared information (https://blog.twitter.com/en_us/topics/company/2020/authoritative-information-about-novel-coronavirus.html) about the work we're doing to surface the right information to promote constructive engagement and to highlight credible information around the spread of #coronavirus (https://twitter.com/hashtag/coronavirus) COVID-19. We will continue to update the public on these efforts this week.

We also have the responsibility of ensuring that the health and safety of our employees and partners is not compromised. We have continued to monitor the situation closely and are adjusting our internal policies to respond to this rapidly evolving situation. On February 29, we informed our people and started notifying partners that we are suspending all noncritical business travel and events.

This policy is effective immediately and will continue until the World Health Organization or Centers for Disease Control deem it appropriate to step back from pandemic precautionary measures or when a vaccine becomes available.

**SER178**

Our goal is to reduce the risk that anyone at Twitter might contract or inadvertently spread the virus. It is important that we take these proactive steps to protect ourselves and others and minimize the spread of COVID-19.

There are enormous transnational efforts underway to tackle this virus. As a global company with a global workforce, we want to do what we can to help the success of these multistakeholder containment efforts. Temporarily suspending travel is an immediate and important step.

We want to thank our people, partners, and customers for their patience and understanding.

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/keeping-our-employees-and-partners-safe-during-coronavirus.html)

**Back to top**

## 7. Sharing Twitter's metrics

*After further examining our data, we have made updates to our proactive enforcement metrics published on January 12, 2021 which were previously misinterpreted. The updated metrics are now reflected in the posts below.*

### *January 12, 2021*

### Updated proactive enforcement metrics

Since introducing our COVID-19 guidance (https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformation), we have removed **8,493 Tweets** and challenged **11.5 million accounts**. We continue to prioritize removing or annotating potentially harmful and misleading information, to ensure that users receive credible information rather than misinformation.

### *Oct 22, 2020*

### Updated proactive enforcement metrics

Since introducing our COVID-19 guidance
(https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformation)  we have
removed **6,466 Tweets** and challenged **8 million accounts**.
*July, 14, 2020*

**An update to our proactive enforcement and metrics on credible information**

Since introducing our COVID-19 guidance we have removed **4,647 Tweets** and
challenged **4.5 million accounts**. It is important to note our approach is not only
about removing or annotating potentially harmful and misleading information, but also
elevating credible information. To date, over 160 million people have visited the
COVID-19 curated page, over two billion times.

*May 4, 2020*

**An update on our proactive enforcement and spam detection**

Since introducing our updated policies on March 18, we have removed more
than **4,074 Tweets** containing misleading and potentially harmful content from
Twitter. Additionally, our automated systems have challenged more than **3.4 million
accounts** which were targeting discussions around COVID-19 with spammy or
manipulative behaviors. We will continue to use both technology and our teams to
help us identify and stop spammy behavior and accounts.

*April 1, 2020*
**Our platform usage**

In the past few weeks, we have seen more and more people turn to Twitter to
participate in the public conversation and follow what's happening in real time.

- The global conversation about COVID-19 and ongoing product improvements
  are driving up total monetizable DAU (mDAU) (https://www.prnewswire.com/news-
  releases/twitter-withdraws-q1-guidance-due-to-covid-19-impact-301028477.html), with quarter-
  to-date average total mDAU reaching approximately 164 million, up 23% from
  134 million in Q1 2019 and up 8% from 152 million in Q4 2019.
- We've also seen a 45% increase in our curated events page
  (https://twitter.com/i/events/1219057585707315201?) usage and a 30% increase in Direct
  Message (DM) usage since March 6.

Case: 3:21-cv-08378-JD Document 181 Filed 01/27/23 Page 632 of 932

Read the original post. (https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.html)

*April 1, 2020*

**Quantifying our efforts to reduce misleading and potentially harmful content**

**Back to top**



(https://www.twitter.com/Twitter)

Twitter Inc.

