NO. 22-15961

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD TRUMP, ET AL.,

PLAINTIFFS-APPELLANTS,

v.

TWITTER, INC., ET AL.,

DEFENDANTS-APPELLEES

On Appeal from the United States District Court
for the Northern District of California, San Francisco
Case No. 3:21-cv-08378-JD
The Honorable James Donato, District Judge

## BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
## FOUNDATION IN SUPPORT OF DEFENDANTS-APPELLEES
## AND AFFIRMANCE

Mukund Rathi
David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: mukund@eff.org,
davidg@eff.org
Telephone: (415) 436-9333

*Counsel for Amicus Curiae*
*Electronic Frontier Foundation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus states that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.


Dated: March 22, 2023           By:   /s/ Mukund Rathi
                                               Mukund Rathi

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS ...............................................................................ii

TABLE OF AUTHORITIES ..........................................................................iv

STATEMENT OF INTEREST OF AMICUS .......................................................1

INTRODUCTION .......................................................................................1

ARGUMENT .............................................................................................2

I.     APPLYING STATE ACTION THEORY TOO BROADLY WOULD
UNDERMINE EDITORIAL FREEDOM .....................................................2

     A.    THE FIRST AMENDMENT REQUIRES CLEARLY DEFINING
WHEN A SPEECH INTERMEDIARY IS A STATE ACTOR ..........3

     B.    A PRIVATE SOCIAL MEDIA SERVICE CANNOT BEAR
LIABILITY AS A STATE ACTOR UNLESS IT HAS
WILLINGLY CEDED ITS EDITORIAL DECISION-MAKING
TO THE GOVERNMENT .................................................5

     C.    A CENSORED USER MAY HOLD THE GOVERNMENT
LIABLE FOR FIRST AMENDMENT VIOLATIONS EVEN
IN THE ABSENCE OF PRIVATE "STATE ACTION" ...................9

     D.    A NARROW PATH TO PLATFORM LIABILITY IS
NECESSARY TO ACCOMMODATE THE LEGITIMATE
CONCERNS FOR GOVERNMENT CO-OPTION OF
CONTENT MODERATION SYSTEMS WITHIN THE
FIRST AMENDMENT RIGHTS OF PUBLISHERS ......................12

          1.    Social media platforms have a First Amendment right to
consult outside resources, including the government, in
making editorial decisions ........................................12

          2.    Nevertheless, a narrow path to platform liability must be
preserved because of the special risks of government
manipulation of content moderation ...........................14

II.     INTERNET USERS ARE BEST SERVED WHEN SOCIAL MEDIA PLATFORMS CAN EXERCISE THEIR FIRST AMENDMENT-PROTECTED EDITORIAL FREEDOM ...................................................16

     A.     MODERATED PLATFORMS ARE THE HISTORIC NORM AND SERVE THE INTERESTS OF USERS AND THE PUBLIC GENERALLY ....................................................16

          1.     Moderation Means that Some User Content Will Be Removed, Downranked, or Otherwise Moderated ...................20

          2.     In Praise of the (Hypothetical) Unmoderated Platform............24

     B.     PLAINTIFFS' STATE ACTION THEORIES WOULD VIOLATE ONLINE PLATFORMS' FIRST AMENDMENT RIGHTS ...........................................................................25

III.    INTERNET USERS ARE BEST SERVED BY VOLUNTARY MEASURES FOR CONTENT MODERATION ........................................27

CONCLUSION ...............................................................................28

CERTIFICATE OF COMPLIANCE ....................................................30

CERTIFICATE OF SERVICE............................................................31

# TABLE OF AUTHORITIES

## Cases

*Associates & Aldrich Co. v. Times Mirror Co.*,
  440 F.2d 133 (9th Cir. 1971) .................................................................7

*Backpage.com v. Dart*,
  807 F.3d 229 (7th Cir. 2015). .............................................................11

*Bantam Books v. Sullivan*,
  372 U.S. 58 (1963).......................................................................10, 11

*Branzburg v. Hayes*,
  408 U.S. 665 (1972)............................................................................12

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001).......................................................................6, 16

*California State Teachers Ass'n v. State Bd. of Education*,
  271 F.3d 1141 (9th Cir. 2001) .............................................................4

*Children's Health Def. v. Facebook Inc.*,
  546 F. Supp. 3d 909 (N.D. Cal. 2021) .............................................9, 12

*Doe v. Cuomo*,
  2013 WL 1213174 (N.D.N.Y. Feb. 25, 2013) .....................................9

*Forbes v. Facebook, Inc.*,
  2016 WL 676396 (E.D.N.Y. Feb. 18, 2016) ........................................9

*Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*,
  765 F.2d 1278 (5th Cir. 1985), *amended,* 777 F.2d 329 (5th Cir. 1985)..............4

*Freedom Watch, Inc. v. Google, Inc.*,
  368 F. Supp. 3d 30 (D.D.C. 2019), *affirmed*, 816 Fed. App'x 497
  (D.C. Cir. 2019) ..................................................................................9

*German v. Fox*,
  267 F. App'x 231 (4th Cir. 2008) ........................................................6

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972).............................................................................4

*Green v. YouTube, LLC*,
  2019 WL 1428890 (D.N.H. Mar. 13, 2019) ........................................9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995).....................................................................26, 27

iv

*Janny v. Gamez*,
  8 F.4th 883 (10th Cir. 2021) .................................................................3

*Janus v. American Federation of State, County, & Municipal Employees,
  Council 31*,
  138 S. Ct. 2448 (2018)........................................................................26

*Kidwell v. Transportation Communications Int'l Union*,
  946 F.2d 283 (4th Cir. 1991) ................................................................7

*Kolinske v. Lubbers*,
  712 F.2d 471 (D.C. Cir. 1983)..............................................................6

*Los Angeles v. Preferred Comms., Inc.*,
  476 U.S. 488 (1986)............................................................................26

*Manhattan Community Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019)....................................................................3, 26

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018)........................................................................26

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
  873 F.3d 1045 (9th Cir. 2017) ..............................................................7

*Miami Herald Co. v. Tornillo*,
  418 U.S. 241 (1974).....................................................................*passim*

*National Inst. of Family Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018)........................................................................26

*NetChoice, LLC v. Att'y Gen., Fla.*,
  34 F.4th 1196 (11th Cir. 2022) ...............................................8, 20, 27

