**No. 22-15961**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

Donald Trump *et al.*,

*Plaintiffs-Appellants*,

v.

Twitter, Inc., and Jack Dorsey,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-08378-JD
Hon. James Donato

_____

**APPELLANT NAOMI WOLF'S REPLY BRIEF**

_____

Scott J. Street (Cal. Bar No. 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

*Attorneys for Appellant Naomi Wolf*

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION…………………………………………………………………6

ARGUMENT……………………………………………………………………8

    A.    The State Action Doctrine Is a Flexible Concept That, at the …………..8
           Pleading Stage, Was Satisfied by Appellants' Alleging That
           Twitter Relied on the U.S. Government to Decide What
           Statements Regarding COVID-19 to Censor.

    B.    Dr. Wolf Alleged that the U.S. Government Encouraged Twitter …..…13
           to Censor Her in Ways that Satisfy the State-Action Doctrine

    C.    This Important Constitutional Case Is Not Moot………………………22

CONCLUSION…………………………………………………………………...24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mfrs. Mutual Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999)……………………………………………………20

*Atkinson v. Meta Platforms, Inc.*,
    No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)…………...15-17

*Bekier v. Bekier*,
    248 F.3d 1051 (11th Cir. 2001)…………………………………………23

*Blum v. Yaretsky*,
    457 U.S. 991 (1982)…………………………………………………10, 13

*Brentwood Academy v. Tennessee Secondary School Athletic Assoc.*,
    531 U.S. 288 (2001)…………………………………………...…………9, 10

*Caviness v. Horizon Community Learning Center, Inc.*,
    590 F.3d 806 (9th Cir. 2010)……………………………………………19

*Chudacoff v. Univ. Med. Ctr. of S. Nevada*,
    649 F.3d 1143 (9th Cir. 2011)……………………………………...…19

*Cohen v. Cal.*,
    403 U.S. 15 (1971)………………………………………………………21

*Denver Area Ed. Telecommc'ns Consortium, Inc.*,
    518 U.S. 727 (1996)…………………………………………………...…21

*Doe v. Google, LLC*,
    No. 21-16934, 2022 WL 17077497
    (9th Cir. Nov. 18, 2022)………………………………...……………..…16, 17

