**Case No. 22-15961**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD J. TRUMP, the Forty-Fifth President of the United States;
LINDA CUADROS; AMERICAN CONSERVATIVE UNION; RAFAEL BARBOSA;
DOMINICK LATELLA; WAYNE ALLYN ROOT; NAOMI WOLF,
*Plaintiffs-Appellants,*

v.

TWITTER, INC.; JACK DORSEY,
*Defendants-Appellees,*

and

UNITED STATES OF AMERICA,
*Intervenor-Appellee.*

———————————————

*Appeal from the United States District Court for the Northern District of California (San Francisco),*
*Case No. 3:21-cv-08378-JD · The Honorable James Donato, District Judge*

## APPELLANTS DONALD J. TRUMP, AMERICAN CONSERVATIVE UNION, RAFAEL BARBOSA, LINDA CUADROS, DOMINICK LATELLA, AND WAYNE ALLYN ROOT'S REPLY BRIEF

JOHN P. COALE
2901 Fessenden Street NW
Washington, D.C. 20008
Telephone: (202) 255-2096
johnpcoale@aol.com

ALEX KOZINSKI
33 Marguerite Drive
Palos Verdes Estates, CA 90275
Telephone: (310) 541-5885
alex@kozinski.com

ANDREI POPOVICI
MARIE L. FIALA
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd., Suite 290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
andrei@apatent.com
marie@apatent.com

*Attorneys for Plaintiffs-Appellants,*
*Donald J. Trump, the Forty-fifth President of the United States;*
*Linda Cuadros; American Conservative Union; Rafael Barbosa;*
*Dominick Latella; Wayne Allyn Root*

**Additional Counsel Listed on Signature Page**

 COUNSEL PRESS · (213) 680-2300     PRINTED ON RECYCLED PAPER 

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..............................................................ii

TABLE OF AUTHORITIES .......................................................iv

INTRODUCTION ....................................................................1

RESPONSE TO DEFENDANTS' COUNTERSTATEMENT OF THE CASE ......6

ARGUMENT ...........................................................................9

I.     Defendants' Suggestion of Mootness Fails...........................9

II.    Plaintiffs Pleaded State Action.......................................9

    A.    Defendants Ignored Post-*Lugar* Developments in the State Action Test. ..................................................10

    B.    *Lugar* Step One—Exercise of a Right or Privilege ..............12

    C.    *Lugar* Step Two—Coercion.......................................15

        1.    Threats Need Not Be Explicit or Enforceable. ..............16

        2.    Plaintiffs Pleaded Coercion. ...........................17

        3.    *Missouri v. Biden* Found These Facts Constituted Coercion........................................................19

        4.    *O'Handley* Is Inapposite.................................21

        5.    A Private Actor May Be Liable Under a Coercion Theory.......................................................22

    D.    *Lugar* Step Two:  Encouragement ............................24

    E.    Joint Action ......................................................26

        1.    Joint Action Exists in a Range of Circumstances...........26

2.      Plaintiffs Pleaded Joint Action. ....................................27

3.      No Conspiracy Is Needed. ...............................................28

4.      Whether Defendants Acted Unilaterally Is a Fact Question. ..........................................................................29

5.      Defendants' Remaining Authorities Are Easily Distinguished. ....................................................................30

III.    State Law Claims................................................................32

   A.   Choice of Law ...............................................................32

   B.   Plaintiffs Pleaded Deception. .......................................33

   C.   The SSMCA Claim ......................................................34

IV.     First Amendment Issues .....................................................36

   A.   No First Amendment Defense Is Available. ...............36

   B.   Twitter's Censorship Is Not Protected Speech. .........37

CONCLUSION ................................................................................39

# TABLE OF AUTHORITIES

**CASES**                                               **Page(s)**

*ABF Capital Corp. v. Grove Props. Co.*,
126 Cal.App.4th 204 (2005) .......................................................33

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ....................................................................28

*Am. Family Ass'n v. City of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ....................................................16

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ....................................................................37

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ................................................18, 19

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ..........................................................16, 18, 19

*Bleecher v. Conte*,
173 Cal. Rptr. 278 (1981) ...........................................................34

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ....................................................................24

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*,
531 U.S. 288 (2001) ...............................................11, 12, 23, 27

*Broadheim v. Cry*,
584 F.3d 1262 (9th Cir. 2009) ....................................................16

*Brunette v. Humane Soc'y*,
294 F.3d 1205 (9th Cir. 2002) ........................................26, 27, 31

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
827 F.2d 1291 (9th Cir. 1987) ................................................18, 19

*Collins v. Womancare*,
878 F.2d 1145 (9th Cir. 1989) ................................................30, 31

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1973) ......................................................................36

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ....................................................................25

*Doe v. Google, LLC,*
    2022 WL 17077497 (9th Cir. Nov. 18, 2022)................................................22

*Franklin v. Fox,*
    312 F.3d 423 (9th Cir. 2002)........................................................................29

*Howerton v. Gabica,*
    708 F.2d 380 (9th Cir. 1982)....................................................................30, 32

*Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995)...............................................................................38, 39

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019)...................................................................................9

*In re Celexa and Lexapro Mktg. and Sales Practices Litig.,*
    291 F.R.D. 13 (D. Mass. 2013)....................................................................33

*Lee v. Katz,*
    276 F.3d 550 (9th Cir. 2002)........................................................................12

*Llado-Carreno v. Guidant Corp.,*
    2011 WL 705403 (S.D. Fla. Feb. 22, 2011) ................................................36

*Lombard v. Louisiana,*
    373 U.S. 267 (1963)...............................................................................18, 19

*Loyd's Aviation, Inc. v. Ctr. for Envtl. Health,*
    2011 WL 4971866 (E.D. Cal. Oct. 19, 2011) ..............................................36

*Lugar v. Edmondson Oil Co.,*
    457 U.S. 922 (1982)..........................................................10, 11, 12, 16, 24

*Manhattan Cmty. Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019)...........................................................................22, 23

*Mendocino Env. Ctr. v. Mendocino Cty.,*
    192 F.3d 1283 (9th Cir. 1999)......................................................................28

*Miami Herald v. Tornillo,*
    418 U.S. 241 (1974)...............................................................................37, 38

*Missouri v. Biden,*
    2023 WL 2578260 (W.D. La. Mar. 20, 2023) ......................................*passim*

*Muir v. Alabama Educ. Television Comm'n,*
    688 F.2d 1033 (5th Cir. 1982) (*en banc*) ......................................................36

*Murphy v. Twitter, Inc.,*
    60 Cal.App.5th 12 (2021) ............................................................................34

*NetChoice v. Paxton*,
  49 F.4th 439 (5th Cir. 2022)..................................................37, 38

*Norwood v. Harrison*,
  413 U.S. 455 (1973).....................................................................13

*O'Handley v. Weber*,
  62 F.4th 1145 (9th 2023).........................................................*passim*

*Ochoa v. Pub. Consulting Grp., Inc.*,
  48 F.4th 1102 (9th Cir. 2022).....................................................23

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003).........................................................17

*Patterson v. ITT Consumer Fin. Corp.*,
  14 Cal.App.4th 1659 (1993).........................................................34

*Pennsylvania Emp. Benefit Tr. Fund v. Zeneca, Inc.*,
  710 F. Supp. 2d 458 (D. Del. 2010).............................................33

*PG&E v. Pub. Utils. Comm'n*,
  475 U.S. 1 (1986)..........................................................................38

*Pittsburgh Press Co. v. Pittsburgh Comm'n*,
  413 U.S. 376 (1973).....................................................................37

*PruneYard Shopping Ctr. v. Robins*,
  447 U.S. 74 (1980)........................................................................39

*Radcliffe v. Rainbow Constr. Co.*,
  254 F.3d 772 (9th Cir. 2001).......................................................31

*Ry. Employees' Dep't v. Hanson*,
  351 U.S. 225 (1956)................................................................14, 15

*Rawson v. Recovery Innovations, Inc.*,
  975 F.3d 742 (9th Cir. 2020)..................................23, 26, 27, 28

*Reitman v. Mulkey*,
  387 U.S. 369 (1967)................................................................14, 15

*Roberts v. AT&T Mobility LLC*,
  877 F.3d 833 (9th Cir. 2017)..................................................25, 26

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
  547 U.S. 47 (2006)..................................................................37, 39

*Skinner v. Ry. Labor Executives' Ass'n*,
  489 U.S. 602 (1989)..................................................14, 15, 24, 26

vi

*Sun'N Lake v. Ayala*,
  247 So. 3d 572 (Fla. Dist. Ct. App. 2018) ...................................................32

*Sutton v. Providence St. Joseph Med. Ctr.*,
  192 F.3d 826 (9th Cir. 1999) ..............................................................22, 23

*Tory v. Cochran*,
  544 U.S. 734 (2005) ..........................................................................9

*Tsao v. Desert Palace, Inc.*,
  698 F.3d 1128 (9th Cir. 2012) ...........................................................26, 28

*U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*,
  931 F.3d 966 (9th Cir. 2019) ................................................................30

*West v. Atkins*,
  487 U.S. 42 (1988) ...................................................................10, 12, 24

*Zauderer v. Off. of Disciplinary Counsel*,
  471 U.S. 626 (1985) ......................................................................36, 37

## STATUTES

9 U.S.C. § 2 .......................................................................................26

47 U.S.C. § 230 .............................................................................*passim*

Cal. Elections Code § 10.5 .............................................................13, 21

Cal. Civ. Code § 1643 ........................................................................34

Cal. Civ. Code § 3541 ........................................................................34

Fla. Stat. 501.2041 .......................................................................34, 36

## RULES

Fed. R. Civ. P. 11 ............................................................................8, 9

Fed. R. Civ. P. 12 ...............................................................................30

## OTHER AUTHORITIES

"*Encourage*." MERRIAM-WEBSTER DICTIONARY (Mar. 26 2023)
  https://www.merriam-webster.com/dictionary/encourage.
  Accessed Apr. 8, 2023 ...................................................................25

Eugene Volokh, *Treating Social Media Platforms as Common Carriers?*
  1 J. of Free Speech L. 1, 85 (2021) ..................................................39

*Hunter Biden Finally Admits Infamous Laptop Is His as He Pleads for Criminal Probe*, THE NEW YORK POST (Feb. 1, 2023), https://nypost.com/2023/02/01/hunter-biden-admits-infamous-laptop-is-his-in-plea-for-probe/ .................................................................................4

*Justice Department Settles with Conservative Groups over IRS Scrutiny*, REUTERS (Oct. 26, 2017), https://www.reuters.com/article/us-usa-tax-conservative/justice-department-settles-with-conservative-groups-over-irs-scrutiny-idUSKBN1CV1TY ...........................................................19

Phillip Hamburger, *Is Social-Media Censorship a Crime?*, WALL ST. J., Dec. 14, 2022 ............................................................................1

RESTATEMENT (SECOND) OF CONFLICTS OF LS. § 148 .............................................33

RESTATEMENT (SECOND) OF CONFLICTS OF LS. § 187 cmt. G .................................32

# INTRODUCTION

Elon Musk's acquisition of Twitter in October 2022 opened a window onto what one eminent constitutional scholar has called "the most massive system of censorship in the nation's history." Phillip Hamburger, *Is Social-Media Censorship a Crime?*, WALL ST. J., Dec. 14, 2022, at A17. Six weeks after buying the company, Musk began releasing heretofore secret company documents to journalists for publication on Twitter. These "Twitter Files" confirm everything Plaintiffs alleged and the District Court deemed "not plausible." 1-ER-8. Motivated by fear of losing its Section 230 immunity and under pressure from federal officials and law enforcement, Twitter entered into a covert collaboration with the government to censor disfavored viewpoints and silence speakers who departed from the party narrative.