# EXHIBIT D

Skip to main content

 Help Center (https://help.twitter.com/)

- Using Twitter (https://help.twitter.com/en/using-twitter)
- Managing your account (https://help.twitter.com/en/managing-your-account)
- Safety and security (https://help.twitter.com/en/safety-and-security)
- Rules and policies (https://help.twitter.com/en/rules-and-policies)
- Resources ∨
  - New user FAQ (https://help.twitter.com/en/resources/new-user-faq)
  - Glossary (https://help.twitter.com/en/resources/glossary)
  - A safer Twitter (https://help.twitter.com/en/resources/a-safer-twitter)
  - Accessibility (https://help.twitter.com/en/resources/accessibility)

  - Our rules (https://help.twitter.com/en/resources/rules)
  - My privacy (https://help.twitter.com/en/resources/how-you-can-control-your-privacy)
  - How we address misinformation on Twitter (https://help.twitter.com/en/resources/addressing-misleading-info)

Feedback

Sign in (https://twitter.com/login?redirect_after_login=https://help.twitter.com/en/using-twitter/community-notes)



Contact Us (https://help.twitter.com/forms.html)



1. About Community Notes on Twitter

# About Community Notes on Twitter

1. Help Center ∧ (https://help.twitter.com/)
2. Tweets ∧ (https://help.twitter.com/en/using-twitter#tweets)

# About Community Notes on Twitter

[Community Notes](https://twitter.github.io/birdwatch/) aim to create a better informed world by empowering people on Twitter to collaboratively add context to potentially misleading Tweets. Contributors can leave notes on any Tweet and if enough contributors from different points of view rate that note as helpful, the note will be publicly shown on a Tweet. [Sign up to become a contributor](https://twitter.com/i/birdwatch/).

Community Notes are now [publicly visible to everyone in the US](https://blog.twitter.com/en_us/topics/product/2022/helpful-birdwatch-notes-now-visible-everyone-twitter-us). For more information, we have included responses to frequently asked questions below, but you can learn more through the [Community Notes Guide](http://twitter.github.io/birdwatch) as well.

This is an open and transparent process, that's why we've made the Community Notes algorithm open source and [publicly available on GitHub](https://twitter.github.io/birdwatch/), along with the data that powers it so anyone can audit, analyze or suggest improvements.

# Community Notes and Twitter Rules

Community Notes do not represent Twitter's viewpoint and cannot be edited or modified by our teams. A Tweet with a Community Note will not be labeled, removed, or addressed by Twitter unless it is found to be violating the Twitter Rules, [Terms of Service](https://twitter.com/en/tos), or our [Privacy Policy](https://twitter.com/en/privacy). Failure to abide by the rules can result in one's removal from accessing Community Notes, and/or other remediations.

Anyone can report notes they believe aren't in accordance with those rules by selecting the ••• menu on a note, and then selecting **Report**, or by using this form.

How to become a Community Notes contributor
- Learn more about contributor eligibility and sign up [here](https://twitter.com/i/flow/join-birdwatch).

We plan to review applications on a rolling, periodic basis.

How to rate a Community Note
- If you see a Tweet with a **Community Notes** card and note, you can **rate how helpful** you think the note is.

SER184

**I have a note on my Tweet. What can I do?**

As a Tweet author, if you disagree that a Community Note provides important context about your Tweet, you can request additional review (https://twitter.github.io/birdwatch/additional-review/).

# Share this article



## Was this article helpful? *

 

Submit

© 2023 Twitter, Inc.

Cookies (https://help.twitter.com/rules-and-policies/twitter-cookies)

Privacy (https://twitter.com/privacy)

Terms and conditions (https://twitter.com/tos)

English

Help Center (https://help.twitter.com/)

Case 2:21-cv-08378-JD Document 189 Filed 01/27/23 Page 650 of 193

- **English** (https://help.twitter.com/en/using-twitter/community-notes)
- **Español** (https://help.twitter.com/es/using-twitter/community-notes)
- **日本語** (https://help.twitter.com/ja/using-twitter/community-notes)
- **한국어** (https://help.twitter.com/ko/using-twitter/community-notes)
- **Português** (https://help.twitter.com/pt/using-twitter/community-notes)
- **Deutsch** (https://help.twitter.com/de/using-twitter/community-notes)
- **Türkçe** (https://help.twitter.com/tr/using-twitter/community-notes)
- **Français** (https://help.twitter.com/fr/using-twitter/community-notes)
- **Italiano** (https://help.twitter.com/it/using-twitter/community-notes)
- **العربية** (https://help.twitter.com/ar/using-twitter/community-notes)
- **Nederlands** (https://help.twitter.com/nl/using-twitter/community-notes)
- **Bahasa Indonesia** (https://help.twitter.com/id/using-twitter/community-notes)
- **Русский** (https://help.twitter.com/ru/using-twitter/community-notes)
- **हिंदी** (https://help.twitter.com/hi)
- **עברית** (https://help.twitter.com/he)
- **简体中文** (https://help.twitter.com/zh-cn)
- **繁體中文** (https://help.twitter.com/zh-tw)
- **ภาษาไทย** (https://help.twitter.com/th)
- **Tiếng Việt** (https://help.twitter.com/vi)
- **Melayu** (https://help.twitter.com/ms)
- **Filipino** (https://help.twitter.com/fil)
- **فارسی** (https://help.twitter.com/fa)
- **Dansk** (https://help.twitter.com/da)
- **Suomi** (https://help.twitter.com/fi)
- **Svenska** (https://help.twitter.com/sv)
- **Norsk** (https://help.twitter.com/no)
- **Polski** (https://help.twitter.com/pl)
- **Magyar** (https://help.twitter.com/hu)
- **Română** (https://help.twitter.com/ro)
- (https://help.twitter.com/cs.html)
- (https://help.twitter.com/el.html)
- **Українська** (https://help.twitter.com/uk)
- (https://help.twitter.com/mr.html)
- (https://help.twitter.com/ta.html)
- **Български** (https://help.twitter.com/bg)
- **Català** (https://help.twitter.com/ca)
- **Hrvatski** (https://help.twitter.com/hr)
- **Српски** (https://help.twitter.com/sr)
- **Slovenčina** (https://help.twitter.com/sk)
- (https://help.twitter.com/kn.html)