*Novak v. City of Parma*,
  932 F.3d 421 (6th Cir. 2019) ..............................................................11

*Nyabwa v. FaceBook*,
  2018 WL 585467 (S.D. Tex. Jan. 26, 2018) .........................................9

*O'Handley v. Weber*,
  2023 WL 2443073 (9th Cir. 2023) .......................................................8

*Patrick v. Floyd Med. Ctr.*,
  201 F.3d 1313 (11th Cir. 2000) ............................................................6

*Perez v. LinkedIn Corp.*,
  No. 20-CV-07238, 2021 WL 519379 (N.D. Cal. Feb. 5, 2021) ...........9

*Prager University v Google LLC*,
   951 F.3d 991 (9th Cir. 2020) ...........................................................................9, 27

*Rundus v. City of Dallas*,
   634 F.3d 309 (5th Cir. 2011) ................................................................................6

*Shulman v. Facebook.com*,
   2017 WL 5129885 (D.N.J. Nov. 6, 2017) ............................................................9

*Sinn v. The Daily Nebraskan*,
   829 F.2d 662 (8th Cir. 1987) ...............................................................................7

*Sutton v. Providence St. Joseph Med. Ctr.*,
   192 F.3d 826 (9th Cir. 1999) ............................................................................4, 6

*Tulsi Now, Inc. v. Google, LLC*,
   No. 19-CV-06444, 2020 WL 4353686 (C.D. Cal. Mar. 3, 2020)..........................9

*United States v. Stevens*,
   559 U.S. 460 (2010)..............................................................................................4

*Wilson v. Twitter*,
   No. 20-CV-00054, 2020 WL 3410349 (S.D.W. Va. May 1, 2020)......................9

**Other Authorities**

8chan, https://en.wikipedia.org/wiki/8chan.........................................................25

*About the YouTube Trusted Flagger program*, YouTube,
   https://support.google.com/youtube/answer/7554338 ........................................14

*Accountability Report 2.0*, Internet Comm'n (2022), https://inetco.org/report.......28

Al Jazeera, *Twitter suspends accounts of Palestinian Quds News Network*,
   Nov. 2, 2019, https://www.aljazeera.com/news/2019/11/2/twitter-suspends-
   accounts-of-palestinian-quds-news-network ......................................................23

Article 19, *Sheikh Jarrah: Facebook and Twitter silencing protestors, deleting
   evidence*, May 10, 2021, https://www.article19.org/resources/sheikh-jarrah-
   facebook-and-twitter-silencing-protests-deleting-evidence/ ..............................23

*Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-
   guidelines ...........................................................................................................18

Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, Oct. 2020,
   https://hackinghustling.org/wp-content/uploads/2020/09/Posting-Into-the-
   Void.pdf ..............................................................................................................22

*Discord Moderator Academy*, Discord, https://discord.com/moderation ..............13

Eric Goldman, *Content Moderation Remedies*,
28 Mich. Tech. L. Rev. 1 (2021) ....................................................20

*Facebook Treats Punk Rockers Like Crazy Conspiracy Theorists, Kicks
Them Offline*, EFF, https://www.eff.org/takedowns/facebook-treats-
punk-rockers-crazy-conspiracy-theorists-kicks-them-offline............22

*Gettr*, https://gettr.com/onboarding ........................................................17

Jillian C. York & David Greene, *How to Put COVID-19 Content
Moderation
Into Context*, Brookings TechStream, May 21, 2020,
https://www.brookings.edu/techstream/how-to-put-covid-19-content-
moderation-into-context/ ..................................................................16

Jillian C. York, *Silicon Values: The Future of Free Speech Under
Surveillance Capitalism* (Verso 2021).........................................21, 22

Kari Paul, *Naked protesters condemn nipple censorship at Facebook
headquarters*, The Guardian (June 3, 2019),
https://www.theguardian.com/technology/2019/jun/03/facebook-nude-
nipple-protest-wethenipple ................................................................14

Kevin Anderson, *YouTube Suspends Egyptian Blog Activist's Account*,
The Guardian (Nov. 28, 2007),
https://www.theguardian.com/news/blog/2007/nov/28/youtube
suspendsegyptianblog ...............................................................21, 22, 23

*Letting the Sun Shine In: Transparency and Accountability in the
Digital Age*, UNESCO (2021),
https://unesdoc.unesco.org/ark:/48223/pf0000377231 .......................28

Malachy Browne, *YouTube Removes Videos Showing Atrocities in Syria*,
N.Y. Times, Aug. 22, 2017,
https://www.nytimes.com/2017/08/22/world/middleeast/syria-youtube-
videos-isis.html ..................................................................................23

Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing
LGBT Videos—and Adding Anti-LGBT Ads to Some*, The Verge,
June 4, 2018, https://www.theverge.com/2018/6/4/17424472/youtube-
lgbt-domentization-ads-alogrithm ....................................................23

*Membership Rules*, Vegan Forum, https://www.veganforum.org/help/terms/ .......20

Mike Masnick*, Masnick's Impossibility Theorem: Content Moderation
At Scale Is Impossible To Do Well*, Techdirt, Nov. 20, 2019,
https://www.techdirt.com/articles/20191111/23032743367/masnicks-

impossibility-theorem-content-moderation-scale-is-impossible-to-do-well.
shtml..........................................................................................................21

*Moderator Code of Conduct*, Reddit,
  https://www.redditinc.com/policies/moderator-guidelines...............................13

ProAmericaOnly, https://proamericaonly.org .......................................................19

RallyPoint, https://www.rallypoint.com/...............................................................19

Ravelry, https://www.ravelry.com .......................................................................19

*Reddiquette*, Reddit, https://reddit.zendesk.com/hc/en-us/articles/205926439-
  Reddiquette ....................................................................................................13

*Report Content on Facebook*, Facebook,
  https://www.facebook.com/help/181495968648557?rdrhc.................................13

*Roblox Community Standards*, Roblox, https://en.help.roblox.com/hc/
  en-us/articles/203313410-Roblox-Community-Standards ...........................18, 19

Ryan Mac, *Instagram Censored Posts About One of Islam's Holiest
  Mosques, Drawing Employee Ire*, BuzzFeed News, May 12, 2021,
  https://www.buzzfeednews.com/article/ryanmac/instagram-facebook-
  censored-al-aqsa-mosque....................................................................................22