*Dow Jones & Co. v. Kaye*,
    256 F.3d 1251 (11th Cir. 2001)…………………………………………23

*Gallagher v. Neil Young Freedom Concert*,

    49 F.3d 1442 (10th Cir. 1995)……………………………………………...12

*Heineke v. Santa Clara Univ.*,

    965 F.3d 1009 (9th Cir. 2020)……………………………………………...19

*In re Burrell*,

    415 F.3d 994 (9th Cir. 2005)……………………………………………….23

*Lee v. Katz*,

    276 F.3d 550 (9th Cir. 2002)…………………………………………...10, 12

*Lugar v. Edmondson Oil Company*,

    457 U.S. 991 (1982)……………………………………………………8, 9

*Manhattan Community Access Corporation v. Halleck*,

    139 S. Ct. 1921 (2019)…………………………………………...………21

*O'Handley v. Weber*,

    62 F.4th 1145 (9th Cir. 2023) …………………………………...12, 16-18

*Prager University v. Google LLC*,

    951 F.3d 991 (9th Cir. 2020) …………………………………………15

*Radcliffe v. Rainbow Construction Company*,

    254 F.3d 772 (9th Cir. 2001) …………………………………………12

*Rawson v. Recovery Innovations, Inc.*,

    975 F.3d 742 (9th Cir. 2020) ……………………………………11, 12, 17

*Roberts v. AT&T Mobility, LLC*,

    871 F.3d 833 (9th Cir. 2017) …………………………………………20

*Rutenberg v. Twitter, Inc.*, No. 21-160743,

    2022 WL 1568360, (9th Cir. May 18, 2022) …………………….…14, 16

*Taylor v. Barker*,

    575 U.S. 822 (2015) …………………………………………………….…10

*Tsao v. Desert Palace, Inc.*,

4

698 F.3d 1128 (9th Cir. 2012) ……………………………………….…13

*Turner Broadcasting Sys., Inc. v. FCC*,

512 U.S. 622 (1994) …………………………………………………….…21

*United States v. Kincaide*,

379 F.3d 813 (9th Cir. 2004) …………………………………………22

*United States v. Munsingwear*,

340 U.S. 36 (1950) ……………………………………………...……23

*Villegas v. Gilroy Garlic Festival*,

541 F.3d 950 (9th Cir. 2008) ………………………………………11, 12, 16

## Statutes and Codes                                                    Page(s)

47 U.S.C. § 230 (Communications Decency Act of 1996) ………………………..7

## Other

George Orwell, Animal Farm (Times Literary Supplement, Sept. 15, 1972)…..21
*available at* https://www.orwellfoundation.com/the-orwell-foundation/orwell/essays-and-other-works/the-freedom-of-the-press/

## INTRODUCTION

Much ink has been spilled already in this appeal, and for good reason. It presents one of the most important constitutional questions of our time: can the United States government censor its critics by encouraging a private party, which effectively has a monopoly over its area of discourse, to silence the dissidents?

The parties have different answers to that question, of course. But, at root, it is a mixed question of law and fact. It requires the development of evidence and the application of law to that evidence. That has not happened yet. Instead, the District Court decided the case on a motion to dismiss. In doing so, it violated settled rules of federal procedure. It did not assume that the complaint's factual allegations were true. It ignored them. It adopted Twitter's explanation and construed the allegations in the light most favorable to Twitter, not Appellants, as the law requires.[1]

The District Court also misconstrued the law that governs the state action analysis. It required that Appellants identify a government created "rule of decision" that dictated Twitter's actions. The Supreme Court has never had such a rigid requirement for state action cases. To the contrary, it has said that that the state action rules are flexible and should focus on deciding whether private action

---

[1] Unless noted otherwise, defined terms have the meaning given to them in Dr. Wolf's opening brief.

is "fairly attributable" to the state. This Court has also spent decades expanding the scope of the state action doctrine, especially at the pleading stage, with the most liberal corners of its bench protesting any efforts to narrow the test.

This should have been an easy case to decide below, especially with respect to Appellant Naomi Wolf. Dr. Wolf alleged that Twitter censored her because the United States government told it to. The government did not want people to hear her thoughts. Those allegations state a claim under the state-action doctrine because, if proven, they provide a basis to hold Twitter liable under several of the Court's joint-action tests.

Twitter did not show otherwise in its opposition brief. Its brief rests on incorrect legal arguments and factual arguments that are not proper at this stage.

There is also no merit to Twitter's argument that, like other publishers of information (say, *The New York Times*), it has a First Amendment right to censor people on its platform. The Fifth Circuit Court of Appeals rejected that argument in a separate case. The argument is also inconsistent with Twitter's business model and past business practices. In fact, the immunity Twitter repeatedly seeks under Section 230 of the Communications Decency Act of 1996—the immunity that has been described as fundamental to its business model—hinges on the assumption that Twitter is *not* a publisher like the *Times* and thus should *not* be subject to the same laws that govern publishers.

In any event, even if Twitter has a right to censor, like any private party, it can be sued under the state action doctrine when it makes the decision to censor based on the government's encouragement or coercion. That is the case here.

Finally, this case is not moot. Twitter still believes it has a right to censor people for criticizing the government. It has stopped enforcing some content moderation policies, including the COVID "misinformation" policy, but it did so only after Elon Musk, the world's richest man, bought Twitter and told it to stop enforcing the policies. Twitter could start enforcing the policies again, especially if Mr. Musk relinquishes control of the company (as he said he might do). Furthermore, the importance of the underlying constitutional issues militates against dismissing this appeal as moot.