Even Orwell could not have imagined the extent of this dystopian arrangement. Musk described what he had uncovered since becoming Twitter's CEO:[1]

- "Twitter acting by itself to suppress free speech is not a 1st amendment violation, but acting under orders from the government to suppress free speech, with no judicial review, is." MOOT_SMJN-157.

---

[1] Plaintiffs concurrently filed a Supplemental Motion for Judicial Notice with appended exhibits, cited as "MOOT_SMJN-xx."

1

- Responding to a Twitter user's tweet stating, "Twitter was basically an FBI subsidiary …," Musk tweeted "True."  MOOT_SMJN-151.

- "Government paid Twitter millions of dollars to censor info from the public."  MOOT_SMJN-30.

- "US govt agency demanded suspension of 250k accounts, including journalists & Canadian officials!"  MOOT_SMJN-84.

- When a Twitter user tweeted, "@Twitter Files show Twitter activist employees, without basis, suppressed and censored the President of the United States … in the days before the 2020 election.  This is damning evidence of election interference," Musk responded, "Unequivocally true. The evidence is clear and voluminous."  MOOT_SMJN-167.

- "The important thing is that Twitter correct a grave mistake in banning [Trump's] account, despite no violation of the law or terms of service."  MOOT_SMJN-245.

There is more.  Much more.  A veritable army of federal Myrmidons coerced and cajoled social media platforms ("SMPs") to censor disfavored viewpoints. MOOT_SMJN-210-12.  Demands came from "the highest levels of the White House."  MOOT_SMJN-210, 215.  Staffers cracked the whip to ensure compliance.  MOOT_SMJN-214-15.  A Twitter executive summarized one such interaction:  "The Biden team was not satisfied with Twitter's enforcement

2

approach as they wanted Twitter to do more and to deplatform several accounts. … They were very angry in nature." MOOT_SMJN-183.

The FBI transmitted an avalanche of censorship requests, including from the Senate Select Committee on Intelligence, State Department, Treasury, HHS, Pentagon, FBI, CIA, CISA, NSA, and DHS. MOOT_SMJN-10, 12, 16, 78, 80, 86-90, 92, 100, 204-05, 211-12, 226-28. Twitter executives met weekly with law enforcement and intelligence services. MOOT_SMJN-12, 16, 51-55, 100-01, 216-17. "We have seen a sustained (if uncoordinated) effort by the IC [intelligence community] to push us to share more information and change our … policies," complained a senior Twitter executive. "They are probing and pushing everywhere they can (including by whispering to congressional staff)." MOOT_SMJN-200. Officials threatened Twitter with ruinous legal consequences if they did not comply. MOOT_SMJN-211, 215-17.

Emails from the FBI and other agencies often attached spreadsheets listing hundreds of targeted accounts. MOOT_SMJN-18, 22, 24, 49, 56-59, 72, 74, 80, 82, 100, 213, 223-25. Officials identified "misinformation" or "malinformation"— a euphemism for "true but inconvenient"—to censor. MOOT_SMJN-204. To facilitate processing these requests, the FBI anointed Twitter executives with Top Secret security clearances and paid Twitter millions for its staff time. MOOT_SMJN-36, 38, 173. Frequently, the government didn't even claim the

targeted tweets contained misinformation.  One remarkable email recommended deleting "true content which could promote vaccine hesitancy" and "stories of true [COVID] vaccine side effects."  MOOT_SMJN-96-97, 129; *see also* MOOT_SMJN-68, 104 (flagging "anti-Ukraine narratives").  Twitter regularly deleted these accounts after receiving the government's blacklists.  MOOT_SMJN-101.

Government direction of Twitter's censorship reached a fever pitch before the 2020 election.  The FBI and Twitter cooperated to suppress reporting about Hunter Biden's laptop, which contained evidence of his and Joe Biden's shady business dealings with China.  MOOT_SMJN-6, 10, 19-20, 40, 42, 74, 222-23.  Deemed "fake news" at the time, the story has since been proved true.[2]  Twitter's joint action with the FBI to suppress this story was overtly political, taken to tilt the election against President Trump.

Defendants have erected a barricade of denial, telling the District Court, "Twitter *does not coordinate* with other entities when making content moderation

---

[2] Hunter Biden has admitted the laptop was his.  *Hunter Biden Finally Admits Infamous Laptop Is His as He Pleads for Criminal Probe*, THE NEW YORK POST (Feb. 1, 2023), https://nypost.com/2023/02/01/hunter-biden-admits-infamous-laptop-is-his-in-plea-for-probe/.

4

decisions."[3]  Even confronted with a mountain of now-public evidence showing the opposite, Defendants maintain the *only* inference is that Twitter acted "independently" when it censored speech.  This is the least likely inference that reasonably could be drawn.  When powerful federal officials threaten to repeal Section 230; the FBI sets up a private communication channel to forward censorship requests, grants Twitter executives Top Secret clearances, pays Twitter millions to process government demands; and Twitter deletes targeted accounts within days of receiving government hit lists, the most reasonable inference is that Twitter served as a censorship proxy for the government.

The stakes in this case are high.  If this extreme scenario does not constitute state action, officials and SMPs can collaborate to suppress any speech that challenges government orthodoxy, so long as they invoke the fig leaf of "content moderation" by nominally private actors.

Denying Plaintiffs the ability to conduct discovery into the clandestine and unlawful government-Twitter partnership would work a grave miscarriage of justice.  The judgment should be reversed.

---

[3] Twitter Reply ISO Mot. to Dismiss (Dkt. 147) at 6 (emphasis in original). Defendants also assured the District Court that Twitter censored content based only on its own policies (Twitter Mot. to Dismiss (Dkt. 138) at 1-2) and there was no government demand that Twitter take any particular action to ban content.  Twitter Opp. to Mot. for Prelim. Inj. (Dkt. 139) at 15, 23.

**RESPONSE TO DEFENDANTS' COUNTERSTATEMENT OF THE CASE**

Defendants' brief paints a fantastical picture of Twitter's practices, one where Twitter unilaterally censored users' speech. The recent disclosures have made it impossible for Defendants to maintain this fiction—although, apparently, have not dissuaded them from attempting to do so.

One month after buying the company, Elon Musk announced: "The Twitter Files on free speech suppression soon to be published on Twitter itself. The public deserves to know what really happened…." MOOT_SMJN-2 (ellipsis in original). Beginning December 2022, Musk released secret Twitter communications with federal officials showing that they worked hand in glove to suppress constitutionally protected speech. This partnership had a single aim—to limit the public's access to vital information, whether true or not, that disserved these officials' favored narratives.[4] MOOT_SMJN-211, 235-37.

The reality behind Plaintiffs' banishment from Twitter was vastly different from Defendants' fictional portrayal. Twitter executives met weekly with the FBI, DHS,[5] and the Office of the Director of National Intelligence. MOOT_SMJN-12,

---

[4] Some *84 officials* communicated with Twitter about censorship, with at least 20 White House officials among them. MOOT_SMJN-213.

[5] DHS argued that "misinformation" is a "cyberattack," thus allowing it to deem tweets misinformation "as justification for censorship, specifically asking [SMPs] to remove users, remove posts, or prevent their spread." MOOT_SMJN-200-01.

16, 51-55, 100-01. Censorship requests poured in from dozens of government sources, flagging thousands of "problem accounts"—so many that Twitter employees had to improvise a system for prioritizing them. MOOT_SMJN-18, 22, 24, 32-34, 49-50, 72, 74, 76, 80, 82, 100, 213, 223-25. The FBI lubricated the effort by providing security clearances and paying Twitter millions. MOOT_SMJN-36, 38, 173.

More, government officials worked closely through taxpayer-funded intermediaries to facilitate Twitter's censorship. According to recent congressional testimony,

> For every government agency scanning Twitter, there were perhaps 20 quasi-private entities doing the same … many taxpayer-funded. A focus of this growing network is making lists of people whose opinions, beliefs, associations, or sympathies are deemed to be misinformation, disinformation, or malinformation. The latter term is just a euphemism for "true but inconvenient." Plain and simple, the making of such lists is a form of digital McCarthyism.

MOOT_SMJN-204-05.

Perhaps the ultimate example of this state-corporate fusion is the Stanford Election Integrity Partnership ("EIP") which worked closely with Twitter and government entities such as CISA in flagging tweets for deletion.[6] MOOT_SMJN-

---

[6] CISA helped create EIP; its leader Alex Stamos said that EIP's purpose was "to try to fill the gap of the things that the government could not do themselves" because the government "lacked both kinda the funding and the legal authorizations." MOOT_SMJN-201, 228-32.

106-47.  EIP's own data show that it surveilled *859 million tweets* and succeeded in getting nearly *22 million tweets* censored in the run-up to the 2020 election. MOOT_SMJN-126, 201-02, 213, 228-29.  Twitter's executives did not distinguish between EIP and government organizations, using phrases like "According to CIS[A], escalated via EIP" when acting on deletion requests.  MOOT_SMJN-127.

Threatened repeal of Section 230 immunity was integral to this campaign:

> All of these censorship demands were occurring against a backdrop of the White House and Congress regularly threatening to revoke Section 230 ….  The social media platforms consider the possible repeal of Section 230 an existential threat.  Without the Act, they could not exist in their current form.

MOOT_SMJN-202; *see also* MOOT_SMJN-214-17.  According to congressional testimony, "government and nongovernmental censors work[ed] together to threaten to revoke the Section 230 protections of social media, on the one hand, and demand censorship on the other.  Sometimes they boast[ed] that **the tech firms only caved thanks to the 'huge regulatory stakes' for not censoring**." MOOT_SMJN-200 (emphasis added).

Twitter's documents confirm it was a state actor and that the District Court erred in holding that Twitter acted alone in making content moderation decisions.[7] 1-ER-10, 14.

---

[7] The Twitter Files also raise issues regarding defense counsel's compliance with Rule 11, which obligates counsel to conduct a reasonable inquiry and certify that *(footnote continues on next page)*

8

## ARGUMENT

### I. Defendants' Suggestion of Mootness Fails.

Defendants filed a Suggestion of Mootness concurrently with their principal brief. To avoid burdening the Court with excessive briefing, Plaintiffs rely on and incorporate by reference their Response in Opposition to Defendants' Suggestion of Mootness.

### II. Plaintiffs Pleaded State Action.

Plaintiffs have plausibly alleged a regime of censorship by federal officials targeting specific viewpoints, a violation of the First Amendment. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (viewpoint discrimination is "presumptively unconstitutional"). By shadowbanning, flagging, and otherwise restricting Plaintiffs' accounts, Defendants engaged in *de facto* prior restraints, also a First Amendment violation. *Tory v. Cochran*, 544 U.S. 734, 738 (2005) (prior restraints are "the most serious and the least tolerable infringement on First Amendment rights").

---

*(footnote continued from previous page)*
denials of factual contentions are warranted on the evidence. Fed. R. Civ. P. 11(b)(3), (4). Even a cursory inquiry would have revealed that Twitter's denials that it acted in concert with the government were contradicted by vast quantities of Twitter's own evidence.