Case 2:15-cv-01187-JPD Document 189-5 Filed 01/27/23 Page 76 of 83

- ಪಾಶ್ತೋ ([https://help.twitter.com/ps](https://help.twitter.com/ps))
- Dari ([https://help.twitter.com/fa-af](https://help.twitter.com/fa-af))
- ([https://help.twitter.com/am.html](https://help.twitter.com/am.html))
- Oromo ([https://help.twitter.com/om](https://help.twitter.com/om))
- Tigrinya ([https://help.twitter.com/ti](https://help.twitter.com/ti))
- Kurdish ([https://help.twitter.com/ckb](https://help.twitter.com/ckb))
- ([https://help.twitter.com/ur.html](https://help.twitter.com/ur.html))
- ([https://help.twitter.com/ha-NG.html](https://help.twitter.com/ha-NG.html))
- ([https://help.twitter.com/ha.html](https://help.twitter.com/ha.html))
- ([https://help.twitter.com/ig.html](https://help.twitter.com/ig.html))
- ([https://help.twitter.com/yo.html](https://help.twitter.com/yo.html))

**SER187**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DONALD J. TRUMP, et al.,

　　　　　　　Plaintiffs,

　　　v.

TWITTER INC., et al.,

　　　　　　　Defendants.

Case No.　3:21-cv-08378-JD

**ORDER RE RULE 60(b) MOTION**

　　　　In July 2021, plaintiff Naomi Wolf joined former President Donald J. Trump and others in a lawsuit alleging that Twitter had "de-platformed" and "censored" them. *See* Dkt. No. 21 ¶¶ 8, 18. Plaintiffs' main theory was that Twitter suspended their accounts in response to pressure from members of Congress, and so was liable for a First Amendment claim under the state-action doctrine. *See Trump v. Twitter Inc.*, 602 F. Supp. 3d 1213, 1218 (N.D. Cal. 2022); Dkt. No. 165 at 4-5. Wolf said that she had "over 146,000 followers" when Twitter suspended her account in June 2021 for "vaccine misinformation." Dkt. No. 21 ¶¶ 157, 159, 162; *see also* Dkt. No. 189-1 ¶ 2.

　　　　In response to Twitter's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court concluded that the complaint fell well short of plausibly alleging that the state-action doctrine applied to Twitter. *See* Dkt. No. 165. Plaintiffs' ancillary claims were also found to be factually inadequate. The complaint was dismissed with leave to amend. *Id.* at 17. Plaintiffs freely elected not to file an amended complaint, and judgment was entered against them. Dkt. No. 168.[1]

　　　　In June 2022, plaintiffs filed an appeal in the Ninth Circuit, which is pending. Dkt. No. 169. In August 2022, Wolf asked the Court under Federal Rule of Civil Procedure 62.1 to provide

---

[1] Wolf's statement that the "Court dismissed this case without leave to amend," Dkt. No. 176 at 4, is incorrect.