*Strava Community Standards*, Strava, https://www.strava.com/community-
  standards .........................................................................................................19

*Strava Terms of Service*, Strava, https://www.strava.com/legal/terms#conduct.....19

Taylor Wofford, *Twitter Was Flagging Tweets Including the Word "Queer"
  as Potentially "Offensive Content*, Mic, June 22, 2017,
  https://www.mic.com/articles/180601/twitter-was-flagging-tweets-
  including-the-word-queer-as-potentially-offensive-content...............................24

*Terms of Use,* Gettr, https://gettr.com/terms .........................................................17

The Democratic Hub, https://www.democratichub.com .........................................20

*The Rules*, SmokingMeatForums.com,
  https://www.smokingmeatforums.com/help/rules/.............................................20

The Santa Clara Principles, https://santaclaraprinciples.org/ ...........................15, 28

*Website Terms and Conditions of Use and Agency Agreement*, Rumble,
  https://rumble.com/s/terms ...............................................................................17

*YouTube Community Guidelines enforcement*, YouTube,
  https://transparencyreport.google.com/youtube-policy/removals.................13, 14

**STATEMENT OF INTEREST OF AMICUS[1]**

The Electronic Frontier Foundation (EFF) is a member-supported, nonprofit civil liberties organization that has worked for over 30 years to protect free speech, privacy, security, and innovation in the digital world. EFF, with over 38,000 members, represents the interests of technology users in court cases and broader policy debates surrounding the application of law to the Internet and other technologies.

**INTRODUCTION**

Although government co-option of the content moderation systems of social media companies is a serious threat to freedom of speech, the social media companies' own First Amendment rights to edit and curate their sites require that liability *against them* be limited to narrow and exceptional circumstances—circumstances not present in this case.

To ensure that the state action doctrine does not nullify platforms' First Amendment rights, this Court should set out a well-defined, though very limited, means for a user to hold a private speech intermediary liable when it cedes its

_____

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amicus certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. With the exception of Plaintiff-Appellant Naomi Wolf whose counsel has not provided a response, parties have consented to the filing of this brief.

editorial control and serves as the vehicle for government censorship of users' speech.

Amicus proposes that in the context of speech intermediaries, a finding of state action be limited to the situations in which, at a minimum: first, the government replaces the intermediary's editorial policy with its own, second, the intermediary willingly cedes its editorial implementation of that policy to the government regarding the specific user speech, and third, the censored party has no possible remedy against the government.

None of these conditions are met in this case. First, individual legislators and government officials urged Twitter to act against certain users or types of content, but they did not replace Twitter's editorial policies. Second, several plaintiffs do not allege that these individual officials ever named them or their content specifically. Third, there is a possible remedy because there was no legal bar to plaintiffs to bring claims against the government. This Court should affirm the district court's dismissal of the claims against Twitter and Jack Dorsey.

## ARGUMENT

## I. APPLYING STATE ACTION THEORY TOO BROADLY WOULD UNDERMINE EDITORIAL FREEDOM

Although government involvement in content moderation is a serious issue around the world, plaintiffs' theory of state action sweeps too broadly and infringes on platforms' constitutionally protected editorial decision-making. *See Manhattan*

*Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1934 (2019) ("Expanding the state-action doctrine beyond its traditional boundaries would expand governmental control while restricting individual liberty and private enterprise."). A censored user has a remedy against the platform only if the government replaces the platform's editorial policy with its own, the platform willingly relinquishes the ultimate publication decision to the government, and the user lacks a remedy against the government.

That this case addresses the use of the state action doctrine to place liability on the private publisher, in addition to the government, is critical. State action analysis is used in two ways: (1) to find that *the government* is liable because an act performed by a private entity is functionally "state action" attributable to the government; and (2) to find that *a private entity* may be liable because it is functionally a "state actor." This case presents only the latter situation, seeking to hold Twitter liable because government officials urged it to moderate content in particular ways, directly threatens Twitter's First Amendment rights, ultimately to the disadvantage of its users.

### A. THE FIRST AMENDMENT REQUIRES CLEARLY DEFINING WHEN A SPEECH INTERMEDIARY IS A STATE ACTOR

Although courts often discuss state action in this context in terms of a "close collaboration" or a "meeting of the minds" between the government and the private actor, *see, e.g.*, *Janny v. Gamez*, 8 F.4th 883, 920 (10th Cir. 2021), the doctrine is

quite limited, even in the absence of countervailing First Amendment concerns. It requires "a symbiotic relationship" that "denotes a functional intertwining" of operations. *Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*, 765 F.2d 1278, 1286, 1287-88 (5th Cir. 1985), *amended,* 777 F.2d 329 (5th Cir. 1985).

But those phrases tend to be conclusions rather than specific points of analysis, and can have widely variant meanings in different contexts. As a result, and not surprisingly, this Court has said that "there is no specific formula for defining state action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 836 (9th Cir. 1999).

The First Amendment, however, requires fixed and definitive standards: the typical fluidity in the state-action-by-collaboration analysis is unacceptable where, as here, a plaintiff seeks to hold a publisher liable as a state actor based on its otherwise constitutionally protected editorial decisions. "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas are clearly marked." *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (quotation marks, ellipsis omitted). *See also United States v. Stevens*, 559 U.S. 460, 470 (2010) (warning against a "free-floating test for First Amendment coverage"); *California State Teachers Ass'n v. State Bd. of Education*, 271 F.3d 1141, 1150 (9th Cir. 2001) (discussing the First Amendment's heightened vagueness standard).

Moreover, defendant publishers must be able to challenge a plaintiff's claims on a motion to dismiss, lest the threat of extensive discovery and prolonged litigation further chill freedom of expression. A defined test assists with this early sorting of meritorious from non-meritorious claims.

**B.  A PRIVATE SOCIAL MEDIA SERVICE CANNOT BEAR LIABILITY AS A STATE ACTOR UNLESS IT HAS WILLINGLY CEDED ITS EDITORIAL DECISION-MAKING TO THE GOVERNMENT**

Amicus thus proposes that a court must make three findings before holding a social media service liable as a state actor because of its collaboration with the government in content moderation decisions.

First, this Court must find that the government has replaced the social media platform's editorial policy with its own.