## ARGUMENT

The judgment of dismissal should be reversed because the District Court misconstrued and misapplied the law in rendering it. It clearly erred.

A. **The State Action Doctrine Is a Flexible Concept That, at the Pleading Stage, Was Satisfied by Appellants' Alleging That Twitter Relied on the U.S. Government to Decide What Statements Regarding COVID-19 to Censor.**

Twitter's primary argument is that, under the Supreme Court's decision in *Lugar v. Edmondson Oil Company*, 457 U.S. 991 (1982), Appellants had to identify a government created "rule of decision" that Twitter relied on when it

censored them. Twitter calls this a "demanding, two-part test" that the Supreme Court uses to identify state action. It is wrong.

The Supreme Court itself has never referred to *Lugar* as a bright-line test for identifying state action. To the contrary, and as explained at length in Appellants' opening brief, the Supreme Court distinguished *Lugar* when it reversed the Sixth Circuit's state action decision in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). It stated, unequivocally, that the state action analysis is a functional one, focused on deciding whether "seemingly private behavior may be fairly treated as that of the State itself." 531 U.S. at 295 (quotations omitted). It then said: "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* It added that "no one fact can function as a necessary condition across the board … nor is any set of circumstances absolutely sufficient …." *Id.* at 295-96.

Of course, the *Brentwood* court recognized that, "[a]midst such variety, examples may be the best teachers …." *Id.* at 296. And, in *Brentwood*, past cases involving the entwinement of government and private actors supported the Court's conclusion that state action had been adequately pleaded. *See id.* at 297-302 (explaining why). But the Court did not say that such examples are necessary. It did not create a standard like the one that exists for qualified immunity in a

damages case, where the plaintiff must show that the defendant violated clearly established law, a high standard that is proven only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barker*, 575 U.S. 822, 825 (2015) (quotations omitted). Thus, *Brentwood* represented a sea change in the Supreme Court's state action jurisprudence. It stopped the narrowing of the doctrine that had developed since the 1980s and moved the doctrine back to the functional and factual analysis that Justice Brennan had urged: "'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'" *Blum v. Yaretsky*, 457 U.S. 991, 1013 (1982) (Brennan and Marshall, JJ., dissenting).

This Court did the same thing. For example, in *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002), the Court reversed a district court's decision that found no state action in a case brought by preachers against a private party (the "OAC") who leased land (the "Commons") from the City of Portland. The OAC had occasionally excluded the preachers from preaching on the land, a plaza near Portland's basketball arena. The City played no role in excluding the preachers from the property: the OAC, a private entity, made that decision for its own reasons. *Id.* at 552-53. But the Court "conclude[d] that, in regulating speech within the Commons, the OAC performs an exclusively and traditionally public function within a public forum." *Id.* at 557. That satisfied the state action doctrine.

10

Similarly, in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), the Court reversed a grant of summary judgment for the defendant, a private entity that operated a private hospital, which the plaintiff sued after he was involuntarily committed at the hospital. The Court discussed the numerous tests used to identify state action, but it emphasized that, "[a]t bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 748 (quotations omitted).

Indeed, until 2021, on the rare occasion that this Court applied the state action doctrine narrowly, it did so over the objection of its most liberal judges. For example, in *Villegas v. Gilroy Garlic Festival*, 541 F.3d 950 (9th Cir. 2008) (en banc), the Court, sitting *en banc*, affirmed the district court's grant of summary judgment for the private association that operates the Gilroy Garlic Festival, and which was sued for excluding the plaintiff (the member of a group called the Top Hatters). Five judges dissented. They explained that, when "deciding whether conduct of private parties amounts to government action, we engage in a highly factual inquiry." *Id.* at 958 (Thomas, Wardlaw, Fisher, Paez and Gould, JJ., dissenting). They criticized the majority's focus on just one of the state action tests—not the one (joint action) that mattered—and they said that "in limiting its analysis to whether organizing a garlic festival is an exclusive governmental

11

function, the majority ignores both the ultimate state action inquiry and the Supreme Court's traditional means of answering that question: 'taking a flexible approach … and applying a variety of tests to the facts of each case.'" *Id.* at 960 (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (cleaned up).