### A. Defendants Ignored Post-*Lugar* Developments in the State Action Test.

Defendants' state action analysis, like the District Court's, relies exclusively on the original test announced in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). Neither acknowledges, let alone discusses, the Supreme Court's and this Court's narrowing of that case.

**First**, as the Court held in *West v. Atkins*, 487 U.S. 42 (1988), *Lugar's* first prong is satisfied where "the deprivation [is] caused by the exercise of some right or privilege created by the State ... **or** by a person for whom the State is responsible." *Id*. at 49 (emphasis added; ellipsis in original). Under this revised formulation, *Lugar's* "state-imposed rule of conduct" element, 457 U.S. at 937, drops out of the equation. State action exists where one of these two alternative tests is met and, further, "the party charged with the deprivation … may fairly be said to be a state actor."[8] *West*, 487 U.S. at 49.

**Second**, despite relying heavily on *O'Handley v. Weber*, 62 F.4th 1145 (9th 2023), Defendants fail to mention *O'Handley's* acknowledgment that "[w]e have refused to apply [*Lugar's*] two-step framework rigidly, and we have suggested that the first step may be unnecessary in certain contexts." *Id*. at 1157. In other words, the Court may bypass the first step ("exercise of some right or privilege" *or* "person for whom the State is responsible") and go directly to the second step, *i.e.*,

---

[8] Numerous post-*West* decisions have relied on *West's* reading of *Lugar*. *See* Plaintiffs' Opening Brief ("Open. Br.") at 29 & n.9.

whether defendant "may fairly be said to be a state actor." *Lugar*, 457 U.S. at 937. *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2001), provides criteria for answering that latter question.

**Third**, Defendants ignore the Supreme Court's and this Court's holdings that satisfying any one of the tests announced in *Brentwood is sufficient by itself* to establish state action, whether or not the allegations conform to *Lugar's* two-prong test. *See* Open. Br. at 23-28. In *Brentwood*, the Supreme Court held that "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id*. at 295. This "nexus" can be established by showing that the challenged conduct results from the State's exercise of "**coercive power**," when the State provides "**significant encouragement**, either overt or covert," or when the private actor is a "**willful participant in joint activity** with the State." *Id.* at 296 (emphases added). These criteria are not exclusive; a "host of facts … can bear on the fairness" of attributing private conduct to the state. *Id*.

After *O'Handley*, the Supreme Court's and this Court's tests effectively merged. *See O'Handley*, 62 F.4th at 1157 (nexus test asks "whether government officials have 'exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be

11

that of the State'") (brackets in original); *id*. at 1159 (nexus exists where "private party was a willful participant in joint action with the State").

Defendants' rationale for ignoring *Brentwood* is based on a fiction.  They claim Plaintiffs argued that *Brentwood* overruled *Lugar*, and then demolish this strawman, without ever addressing *Brentwood* substantively.  Def. Br. at 31-33.  Plaintiffs advanced no such argument.  They only said what this Court has expressly held:

> [I]n *Brentwood*, the Court determined that the nominally private entity whose conduct was challenged was a State actor solely on the basis that the entity was entwined with the State.  The Court held that satisfaction of this single test was sufficient, so long as no countervailing factor existed.

*Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (citations omitted); Open Br. at 23-27.

**Finally**, the District Court compounded this error by substituting "governmental policy" for *Lugar's* "rule of conduct" and thus applying an even more demanding formulation of this now-discarded element.  1-ER-7-8.  By failing to consider whether Plaintiffs adequately pleaded state action under *Brentwood* or *West*, the court erred.  *See* Open Br. at 23-30.

### B.    *Lugar* Step One—Exercise of a Right or Privilege

The District Court did not consider Plaintiffs' argument that the state has granted SMPs a "right or privilege" in the form of Section 230 immunity.  Exactly

this argument was recently accepted by the court hearing a landmark lawsuit brought by Louisiana and Missouri against 67 government defendants for coercing or colluding with SMPs to suppress disfavored speech. *Missouri v. Biden*, 2023 WL 2578260 (W.D. La. Mar. 20, 2023). Recognizing that Section 230 immunity "constitutes the type of 'tangible financial aid,' here worth billions of dollars per year, that the Supreme Court identified" as a basis for state action, the court found that Section 230

> "has a significant tendency to facilitate, reinforce, and support private" censorship. Combined with other factors such as the coercive statements and significant entwinement of federal officials and censorship decisions on social-media platforms … this serves as another basis for finding government action.

*Id.*, at *34 (quoting *Norwood v. Harrison*, 413 U.S. 455 (1973)).

Defendants respond by selectively quoting from *O'Handley*, which they say is "directly on point." Def. Br. at 25-26. Not so. Plaintiff there made no argument based on Section 230; indeed, no reference to that statute appears anywhere in the opinion. O'Handley based his argument on California Elections Code § 10.5, which formed the Office of Elections Cybersecurity ("OEC") to "monitor and counteract false or misleading information regarding the electoral process that is published online." 62 F.4th at 1154. That statute confers no benefits on SMPs. Unsurprisingly, this Court concluded that

13

> O'Handley's attempt to analogize the authority conferred by California Elections Code § 10.5 to the 'procedural scheme' in *Lugar* is wholly unpersuasive. *Lugar* involved a prejudgment attachment system … that authorized private parties to sequester disputed property. Section 10.5, by contrast, does not vest Twitter with any power ….

*Id*. at 1156 (citations omitted).

By contrast, Section 230 grants SMPs the extraordinary power to censor protected speech without risking a lawsuit. This legislative gift has enormous economic value. 2-ER-136 (Dorsey: "Section 230 is the Internet's most important law"); MJN-20 (Dorsey: Twitter could not have started without 230); MOOT_SMJN-215-17. In addition, officials granted valuable security clearances to Twitter executives to facilitate their joint undertaking.

These governmentally-bestowed privileges far exceed the immunities that converted private conduct into state action in *Ry. Employees' Dep't v. Hanson*, 351 U.S. 225 (1956), *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989), and *Reitman v. Mulkey*, 387 U.S. 369 (1967). *See* Open. Br. at 32-34. Just like Section 230, each of those cases involved a law or regulation immunizing private conduct. *See Hanson*, 351 U.S. at 232 (private employers' union shop agreements could not be "made illegal" by state law); *Skinner*, 489 U.S. at 611 (government regulations immunized employers for performing employee drug tests); *Reitman*, 387 U.S. at 381 (constitutional amendment allowing private parties to freely discriminate). Section 230(c) similarly removes all legal barriers to Defendants' censorship and

14

thus satisfies the first part of the *Lugar* test. The court in *Missouri v. Biden* cited *Hanson* and *Skinner* in support of finding state action based, in part, on Section 230 immunity. 2023 WL 2578260, at *28, *32-33.

Defendants' half-hearted attempt to distinguish these cases on the ground that the laws in question "authorized" the challenged private conduct, Def. Br. at 25-26, fails. Just as with Section 230, the private actors in each case were free to make their own decisions. *Hanson*, 351 U.S. at 231 ("The union shop provision … is only permissive. Congress has not compelled nor required carriers and employees to enter into union shop agreements."); *Skinner*, 489 U.S. at 614 ("[N]othing in Subpart D compels any testing by private railroads."); *Reitman*, 387 U.S. at 374 (constitutional amendment "'forestall[ed] future state action that might circumscribe [private right to discriminate].'"). As with Section 230, in each instance the government removed the possibility of a legal challenge to the private party's private choice. And that's what converted private action to state action.

Defendants argue, without support, that these cases are inapplicable because Defendants have, so far, avoided raising Section 230(c) as a defense. Defendants' litigation strategy in this case has no bearing on their business decisions. Section 230 is the water in which Defendants swim; their freedom from liability informs every content censorship decision they make.

15

### C. *Lugar* Step Two—Coercion.

#### 1. Threats Need Not Be Explicit or Enforceable.

Defendants assert that none of the alleged threats amount to coercion because they did not expressly threaten sanctions and were insufficiently specific. Def. Br. at 34-41. Defendants have unduly cabined the meaning of "coercion." Officials cross the line from persuasion to coercion when they threaten an imposition of government power, whether expressly or implicitly. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) ("veiled" threats); *Broadheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) ("implicit threat"). The dispositive question is whether a reasonable person could view the governmental statements as exceeding "mere criticism" and conveying a threat to deploy "government power" or "adverse regulatory actions." *Am. Family Ass'n v. City of San Francisco*, 277 F.3d 1114, 1124-25 (9th Cir. 2002).

Plaintiffs have detailed a litany of government officials' threats to impose draconian consequences if Defendants failed to rein in free speech. Open Br. at 7-13. Prominent federal actors waged a relentless coercive campaign, warning Defendants that they were at risk of losing their Section 230 immunity if they failed to comply. Open. Br. at 7-17; MOOT_SMJN-215-17. These officials had it well within their power to carry out these threats and Defendants took them seriously. According to the FBI, "pressure from Congress … pushed [SMPs] to adopt more aggressive censorship policies." MOOT_SMJN-216-17. And even

16

were that not the case, it would make no difference. An official who threatens to use state power to stifle speech violates the First Amendment even if s/he lacks authority over the private actor. *Okwedy v. Molinari*, 333 F.3d 339, 340-41 (2d Cir. 2003); *Missouri v. Biden*, 2023 WL 2578260, at *31 ("[A]ny suggestion that a threat must be enforceable in order to constitute coercive state action is clearly contradicted by the overwhelming weight of authority.").

### 2. Plaintiffs Pleaded Coercion.

In addition to the barrage of threats from elected officials and Executive Branch employees, the Twitter Files reveal coercion ratcheted up many times over. Musk admitted that Twitter acted under "orders" from the government, an admission Defendants do not dispute.[9] The White House made specific demands to censor disfavored speech and pressured SMPs with belligerent language. MOOT_SMJN-155, 177, 179, 181, 183, 214-15, 217-18. Censorship demands poured into Twitter from an alphabet soup of law enforcement and intelligence agencies. MOOT_SMJN-10, 12, 16, 26, 78, 80, 86-90, 92, 204-05. Federal officials followed up to confirm SMPs' compliance with their demands and

---

[9] Musk tweeted: "Twitter acting by itself to suppress free speech is not a 1st amendment violation, but **acting under orders from the government to suppress free** speech …is." MOOT_SMJN-157 (emphasis added). Defendants agree with the first half of this statement but say nothing about the second half. Def. Br. at 45 n.11. Musk's tweet coupled with the lack of any denial constitutes a party admission. Fed. R. Evid. 801. *See* Open. Br. at 7 n.3

boasted that SMPs "caved thanks to the 'huge regulatory stakes' for not censoring." MOOT_SMJN-26, 28, 72, 86-90, 200, 208. It would be naïve to assume that Defendants would "lightly disregard" officially-sanctioned censorship requests from these sources. *Cf. Bantam Books*, 372 U.S. at 68-69.