**SER188**

an "indicative ruling" with respect to a motion for relief from judgment under Rule 60(b)(2) on the basis of what is said to be newly discovered evidence about government pressure on Twitter. Dkt. No. 176. A few months later, Twitter was acquired by Elon Musk, who made a number of widely publicized changes that reversed prior limitations on users and content. The Court on its own motion directed Wolf to show cause why her First Amendment claim was not moot and was still a live controversy in light of this dramatic intervening event. Dkt. No. 185; *see also NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 612 n.1 (9th Cir. 2016) (in evaluating how to resolve a motion under Rule 62.1, "the district court is free to consider new evidence at its discretion"). Wolf filed a response, Dkt. No. 186, and Twitter expressed its views, Dkt. No. 189.

The record establishes that Wolf has been restored as an active Twitter account holder without any of the challenged limitations on her tweets. Consequently, Wolf's First Amendment claim is moot, and the Court denies the Rule 60(b) motion on that ground. *See* Fed. R. Civ. P. 62.1(a)(2); *see also NewGen*, 840 F.3d at 612 n.1; *Out of the Box Enters., LLC v. El Paseo Jewelry Exch., Inc.*, 737 F. App'x 304, 305 (9th Cir. 2017) (unpublished).

## BACKGROUND

The heart of this lawsuit was plaintiffs' demand that Twitter restore their accounts and not interfere with their content. Plaintiffs sued for an "injunction and declaratory judgment ordering Twitter" to (1) "immediately reinstate [their] Twitter accounts," (2) "remove its warning labels and misclassification of all [their] content," and (3) "desist from any further warnings or classifications." Dkt. No. 21 at ECF p. 56.[2]

In October 2022, approximately 15 months after plaintiffs filed the complaint, the situation at Twitter changed radically. Twitter was acquired by X Holdings I, Inc., a company owned and controlled by Elon Musk. Musk announced a "general amnesty" for suspended users, which resulted in the restoration of Wolf's account, among others, in December 2022. *See* Dkt. No. 189-1 ¶ 3. Twitter also announced in November 2022 that "it is no longer enforcing the COVID-19 misleading information policy," which Wolf said in the complaint was the reason her account had

---

[2] Plaintiffs requested additional injunctive relief under Florida law that is not germane here. *See* Dkt. No. 21 ¶¶ 220, 233.

United States District Court
Northern District of California

2

**SER189**

United States District Court
Northern District of California

1  been suspended.  Dkt. No. 189-5 at ECF p. 2; Dkt. No. 189 at 1.  Twitter represents that, since the

2  restoration of Wolf's account, Twitter "has affixed no labels to Wolf's Tweets," Dkt. No. 189 at 2,

3  and "has not enforced any of its content moderation policies against her account," Dkt. No. 189-1

4  ¶ 3.

5         Wolf acknowledges that "Mr. Musk has made many changes to Twitter's policies."  Dkt.

6  No. 186-1 ¶ 2 (Wolf declaration).  The record indicates that she has resumed active tweeting on

7  her account.  Twitter proffered recent screenshots of Wolf's account that showed a variety of posts

8  on topics ranging from vaccines and "Big Pharma" to political events in Spain.  *See* Dkt. No. 189-

9  4.

10  <center>**DISCUSSION**</center>

11         As these developments indicate, there is no longer a live controversy for purposes of

12  Article III jurisdiction with respect to Wolf's First Amendment claim.  Article III requires that "an

13  'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages'

14  of the litigation."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013) (quoting *Alvarez v. Smith*,

15  558 U.S. 87, 92 (2009)); *see also Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir.

16  2002) ("An actual controversy must be extant at all stages of review, not merely at the time the

17  complaint is filed.").  "A case becomes moot -- and therefore no longer a 'Case' or 'Controversy'

18  for purposes of Article III -- 'when the issues presented are no longer "live" or the parties lack a

19  legally cognizable interest in the outcome.'"  *Already*, 568 U.S. at 91 (quoting *Murphy v. Hunt*,

20  455 U.S. 478, 481 (1982) (per curiam)).  Mootness is evaluated for "each form of relief sought."

21  *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013); *see also Martinez v. Newsom*,

22  46 F.4th 965, 972 (9th Cir. 2022).

23        On the record before the Court, there is no doubt that Wolf's First Amendment claim for

24  an injunction restoring her Twitter account is moot.  "A request for injunctive relief remains live

25  only so long as there is some present harm to enjoin."  *Bayer v. Neiman Marcus Grp., Inc.*, 861

26  F.3d 853, 864 (9th Cir. 2017) (internal quotations and citation omitted).  Such harm is not in

27  evidence here.  Twitter has restored Wolf's account and she is currently tweeting with vigor and

28  frequency.  Twitter has renounced content moderation of her posts, specifically with respect to

<center>3</center>

<center>**SER190**</center>

1    vaccine information. In effect, Wolf has obtained all the injunctive relief she asked for in the

2    complaint, even though the Court concluded that the First Amendment claim against Twitter was

3    not plausible. There is no other meaningful relief the Court might have ordered.