Second, this Court must find that the social media service willingly relinquished to the government its control over the ultimate publication decision regarding the plaintiff's speech.

Third, the plaintiff must be legally barred from seeking an adequate remedy against the government.

These findings are necessary, but not per se sufficient to establish the social media service as a state actor; there may always be "some countervailing reason against attributing activity to the government." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001).

This test is consistent with the analyses applied by this and other courts.

State action requires more than the private actor seeking government input or being influenced by government experts or politicians. *See German v. Fox*, 267 F. App'x 231, 235 (4th Cir. 2008). There is no state action when the private actor and the government collaborate on a general position but do not agree on specific action against a particular plaintiff. *See Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315-16 (11th Cir. 2000). Nor is it state action when the government merely approves of the private actor's decision. *Sutton*, 192 F.3d at 843.

A key finding in all cases, and *the* critical finding when the purported state actor is a publisher, is whether the private actor has ceased to exercise its own independent judgment. *See Kolinske v. Lubbers*, 712 F.2d 471, 480 (D.C. Cir. 1983) (finding no state action where there is "the interposition of the independent judgment of a private party between the act that allegedly resulted in a constitutional deprivation and the decision of the state"); *Rundus v. City of Dallas*, 634 F.3d 309 (5th Cir. 2011). Thus, even a private actor who exercises authority granted by the government, but does so by adopting and applying its own internal rules, is not a state actor. *See Kidwell v. Transportation Communications Int'l Union*, 946 F.2d 283, 299 (4th Cir. 1991).[2]

---

[2] These factors are consistent with those considered in an analogous context, agency law. Courts analyzing the principal-agent relationship look to whether the

As discussed below, the First Amendment protects editorial decision-making: a publisher does not forfeit those free speech rights so long as it itself makes the editorial decisions. *See Miami Herald Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Thus, in *Sinn v. The Daily Nebraskan*, the court found that a public university newspaper was not a state actor when it refused to publish certain classified advertisements submitted to it because the evidence that the university controlled the editorial decision regarding the plaintiffs' ads was attenuated and speculative. 829 F.2d 662, 664-66 (8th Cir. 1987) (citing *Associates & Aldrich Co. v. Times Mirror Co.,* 440 F.2d 133 (9th Cir. 1971)).

The first two parts of amicus's proposed test reflect that a social media service cannot be liable as a state actor unless the government seizes control of each step of the editorial process. As discussed in greater detail below, for social media services, like other publishers, that process involves both the development of an editorial policy and then the enforcement of that policy as to specific content. As the Eleventh Circuit recently wrote, platforms "publish terms of service or community standards specifying the type of content that it will (and won't) allow on its site." *NetChoice, LLC v. Att'y Gen.*, *Fla.*, 34 F.4th 1196, 1204 (11th Cir. 2022). Then, they "exercise[] editorial judgment" by "remov[ing] posts that violate

---

agent acts on the principal's behalf, subject to the principal's control. *See Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017).

its terms of service or community standards—for instance, those containing hate speech, pornography, or violent content" and "arrang[ing] available content by choosing how to prioritize and display posts—effectively selecting which users' speech the viewer will see, and in what order, during any given visit to the site." *Id*.

Lastly, a court considering whether a private social media service bears liability as a state actor for cooperating with the government in its content moderation decisions must also find that an aggrieved plaintiff lacks an adequate remedy against the government actor. This factor comes into play when an otherwise meritorious claim is blocked by the existence of some special governmental privilege or immunity.

Emphasizing these factors, this Court and other courts have correctly dismissed lawsuits alleging state action between social media platforms and the government based on communication about problematic content. *See, e.g.*, *O'Handley v. Weber*, 2023 WL 2443073 at *6 (9th Cir. 2023) ("Even if we accept O'Handley's allegation that the [government's] message was a specific request that Twitter remove his November 12th post, Twitter's compliance with that request was purely optional."); *Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 930 (N.D. Cal. 2021) ("None of the general statements or questions in Representative Schiff's letter can be interpreted as providing a specific standard of

decision that mandated the particular actions that Facebook took with regard to

CHD's Facebook page.").[3]

### C. A CENSORED USER MAY HOLD THE GOVERNMENT LIABLE FOR FIRST AMENDMENT VIOLATIONS EVEN IN THE ABSENCE OF PRIVATE "STATE ACTION"

When the government exhorts private publishers to censor, the censored

party's first and favored recourse is against the government. And the narrow path

---

[3] To date, courts have uniformly rejected the argument that social media platforms, by moderating content, are state actors under any state action theory. *See, e.g.*, *Prager University v Google LLC*, 951 F.3d 991, 995 (9th Cir. 2020) (rejecting characterization of YouTube as a state actor under the public function test); *Wilson v. Twitter*, No. 20-CV-00054, 2020 WL 3410349, at *1, *4-5 (S.D.W. Va. May 1, 2020) ("While Twitter no doubt provides a valuable public forum . . . this alone is insufficient to establish that Twitter is a state actor."); *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019) ("Facebook and Twitter . . . are private businesses that do not become 'state actors' based solely on the provision of their social media networks to the public."), *affirmed*, 816 Fed. App'x 497 (D.C. Cir. 2019); *Green v. YouTube, LLC*, 2019 WL 1428890, at *4 (D.N.H. Mar. 13, 2019) (there is no "state action giving rise to the alleged violations of [plaintiff's] First Amendment rights" by YouTube and other platforms that are "all private companies"); *Nyabwa v. FaceBook*, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018) ("Because the First Amendment governs only governmental restrictions on speech, [plaintiff] has not stated a cause of action against FaceBook."); *Shulman v. Facebook.com*, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017) (Facebook is not a state actor); *Forbes v. Facebook, Inc.*, 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016) ("Facebook is a private corporation" whose actions may not "be fairly attributable to the state"); *Doe v. Cuomo*, 2013 WL 1213174, at *9 (N.D.N.Y. Feb. 25, 2013) (Facebook is not a state actor under the joint action test); *Tulsi Now, Inc. v. Google, LLC*, No. 19-CV-06444, 2020 WL 4353686 at *1 (C.D. Cal. Mar. 3, 2020) ("Google is not now, nor . . . has it ever been, an arm of the United States government."); *Perez v. LinkedIn Corp.*, No. 20-CV-07238, 2021 WL 519379 at *1, *4 (N.D. Cal. Feb. 5, 2021) ("Courts across the country have found social media companies are private, not state actors.").

to holding private publishers liable as state actors proposed above in no way limits a plaintiff's ability to hold *governments* liable for their role in pressuring social media companies to censor user speech. Obviously, governments themselves are always state actors, and must always act constitutionally.