The *Villegas* dissenters also emphasized the procedural posture, a defense motion for summary judgment, and blasted the majority for not applying it faithfully. "Viewing the evidence in the light most favorable to the Top Hatters, as we are required to do here—a standard the majority fails to mention, let alone apply—demonstrates that the relationship between the City and the Festival Association is sufficiently intertwined to create a triable issue of fact as to whether the joint action test has been satisfied." *Id.*[2]

Those words should echo in the Court's mind today. *Villegas* was wrongly decided. That is why no other circuit court has cited it, and why this Court has mentioned it just a few times, usually in passing. *See, e.g., O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023) (mentioning *Villegas* just once and only for a

---

[2] *Rawson* was decided on summary judgment, while *Lee* came to this Court after a bench trial. Another case cited by Twitter, *Radcliffe v. Rainbow Construction Company*, 254 F.3d 772, 783 (9th Cir. 2001), was also decided on summary judgment, not at the pleading stage.

basic statement of law); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (same).

Twitter cannot square its narrow construction of the state action doctrine with that history. As Justice Brennan explained:

> If the Fourteenth Amendment is to have its intended effect as a restraint on the abuse of state power, courts must be sensitive to the manner in which state power is exercised. In an era of active government intervention to remedy social ills, the true character of the State's involvement in, and coercive influence over, the activities of private parties, often through complex and opaque regulatory frameworks, may not always be apparent. But if the task that the Fourteenth Amendment assigns to the courts is thus rendered more burdensome, the courts' obligation to perform that task faithfully, and consistently with the constitutional purpose, is rendered more, not less, important.

*Blum*, 457 U.S. at 1012. Of course, this does not mean that conclusory allegations of state action will suffice, nor does it change the evidentiary burdens the parties face on summary judgment. And the cases that *hold* private parties liable as state actors may be rare. But a plaintiff who pleads facts that, accepted as true and liberally construed in her favor, show a plausible argument that a private party's actions were attributable to the state deserves a chance to gather discovery and prove her case.

### B. Dr. Wolf Alleged that the U.S. Government Encouraged Twitter to Censor Her in Ways that Satisfy the State-Action Doctrine.

The complaint alleged such facts for Dr. Wolf. ER 343-352 (¶¶ 78-104). She would have alleged even more facts in an amended complaint, based on the

documents the Louisiana and Missouri Attorneys General obtained and which formed the basis for Dr. Wolf's Rule 60 motion. Dist. Ct. ECF 177. Those allegations state a plausible claim that Twitter engaged in state action under the joint action and encouragement/coercion tests. Opening Brief, at 9-20 (explaining why).

Twitter did not show otherwise. For the most part, it ignored the complaint's allegations about the extensive cooperation (at least once called a "partner[ship]," Dist. Ct. ECF 180 at p. 37) between Twitter and the United States government concerning COVID-19 information, instead focusing on Twitter's decision to ban Donald Trump after the January 6 riots. That makes sense, as Twitter could plausibly argue that it decided to ban Trump for its own reasons, not because the United States government told it do so.[3] *See Rutenberg v. Twitter, Inc.*, No. 21-160743, 2022 WL 1568360, at *1 (9th Cir. May 18, 2022) (finding that "it would be 'ironic' to conclude that Twitter's imposition of sanctions against a public official—sanctions the official 'steadfastly opposed'—is state action"). No such argument can be made with respect to Dr. Wolf, as the complaint alleged that Twitter worked *with* the CDC and other federal officials to censor statements about COVID-19 that the government did not want people to hear. ER 343-352 (¶¶ 78-

---

[3] This does not mean that Dr. Wolf agrees with Twitter's argument, or that Twitter would be able to prove its case at trial, but it shows a difference between the claims.