Defendants hold up *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987), *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), and *Lombard v. Louisiana*, 373 U.S. 267 (1963),[10] as paradigmatic of coercion. Def. Br. at 38. But, as the *Missouri v. Biden* court explained when discussing these same authorities, the threats alleged by the States—nearly identical to those alleged here—"far exceed, in both number and coercive power, the threats at issue in the above-mentioned cases." 2023 WL 2578260, at *31. The *in terrorem* effect of receiving a warning letter from a deputy county attorney (*Carlin*) or county sheriff (*Backpage.com*) or being mentioned in a mayor's press conference (*Lombard*) pales in comparison to being pressured by the FBI, CIA, NSA, and DHS. If the former "can reasonably be interpreted" as coercive, then a

---

[10] The threats in *Lombard* were *aimed at the demonstrators, not at the restaurant owners* who were the ones in the position analogous to Defendants here, thus further diluting the coercive effect of the officials' statements. Open. Br. at 49-50. Nonetheless, that was enough for the Court to find state action.

jury certainly could interpret the latter as such.[11]  In a telling omission, Defendants

ignore Plaintiffs' argument that the coercion inquiry in each of these cases was

decided only after *a fact-finding proceeding*—a trial (*Lombard*), summary

judgment (*Carlin*), or preliminary injunction hearing (*Bantam Books*,

*Backpage.com*).  Open Br. at 47-52.  The District Court erred in making a

comparable factual determination about the coercive effect of government actions

on a motion to dismiss.  *See* Open. Br. at 47-52.

### 3.    *Missouri v. Biden* Found These Facts Constituted Coercion.

*Missouri v. Biden* found plaintiffs had sufficiently pleaded coercion based

largely on the same facts presented here.  The States alleged that multiple federal

agencies and legislators had coerced and collaborated with SMPs to suppress

disfavored information about, *inter alia*, the COVID-19 lab-leak, the Hunter Biden

laptop story, and election integrity.  They cited many of the same government

statements described in the FAC, including legislative threats to roll back Section

---

[11] Defendants attempt to explain away their admission that a state attorney general's mere *instigation* of an investigation is coercive, Open Br. at 46, by saying that the AG has authority to take legal action against the company.  Def. Br. at 40 n.9.  The same is true of the White House and every Executive Department and law enforcement agency identified herein.  One need only remember the Obama White House siccing the Internal Revenue Service on dozens of conservative groups that applied for tax-exempt status.  *Justice Department Settles with Conservative Groups over IRS Scrutiny*, REUTERS (Oct. 26, 2017), https://www.reuters.com/article/us-usa-tax-conservative/justice-department-settles-with-conservative-groups-over-irs-scrutiny-idUSKBN1CV1TY.

230, saber-rattling by Joe Biden and members of Congress, and pressure by the White House staff and other Executive Branch officials. *Missouri v. Biden*, 2023 WL 2578260, at *2-4, *21-22, *30-33. "Plaintiffs allege and link threats of official government action in the form of threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA with calls for more aggressive censorship and suppression of speakers and viewpoints that government officials disfavor." *Id.*, at *31. These allegations, the court said, showed a "cohesive and coercive campaign … to threaten and persuade social-media companies to more avidly censor so-called 'misinformation'" that sufficed to allege state action under a coercion theory. *Id.* at *21, *31.

The court rejected arguments identical to those Defendants make here: that plaintiffs had alleged only "isolated episodes in which federal officials engaged in rhetoric about misinformation on social media platforms," the Complaint was "devoid" of any "enforceable threat," and the threats to amend Section 230 or institute antitrust suits were not coercive because no single government official "could unilaterally take such actions." *Id.* at *31. As the court pointed out, these threats could easily have been carried out after the Biden administration took office and Democrats gained control of Congress. *Id.* Furthermore, "the government actor making the threat need not possess the direct power or decisionmaking

20

authority to enforce the threat in order for the threat to constitute coercive action." *Id*. at *31 n.206.

### 4. *O'Handley* **Is Inapposite.**

Nothing resembling a government threat was alleged in *O'Handley*. Plaintiff claimed only that the OEC flagged one of his tweets for possible removal. "[T]he OEC did nothing more than make a request with no strings attached." 62 F.4th at 1158. The OEC's mandate gave it no enforcement power over Twitter,[12] which was therefore "free to ignore" the OEC's suggestion. *Id*.

Plaintiffs have alleged far more than a "request." The record is replete with officials' threats to remove Section 230 immunity and of antitrust enforcement if Defendants failed to accede to their demands. Open. Br. at 7-13. These allegations supply the element missing in *O'Handley*: the "threaten[ed] adverse consequences if the [private] intermediary refuses to comply." *Id*.

Just as here, defendants in *Missouri v. Biden* leaned heavily on *O'Handley*. The court rejected that comparison:

> [Plaintiffs] clearly alleged that Defendants attempted to convince social-media companies to censor certain viewpoints. … Further, the Complaint alleges threats, some thinly veiled and some blatant, made by Defendants in an attempt to effectuate its [*sic*] censorship program.

---

[12] Cal. Elec. Code § 10.5(b)(2).

2023 WL 2578260, at *30. By contrast, "[b]ecause the [*O'Handley*] plaintiff failed to allege any threat or attempt at coercion aside from the takedown request, … plaintiff failed to allege state action." *Id*. The court was "unpersuaded" by Defendants' reliance on *O'Handley*. *Id*., at *31. This Court should be as well.

### 5. A Private Actor May Be Liable Under a Coercion Theory.

Defendants and Amicus NetChoice argue that only the government agent coercing private action, and not the private actor, can be held liable under the state action compulsion test. Def. Br. at 34, 42; NetChoice Br. at 7-11. This "wrong party" argument is based on an overbroad reading of *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 841 (9th Cir. 1999). The claimed source of state action in *Sutton* was a statute requiring employers to obtain employees' Social Security numbers. In that context, *Sutton* held that "governmental compulsion in the form of a generally applicable law, without more, is [not] sufficient to deem a private entity a governmental actor," *id*. at 841; a plaintiff suing a private actor must also show "some other nexus between the private entity and the government …."[13] *Id.* at 838.

---

[13] Defendants and NetChoice also cite *Doe v. Google, LLC,* 2022 WL 17077497, at * (9th Cir. Nov. 18, 2022), which cites only *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) and *Sutton* for its holding. *Halleck* says no such thing. *See supra* at 23.

22

Moreover, *Sutton* could not have prohibited private liability under a coercion theory given Supreme Court precedents recognizing the availability of such a claim.[14] *Halleck*, 139 S. Ct. at 1928 ("[A] private entity can qualify as a state actor … when the government compels the private entity to take a particular action …."); *Brentwood*, 531 U.S. at 296 (coercion is one available state action theory in case against private defendant). This Court also has found state action based on coercion in post-*Sutton* cases against private defendants. *Ochoa v. Pub. Consulting Grp., Inc.*, 48 F.4th 1102, 1109-10 (9th Cir. 2022) (finding private defendant to be state actor under coercion test); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 755-56 (9th Cir. 2020) (same).

*Sutton* is inapplicable here. Plaintiffs have never claimed that some general statute compelled Twitter to censor speech. *See* Open Br. at 52. *Sutton's* "something more," 192 F.3d at 838, is present in spades in the form of a years' long, Hydra-headed entanglement between government and Twitter in which threats to dismantle Section 230 provided the enforcement "stick."

---

[14] Extending *Sutton*'s reasoning to foreclose all state action/compulsion liability against private actors would eliminate relief for plaintiffs injured by coercive government practices. Twitter is the only party capable of reinstating Plaintiffs' accounts and remedying the other complained-of violations.

### D.   *Lugar* Step Two:  Encouragement

State action exists when the government provides significant encouragement, overt or covert, to the private party's conduct.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  Even though encouragement satisfies the "state actor" prong of the *Lugar*/*West* test, the District Court did not analyze this theory.  1-ER-16; Open. Br. at 53.  By contrast, the *Missouri v. Biden* court conducted the requisite analysis and found "significant encouragement" in the above-described threats coupled with Defendants' Section 230 immunity and "private (i.e., 'covert') communications between the [government] and social-media platforms."  2023 WL 2578260, at *30.

The same is true here.  Executive Branch officials met regularly with SMPs and demanded they "create robust enforcement strategies," "tak[e] faster action against harmful posts," "monitor misinformation more closely," and "consistently take action against misinformation … on their platforms."  3-ER-346-52; MJN-55. White House staffers applied relentless pressure, including making specific censorship demands, asking SMPs to document their compliance, and threatening consequences for inaction.  MOOT_SMJN-155, 177, 179, 181, 183, 214-15.  As in *Skinner*, "the Government did more than adopt a passive position toward the underlying private conduct."  489 U.S. at 615.

The recently-disclosed covert communications between officials and Twitter remove any doubt that the government "encouraged"—i.e., "attempted to persuade,

spurred on, gave help to"[15]—Defendants' censorship.  If the hundreds of examples of officials dictating specific censorship decisions to Twitter, along with providing security clearances and millions in taxpayer dollars, is not "encouragement," it is hard to imagine what would be.

Defendants' briefing on this issue is limited to whether the existence of Section 230, by itself, is enough to plead encouragement.  Def. Br. at 43-45.  But Plaintiffs' showing does not rest on Section 230 alone, nor may their allegations be compartmentalized in that way.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  Encouragement included the many congressional and Executive Branch exhortations, occurring in an environment where Defendants' invaluable Section 230 immunity could be stripped away.  *See* Open Br. at 7-13.  As the court said in *Missouri v. Biden*,

> Defendants' alleged use of Section 230's immunity—and its obvious
> financial incentives for social-media companies—as a metaphorical
> carrot-and-stick combined with the alleged back-room meetings,
> hands-on approach to online censorship, and other factors discussed
> above transforms Defendants' actions into state action.

2023 WL 2578260, at *34.

*Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017), is inapposite. Plaintiffs there based their state action claim solely on the existence of the Federal

---

[15] "*Encourage*." MERRIAM-WEBSTER DICTIONARY (Mar. 26 2023)
https://www.merriam-webster.com/dictionary/encourage.  Accessed Apr. 8,  2023.

Arbitration Act ("FAA"), 9 U.S.C. § 2, which they said "encourages" private arbitration agreements. No interactions, let alone direct communications, between officials and the private defendant were alleged. Even focusing on Section 230 alone, the cases are markedly different. The FAA "merely gives [private parties] the private choice to arbitrate," *Roberts*, 877 F.3d at 837; it does not put a thumb on the scale in favor of arbitration. Far from preserving private choice, Section 230 eliminates the possibility of bringing liability claims against SMPs. Rather than adopting "a passive position," *Skinner*, 489 U.S. at 615, the government prioritized protecting SMPs over their users' rights.

### E. Joint Action

#### 1. Joint Action Exists in a Range of Circumstances.

Joint action is alternative to coercion as a basis for finding state action. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). The more Defendants protest that they were not coerced, the more apparent it becomes that they collaborated with the government in suppressing speech.

The joint-action test is more expansive than Defendants' narrow definition. Def. Br. at 46, 50-52. Joint action exists when the State "significantly involves itself in the private parties' actions and decisionmaking" in a "complex and deeply intertwined process." *Rawson*, 975 F.3d at 753. It also occurs where there is a "symbiotic relationship" between government and the private party, *Brunette v.*

*Humane Soc'y*, 294 F.3d 1205, 1210 (9th Cir. 2002); the private entity is "entwined with governmental policies," *Brentwood*, 531 U.S. at 296; government has "authorized or approved the private parties' actions," *Rawson*, 975 F.3d at 754-55; or the private action "received clear state imprimatur." *Id.*

### 2. Plaintiffs Pleaded Joint Action.

Rather than recognizing joint action as a distinct test, the District Court brushed it aside as a "minor variation the state action theme," 1-ER-16, and stopped there. Had the Court examined the record, it would have found ample material to support a joint-action finding. The FAC contains *twelve pages* of allegations showing joint activity between officials and Defendants to censor disfavored content. 3-ER-342-54. Plaintiffs' Opening Brief includes *five more pages* highlighting concerted action between Defendants and government actors. Open. Br. at 13-17; *see also* 2-ER-122, 125-26, 152; 3-ER-341-42, 346-48; MJN-10-11, 19. Defendants quibble about how to characterize these joint activities, *see, e.g.*, Def. Br. at 48 (government "express[ed] general interest in content moderation" and "asked [SMPs] generally to take action to address misinformation"), but their semantic gymnastics are not the stuff of a dismissal order. Plaintiffs' allegations should have been credited by the District Court.