4       Wolf's rather halfhearted arguments against mootness are not well taken. She makes a

5    cursory reference to the voluntary cessation exception, which holds that "a defendant cannot

6    automatically moot a case simply by ending its unlawful conduct once sued." *Already*, 568 U.S.

7    at 91. The exception addresses the concern that "a party should not be able to evade judicial

8    review, or to defeat a judgment, by temporarily altering questionable behavior." *Brach v.*

9    *Newsom*, 38 F.4th 6, 12 (9th Cir. 2022) (en banc) (internal quotations and citation omitted).

10       The problem for Wolf is that this concern does not apply here. Nothing in the record

11    indicates that Twitter restored her account and changed its moderation policies in response to this

12    litigation. The changes happened only after a new owner acquired Twitter and publicly

13    announced new policies for users and content. This is not a situation where a wrongdoer sought to

14    evade judgment day with an expedient change of conduct. It also bears mention that Twitter

15    obtained a dismissal of the complaint and was not staring down the barrel of an adverse outcome.

16    In these circumstances, an application of the voluntary cessation exception is unwarranted. *See*

17    *Pub. Utils. Comm'n v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996) ("[F]or this exception to apply,

18    the defendant's voluntary cessation must have arisen *because of* the litigation.") (emphasis in

19    original) (citation omitted); *see also Sze v. INS*, 153 F.3d 1005, 1008 (9th Cir. 1998).

20       Twitter has also demonstrated that the changes are not transient. Twitter describes them as

21    part and parcel of a fundamentally "different business vision articulated by the company's new

22    ownership." Dkt. No. 189 at 3. Wolf has not shown otherwise, and her account has remained

23    active and moderation-free since it was restored some months ago.

24       Wolf's passing mention of another mootness exception is unavailing for the same reasons.

25    Wolf says her claim is capable of repetition, yet evading review, and so should be deemed to be

26    live. This exception to mootness "is limited to extraordinary cases where (1) the duration of the

27    challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable

28    expectation that the plaintiffs will be subjected to it again." *Brach*, 38 F.4th at 15 (internal

United States District Court
Northern District of California

4

**SER191**

1  quotations and citation omitted).  The factors that foreclosed the voluntary cessation exception

2  apply here to the same end.

3  Wolf's suggestion that mootness is barred because she has requested damages is also

4  misdirected.  Wolf says that she "lost over half of her business model, investors in her business,

5  and other sources of income."  Dkt. No. 21 ¶ 167.  But the only claim for which Wolf seeks relief

6  under Rule 60(b) is the First Amendment claim.  *See* Dkt. No. 176 at 3.  Even assuming just for

7  present purposes that Wolf had shown that "Twitter was in effect operating as the [federal]

8  government under the 'state-action doctrine,'" *Trump*, 602 F. Supp. 3d at 1218, there is no legal

9  basis for damages against Twitter.  The Supreme Court has foreclosed an implied cause of action

10  for damages against a private corporation for First Amendment violations.  *See Egbert v. Boule*,

11  142 S. Ct. 1793, 1807-09 (2022); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71-72 (2001); *see*

12  *also Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *3 (9th Cir. Nov. 18, 2022)

13  (unpublished) ("Combined, *Malesko* and *Egbert* foreclose Appellants' effort to assert a First

14  Amendment claim against Google and YouTube.  The claim is either barred by *Malesko* or would

15  appear to expand *Bivens* contrary to the spirit of *Egbert*.").

16  <div align="center">**CONCLUSION**</div>

17  Wolf has nothing live in the way of a First Amendment claim against Twitter.  The

18  ostensible new evidence she proffers does not point to a different conclusion.  The evidence

19  involves events that happened before Twitter changed hands, reinstated her account, and ended the

20  COVID-19 content moderation policy.  *See* Dkt. Nos. 177, 180, 183.  Like the allegations in the

21  complaint, this evidence has been overtaken by developments.  It does not change the mootness

22  analysis in any way.  The motion under Rule 60(b) is denied.

23  **IT IS SO ORDERED.**

24  Dated:  February 14, 2023

25

26  _____

27  JAMES DONATO
   United States District Judge

28

United States District Court
Northern District of California

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/  Ari Holtzblatt
ARI HOLTZBLATT