In First Amendment cases, there is a lower threshold for suits *against government agencies and officials* that coerce private censorship: the government may violate speakers' First Amendment rights with "system[s] of informal censorship" aimed at speech intermediaries. *Bantam Books v. Sullivan*, 372 U.S. 58, 61, 71 (1963).

In *Bantam Books*, the Supreme Court found that "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" against book distributors were enough to violate the book publishers' First Amendment rights. *Id*. at 67. A state commission issued notices to book distributors that "certain designated books," published by plaintiffs, were "objectionable for sale," and that it was the commission's "duty to recommend to the Attorney General prosecution of purveyors of obscenity." *Id.* at 62. The commission also circulated the notices to local police, who usually visited the distributor "to learn what action he had taken." *Id*. at 62-63. Predictably, the distributor stopped selling the effectively banned books. *Id*. at 64. The publishers had standing and a First Amendment remedy against the state commission, even though it was the distributor's action that

10

directly harmed the publishers' sales, and the government did not actually seize any books or prosecute anyone. *Id*. at 64 n.6.

More recently, in *Backpage.com v. Dart*, the Seventh Circuit stopped "a [government] campaign intended to crush [the website] Backpage's adult section ... by demanding that firms such as Visa and MasterCard prohibit the use of their credit cards to purchase any ads on Backpage." 807 F.3d 229, 230 (7th Cir. 2015). On official letterhead, the defendant sheriff requested that the credit card companies "cease and desist" allowing payments for Backpage ads, citing the federal money-laundering statute. *Id*. at 231-32. According to the Seventh Circuit, the sheriff's letter, "in the absence of any threatening language[,] would have been a permissible attempt at mere persuasion." *Id*. at 238. But there was a threat, "Visa and MasterCard got the message[,] and cut all their ties to Backpage." *Id*. at 232. Thus, the court found that Backpage had a First Amendment remedy against the ongoing government coercion of credit card and financial services companies. *Id*. at 239. *See also Novak v. City of Parma*, 932 F.3d 421, 433 (6th Cir. 2019) (citing *Bantam Books*, 372 U.S. at 70) (reversing the dismissal of a claim that a police officer's letter and email to Facebook requesting that comments be removed were "administrative orders that constituted a prior restraint").

**D.**    **A NARROW PATH TO PLATFORM LIABILITY IS NECESSARY TO ACCOMMODATE THE LEGITIMATE CONCERNS FOR GOVERNMENT CO-OPTION OF CONTENT MODERATION SYSTEMS WITHIN THE FIRST AMENDMENT RIGHTS OF PUBLISHERS**

**1.**    **Social media platforms have a First Amendment right to consult outside resources, including the government, in making editorial decisions**

As explained in greater detail below, content moderation is a difficult and often fraught process that even the largest and best resourced social media companies struggle with, often to the frustration of users.

To even hope for fairness and consistency in their decisions, social media companies need to have breathing room to draw on outside resources. Indeed, the First Amendment protects this information gathering part of their editorial process. *See Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Applying state action theory too broadly would restrain and chill conversations about content moderation—not only between platforms and government experts, but also between platforms and users, and platforms and civil society. *Cf. Children's Health Def.*, 546 F. Supp. 3d at 916, 928 (dismissing state action claim against fact-checking service that contracted with Facebook).

Platforms seek feedback from users in a number of ways.

Reddit and Discord rely on certain users to moderate content through the practice of "community moderation." Reddit users manage and create thousands of

communities, called "subreddits." Although Reddit has an overriding content policy, a moderator makes the decisions within each community as guided by Reddit's "Moderator Code of Conduct."[4] Discord employs a similar model.[5] Each site thereby empowers some users to remove and down-rank other users' speech if that speech is against the community's rules.[6] Platforms also commonly rely on users to report content that violates the law or the platform's policies.[7]

YouTube also relies heavily on others flagging content on its site as violating its rules. From July to September of last year, YouTube removed over 250,000 videos due to user complaints.[8]

Platforms also seek input from civil society groups, activists, and other stakeholders who are not necessarily their users. For example, amicus has joined efforts pressuring Facebook to end its ban on pictures of female nipples, which can

---

[4] *Moderator Code of Conduct*, Reddit, https://www.redditinc.com/policies/moderator-guidelines (effective Sept. 8, 2022).

[5] *Discord Moderator Academy*, Discord, https://discord.com/moderation (last visited Mar. 21, 2023).

[6] *See, e.g., Reddiquette*, Reddit, https://reddit.zendesk.com/hc/en-us/articles/205926439-Reddiquette (last visited Mar. 21, 2023).

[7] *See, e.g., Report Content on Facebook*, Facebook, https://www.facebook.com/help/181495968648557?rdrhc (last visited Mar. 21, 2023).

[8] *YouTube Community Guidelines enforcement*, YouTube, https://transparencyreport.google.com/youtube-policy/removals (last visited Mar. 21, 2023).

harm users exploring gender and identity. In response, Facebook now allows some of these images, such as pictures of breastfeeding.[9] YouTube also has a "Trusted Flagger" program that prioritizes complaints from certain entities, including individuals and NGOs, that are "particularly effective" at notifying YouTube of violative content. From January to March of this year, the platform removed over 115,000 videos due to these complaints.[10]

Platforms also seek input from governments. Although concerning, this is appropriate where the government is uniquely situated to verify information—such as, for example, the location of polling places, a list of street closures, or a synopsis of the CDC's current COVID policies.

> **2.  Nevertheless, a narrow path to platform liability must be preserved because of the special risks of government manipulation of content moderation**

Amicus proposes a narrow, defined path to holding social media platforms liable as state actors; but it is a viable path in the correct case.

It is important to preserve a possible path because government involvement

---

[9] Kari Paul, *Naked protesters condemn nipple censorship at Facebook headquarters*, The Guardian (June 3, 2019), https://www.theguardian.com/technology/2019/jun/03/facebook-nude-nipple-protest-wethenipple.