14

104); *see also* ER 351 (¶ 100) ("Twitter functions as an agent of the Executive

Branch in censoring uploads of the Plaintiff, and/or the Putative Class Members,

regarding COVID-19.").

These allegations state a claim even under the technology related state action

cases the Court has issued during the past decade. For example, in *Prager*

*University v. Google LLC*, 951 F.3d 991, 995-96 (9th Cir. 2020), the Court

dismissed a First Amendment claim brought by a conservative commentator after

YouTube tagged some of his company's videos for its "Restricted Mode." That

mattered to Prager because third parties cannot advertise in Restricted Mode.

*Prager* did not discuss the state action doctrine at length because Prager only

alleged that Google should be held liable under the public function test, with

YouTube designated a public forum. *Id.* at 996-99.

The plaintiff in *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL

5447022, at *1 (9th Cir. Nov. 22, 2021), did allege that a Big Tech company

(Facebook) engaged in state action under the coercion and joint action tests, but his

allegations were conclusory or "cast Meta Platforms' decision to adopt community

standards [used to censor him] as a self-interested business decision." Notably,

Atkinson did not allege any facts that showed coordination between Facebook and

the government, and the Court declined to "infer that state officials 'dominate[d]'

Meta Platforms' decision making from Atkinson's allegations." *Id.* (quoting

*Villegas*, 541 F.3d at 955). Similar defects existed in *Rutenberg*, a case brought by a private citizen that challenged Twitter's decision to suspend President Trump's account. The Court emphasized Rutenburg's "acknowledge[ment] that Twitter exercised its own 'discretion and authority' in moderating President Trump's account, and that Twitter acted as President Trump's 'opponent' in doing so." *Rutenberg*, 2022 WL 1568360, at *1.

And in *Doe v. Google, LLC*, No. 21-16934, 2022 WL 17077497, at *1-2 (9th Cir. Nov. 18, 2022), the Court affirmed an order of dismissal in a case that challenged YouTube's termination of their channels. Although the plaintiffs "cite[d] seven events involving federal officials regarding YouTube, Google, or general social media platform moderation policies" they consisted mostly of comments by legislators, notably House Speaker Nancy Pelosi. The Court had no trouble finding that the plaintiffs failed to allege state action under the joint action test because they "failed to show any link between the alleged actions by the Speaker and the House and YouTube's decision to remove [their] channels." *Id.* at *3. The Court rejected their coercion theory for a similar reason. *Id.* at *2.

That set the stage for *O'Handley*. There a conservative political commentator sued Twitter for suspending his account due to alleged violation of Twitter's election integrity policy. Unlike the plaintiffs in *Atkinson*, *Rutenburg* and *Doe*, O'Handley had evidence that Twitter suspended his account at least once

16

after a California government agency called the Office of Elections Cybersecurity (OEC) notified Twitter of his post. O'Handley alleged that this government notification process was sufficient to show state action under the joint action and nexus texts. 62 F.4th at 1153-55.

The Court struggled with these allegations, issuing a lengthy (and published) opinion after rejecting the appeals in *Atkinson*, *Rutenburg* and *Doe* in short, unsigned dispositions. It dispatched O'Handley's nexus argument by stating that "[t]he OEC offered Twitter no incentive for taking down the post it flagged." *Id.* at 1158. It said the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.*

Of course, in saying that, the Court necessarily viewed the allegations in the light most favorable to Twitter, not the other way around. It improperly drew inferences in Twitter's favor. The panel seemed to recognize that, qualifying its nexus analysis by noting that "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government," but it concluded that "we do not see the high degree of entwinement needed for state action in this case." *Id.* at 1158 n.2 (citing *Rawson*).

17

That high degree of entwinement does exist here. ER 343-352 (¶¶ 78-104); *see also* Dist. Ct. ECF 177, 180 (Dr. Wolf's Rule 60 motion). This case also presents the type of facts that *O'Handley* said would satisfy the joint action and nexus tests. In fact, the Court specifically acknowledged that "[a] constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *O'Handley*, 62 F.4th at 1159.