Defendants again analogize this case to *O'Handley*, Def. Br. at 47-49, but their Procrustean effort fails. *O'Handley* involved a permissible "arms-length"

relationship: a one-way channel, whereby California's OEC flagged tweets the agency deemed problematic. 62 F.4th at 1160. In this case, the federal government, led by the FBI, engaged in a "complex and deeply intertwined process." *Rawson*, 975 F.3d at 753. Federal officials set up a schedule of formal meetings, created privileged reporting channels, and established and funded a federal-private partnership to procure censorship of disfavored viewpoints. As the *Missouri v. Biden* court held in approving a joint-action claim based on the same facts, "These allegations are a far cry from the complained-of action in *O'Handley*: a single message from an unidentified member of a state agency to Twitter." 2023 WL 2578260, at *33.

### 3. No Conspiracy Is Needed.

Defendants err in saying a formal conspiracy is required to establish joint action. Def. Br. at 50-51. The test "can be satisfied either 'by proving the existence of a conspiracy or by showing that the private party was "a willful participant in joint action with the State."'" *Tsao*, 698 F.3d at 1140. A tacit understanding between private parties and government officials to accomplish a common objective is sufficient. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence…." *Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999).

28

Defendants claim that "there can be no joint action absent an agreement specifically to violate Plaintiffs' rights." Def. Br. at 51. That is simply false. Alleging a conspiracy is only one avenue for pleading joint action. And even in the case of an agreement, all that is required is for "state officials and private parties [to] have acted in concert **in effecting a particular deprivation of constitutional rights**." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (emphasis added). "In effecting" does not require sharing a goal of violating Plaintiffs' rights, only that their rights were violated by joint action.

### 4. Whether Defendants Acted Unilaterally Is a Fact Question.

Defendants work hard to convince the Court that they acted alone in making content moderation decisions in accordance with their Terms of Service ("TOS"), Def. Br. at 48, 51, 54, and deny "any government participation in any specific action with respect to any particular user." *Id.* at 48. To the contrary, there was "government participation" galore, to the tune of a quarter million censorship requests. Defendants certainly knew the extent of the government's covert partnership with Twitter yet persisted in presenting a false picture to this Court.

Defendants' TOS defense has been eviscerated by Musk's admission that Twitter suspended President Trump's account "despite no violation of the law or terms of service" and by the Twitter Files. MOOT_SMJN-185, 187, 189, 191, 193, 195, 245. Accepting Defendants' argument that Twitter acted pursuant to its

TOS would require the Court to resolve contested fact issues. A Rule 12(b)(6) motion is not the proper vehicle for making that determination. *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019) (dismissal based on affirmative defense permitted only when complaint establishes the defense).

### 5. Defendants' Remaining Authorities Are Easily Distinguished.

The rest of Defendants' joint action argument consists of out-of-context quotes, which Defendants misrepresent, and citations to irrelevant decisions.

*Howerton v. Gabica*, 708 F.2d 380 (9th Cir. 1982) (Def. Br. at 46, 53), challenged police officers' involvement with the defendant-landlords' eviction of the plaintiff-tenants. This Court found the allegations sustained a Section 1983 claim because, *as a factual matter*, defendants had "cloaked themselves with the authority of the state" in carrying out the eviction. *Id*. at 384-85. The Court did not purport to engraft this requirement onto the joint action doctrine.

In *Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989) (Def. Br. at 49), demonstrators claimed that abortion clinic employees had wrongfully placed plaintiffs under "citizen's arrest," aided by police officers. This Court found that "virtually all of the circumstances … point to the opposite conclusion." *Id*. at 1155. The "impetus for the arrests came from [clinic] employees … Indeed, the

police officer attempted to **discourage** Womancare employees from making the arrests …." *Id*. (emphasis in original).  Here, federal officials provided plenty of "impetus" for censorship.

*Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772 (9th Cir. 2001) (Def. Br. at 52), is even further afield.  Union representatives who were subjected to citizen's arrests brought civil rights claims against Rainbow and the District Attorney who prosecuted them for trespassing.  Unlike here, there was zero evidence of joint government-private action leading up to the alleged violation.  The only interaction between Rainbow and the DA occurred *after* the arrests.  "This unremarkable exchange between a complaining citizen and a prosecutor," the Court said, "does not amount to a conspiracy to deprive the plaintiffs of their Fourth Amendment rights." *Id*. at 783.

*Brunette*, Def. Br. at 52, considered a claim that news organizations violated the Fourth Amendment by filming the execution of a search warrant on plaintiff's premises.  The Court rejected the proposition that the media, in the course of reporting a news story, engaged in joint action with the government.  294 F.3d at 1212-13.  Far from being a requirement for joint action, the "mutual benefits" language which Defendants cite was *the Court's quotation of plaintiff's allegation*—an allegation the Court found "f[ell] far short" of pleading joint action. *Id*. at 1214.

31

The remaining mishmash, Def. Br. at 53, does not advance the analysis, only repeating *Howerton's* "deliberately cloaked" factual finding and parroting the definition of the joint-action test from cases that bear no resemblance to the claims here.

## III.    State Law Claims

### A.    Choice of Law

Defendants do not dispute that the District Court misread California law in making the choice-of-law determination, relying on Section 17200's remedies instead of its standing requirements.  Open. Br. at 57-58.  Instead, Defendants claim there is no policy conflict between California's law (requiring economic injury) and Florida's law (no such requirement).  Def. Br. at 57.

FDUPTA represents Florida's fundamental "policy decision that the consuming public is entitled to expanded remedies for [injury] suffered as a consequence of deceptive and unfair trade practices …."  *Sun'N Lake v. Ayala*, 247 So. 3d 572, 573 (Fla. Dist. Ct. App. 2018).  California law leaves a substantial subset of potential plaintiffs—those without economic injury—with no remedy.  That is the requisite "fundamental policy conflict."  *Cf.* RESTATEMENT (SECOND) OF CONFLICTS OF LS. ("REST.") § 187 cmt. g ("fundamental policy" embodied in statute designed to redress oppressive use of superior bargaining power).

32

Florida has a materially greater interest in protecting injured consumers than does California in protecting multi-billion-dollar enterprises from liability. Four of the six Plaintiffs are domiciled and entered into the User Agreement ("Agreement") in Florida. 3-ER-354-59. *ABF Capital Corp. v. Grove Props. Co.*, 126 Cal.App.4th 204, 219-20 (2005) (California had materially greater interest because parties resided and contract signed in California); REST. § 148(1) (in fraud claim, law of state where plaintiff received false representations and suffered harm applies). Defendants' suggestion that California has the greater interest— protecting businesses—is unpersuasive; the relevant party's interest in a consumer protection case is the *consumer's*. *In re Celexa and Lexapro Mktg. and Sales Practices Litig.*, 291 F.R.D. 13, 17 (D. Mass. 2013) ("[W]ith respect to consumer protection laws, the law of the home state should govern."); *Pennsylvania Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 476-77 (D. Del. 2010) (Michigan's interest in protecting citizens from fraudulent practices trumps Delaware's interest in regulating business behavior).

### B. Plaintiffs Pleaded Deception.

The FAC alleges that Defendants failed to apply their stated content moderation policies consistently and in good faith. 3-ER-367-74. Plaintiffs justifiably assumed the Agreement's terms were meaningful and would be applied fairly. Defendants ask the Court to find that eight words in the TOS—"at any time

33

for any or no reason"[16]—negate everything else in the 140-page Agreement. Def. Br. at 59-59. That position guts any semblance of mutual obligations between the contracting parties and renders the Agreement illusory. Open Br. at 58 n.15. If a contract is capable of two constructions, the court must choose that which will make the contract legally binding. *Bleecher v. Conte*, 173 Cal. Rptr. 278, 280 (1981); Cal. Civ. Code, §§ 1643, 3541.

*Murphy v. Twitter, Inc.*, 60 Cal.App.5th 12, 37 (2021), is beside the point. *Murphy* found plaintiff had not sufficiently pleaded *procedural unconscionability*, which entails a contract between parties with unequal bargaining power, terms hidden in a "prolix printed form," and contractual risks allocated in an "objectively unreasonable" manner. *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal.App.4th 1659, 1664 (1993). Plaintiffs make no such claim.

### C. The SSMCA Claim

The SSMCA provides that SMPs "must apply censorship … standards in a consistent manner." Fla. Stat. 501.2041(2)(b). Defendants do not dispute that any Twitter user may bring an SSMCA claim even if the alleged inconsistent treatment was directed at another user's account, Open. Br. at 58-59, but argue the claim must be dismissed because the FAC does not allege violations after July 1, 2021.

---

[16] This language does not even appear in Twitter's content moderation policies but in a section entitled "Ending These Terms." SER-72.

Not true.  The FAC alleges that Plaintiffs' accounts remained suspended past that date.  3-ER-354-59.  Other users who routinely posted reprehensible content—calling for the "elimination" of Israel's "Zionist regime," celebrating Rep. Steve Scalise's shooting, or railing against Jewish, White, and LGBT people—remain on the platform today.[17]  3-SER-369-74.  This pleads Twitter's inconsistent treatment of users.

Defendants respond with two near-absurd arguments.  First, that Plaintiffs haven't alleged these abhorrent views violated Twitter's policies.  The FAC alleges this content was "violent," "dangerous," and espoused "extremist" views based on race, religion, and sexual identity.  *Id*.  Twitter admits its "Glorification of Violence Policy" prohibits "glorify[ing], celebrat[ing], prais[ing], or condon[ing]violent crimes," or targeting people "because of their membership in a protected group."  Def. Br. at 4.  End of story.

Second, Defendants say, the mandate to consistently "apply censorship standards" only attaches at the instant Twitter suspends an account, not to maintaining the suspension.  But the statute defines "censor" to include "any

---

[17] *See* https://twitter.com/khamenei_ir (Khamenei); https://twitter.com/tariqnasheed (Nasheed); https://twitter.com/BigMeanInternet (Harris); https://twitter.com/waltisfrozen (waltisfrozen); https://twitter.com/NicolasMaduro (Maduro); https://twitter.comLouisFarrakhan (Farrakhan).

action" by an SMP to "delete, regulate, restrict, edit, alter, inhibit the publication"
of content or "inhibit the ability of a user to be viewable" on a platform. Fla. Stat.
501.2041(1)(b). Twitter's continued suspension of Plaintiffs' accounts did just
that.

## IV. First Amendment Issues

### A. No First Amendment Defense Is Available.

Whatever First Amendment rights Defendants may possess cannot defeat
Plaintiffs' federal claim. A state action defendant "stands in the shoes of public
officials." *Loyd's Aviation, Inc. v. Ctr. for Envtl. Health*, 2011 WL 4971866, at *6
(E.D. Cal. Oct. 19, 2011). First Amendment protection does not inure to
government speech. *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412
U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects the
press from governmental interference, it confers no analogous protection on the
Government."); *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1037
(5th Cir. 1982) (*en banc*) (government expression is "unprotected by the First
Amendment").