[10] *YouTube Community Guidelines enforcement, supra* n.8; *About the YouTube Trusted Flagger program*, YouTube, https://support.google.com/youtube/answer/7554338 (last visited Mar. 21, 2023).

in private companies' content moderation processes raises human rights concerns not raised by the companies' consultations with other experts. The newly revised Santa Clara Principles, of which amicus curiae is a co-author, specifically scrutinize "State Involvement in Content Moderation." As set forth in the Principles:

> Companies should recognise the particular risks to users' rights that result from state involvement in content moderation processes. This includes a state's involvement in the development and enforcement of the company's rules and policies, either to comply with local law or serve other state interests. Special concerns are raised by demands and requests from state actors (including government bodies, regulatory authorities, law enforcement agencies and courts) for the removal of content or the suspension of accounts.[11]

The governmental manipulation of the already fraught content moderation systems to control public dialogue and silence disfavored voices raises classic First Amendment concerns; indeed, the platforms too must be able to sue the government in the proper circumstances.

And in the exceptional case when the criteria set forth above are met, including a legal bar to a remedy against the government, and there are no countervailing interests, *see Brentwood Acad.,* 531 U.S. at 295-96, relief may also be sought against the private actor.

---

[11] The Santa Clara Principles, https://santaclaraprinciples.org/ (last visited Mar. 21, 2023).

## II.     INTERNET USERS ARE BEST SERVED WHEN SOCIAL MEDIA PLATFORMS CAN EXERCISE THEIR FIRST AMENDMENT-PROTECTED EDITORIAL FREEDOM

The "content moderation" undertaken by Twitter and practically every other social media site is not only constitutionally protected—it is the omnipresent and historic norm.

### A.     MODERATED PLATFORMS ARE THE HISTORIC NORM AND SERVE THE INTERESTS OF USERS AND THE PUBLIC GENERALLY

Twitter is not the first online service to moderate—or edit, or curate—the user speech it publishes. Online services, at least from their point of mass adoption, have all moderated user speech and have rarely published all legal speech submitted to their sites. From the beginning, they made editorial decisions about what they wanted communicated on their services and set rules for their online communities. For example, most platforms banned users from posting non-obscene sexual content, even though such speech is legal and enjoys First Amendment protection. Large-scale, outsourced content moderation emerged in the early 2000s.[12]

Internet users benefit from moderated platforms. Users may prefer

_____

[12] Jillian C. York & David Greene, *How to Put COVID-19 Content Moderation Into Context*, Brookings TechStream, May 21, 2020, https://www.brookings.edu/techstream/how-to-put-covid-19-content-moderation-into-context/.

16

environments that shield them from certain kinds of legal speech, including hateful rhetoric and harassment. Users may want a service that attempts to filter out misinformation by relying on sources they trust. And users uniformly want services to filter out junk content.

As a result, every major general-purpose social media service—those generally open to all users and covering all subject matters—enforces its own content moderation policies.

Gettr, a "social media platform founded on the principles of free speech, independent thought, and rejecting political censorship and 'cancel culture,'"[13] reserves the right to "address" content that attacks any religion or race.[14]

Rumble, a video sharing alternative to YouTube, bars content that "[p]romotes, supports or incites individuals and/or groups which engage in violence or unlawful acts, including but not limited to Antifa groups and persons affiliated with Antifa, the KKK and white supremacist groups and or persons affiliated with these groups."[15]

This First Amendment-protected editorial freedom also allows sites, from very large to very small ones, to limit user speech in order to appeal to specific

---

[13] *Gettr*, https://gettr.com/onboarding (last visited Mar. 21, 2023).

[14] *Terms of Use,* Gettr, https://gettr.com/terms (last updated Jan. 12, 2022).

[15] *Website Terms and Conditions of Use and Agency Agreement*, Rumble, https://rumble.com/s/terms (last modified Oct. 27, 2022).

interests.

Pinterest, a site designed to visually inspire creative projects, has "community guidelines" that "outline what we do and don't allow on Pinterest."[16] Under these guidelines, Pinterest reserves the right to remove several categories of speech: "Adult content," "Exploitation," "Hateful activities," "Misinformation," "Harassment and criticism," "Private information," "Self-injury and harmful behavior," "Graphic Violence and Threats," "Violent actors," "Dangerous goods and activities," "Harmful or Deceptive Products & Practices," and "Impersonation." Pinterest has special rules for comments users post on other users' "Pins," including a ban on "Irrelevant or non-purposeful material."[17]

Roblox, a rapidly growing social network where users build and play their own games, warns that its Community Standards "prohibit things that certain other online platforms allow."[18] For example, Roblox prohibits: "Singling out a user or group for ridicule or abuse," "all sexual content or activity of any kind," "The depiction, support, or glorification of war crimes or human rights violations, including torture," and much political content, including any discussion of political

---

[16] *Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines (last visited Mar. 21, 2023).

[17] *Id.*

[18] *Roblox Community Standards*, Roblox, https://en.help.roblox.com/hc/en-us/articles/203313410-Roblox-Community-Standards (last visited Mar. 21, 2023).

parties or candidates for office.[19]

Strava, a social media platform for athletes, has Community Standards that prohibit posting content that is "harassing, abusive, or hateful or that advocates violence."[20] One of Strava's main features is for cyclists and runners to share their routes, called "segments," on the platform; but Strava's Community Standards allow only "good segments" created with "common sense."[21] The Community Standards also require all users to be "inclusive and anti-racist."[22]

The Internet is also full of smaller specialized services with unique editorial viewpoints—from RallyPoint, a social media platform for members of the armed services,[23] to Ravelry, a social media site focused on knitting.[24] Users can choose between ProAmericaOnly, which promotes itself as "Social Media for Conservatives" and promises "No Censorship | No Shadow Bans | No BS | NO LIBERALS"[25] and The Democratic Hub, an "online community . . . for liberals,

---

[19] *Id.*

[20] *Strava Terms of Service*, Strava, https://www.strava.com/legal/terms#conduct (updated Dec. 15, 2020).

[21] *Strava Community Standards*, Strava, https://www.strava.com/community-standards (last visited Mar. 21, 2023).

[22] *Id.*

[23] RallyPoint, https://www.rallypoint.com/ (last visited Mar. 21, 2023).

[24] Ravelry, https://www.ravelry.com (last visited Mar. 21, 2023).