If this case does not fit that example, what does? The complaint alleged the types of facts that *O'Handley* said would adequately plead state action in this context, including the U.S. government interjecting itself into Twitter's content moderation policies and the government telling Twitter what information to censor. ER 346-54. These were not isolated incidents but part of a partnership between the U.S. government and Big Tech companies to, as the Surgeon General said, "help lift up the voices of credible health authorities" like government agencies "so that the true voices of experts can shine through." ER 348-49 (¶ 97); *see also* Dist. Ct. ECF 180, at pp. 14-32 (referring to numerous meetings between tech executives and government officials about COVID-19 censorship policies).

Unlike in prior cases, those facts do not have to be inferred here. They were alleged in detail and could be alleged in even more detail now, based on the documents released by the Louisiana and Missouri Attorneys General. Dist. Ct. ECF 177 (explaining why). Moreover, unlike in previous cases, the Court cannot

infer that Twitter made an independent decision to block information about COVID-19 Twitter based its COVID information policies on what the U.S. government wanted people to hear, or not hear, about COVID-19 because the complaint alleged otherwise: it was the government's opinion about the verity of Dr. Wolf's statements that caused Twitter to censor Dr. Wolf. She said something that the government—the "credible health authorities"—said was wrong. ER 346-50; *see also* Dist. Ct. ECF 177, at p. 6, and ECF 180, at pp. 10, 34 (showing that government told Twitter to censor Dr. Wolf and Twitter complied). That is the type of action that, while informal, could, if proven, constitute state action under the nexus or joint action tests. *Cf. Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (explaining that section 1983 liability can be based not only on formal laws but on any government "custom[ ] or usage"); *see also Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143, 1149 (9th Cir. 2011) (noting that "'under color of law'" requirement under § 1983 is the same as the Fourteenth Amendment's 'state action' requirement").

This does not mean that Twitter had to cloak itself in the power of the state, nor that Appellants had to identify a specific threat made by the U.S. government that got Twitter to do its bidding. True, merely accepting public funds and complying with generally applicable laws will not suffice. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020). And laws that simply give federal

protection to private actions (like arbitration agreements) do not automatically transform private action into state action. *Roberts v. AT&T Mobility, LLC*, 871 F.3d 833, 844-45 (9th Cir. 2017). For good reason, as the Supreme Court has said it "will not tolerate the imposition of constitutional restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (cleaned up) (quotations omitted). But if the state action doctrine means anything, it must be applied faithfully when a private party like Twitter does the government's bidding at the government's behest and to promote the government's own, preferred message.[4]

The Court must recognize that. Its prior decisions show it trying to reconcile its historically liberal approach to the state action doctrine with its similarly liberal approach to the technology industry. But the former should not outweigh the latter, especially when the case involves speech on matters of public concern. "In the realm of speech and expression, the First Amendment envisions the citizen shaping the government, not the reverse; it removes 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will

---

[4] The "threat" cases that Twitter cited on page 35 of its brief included First Amendment retaliation cases against government officials that do not apply here.

ultimately produce a more capable citizenry and more perfect polity.'" *Denver*

*Area Ed. Telecommc'ns Consortium, Inc.*, 518 U.S. 727, 782-83 (1996)

(O'Connor, J., concurring in part and dissenting in part) (quoting *Cohen v. Cal.*,

403 U.S. 15, 24 (1971)). Indeed, the Supreme Court has repeatedly emphasized

that "each person should decide for himself or herself the ideas and beliefs

deserving of expression, consideration, and adherence. Our political system and

cultural life rest upon this ideal." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S.