Plaintiffs' state law claims (both within FDUPTA) sound in fraud. *Llado-
Carreno v. Guidant Corp.*, 2011 WL 705403, at *5 (S.D. Fla. Feb. 22, 2011)
(FDUPTA claim sounds in fraud). False or misleading commercial speech enjoys
no First Amendment protection. *Zauderer v. Off. of Disciplinary Counsel*, 471

U.S. 626, 638 (1985) (no First Amendment protection for deceptive commercial speech).

### B.      Twitter's Censorship Is Not Protected Speech.

Defendants and amicus EFF "offer a rather odd inversion of the First Amendment. … [They] argue that buried somewhere in the person's enumerated right to free speech lies a corporation's unenumerated right to muzzle speech." *NetChoice v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022).

Defendants say they exercise "editorial control" when censoring speech. Def. Br. at 63.  But the Supreme Court "has never recognized 'editorial discretion' as a freestanding category of First-Amendment-protected expression."  *Paxton*, 49 F.4th at 465; *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) (denial of access is not inherently expressive).  And, even were such discretion sometimes protected, Defendants' censorship doesn't qualify. First, an entity that exercises editorial discretion accepts "legal responsibility for the content it edits."  *Paxton*, 49 F.4th at 464; *Pittsburgh Press Co. v. Pittsburgh Comm'n*, 413 U.S. 376, 386 (1973).  Twitter expressly disclaims any such responsibility.  TOS § 3, https://twitter.com/en/tos (Twitter "do[es] not endorse" and "cannot take responsibility for" content).  Second, editorial discretion involves "selection and presentation" *before* content is published.  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *Miami Herald v. Tornillo*, 418 U.S.

241, 258 (1974). Defendants do not choose material before posting it; they engage in viewpoint-based censorship as to a fraction of the already-disseminated content. No Supreme Court case suggests that *ex post* censorship constitutes editorial discretion akin to *ex ante* selection.

Twitter invokes an analogy between its platform and a newspaper or utility billing envelope. Section 230 destroys the newspaper comparison; it "instructs courts not to treat [SMPs] as 'the publisher or speaker' of the user-submitted content they host." *Paxton*, 49 F.4th at 466; 47 U.S.C. § 230(c)(1). And unlike the newspaper in *Miami Herald*, Defendants exercise virtually no editorial judgment. Twitter uses algorithms to screen out undesirable speech; "everything else is just posted to the Platform with *zero* editorial control." *Paxton*, 49 F.4th at 459 (emphasis in original). The comparison further fails because Twitter is not a "forum[s] of inherently limited scope." *PG&E v. Pub. Utils. Comm'n*, 475 U.S. 1, 24 (1986). In *Miami Herald* and *PG&E*, a requirement to carry speech necessarily curtailed the owner's ability to speak. *Miami Herald*, 418 U.S. at 256. Space constraints on Twitter's platform are practically nonexistent.

Defendants fare no better likening Twitter to a parade. In *Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 576 (1995), the Court limited its holding to a host who is "intimately connected" with the hosted speech. SMPs, by contrast, don't pick content to "mak[e] some sort of

38

collective point," like "what merits celebration on [St. Patrick's] day. *Id*. at 568, 574-76.

Additionally, the Supreme Court has limited forced-affiliation claims. *See Rumsfeld*, 547 U.S. at 65 (allowing military recruitment at law schools does not suggest schools agree with recruiters' speech). Defendants are free to disclaim any affiliation with hosted speech. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 88 (1980) (shopping mall owner "free to publicly dissociate" himself from pamphleteers' views).

Finally, as a conduit for other people's viewpoints, rather than a content originator, Twitter should be treated like a common carrier with limited "ability to pick and choose among customers, including based on customer viewpoint." Eugene Volokh, *Treating Social Media Platforms as Common Carriers?* 1 J. of Free Speech L. 1, 85 (2021).

## CONCLUSION

Plaintiffs respectfully submit the judgment should be reversed.

Date: May 5, 2023          LAW OFFICE OF ANDREI D. POPOVICI, P.C.

*s/ Marie L. Fiala*
Marie L. Fiala
*Attorneys for Appellants*
*Donald J. Trump, American Conservative*
*Union, Rafael Barbosa, Linda Cuadros,*
*Dominick Latella, and Wayne Allyn Root*

39

JOHN P. COALE
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

RICHARD POLK LAWSON
GARDNER BREWER HUDSON
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gardnerbrewer.com

JOHN Q. KELLY
FERGUSON COHEN LLP
25 Field Point Road
Greenwich, CT 06830
Telephone: (203) 896-4504
Email: jqkelly@fercolaw.com

ALEX KOZINSKI
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
Telephone: (310) 541-5885
Email: alex@kozinski.com

FRANK C. DUDENHEFER, JR.
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

MICHAEL J. JONES
RYAN TOUGIAS
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: mjones@ibolaw.com
Email: rtougias@ibolaw.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Compliance

**9th Cir. Case Number:  No. 22–15961**

I am the attorney or self-represented party.

**This brief contains 8,397 words,** excluding the items exempted by Fed. R.
App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.
32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[**X**] complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [**X**] a party or parties are filing a single brief in response to multiple briefs;
    or
    [  ] a party or parties are filing a single brief in response to a longer joint
    brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *s/ Marie L. Fiala*        **Date:** May 5, 2023

boasted that SMPs "caved thanks to the 'huge regulatory stakes' for not censoring."  MOOT_SMJN-26, 28, 72, 86-90, 200, 208.  It would be naïve to assume that Defendants would "lightly disregard" officially-sanctioned censorship requests from these sources.  *Cf. Bantam Books*, 372 U.S. at 68-69.

Defendants hold up *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987), *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), and *Lombard v. Louisiana*, 373 U.S. 267 (1963),[10] as paradigmatic of coercion.  Def. Br. at 38.  But, as the *Missouri v. Biden* court explained when discussing these same authorities, the threats alleged by the States—nearly identical to those alleged here—"far exceed, in both number and coercive power, the threats at issue in the above-mentioned cases."  2023 WL 2578260, at *31.  The *in terrorem* effect of receiving a warning letter from a deputy county attorney (*Carlin*) or county sheriff (*Backpage.com*) or being mentioned in a mayor's press conference (*Lombard*) pales in comparison to being pressured by the FBI, CIA, NSA, and DHS.  If the former "can reasonably be interpreted" as coercive, then a

---

[10] The threats in *Lombard* were *aimed at the demonstrators, not at the restaurant owners* who were the ones in the position analogous to Defendants here, thus further diluting the coercive effect of the officials' statements.  Open. Br. at 49-50. Nonetheless, that was enough for the Court to find state action.

jury certainly could interpret the latter as such.[11]  In a telling omission, Defendants

ignore Plaintiffs' argument that the coercion inquiry in each of these cases was

decided only after *a fact-finding proceeding*—a trial (*Lombard*), summary

judgment (*Carlin*), or preliminary injunction hearing (*Bantam Books*,

*Backpage.com*).  Open Br. at 47-52.  The District Court erred in making a

comparable factual determination about the coercive effect of government actions

on a motion to dismiss.  *See* Open. Br. at 47-52.

### 3. *Missouri v. Biden* Found These Facts Constituted Coercion.

*Missouri v. Biden* found plaintiffs had sufficiently pleaded coercion based

largely on the same facts presented here.  The States alleged that multiple federal

agencies and legislators had coerced and collaborated with SMPs to suppress

disfavored information about, *inter alia*, the COVID-19 lab-leak, the Hunter Biden

laptop story, and election integrity.  They cited many of the same government

statements described in the FAC, including legislative threats to roll back Section

---

[11] Defendants attempt to explain away their admission that a state attorney general's mere *instigation* of an investigation is coercive, Open Br. at 46, by saying that the AG has authority to take legal action against the company.  Def. Br. at 40 n.9.  The same is true of the White House and every Executive Department and law enforcement agency identified herein.  One need only remember the Obama White House siccing the Internal Revenue Service on dozens of conservative groups that applied for tax-exempt status.  *Justice Department Settles with Conservative Groups over IRS Scrutiny*, REUTERS (Oct. 26, 2017), https://www.reuters.com/article/us-usa-tax-conservative/justice-department-settles-with-conservative-groups-over-irs-scrutiny-idUSKBN1CV1TY.

230, saber-rattling by Joe Biden and members of Congress, and pressure by the White House staff and other Executive Branch officials. *Missouri v. Biden*, 2023 WL 2578260, at *2-4, *21-22, *30-33. "Plaintiffs allege and link threats of official government action in the form of threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA with calls for more aggressive censorship and suppression of speakers and viewpoints that government officials disfavor." *Id.*, at *31. These allegations, the court said, showed a "cohesive and coercive campaign … to threaten and persuade social-media companies to more avidly censor so-called 'misinformation'" that sufficed to allege state action under a coercion theory. *Id.* at *21, *31.

The court rejected arguments identical to those Defendants make here: that plaintiffs had alleged only "isolated episodes in which federal officials engaged in rhetoric about misinformation on social media platforms," the Complaint was "devoid" of any "enforceable threat," and the threats to amend Section 230 or institute antitrust suits were not coercive because no single government official "could unilaterally take such actions." *Id.* at *31. As the court pointed out, these threats could easily have been carried out after the Biden administration took office and Democrats gained control of Congress. *Id.* Furthermore, "the government actor making the threat need not possess the direct power or decisionmaking

20

authority to enforce the threat in order for the threat to constitute coercive action." *Id*. at *31 n.206.

### 4. *O'Handley* **Is Inapposite.**

Nothing resembling a government threat was alleged in *O'Handley*. Plaintiff claimed only that the OEC flagged one of his tweets for possible removal. "[T]he OEC did nothing more than make a request with no strings attached." 62 F.4th at 1158. The OEC's mandate gave it no enforcement power over Twitter,[12] which was therefore "free to ignore" the OEC's suggestion. *Id.*

Plaintiffs have alleged far more than a "request." The record is replete with officials' threats to remove Section 230 immunity and of antitrust enforcement if Defendants failed to accede to their demands. Open. Br. at 7-13. These allegations supply the element missing in *O'Handley*: the "threaten[ed] adverse consequences if the [private] intermediary refuses to comply." *Id*.

Just as here, defendants in *Missouri v. Biden* leaned heavily on *O'Handley*. The court rejected that comparison:

> [Plaintiffs] clearly alleged that Defendants attempted to convince social-media companies to censor certain viewpoints. … Further, the Complaint alleges threats, some thinly veiled and some blatant, made by Defendants in an attempt to effectuate its [*sic*] censorship program.

---

[12] Cal. Elec. Code § 10.5(b)(2).

2023 WL 2578260, at *30. By contrast, "[b]ecause the [*O'Handley*] plaintiff failed to allege any threat or attempt at coercion aside from the takedown request, … plaintiff failed to allege state action." *Id*. The court was "unpersuaded" by Defendants' reliance on *O'Handley*. *Id*., at *31. This Court should be as well.

### 5. A Private Actor May Be Liable Under a Coercion Theory.

Defendants and Amicus NetChoice argue that only the government agent coercing private action, and not the private actor, can be held liable under the state action compulsion test. Def. Br. at 34, 42; NetChoice Br. at 7-11. This "wrong party" argument is based on an overbroad reading of *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 841 (9th Cir. 1999). The claimed source of state action in *Sutton* was a statute requiring employers to obtain employees' Social Security numbers. In that context, *Sutton* held that "governmental compulsion in the form of a generally applicable law, without more, is [not] sufficient to deem a private entity a governmental actor," *id*. at 841; a plaintiff suing a private actor must also show "some other nexus between the private entity and the government …."[13] *Id.* at 838.