[25] ProAmericaOnly, https://proamericaonly.org (last visited Mar. 21, 2023).

progressives, moderates, independent[s] and anyone who has a favorable opinion of Democrats and/or liberal political views or is critical of Republican ideology,"[26] and everything else on the political spectrum. And we can choose between Vegan Forum, which does not require its users to be vegan, but since it is a site designed to promote a vegan lifestyle, "will not tolerate members who promote contrary agendas,"[27] and SmokingMeatsForums.com, a "community of barbecue and outdoor cooking enthusiasts dedicated to smoking meat," which more generally bans "fighting or excessive arguing" in its user discussion forums.[28] *See Netchoice v. Attorney General*, 34 F. 4th 1196, 1204, 1213-14 (11th Cir. 2022).

### 1. Moderation Means that Some User Content Will Be Removed, Downranked, or Otherwise Moderated

All of the sites discussed above use editing and curation: they reject, downrank, hide, label, or otherwise moderate user speech.[29] And this sometimes frustrates, angers, or perplexes both the users who posted it and the users who expected to see it.

Sites may moderate speech because the user clearly violated the site's rules,

---

[26] The Democratic Hub, https://www.democratichub.com (last visited Mar. 21, 2023).

[27] *Membership Rules*, Vegan Forum, https://www.veganforum.org/help/terms/ (last visited Mar. 21, 2023).

[28] *The Rules*, SmokingMeatForums.com, https://www.smokingmeatforums.com/help/rules/ (last visited Mar. 21, 2023).

[29] Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1 (2021).

like those above.

But frequently, sites just make mistakes. Content moderation at scale is impossible to do perfectly, and nearly impossible to do well.[30] Even when using a set of precise rules or carefully articulated "community standards," moderated platforms often struggle to draw workable lines between permitted and forbidden speech. Every online forum for user speech, not just the dominant social media platforms, struggles with this problem.

This is neither a new problem, nor one limited to U.S. conservative politics. In 2007, YouTube, only two years old at the time, shut down the account of Egyptian human rights activist Wael Abbas after receiving multiple reports that the account featured graphic videos of police brutality and torture. YouTube's community standards at the time stated that "Graphic, gratuitous violence is not allowed." Just one year before, Abbas became the first blogger to receive the Knight International Journalism Award.[31]

---

[30] *See, e.g.*, Mike Masnick, *Masnick's Impossibility Theorem: Content Moderation At Scale Is Impossible To Do Well*, Techdirt, Nov. 20, 2019, https://www.techdirt.com/articles/20191111/23032743367/masnicks-impossibility-theorem-content-moderation-scale-is-impossible-to-do-well.shtml.

[31] Jillian C. York, *Silicon Values: The Future of Free Speech Under Surveillance Capitalism* 25-27 (Verso 2021); Kevin Anderson, *YouTube Suspends Egyptian Blog Activist's Account*, The Guardian (Nov. 28, 2007), https://www.theguardian.com/news/blog/2007/nov/28/youtubesuspendsegyptianblog.

And government's attempts to influence content moderation dates back just as far: Abbas's account was restored only after the U.S. State Department communicated with YouTube's new owner, Google.[32]

Platforms continue to make a variety of contentious and erroneous decisions every day. In January 2021, Facebook's updated policy to remove "harmful conspiracy theories" resulted in it disabling a punk rock band's page because its name, Adrenochrome, is a chemical that was a central part of the QAnon conspiracy theory.[33] Also in 2021, Instagram removed posts about one of Islam's holiest mosques, Al-Aqsa, because its name is contained within the name of a designated terrorist organization.[34] Sex worker advocates have documented how they are routinely shadow-banned across a variety of social media platforms.[35] YouTube has removed videos documenting atrocities in Syria and elsewhere under

---

[32] *Id.*

[33] *Facebook Treats Punk Rockers Like Crazy Conspiracy Theorists, Kicks Them Offline*, EFF, https://www.eff.org/takedowns/facebook-treats-punk-rockers-crazy-conspiracy-theorists-kicks-them-offline (last visited Mar. 21, 2023).

[34] Ryan Mac, *Instagram Censored Posts About One of Islam's Holiest Mosques, Drawing Employee Ire*, BuzzFeed News, May 12, 2021, https://www.buzzfeednews.com/article/ryanmac/instagram-facebook-censored-al-aqsa-mosque.

[35] *See* Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, Oct. 2020, https://hackinghustling.org/wp-content/uploads/2020/09/Posting-Into-the-Void.pdf.

its graphic violence policy.[36] YouTube has also been accused of restricting and demonetizing LGBTQ+ content.[37]

Twitter is thus just one example of an actively curated, large social media platform that makes controversial moderation decisions on content from around the world; its actions against plaintiffs are in no way uncommon. For example, Twitter has been repeatedly criticized for moderating pro-Palestinian tweets, including removing those reporting on the events in Sheikh Jarrah in 2021[38] and blocking accounts associated with a major Palestinian news publication.[39] In 2017, users protested that Twitter had marked tweets containing the word "queer" as

---

[36] Malachy Browne, *YouTube Removes Videos Showing Atrocities in Syria*, N.Y. Times, Aug. 22, 2017, https://www.nytimes.com/2017/08/22/world/middleeast/syria-youtube-videos-isis.html; Kevin Anderson, *YouTube Suspends Egyptian Blog Activist's Account*, The Guardian, Nov. 28, 2007, https://www.theguardian.com/news/blog/2007/nov/28/youtubesuspendsegyptianblog.

[37] Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing LGBT Videos—and Adding Anti-LGBT Ads to Some*, The Verge, June 4, 2018, https://www.theverge.com/2018/6/4/17424472/youtube-lgbt-domentization-ads-alogrithm.

[38] Article 19, *Sheikh Jarrah: Facebook and Twitter silencing protestors, deleting evidence*, May 10, 2021, https://www.article19.org/resources/sheikh-jarrah-facebook-and-twitter-silencing-protests-deleting-evidence/.