622, 641 (1994). A similar sentiment appears on the statue of George Orwell

outside the BBC's London headquarters. It reads: "If liberty means anything at all

it means the right to tell people what they do not want to hear." George Orwell,

*Proposed Preface* to ANIMAL FARM (Times Literary Supplement, Sept. 15, 1972)

*available at* https://www.orwellfoundation.com/the-orwell-

foundation/orwell/essays-and-other-works/the-freedom-of-the-press/ (last visited

May 2, 2023).

  The Supreme Court did not deviate from these principles in *Manhattan*

*Community Access Corporation v. Halleck*, 139 S. Ct. 1921 (2019). In *Halleck*, the

plaintiffs argued that a private entity (MNN) "exercises a traditional, exclusive

public function when it operates the public access [television] channels on Time

Warner's cable system in Manhattan." *Id.* at 1928. The majority disagreed and

reversed the Second Circuit's decision, but four justices dissented in an opinion

that echoed the state action doctrine's liberal roots, and which noted that "[t]he right to convey expressive content using someone else's physical infrastructure is not new." *Id.* at 1938 (Sotomayor, Ginsburg, Breyer and Kagan, JJ., dissenting).

Thus, *Halleck* is not the groundbreaking, pro-censorship decision that Twitter claims. And it would be strange for this Court to use *Halleck's* conservative majority opinion to jettison its functional approach to deciding state action and First Amendment cases.

Unfortunately, it has been easy for some judges to deviate from constitutional norms during the COVID-19 pandemic, with people from the president to the ACLU urging Americans to give up their rights to promote public health. "'They that can give up essential liberty to obtain a little safety deserve neither liberty nor safety.'" *United States v. Kincaide*, 379 F.3d 813, 842 (9th Cir. 2004) (en banc) (Reinhardt, Pregerson, Kozinski and Wardlaw, JJ., dissenting) (quoting B. Franklin, *Historical Review of Pennsylvania* (1759)). The Court should return to its roots and apply the functional state action analysis that it has long advocated for.

## C.     This Important Constitutional Case Is Not Moot.

Given the importance of this constitutional issue—something considered so fundamental to American democracy—it would be a mistake for the Court to dismiss the appeal as moot.

22

Dr. Wolf explained in her response to the Court's suggestion of mootness why Elon Musk's purchase of Twitter did not moot this case. ECF 78. We will not repeat those arguments here. But if the Court disagrees, it should not order that the case be dismissed on the current record.

"Where a case becomes moot after the district court enters judgment but before the appellate court has issued a decision, the appellate court must dismiss the appeal, vacate the district court's judgment, and remand with instructions to dismiss as moot." *Bekier v. Bekier*, 248 F.3d 1051, 1056 (11th Cir. 2001) (quotations omitted). In fact, the Supreme Court has said the "established practice" when "dealing with a civil case … which has become moot while on its way here … is to reverse or vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear*, 340 U.S. 36, 39 (1950). This is especially appropriate when, as here, the party that prevailed below is the one that causes the case to become moot. *Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1258 (11th Cir. 2001) (vacating district court's decision because order favored media and because "mootness seems more attributable to the inaction of the media" than to opposing party).

This Court has applied the *Munsingwear* rule faithfully, ordering vacatur when "the appeal has become moot through no act of the party seeking relief …." *In re Burrell*, 415 F.3d 994, 1000 (9th Cir. 2005). That is the case here. Allowing

23

the District Court's order of dismissal to stand, based on Twitter's actions and after the lower court delayed ruling for months on Dr. Wolf's Rule 60 motion, would cause severe prejudice to Dr. Wolf and jeopardize all Americans' speech rights.

## CONCLUSION

The judgment should be reversed or, at minimum, vacated before the case is dismissed as moot.

Respectfully submitted,

Date:  May 5, 2023

JW HOWARD/ATTORNEYS, LTD.


*s/ Scott J. Street*
Scott J. Street

*Attorneys for Appellant Naomi Wolf*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 22-15961**

I am the attorney or self-represented party.

**This brief contains 4,394 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature:** *s/ Scott J. Street*          **Date:** May 5, 2023

25