---

[13] Defendants and NetChoice also cite *Doe v. Google, LLC,* 2022 WL 17077497, at * (9th Cir. Nov. 18, 2022), which cites only *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) and *Sutton* for its holding. *Halleck* says no such thing. *See supra* at 23.

Moreover, *Sutton* could not have prohibited private liability under a coercion theory given Supreme Court precedents recognizing the availability of such a claim.[14] *Halleck*, 139 S. Ct. at 1928 ("[A] private entity can qualify as a state actor … when the government compels the private entity to take a particular action …."); *Brentwood*, 531 U.S. at 296 (coercion is one available state action theory in case against private defendant). This Court also has found state action based on coercion in post-*Sutton* cases against private defendants. *Ochoa v. Pub. Consulting Grp., Inc.*, 48 F.4th 1102, 1109-10 (9th Cir. 2022) (finding private defendant to be state actor under coercion test); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 755-56 (9th Cir. 2020) (same).

*Sutton* is inapplicable here. Plaintiffs have never claimed that some general statute compelled Twitter to censor speech. *See* Open Br. at 52. *Sutton's* "something more," 192 F.3d at 838, is present in spades in the form of a years' long, Hydra-headed entanglement between government and Twitter in which threats to dismantle Section 230 provided the enforcement "stick."

---

[14] Extending *Sutton*'s reasoning to foreclose all state action/compulsion liability against private actors would eliminate relief for plaintiffs injured by coercive government practices. Twitter is the only party capable of reinstating Plaintiffs' accounts and remedying the other complained-of violations.

### D.  *Lugar* Step Two:  Encouragement

State action exists when the government provides significant encouragement, overt or covert, to the private party's conduct.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  Even though encouragement satisfies the "state actor" prong of the *Lugar*/*West* test, the District Court did not analyze this theory.  1-ER-16; Open. Br. at 53.  By contrast, the *Missouri v. Biden* court conducted the requisite analysis and found "significant encouragement" in the above-described threats coupled with Defendants' Section 230 immunity and "private (i.e., 'covert') communications between the [government] and social-media platforms."  2023 WL 2578260, at *30.

The same is true here.  Executive Branch officials met regularly with SMPs and demanded they "create robust enforcement strategies," "tak[e] faster action against harmful posts," "monitor misinformation more closely," and "consistently take action against misinformation … on their platforms."  3-ER-346-52; MJN-55.  White House staffers applied relentless pressure, including making specific censorship demands, asking SMPs to document their compliance, and threatening consequences for inaction.  MOOT_SMJN-155, 177, 179, 181, 183, 214-15.  As in *Skinner*, "the Government did more than adopt a passive position toward the underlying private conduct."  489 U.S. at 615.

The recently-disclosed covert communications between officials and Twitter remove any doubt that the government "encouraged"—i.e., "attempted to persuade,

24

spurred on, gave help to"[15]—Defendants' censorship.  If the hundreds of examples of officials dictating specific censorship decisions to Twitter, along with providing security clearances and millions in taxpayer dollars, is not "encouragement," it is hard to imagine what would be.

Defendants' briefing on this issue is limited to whether the existence of Section 230, by itself, is enough to plead encouragement.  Def. Br. at 43-45.  But Plaintiffs' showing does not rest on Section 230 alone, nor may their allegations be compartmentalized in that way.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  Encouragement included the many congressional and Executive Branch exhortations, occurring in an environment where Defendants' invaluable Section 230 immunity could be stripped away.  *See* Open Br. at 7-13.  As the court said in *Missouri v. Biden*,

> Defendants' alleged use of Section 230's immunity—and its obvious
> financial incentives for social-media companies—as a metaphorical
> carrot-and-stick combined with the alleged back-room meetings,
> hands-on approach to online censorship, and other factors discussed
> above transforms Defendants' actions into state action.

2023 WL 2578260, at *34.

*Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017), is inapposite. Plaintiffs there based their state action claim solely on the existence of the Federal

---

[15] "*Encourage*." MERRIAM-WEBSTER DICTIONARY (Mar. 26 2023) https://www.merriam-webster.com/dictionary/encourage.  Accessed Apr. 8,  2023.

Arbitration Act ("FAA"), 9 U.S.C. § 2, which they said "encourages" private arbitration agreements. No interactions, let alone direct communications, between officials and the private defendant were alleged. Even focusing on Section 230 alone, the cases are markedly different. The FAA "merely gives [private parties] the private choice to arbitrate," *Roberts*, 877 F.3d at 837; it does not put a thumb on the scale in favor of arbitration. Far from preserving private choice, Section 230 eliminates the possibility of bringing liability claims against SMPs. Rather than adopting "a passive position," *Skinner*, 489 U.S. at 615, the government prioritized protecting SMPs over their users' rights.

### E. Joint Action

#### 1. Joint Action Exists in a Range of Circumstances.

Joint action is alternative to coercion as a basis for finding state action. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). The more Defendants protest that they were not coerced, the more apparent it becomes that they collaborated with the government in suppressing speech.

The joint-action test is more expansive than Defendants' narrow definition. Def. Br. at 46, 50-52. Joint action exists when the State "significantly involves itself in the private parties' actions and decisionmaking" in a "complex and deeply intertwined process." *Rawson*, 975 F.3d at 753. It also occurs where there is a "symbiotic relationship" between government and the private party, *Brunette v.*

26

*Humane Soc'y*, 294 F.3d 1205, 1210 (9th Cir. 2002); the private entity is "entwined with governmental policies," *Brentwood*, 531 U.S. at 296; government has "authorized or approved the private parties' actions," *Rawson*, 975 F.3d at 754-55; or the private action "received clear state imprimatur." *Id.*

### 2. Plaintiffs Pleaded Joint Action.

Rather than recognizing joint action as a distinct test, the District Court brushed it aside as a "minor variation the state action theme," 1-ER-16, and stopped there. Had the Court examined the record, it would have found ample material to support a joint-action finding. The FAC contains *twelve pages* of allegations showing joint activity between officials and Defendants to censor disfavored content. 3-ER-342-54. Plaintiffs' Opening Brief includes *five more pages* highlighting concerted action between Defendants and government actors. Open. Br. at 13-17; *see also* 2-ER-122, 125-26, 152; 3-ER-341-42, 346-48; MJN-10-11, 19. Defendants quibble about how to characterize these joint activities, *see, e.g.*, Def. Br. at 48 (government "express[ed] general interest in content moderation" and "asked [SMPs] generally to take action to address misinformation"), but their semantic gymnastics are not the stuff of a dismissal order. Plaintiffs' allegations should have been credited by the District Court.

Defendants again analogize this case to *O'Handley*, Def. Br. at 47-49, but their Procrustean effort fails. *O'Handley* involved a permissible "arms-length"

relationship: a one-way channel, whereby California's OEC flagged tweets the agency deemed problematic. 62 F.4th at 1160. In this case, the federal government, led by the FBI, engaged in a "complex and deeply intertwined process." *Rawson*, 975 F.3d at 753. Federal officials set up a schedule of formal meetings, created privileged reporting channels, and established and funded a federal-private partnership to procure censorship of disfavored viewpoints. As the *Missouri v. Biden* court held in approving a joint-action claim based on the same facts, "These allegations are a far cry from the complained-of action in *O'Handley*: a single message from an unidentified member of a state agency to Twitter." 2023 WL 2578260, at *33.

### 3. No Conspiracy Is Needed.

Defendants err in saying a formal conspiracy is required to establish joint action. Def. Br. at 50-51. The test "can be satisfied either 'by proving the existence of a conspiracy or by showing that the private party was "a willful participant in joint action with the State."'" *Tsao*, 698 F.3d at 1140. A tacit understanding between private parties and government officials to accomplish a common objective is sufficient. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence…." *Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999).

28

Defendants claim that "there can be no joint action absent an agreement specifically to violate Plaintiffs' rights." Def. Br. at 51. That is simply false. Alleging a conspiracy is only one avenue for pleading joint action. And even in the case of an agreement, all that is required is for "state officials and private parties [to] have acted in concert **in effecting a particular deprivation of constitutional rights**." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (emphasis added). "In effecting" does not require sharing a goal of violating Plaintiffs' rights, only that their rights were violated by joint action.

## 4. Whether Defendants Acted Unilaterally Is a Fact Question.

Defendants work hard to convince the Court that they acted alone in making content moderation decisions in accordance with their Terms of Service ("TOS"), Def. Br. at 48, 51, 54, and deny "any government participation in any specific action with respect to any particular user." *Id.* at 48. To the contrary, there was "government participation" galore, to the tune of a quarter million censorship requests. Defendants certainly knew the extent of the government's covert partnership with Twitter yet persisted in presenting a false picture to this Court.

Defendants' TOS defense has been eviscerated by Musk's admission that Twitter suspended President Trump's account "despite no violation of the law or terms of service" and by the Twitter Files. MOOT_SMJN-185, 187, 189, 191, 193, 195, 245. Accepting Defendants' argument that Twitter acted pursuant to its

29

TOS would require the Court to resolve contested fact issues. A Rule 12(b)(6) motion is not the proper vehicle for making that determination. *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019) (dismissal based on affirmative defense permitted only when complaint establishes the defense).

### 5. Defendants' Remaining Authorities Are Easily Distinguished.

The rest of Defendants' joint action argument consists of out-of-context quotes, which Defendants misrepresent, and citations to irrelevant decisions.

*Howerton v. Gabica*, 708 F.2d 380 (9th Cir. 1982) (Def. Br. at 46, 53), challenged police officers' involvement with the defendant-landlords' eviction of the plaintiff-tenants. This Court found the allegations sustained a Section 1983 claim because, *as a factual matter*, defendants had "cloaked themselves with the authority of the state" in carrying out the eviction. *Id*. at 384-85. The Court did not purport to engraft this requirement onto the joint action doctrine.

In *Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989) (Def. Br. at 49), demonstrators claimed that abortion clinic employees had wrongfully placed plaintiffs under "citizen's arrest," aided by police officers. This Court found that "virtually all of the circumstances … point to the opposite conclusion." *Id*. at 1155. The "impetus for the arrests came from [clinic] employees … Indeed, the

30

police officer attempted to **discourage** Womancare employees from making the arrests ….." *Id*. (emphasis in original). Here, federal officials provided plenty of "impetus" for censorship.

*Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772 (9th Cir. 2001) (Def. Br. at 52), is even further afield. Union representatives who were subjected to citizen's arrests brought civil rights claims against Rainbow and the District Attorney who prosecuted them for trespassing. Unlike here, there was zero evidence of joint government-private action leading up to the alleged violation. The only interaction between Rainbow and the DA occurred *after* the arrests. "This unremarkable exchange between a complaining citizen and a prosecutor," the Court said, "does not amount to a conspiracy to deprive the plaintiffs of their Fourth Amendment rights." *Id*. at 783.

*Brunette*, Def. Br. at 52, considered a claim that news organizations violated the Fourth Amendment by filming the execution of a search warrant on plaintiff's premises. The Court rejected the proposition that the media, in the course of reporting a news story, engaged in joint action with the government. 294 F.3d at 1212-13. Far from being a requirement for joint action, the "mutual benefits" language which Defendants cite was *the Court's quotation of plaintiff's allegation*—an allegation the Court found "f[ell] far short" of pleading joint action. *Id*. at 1214.