[39] Al Jazeera, *Twitter suspends accounts of Palestinian Quds News Network*, Nov. 2, 2019, https://www.aljazeera.com/news/2019/11/2/twitter-suspends-accounts-of-palestinian-quds-news-network.

offensive.[40]

## 2. In Praise of the (Hypothetical) Unmoderated Platform

A legal regime of editorial freedom also leaves open the possibility of unmoderated platforms, where the operator plays no role in selecting content or ordering its presentation. Although unmoderated forums are at present highly rare, they conceivably benefit internet users and the public generally: they eliminate corporate editors, inhibiting the creation of silos, and allow users to engage in free-form discussions and debates of their choosing and find unexpected sources of ideas and information. Users need not be concerned that their communications are actively screened, nor that they may accidentally run afoul of content rules. Unmoderated platforms can be especially valuable to political dissidents and others who may be targeted for censorship by governments and private actors. They would provide an accessible forum for speech that is unpopular, disfavored, or inadvertently suppressed.

---

[40] Taylor Wofford, *Twitter Was Flagging Tweets Including the Word "Queer" as Potentially "Offensive Content*, Mic, June 22, 2017, https://www.mic.com/articles/180601/twitter-was-flagging-tweets-including-the-word-queer-as-potentially-offensive-content.

Unfortunately, there are no large-scale positive models of unmoderated forums. 8kun,[41] formerly 8chan, is probably the most well-known example and it is notoriously rife with hateful speech.

Nevertheless, liability regimes must allow for the possibility of positive models.

## B. PLAINTIFFS' STATE ACTION THEORIES WOULD VIOLATE ONLINE PLATFORMS' FIRST AMENDMENT RIGHTS

This Court must account for Twitter's considerable First Amendment interests in applying any state action theory.

Contrary to plaintiffs' argument, every court that has ruled on the issue has rightfully found that private entities that operate online platforms for speech and that open those platforms for others to speak enjoy a First Amendment right to edit and curate that speech.

The Supreme Court has long held that private publishers have a First Amendment right to control the content of their publications. *Miami Herald Co. v. Tornillo*, 418 U.S. 241, 254 (1974); *see also Los Angeles v. Preferred Comms., Inc.*, 476 U.S. 488, 494 (1986) (recognizing cable television providers' First Amendment right to "exercis[e] editorial discretion over which stations or programs to include in its repertoire"); *cf. Manhattan Community Access Corp.*,

---

[41] 8chan, https://en.wikipedia.org/wiki/8chan (last visited June 2, 2022).

139 S. Ct. at 1930 (reaffirming that "when a private entity provides a forum for speech," "[t]he private entity may . . . exercise editorial discretion over the speech and speakers in the forum").

Though phrased in terms of traditional print newspaper publishers, *Tornillo* has been applied in a variety of speech contexts, including once in the 2019 and thrice in the 2018 Supreme Court terms. *See Manhattan Community Access*, 139 S. Ct. at 1928; *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018); *National Inst. of Family Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1745 (2018) (Thomas, J., concurring). In one noteworthy non-press setting, the Supreme Court applied *Tornillo*, among other authorities, in holding that the organizers of a parade had a First Amendment right to curate its participants, and thus could not be required to include a certain message. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569-70 (1995). As the *Hurley* Court explained, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech. Nor, under our precedent, does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication." *Id.*

The Eleventh Circuit recently joined the many other federal courts that have applied *Tornillo* to protect the right of social media companies to moderate their users' posts. The court regarded *Tornillo* as "the pathmarking case" on editorial judgment and upheld an injunction against a Florida law that would have required online platforms to publish speech from and about political candidates and from "journalistic enterprises" as defined by the law. *NetChoice*, 34 F.4th at 1213. "Platforms employ editorial judgment to convey some messages but not others and thereby cultivate different types of communities that appeal to different groups." *Id.* Users like plaintiffs may feel that platforms like Twitter have treated them unfairly, but "private actors have a First Amendment right to be 'unfair'—which is to say, a right to have and express their own points of view." *Id.* at 1228 (citing *Tornillo*, 418 U.S. at 258).

Moreover, this Court has specifically rejected the argument that a social media platform is a public forum that loses its editorial freedom and must remain open to all as a government-controlled forum would be. *See Prager University v Google LLC*, 951 F.3d 991, 995 (9th Cir. 2020).

## III. INTERNET USERS ARE BEST SERVED BY VOLUNTARY MEASURES FOR CONTENT MODERATION

Rather than having courts deem private online platforms state actors, thus mandating publication, Internet users are best served by "consensual . . . mechanisms," in the words of the Supreme Court in *Tornillo*, 418 U.S. at 254,

particularly the voluntary adoption of a human rights framework for content moderation.

Both companies and users can look to several models for self-regulation. EFF is among a broad range of civil society groups that has endorsed the aforementioned Santa Clara Principles.[42] UNESCO has published principles focusing on transparency around content moderation decisions that are purposefully high-level, rather than prescriptive, in recognition of the "[v]ast differences in types, sizes, business models and engineering of internet platform companies" that make government mandates inappropriate.[43] And the Internet Commission's annual Accountability Report aims to identify best practices scaled to an online service's maturity.[44]

## CONCLUSION

For the foregoing reasons, amicus respectfully requests that the Court affirm district court's dismissal of Twitter and Jack Dorsey from this matter.

---

[42] Santa Clara Principles, https://www.santaclaraprinciples.org/. Relevant to the issues raised in this case, the Santa Clara Principles establish a standard whereby companies voluntarily disclose to users when a government has requested action on that user's posts, and other transparency measures regarding interactions with governments regarding content moderation.

[43] *Letting the Sun Shine In: Transparency and Accountability in the Digital Age* at 1, UNESCO (2021), https://unesdoc.unesco.org/ark:/48223/pf0000377231.

[44] *Accountability Report 2.0*, Internet Comm'n (2022), https://inetco.org/report.

Dated: March 22, 2023          By:  /s/ Mukund Rathi
                                    Mukund Rathi
                                    David Greene
                                    ELECTRONIC FRONTIER
                                    FOUNDATION
                                    815 Eddy Street
                                    San Francisco, CA 94109
                                    Telephone:  (415) 436-9333
                                    Email: mukund@eff.org,
                                    davidg@eff.org

                                    *Counsel for Amicus Curiae*
                                    *Electronic Frontier Foundation*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1. This Brief of Amicus Curiae the Electronic Frontier Foundation in Support of Defendants-Appellees and Affirmance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,068 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: March 22, 2023       /s/ Mukund Rathi
                                       Mukund Rathi

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 22, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  March 22, 2023                    /s/ Mukund Rathi
                                          Mukund Rathi