31

The remaining mishmash, Def. Br. at 53, does not advance the analysis, only repeating *Howerton's* "deliberately cloaked" factual finding and parroting the definition of the joint-action test from cases that bear no resemblance to the claims here.

## III.    State Law Claims

### A.    Choice of Law

Defendants do not dispute that the District Court misread California law in making the choice-of-law determination, relying on Section 17200's remedies instead of its standing requirements.  Open. Br. at 57-58.  Instead, Defendants claim there is no policy conflict between California's law (requiring economic injury) and Florida's law (no such requirement).  Def. Br. at 57.

FDUPTA represents Florida's fundamental "policy decision that the consuming public is entitled to expanded remedies for [injury] suffered as a consequence of deceptive and unfair trade practices …."  *Sun'N Lake v. Ayala*, 247 So. 3d 572, 573 (Fla. Dist. Ct. App. 2018).  California law leaves a substantial subset of potential plaintiffs—those without economic injury—with no remedy. That is the requisite "fundamental policy conflict."  *Cf.* RESTATEMENT (SECOND) OF CONFLICTS OF LS. ("REST.") § 187 cmt. g ("fundamental policy" embodied in statute designed to redress oppressive use of superior bargaining power).

Florida has a materially greater interest in protecting injured consumers than does California in protecting multi-billion-dollar enterprises from liability. Four of the six Plaintiffs are domiciled and entered into the User Agreement ("Agreement") in Florida. 3-ER-354-59. *ABF Capital Corp. v. Grove Props. Co.*, 126 Cal.App.4th 204, 219-20 (2005) (California had materially greater interest because parties resided and contract signed in California); REST. § 148(1) (in fraud claim, law of state where plaintiff received false representations and suffered harm applies). Defendants' suggestion that California has the greater interest—protecting businesses—is unpersuasive; the relevant party's interest in a consumer protection case is the *consumer's*. *In re Celexa and Lexapro Mktg. and Sales Practices Litig.*, 291 F.R.D. 13, 17 (D. Mass. 2013) ("[W]ith respect to consumer protection laws, the law of the home state should govern."); *Pennsylvania Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 476-77 (D. Del. 2010) (Michigan's interest in protecting citizens from fraudulent practices trumps Delaware's interest in regulating business behavior).

## B. Plaintiffs Pleaded Deception.

The FAC alleges that Defendants failed to apply their stated content moderation policies consistently and in good faith. 3-ER-367-74. Plaintiffs justifiably assumed the Agreement's terms were meaningful and would be applied fairly. Defendants ask the Court to find that eight words in the TOS—"at any time

33

for any or no reason"[16]—negate everything else in the 140-page Agreement. Def. Br. at 59-59. That position guts any semblance of mutual obligations between the contracting parties and renders the Agreement illusory. Open Br. at 58 n.15. If a contract is capable of two constructions, the court must choose that which will make the contract legally binding. *Bleecher v. Conte*, 173 Cal. Rptr. 278, 280 (1981); Cal. Civ. Code, §§ 1643, 3541.

*Murphy v. Twitter, Inc.*, 60 Cal.App.5th 12, 37 (2021), is beside the point. *Murphy* found plaintiff had not sufficiently pleaded *procedural unconscionability*, which entails a contract between parties with unequal bargaining power, terms hidden in a "prolix printed form," and contractual risks allocated in an "objectively unreasonable" manner. *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal.App.4th 1659, 1664 (1993). Plaintiffs make no such claim.

## C.    The SSMCA Claim

The SSMCA provides that SMPs "must apply censorship … standards in a consistent manner." Fla. Stat. 501.2041(2)(b). Defendants do not dispute that any Twitter user may bring an SSMCA claim even if the alleged inconsistent treatment was directed at another user's account, Open. Br. at 58-59, but argue the claim must be dismissed because the FAC does not allege violations after July 1, 2021.

---

[16] This language does not even appear in Twitter's content moderation policies but in a section entitled "Ending These Terms." SER-72.

Not true.  The FAC alleges that Plaintiffs' accounts remained suspended past that date.  3-ER-354-59.  Other users who routinely posted reprehensible content—calling for the "elimination" of Israel's "Zionist regime," celebrating Rep. Steve Scalise's shooting, or railing against Jewish, White, and LGBT people—remain on the platform today.[17]  3-SER-369-74.  This pleads Twitter's inconsistent treatment of users.

Defendants respond with two near-absurd arguments.  First, that Plaintiffs haven't alleged these abhorrent views violated Twitter's policies.  The FAC alleges this content was "violent," "dangerous," and espoused "extremist" views based on race, religion, and sexual identity.  *Id.*  Twitter admits its "Glorification of Violence Policy" prohibits "glorify[ing], celebrat[ing], prais[ing], or condon[ing]violent crimes," or targeting people "because of their membership in a protected group."  Def. Br. at 4.  End of story.

Second, Defendants say, the mandate to consistently "apply censorship standards" only attaches at the instant Twitter suspends an account, not to maintaining the suspension.  But the statute defines "censor" to include "any

---

[17] *See* https://twitter.com/khamenei_ir (Khamenei); https://twitter.com/tariqnasheed (Nasheed); https://twitter.com/BigMeanInternet (Harris); https://twitter.com/waltisfrozen (waltisfrozen); https://twitter.com/NicolasMaduro (Maduro); https://twitter.comLouisFarrakhan (Farrakhan).

action" by an SMP to "delete, regulate, restrict, edit, alter, inhibit the publication" of content or "inhibit the ability of a user to be viewable" on a platform. Fla. Stat. 501.2041(1)(b). Twitter's continued suspension of Plaintiffs' accounts did just that.

## IV. First Amendment Issues

### A. No First Amendment Defense Is Available.

Whatever First Amendment rights Defendants may possess cannot defeat Plaintiffs' federal claim. A state action defendant "stands in the shoes of public officials." *Loyd's Aviation, Inc. v. Ctr. for Envtl. Health*, 2011 WL 4971866, at *6 (E.D. Cal. Oct. 19, 2011). First Amendment protection does not inure to government speech. *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects the press from governmental interference, it confers no analogous protection on the Government."); *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1037 (5th Cir. 1982) (*en banc*) (government expression is "unprotected by the First Amendment").

Plaintiffs' state law claims (both within FDUPTA) sound in fraud. *Llado-Carreno v. Guidant Corp.*, 2011 WL 705403, at *5 (S.D. Fla. Feb. 22, 2011) (FDUPTA claim sounds in fraud). False or misleading commercial speech enjoys no First Amendment protection. *Zauderer v. Off. of Disciplinary Counsel*, 471

36

U.S. 626, 638 (1985) (no First Amendment protection for deceptive commercial speech).

###    B.    Twitter's Censorship Is Not Protected Speech.

Defendants and amicus EFF "offer a rather odd inversion of the First Amendment. … [They] argue that buried somewhere in the person's enumerated right to free speech lies a corporation's unenumerated right to muzzle speech." *NetChoice v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022).

Defendants say they exercise "editorial control" when censoring speech. Def. Br. at 63. But the Supreme Court "has never recognized 'editorial discretion' as a freestanding category of First-Amendment-protected expression." *Paxton*, 49 F.4th at 465; *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) (denial of access is not inherently expressive). And, even were such discretion sometimes protected, Defendants' censorship doesn't qualify. First, an entity that exercises editorial discretion accepts "legal responsibility for the content it edits." *Paxton*, 49 F.4th at 464; *Pittsburgh Press Co. v. Pittsburgh Comm'n*, 413 U.S. 376, 386 (1973). Twitter expressly disclaims any such responsibility. TOS § 3, https://twitter.com/en/tos (Twitter "do[es] not endorse" and "cannot take responsibility for" content). Second, editorial discretion involves "selection and presentation" *before* content is published. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *Miami Herald v. Tornillo*, 418 U.S.

241, 258 (1974). Defendants do not choose material before posting it; they engage in viewpoint-based censorship as to a fraction of the already-disseminated content. No Supreme Court case suggests that *ex post* censorship constitutes editorial discretion akin to *ex ante* selection.

Twitter invokes an analogy between its platform and a newspaper or utility billing envelope. Section 230 destroys the newspaper comparison; it "instructs courts not to treat [SMPs] as 'the publisher or speaker' of the user-submitted content they host." *Paxton*, 49 F.4th at 466; 47 U.S.C. § 230(c)(1). And unlike the newspaper in *Miami Herald*, Defendants exercise virtually no editorial judgment. Twitter uses algorithms to screen out undesirable speech; "everything else is just posted to the Platform with *zero* editorial control." *Paxton*, 49 F.4th at 459 (emphasis in original). The comparison further fails because Twitter is not a "forum[s] of inherently limited scope." *PG&E v. Pub. Utils. Comm'n*, 475 U.S. 1, 24 (1986). In *Miami Herald* and *PG&E*, a requirement to carry speech necessarily curtailed the owner's ability to speak. *Miami Herald*, 418 U.S. at 256. Space constraints on Twitter's platform are practically nonexistent.

Defendants fare no better likening Twitter to a parade. In *Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 576 (1995), the Court limited its holding to a host who is "intimately connected" with the hosted speech. SMPs, by contrast, don't pick content to "mak[e] some sort of

collective point," like "what merits celebration on [St. Patrick's] day. *Id*. at 568, 574-76.

Additionally, the Supreme Court has limited forced-affiliation claims. *See Rumsfeld*, 547 U.S. at 65 (allowing military recruitment at law schools does not suggest schools agree with recruiters' speech). Defendants are free to disclaim any affiliation with hosted speech. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 88 (1980) (shopping mall owner "free to publicly dissociate" himself from pamphleteers' views).

Finally, as a conduit for other people's viewpoints, rather than a content originator, Twitter should be treated like a common carrier with limited "ability to pick and choose among customers, including based on customer viewpoint." Eugene Volokh, *Treating Social Media Platforms as Common Carriers?* 1 J. of Free Speech L. 1, 85 (2021).

## CONCLUSION

Plaintiffs respectfully submit the judgment should be reversed.

Date: May 5, 2023          LAW OFFICE OF ANDREI D. POPOVICI, P.C.

                        *s/ Marie L. Fiala*
                        Marie L. Fiala
                        *Attorneys for Appellants*
                        *Donald J. Trump, American Conservative*
                        *Union, Rafael Barbosa, Linda Cuadros,*
                        *Dominick Latella, and Wayne Allyn Root*

JOHN P. COALE
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

RICHARD POLK LAWSON
GARDNER BREWER HUDSON
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gardnerbrewer.com

JOHN Q. KELLY
FERGUSON COHEN LLP
25 Field Point Road
Greenwich, CT 06830
Telephone: (203) 896-4504
Email: jqkelly@fercolaw.com

ALEX KOZINSKI
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
Telephone: (310) 541-5885
Email: alex@kozinski.com

FRANK C. DUDENHEFER, JR.
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

MICHAEL J. JONES
RYAN TOUGIAS
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: mjones@ibolaw.com
Email: rtougias@ibolaw.com

40

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Compliance

**9th Cir. Case Number:  No. 22–15961**

I am the attorney or self-represented party.

**This brief contains 8,397 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[**X**] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [  ] it is a joint brief submitted by separately represented parties;
   [**X**] a party or parties are filing a single brief in response to multiple briefs; or
   [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signatur**e: *s/ Marie L. Fiala*          **Date:** May 5, 2023